Matthew J. Preusch (Bar No. 298144)
mpreusch@kellerrohrback.com
**KELLER ROHRBACK L.L.P.**
1129 State Street, Suite 8
Santa Barbara, California 93101
(805) 456-1496, Fax (805) 456-1497

***Attorney for Plaintiff Shahriar Jabbari***
***(Additional Counsel on Signature Page)***

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHAHRIAR JABBARI, on behalf of himself and all others similarly situated<br><br>                          Plaintiff,<br><br>    v.<br><br>WELLS FARGO & COMPANY AND WELLS FARGO BANK, N.A.,<br><br>                  Defendants. | No. 4:15-cv-02159 DMR<br><br>**COMPLAINT**<br>**CLASS ACTION**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Shahriar Jabbari, on behalf of himself and all others similarly situated nationwide, hereby files this Class Action Complaint against Defendants, Wells Fargo & Company, a Delaware Corporation, and Wells Fargo Bank, N.A., a National Banking Association, (collectively "Wells Fargo"). In support thereof, Plaintiff states as follows:

## I.      INTRODUCTION

1.      Wells Fargo victimizes its customers by using illegal, fraudulent, and deceptive tactics to generate sales of their banking and financial products. The bank's business model is based in part on enrolling its customers in multiple banking products, which Wells Fargo calls "solutions." The more "solutions" Wells Fargo sells to its customers, the more opportunities the bank has to make money from them through fees, interest, and other transactions.

2.       In order to maximize the number of solutions per customer, and thus maximize its profits, Wells Fargo engages in and promotes a system of unfair, deceptive, illegal, and fraudulent practices. To enroll customers in numerous accounts and services, Wells Fargo and its employees actively misrepresent material facts about financial products, including associated fees and costs, in an effort to induce customers to purchase more "solutions." Not only does Wells Fargo deceive its customers about the costs and benefits of particular financial products, the bank also routinely opens customer accounts and issues credit cards *without the customer's authorization or knowledge*. Then, when customers fail to maintain mandatory account balances, pay fees for accounts they did not know existed, or comply with some other undisclosed policy, Wells Fargo charges the customer a fee. Often Wells Fargo simply "pays" this resulting fee by taking money from the clients' existing accounts. Or Wells Fargo sends the "debt" the customers "owe" to a debt collection agency.

3.       Wells Fargo promotes this "sales" system by imposing unrealistic sales quotas on its employees. The bank has adopted policies that have, unsurprisingly and naturally, driven its bankers to engage in fraudulent behavior to meet those unreachable goals.  Wells Fargo has known about and promoted these practices for years, and has done little to nothing to curb such practices.

4.       As a result of its deceptive and illegal practices, Wells Fargo has engineered a fee-generating machine that produces extraordinary profits for the corporation at the significant expense of its customers.

5.       Wells Fargo & Company operates the fourth biggest bank in the United States, and is the largest bank headquartered in California.  Wells Fargo Bank, N.A. is a subsidiary of Wells Fargo & Company, and provides most of the banking products and services that are the subject of this action.

6.       "Cross-selling," the practice of selling many different financial products to each of its customers, is at the heart of Wells Fargo's business.  Indeed, Wells Fargo routinely touts the fact that its customers, on average, hold a high number of Wells Fargo financial products—currently approximately

six bank accounts or financial products per customer.  Wells Fargo seeks to increase this to an average of eight accounts or financial products per customer, through its so-called "Gr-eight" or "Great Eight" initiative.

7.     Wells Fargo's "success" at cross-selling has come in large part because of its strictly enforced sales quota system. Wealth managers and bankers at Wells Fargo must meet very high quotas of generating new accounts, or else lose their pay or their jobs. Because the stakes are so high for the employees, and the quotas so difficult, Wells Fargo employees inevitably must resort to using the abusive and fraudulent tactics described further below. Moreover, Wells Fargo enforces its sales quotas by constant monitoring. Daily sales for each branch, and each sales employee, are reported and discussed by Wells Fargo's District Managers four times a day, at 11:00 a.m., 1:00 p.m., 3:00 p.m., and 5:00 p.m. Those failing to meet daily sales quotas are approached by management, and often reprimanded and/or told to "do whatever it takes" to meet their individual sales quotas. As a direct and expected result of this quota system, Wells Fargo knows its employees must engage in the fraudulent, deceptive and often illegal activity described below.

8.     So engrained is this practice of using deceptive and illegal tactics to cross sell financial products, it is known as "gaming" within the company.  Wells Fargo's managers and bankers have for years engaged in such gaming practices.  Gaming consists of, among other things, opening and manipulating fee-generating customer accounts through unfair, fraudulent, and unlawful means, such as omitting signatures and adding unwanted secondary accounts to primary accounts without permission. Other practices utilized as part of these gaming schemes have included misrepresenting the costs, benefits, fees, and/or attendant services that come with an account or product, all in order to meet sales quotas.

9.     Not only does Wells Fargo know of and encourage gaming, its systems enable it. On information and belief, Wells Fargo maintains internal systems or databases that allow certain

COMPLAINT – CLASS ACTION

employees to access customer information needed to open new accounts. Those Wells Fargo employees can use this information to create unauthorized and/or unwanted accounts for customers without the customers' knowledge. The employees then receive credit for having "sold" a customer a new solution.

10.    Wells Fargo's gaming practices have caused significant stress to, and hardship and financial loses for, its customers. Specifically, Wells Fargo has: (a) withdrawn money from customers' authorized accounts to pay for the fees assessed by Wells Fargo on unauthorized accounts opened in customers' names; (b) placed customers into collections when the unauthorized withdrawals from customer accounts went unpaid; (c) placed derogatory information in credit reports when unauthorized fees went unpaid; (d) denied customers access to their funds while Wells Fargo stockpiled account applications; and (e) caused customers to purchase identity theft protection.

11.    While Wells Fargo has ostensibly terminated a small number of employees who have engaged in gaming, other employees have been rewarded for these practices, and even promoted, perpetuating the problem. Moreover, Wells Fargo has continued to impose the same companywide goals of attaining as many accounts as possible at any expense, thereby fostering the practice of gaming. Wells Fargo thus puts its employees between a rock and a hard place, forcing them to choose between keeping their jobs and opening unauthorized accounts.

12.    Wells Fargo has also failed to inform its customers when their personal information has been accessed or compromised as a result of Wells Fargo's gaming practices, in breach of its statutory duties to do so, thus causing its customers additional harm.

## II.    JURISDICTION AND VENUE

13.    This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because Plaintiff is a citizen of California, and Defendants are citizens of Delaware. California, and South Dakota; there are 100 or more class members, many of whom citizens of states

other than those where Defendants are citizens; and the aggregate amount in controversy will exceed $5,000,000.

14.     The Court has personal jurisdiction over Defendants because a substantial portion of the alleged wrongdoing occurred in California.

15.     Venue is proper in the Northern District of California pursuant to 28 U.S.C. § 1391(b)(2) and (3) because a substantial part of the events or omissions giving rise to the claims at issue in this Complaint arose in this District.

### III.     PARTIES

16.     Plaintiff Shahriar Jabbari is and at all relevant times was a citizen of California.

17.     Defendant Wells Fargo & Company is a Delaware corporation with its principal place of business in San Francisco, California.  Wells Fargo & Company is a financial services company with $1.5 trillion in assets, and provides banking, insurance, investments, mortgage, and consumer and commercial finance through more than 9,000 locations, 12,000 ATMs, and the Internet.  It has approximately 265,000 full-time employees, and is ranked 29th on Fortune Magazine's 2014 rankings of America's 500 largest corporations.

18.     Defendant Wells Fargo Bank, N.A. is a national banking association chartered under the laws of the United States with its primary place of business in Sioux Falls, South Dakota.  Wells Fargo Bank, N.A. provides Wells Fargo & Company personal and commercial banking services, and is Wells Fargo & Company's principal subsidiary.

19.     Each Defendant is a "person" within the meaning of Business and Professions Code section 17201.

### IV.     FACTUAL ALLEGATIONS

20.     Wells Fargo has built its retail banking business by cross-selling its products and encouraging its customers to maintain numerous accounts with the bank.  Its drive to maximize accounts

per customer has led Wells Fargo to promote and tolerate fraudulent, deceptive, and illegal practices that harm customers while inflating the bank's bottom line.

**A.      Wells Fargo Requires its Employees to Reach Unreasonable Quotas**

21.      A centerpiece of Wells Fargo's business model is getting each customer to maintain multiple accounts.  In a brochure published by Wells Fargo called "The Vision & Values of Wells Fargo," Wells Fargo states: "'Going for gr-eight.' Our average retail banking household has about six products with us. We want to get to eight . . . and beyond.  One of every four already has eight or more. Four of every 10 have six or more."

22.      In its 2014 Annual Report to the U.S. Securities and Exchange Commission, Wells Fargo boasts about its "products" per customer and its "cross-sell strategy": "Our vision is to satisfy all our customers' financial needs, help them succeed financially, be recognized as the premier financial services company in our markets and be one of America's great companies.  Important to our strategy to achieve this vision is to increase the number of our products our customers use and to offer them all of the financial products that fulfill their financial needs."  That report further states: "Our cross-sell strategy is to increase the number of products our customers use by offering them all of the financial products that satisfy their financial needs."

23.      Wells Fargo further stated in its 2014 Annual Report to the U.S. Securities Exchange Commission: "we continued to maintain our solid customer relationships across the Company, with retail banking household cross-sell of 6.17 products per household (November 2014); Wholesale Banking cross-sell of 7.2 products per relationship (September 2014); and Wealth, Brokerage and Retirement cross-sell of 10.49 products per retail banking household (November 2014)." Wells Fargo further stated in that same filing: "We believe there is more opportunity for cross-sell as we continue to earn more business from our customers. Our goal is eight products per household . . . ."

24.     In order to achieve its goal of eight accounts per household, Wells Fargo puts unrelenting pressure on its bankers to open numerous accounts per customer.

25.     Wells Fargo has strict quotas regulating the number of daily "solutions" its bankers must reach. Those "solutions" include the opening of new banking and credit card accounts. Bankers are under intense pressure to meet those quotas; managers hound, berate, demean, and threaten those who do not. Employees who do not reach their quotas are often required to work hours beyond their typical work schedule without being compensated for that extra work time, are threatened with termination, or both.

26.     A current employee of Wells Fargo, referred to in this Complaint as a Confidential Informant, explained that Wells Fargo's sales quota system "creates a culture of doing what you have to do to meet numbers."  This employee, who has worked as a teller and Personal Banker in multiple Wells Fargo branches, said employees were threatened or embarrassed during morning meetings if they did not meet the previous day's quota.

27.     Those quotas are often not attainable because there simply are not enough customers who enter a branch on a daily basis for employees to meet their quotas through traditional means.

28.     Wells Fargo's bankers are thus naturally and predictably forced to resort to alternative means to meet quotas, including using high pressure sales tactics to coerce customers into opening additional accounts or using inaccurate or misleading information about potential accounts to induce customers to open them.

29.     Such "gaming" is so commonplace in Wells Fargo's business that many of the tactics employed to meet these sky-high quotas have commonly-used names.  Below are description of some of the many tactics Wells Fargo has employed.

COMPLAINT – CLASS ACTION

### 1.   Bundling

30.   In the practice known at Wells Fargo as "bundling," its customers are told that the account or product they seek can be obtained only with the purchase of additional accounts or products, when, in fact, the desired product is available on its own. In many instances, employees are coached by management to ensure that every checking account is sold with three other products—a tactic also known as "packing" an account. Employees were, and are, instructed by management to lie to customers by telling them that each checking account automatically comes with a savings account, credit card, or other products such as life insurance, and/or "Express Send" (an online program that allows customers to send money to foreign countries).

31.   Sometimes, Wells Fargo will simply "bundle" numerous products without even asking the customer. In this context, when a customer opens an account, Wells Fargo simply opens a series of other accounts as the same time.

32.   When customers discover an unauthorized account and inquire of Wells Fargo about it, they are often informed that the products and services came with the authorized accounts automatically. Even in the face of customer complaints, the "bundling" continues.

33.   Customers who complain about receiving credit cards they did not request are advised by Wells Fargo to simply destroy the unrequested and unauthorized cards. However, simply destroying these unauthorized cards does not close the account nor repair the impact to a customer's credit profile.

### 2.   Pinning

34.   In the practice known at Wells Fargo as "pinning," a Wells Fargo banker obtains a debit card number, and personally sets the PIN, often to 0000, without customer authorization.  "Pinning" permits a banker to enroll a customer in online banking, for which the banker would receive a sales credit. To bypass computer prompts requiring customer contact information, bankers impersonate the customer online, and input false generic email addresses such as 1234@wellsfargo.com,

noname@wellsfargo.com, or none@wellsfargo.com to ensure that the transaction is completed, and that the customer remains unaware of the unauthorized activity.

### 3. Confidential Informant's Explanation of Gaming

35.     The Confidential Informant explained another common practice employees use to open unauthorized accounts on a "nearly daily basis." Usually, a customer will come in asking to convert their checking or savings account to a free account. According to the Confidential Informant, the appropriate practice would be to convert that person's account. That is not what happens.

36.     Instead, the banker will open an entirely new account in order to create a "sale" and then will not close the old account. If the banker were to close the old account, they would not get credit for the sale. "That's why bankers are not closing [the old accounts]. Some good bankers will set reminders to close it on 31 days after, but most just leave it open." The end result is that the customer still has the old account, which continues to generate fees, and a new account, which is a "sale" for the banker.

37.     All of this is done without informing the customer, according to the Confidential Informant. When a customer is seated at a banker's desk, the banker generates a new account application on their computer. But instead of showing that application to the customer, the banker will simply have the customer sign a digital pad, which does not indicate what the customer is approving. "It's quick, fast-talking, get them seated and send them on their way," explained the employee. "They may have never seen the account application. All they know from their perspective is that this is what they have to do to take care of the fee for their account."

38.     Another tactic the Confidential Informant witnesses was the use of "off-site applications" or "quick apps" in Wells Fargo branches. These forms are mostly blank templates with signature lines that are intended to be used at events outside the branch. Instead, Wells Fargo employees rush customers into signing the forms under some false pretense and then fill the forms in later to open new accounts.

### 4.     Other Gaming Tactics

39.     The descriptions above are just a sample of Wells Fargo's cross-selling tactics.  In addition, Wells Fargo's unrealistic sales goals and "culture" mean that Wells Fargo employees have engaged in, and continue to engage in, other gaming tactics, including but not limited to:

A.     Making misrepresentations to customers to get them to open additional accounts such as falsely stating: "you will incur a monthly fee on your checking account until you add a savings account."

B.     Misrepresenting that additional accounts do not have monthly fees, when they actually do incur such fees.

C.     Referring unauthorized, and therefore unfunded, accounts to collections because Wells Fargo's practices cause the accounts to have negative balances.

D.     Targeting individuals holding Mexican Matriculada Consular cards, which are identification cards issued by the Mexican government, because the lack of a Social Security Number makes it easier to open numerous fraudulent accounts. Wells Fargo employees provide false information to complaining customers, and advise many of these victims to ignore the unauthorized fees and letters from collection agencies because the lack of a Social Security number means the debt will not affect them.

E.     Advising customers who do not want credit cards that they will be sent a credit card anyway, and to just tear it up when they receive it.

**B.     Wells Fargo's Practices Cause Serious Harm to Consumers**

40.     Customers who have discovered unauthorized accounts often make the discovery accidentally. For instance: (a) unexplained money being withdrawn from authorized accounts to fund unauthorized accounts; (b) mailings from Wells Fargo congratulating a customer on opening a new account the customer does not recognize, or asking a customer to update account information for

accounts that the customer does not recognize; (c) calls from collection agencies stating the customer is overdrawn on an account that the customer does not recognize; and (d) discovering that checks a customer intended to be deposited into an authorized account do not appear in monthly statements because the checks had instead been deposited into an unauthorized account.

41.     Customers suffer significant harms in numerous ways from Wells Fargo's deceptive and illegal gaming practices: (a) customers lose money to monthly service fees charged for unauthorized accounts; (b) customer accounts are placed into collection, forcing customers to fight with debt collection agencies for fees charged by Wells Fargo on unauthorized accounts; (c) customers' credit reports are affected, impacting job applications, loans for automobiles, and mortgage applications; and (d) customers are forced to purchase costly identity theft protection services to ensure against further fraudulent activities. But for Wells Fargo's quota-based business model, its customers would not have incurred wrongful fees, been put into collections, suffered derogatory references on their credit reports, or forced to purchase identity theft protection.

42.     Astonishingly, customers' unauthorized accounts routines remain open even after repeated customer requests to Wells Fargo to close those accounts.

43.     Customers have difficulty reporting unauthorized activity. Reaching the correct representative is no guarantee the unauthorized account will be remedied, as complaining customers often never receive return calls from Wells Fargo.

**C.     Wells Fargo Knows of and Promotes the Gaming Practices**

44.     Wells Fargo knew or should have known that its employees routinely open unauthorized accounts. When the Confidential Informant and other employees complained about unethical practices they were written up and chastised by their manager for having poor "numbers." "Our sales goals are extremely lofty, and that creates a culture of doing what you have to do to meet numbers," the employee told the Confidential Informant.

45.     Below is a list of some, but not necessarily all, of the reasons Wells Fargo is or should be intimately familiar with the gaming practices used to "cross-sell" Wells Fargo products:

A.     Wells Fargo customers have complained in person and over the phone to Wells Fargo management and representatives.

B.     Wells Fargo has access to, and frequently monitors, actions taken on its computers by employees.  Wells Fargo has been put on notice by unusual activity such as: numerous accounts being opened on January 1, a bank holiday; numerous unfunded accounts; frequent reopening of closed accounts; and customer accounts in which the only activity are fees charged by Wells Fargo.

C.     Wells Fargo requires that all new customer accounts be approved by a branch manager or assistant manager, thereby providing Wells Fargo management with a clear record of the number and types of accounts opened for each customer.

D.     Wells Fargo is also aware its quotas are unrealistic for employees during normal working hours, since they have generated numerous complaints and lawsuits by employees.

E.     Online banking accounts are often by Wells Fargo with obviously false customer contact information, such as "noname@wellsfargo.com".

F.     Wells Fargo allows all bank employees to access sensitive client data – access to which would allow the creation of a new account – and can and does monitor employees' access to such data.

G.     Wells Fargo has terminated and/or otherwise disciplined a number of employees for gaming practices, but far fewer than have actually engaged in such practices.

46.     Despite Wells Fargo's knowledge of gaming by its employees, it has done little, if anything, to terminate these practices, nor to reform the business model it created that has fostered them. While Wells Fargo has made a few minor changes to its policies, and has terminated a handful of

employees, those efforts have been, at most, cosmetic, and ultimately benefit Wells Fargo by creating the illusion that it was taking some action to address the problem when, in fact, it was not. However, the policies that encourage these tactics continue, and employees who engage in them continue to be rewarded monetarily, and even promoted. On information and belief, Wells Fargo has not altered its quota system, nor has it reduced the pressure it has applied to its management and employees to reach their quotas, and the gaming that has been its inevitable result.

**D.     Plaintiff Jabbari's Experience**

47.     Plaintiff Jabbari first opened an account with Wells Fargo in 2011. Like many people, he only wanted two accounts: checking and savings. Within two years, however, Mr. Jabbari had 7 additional Wells Fargo accounts that he did not authorize and was not aware of.

48.     After opening those accounts in 2011, Mr. Jabbari experienced some anomalies, such as unexplained fees. In 2013, Mr. Jabbari visited the Wells Fargo branch in Los Gatos, California to inquire about an unauthorized charge. During that visit Mr. Jabbari learned he had multiple Wells Fargo accounts that he did not open. Some of those accounts had already been closed and were already in collection due to unpaid fees.

49.     A Wells Fargo employee in that branch shared with Mr. Jabbari "screen captures" showing how accounts had been opened in his name using a signature that was not his. For example, one screen capture showed this signature for an authorized account that misspells his name as "Sharriar":

13          COMPLAINT – CLASS ACTION



50.     A second screen capture shows a second signature for the same unauthorized account that does not include any "Signer Name":



51.     Mr. Jabbari did not authorize those accounts. He was told by a Wells Fargo representative that a Wells Fargo employee had opened them in his name without his approval.

52.     That was not the only evidence of abuse and unauthorized accounts. On other occasions, Mr. Jabbari received three debit cards in the mail from Wells Fargo that he did not request. When he contacted the bank about those cards, he was essentially told to disregard the additional cards and dispose of them.

53.     A few months after his visit to the Los Gatos branch, Mr. Jabbari received a change of address notification showing several accounts that he had not opened and that he thought had been closed:



> **Change of Address Notification**
> We received a Change of Address request that was filed with the U.S. Postal Service in your name. As a result, we updated the address on the following account(s):
>
> XXXXXXXXXXXXXX5594     CHECKING/SAVING
> XXXXXXXXXXXXXX9612     CHECKING/SAVING
> XXXXXXXXXXXXXX1014     CHECKING/SAVING
> XXXXXXXXXXXXXX8440     CHECKING/SAVING
> XXXXXXXXXXXXXX0035     CHECKING/SAVING
> XXXXXXXXXXXXXX4779     ATM/CHECK CARD
> XXXXXXXXXXXXXX4811     ATM/CHECK CARD
> XXXXXXXXXXXXXX5013     ATM/CHECK CARD
>
> No further action is required. However, if you feel this change was made in error, please call us immediately at 1-800-869-3557.
> Your account address information can be verified anytime through one of the following options:
> • Visit us online at wellsfargo.com, sign on, then click on the Account Services tab and Account Profile link.
> • Visit your local Wells Fargo store during business hours.
> • Call us at 1-800-869-3557, 24 hours a day, 7 days a week.
> Thank you for choosing Wells Fargo. We appreciate your business.

54.     In total, Mr. Jabbari knows of seven unauthorized accounts with Wells Fargo. He believes that he has been charged fees for all of them, and that Wells Fargo may still be assessing fees for those and other accounts.

55.     As a result of the unauthorized accounts, Mr. Jabbari has received notices from collection agencies seeking to collect unpaid fees allegedly owed to Wells Fargo. He has also been assessed an unknown amount in unauthorized fees. Moreover, he believes his credit score has been harmed as a result of Wells Fargo's effort to collect on unpaid fees; because of the damage Wells Fargo has done to his credit, Mr. Jabbari has been unable to open a new bank account.

56.     A Wells Fargo employee told Mr. Jabbari that the bank would investigate how he came to have so many unauthorized accounts, but he has not heard any results of that investigation.

**E.    Other Online Complaints**

57.    While Mr. Jabbari's experience may sound egregious, a review of online complaints against Wells Fargo show the practices he experienced are widespread. The Consumer Product Safety Commission's complaint database includes over 3,000 complaints against Wells Fargo nationwide for "Account opening, closing, or management."

58.    Recently, readers of the *Los Angeles Times* provided the following additional examples:

A.    "At one time, I had at least 12 accounts open with them when I only needed & wanted 2."

B.    "Yep, they talked me into having 6 accounts I don't need. Once I called about fees, they asked me to open more accounts to avoid the fees."

C.    "They will open and reopen accounts they do not need as well as talk them into CDs and other products that hold their money hostage."

D.    "They've been doing this for years. They opened an unauthorized account in my name 10 years ago."

59.    In sum, Wells Fargo has engaged in a long-running and widespread pattern of deception that has harmed Plaintiff and others like him.

## V.    CLASS ACTION ALLEGATIONS

60.    This matter is brought by Plaintiff on behalf of himself and those similarly situated, under Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3).

61.    The Class that Plaintiff seeks to represent is defined as follows:

All persons who opened one or more accounts or purchased one or more financial product)s_ from above Wells Fargo as a result of the gaming described, and all persons who had one or more unauthorized or unwanted account(s) opened by Wells Fargo, herein (the "Class").

62.   **Numerosity/Impracticability of Joinder:** The members of the Class are so numerous that joinder of all members would be impractical.  The proposed Class likely contains thousands of members.  The precise numbers of members can be ascertained through discovery, which will include Defendants' sale and other records.

63.   **Commonality and Predominance:** There are common questions of law and fact that predominate over any questions affecting only individual members of the Class.

64.   For Plaintiff and the Class, the common legal and factual questions include, but are not limited to the following:

A.   Whether and how Wells Fargo and its employees engaged in deceptive, fraudulent, and/or deceptive practices in order to get each customer to maintain numerous accounts with Wells Fargo;

B.   Whether Wells Fargo knew or should have known of its employees' deceptive, fraudulent, and/or illegal "gaming" practices;

C.   Whether Wells Fargo omitted and concealed material facts from its communications and disclosures to Plaintiff and the Class regarding the costs, benefits, and policies regarding bank accounts and other financial products.

D.   Whether Wells Fargo has engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices with the sale of its software;

E.   Whether Wells Fargo violated California and/or other consumer protection statutes;

F.   Whether Wells Fargo has been unjustly enriched;

G.   Whether, as a result of Wells Fargo's conduct, Plaintiff and the Classes have suffered damages; and if so, the appropriate amount thereof; and

COMPLAINT – CLASS ACTION

H.      Whether as a result of Wells Fargo's misconduct, Plaintiff and the Class are entitled to equitable and declaratory relief, and, if so, the nature of such relief.

65.     **Typicality:** The representative Plaintiff's claims are typical of the claims of the members of the Class.  Plaintiff and all the members of the Class have been injured by the same wrongful practice of Wells Fargo.  Plaintiff's claims arise from the same practices and course of conduct that give rise to the claims of the members of the Class and are based on the same legal theories.

66.     **Adequacy:** Plaintiff is a representative who will fully and adequately assert and protect the interests of the Class, and have retained class counsel who are experienced and qualified in prosecuting class actions.  Neither Plaintiff nor his attorneys have any interests contrary to or in conflict with the Class.

67.     **Superiority:** A class action is superior to all other available methods for the fair and efficient adjudication of this lawsuit, because individual litigation of the claims of all members of the Class is economically unfeasible and procedurally impracticable.  While the aggregate damages sustained by the Class are likely in the millions of dollars, the individual damages incurred by each Class member are too small to warrant the expense of individual suits.  The likelihood of individual Class members prosecuting their own separate claims is remote, and even if every member of the Class could afford individual litigation, the court system would be unduly burdened by individual litigation of such cases.  Further, individual members of the Class do not have a significant interest in individually controlling the prosecution of separate actions, and individualized litigation would also result in varying, inconsistent, or contradictory judgments and would magnify the delay and expense to all of the parties and the court system because of multiple trials of the same factual and legal issues.  Plaintiffs know of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.  In addition, Wells Fargo has acted or refused to act on grounds generally applicable to

the Class and, as such, final injunctive relief or corresponding declaratory relief with regard to the members of the Class as a whole is appropriate.

68. Plaintiff does not anticipate any difficulty in the management of this litigation.

69. Wells Fargo has, or has access to, address and/or other contact information for the Members of the Class, which may be used for the purpose of providing notice of the pendency of this action.

## VI. CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### Asserted on Behalf of Plaintiff and the Class
### Violations of California's Consumers Legal Remedy Act, Cal. Civ. Code §§ 1750, *et seq.*

70. Plaintiff, a resident of California, incorporates by reference each and every prior and subsequent allegation of this Complaint as if fully restated here.

71. California's Consumer Legal Remedies Act, Cal. Civ. Code §§ 1750, *et seq*. makes it unlawful to engage in unfair methods of competition and unfair or deceptive acts or practices intended to result, or which results, in the sale or lease of goods or services to any consumer.

72. Plaintiff and the Class were, and continue to be, at all times material to the Complaint, "consumers" and "persons" as defined by the Cal. Civ. Code § 1761. Plaintiff, as well as the Class, purchased and/or used Wells Fargo products for personal and/or family and/or household use.

73. As alleged throughout this Complaint, Wells Fargo engaged in unfair, deceptive, and/or unlawful marketing in violation of Civ. Code § 1770(a) by providing customers with false, misleading, deceptive, and/or unlawful statements about the costs, benefits, and policies regarding Wells Fargo financial products.

74. The false, misleading, deceptive and/or unlawful statements about its products were material misstatements and/or omissions that caused consumers to believe, falsely, that, *inter alia*, they

needed to purchase more Wells Fargo products in order to receive specific benefits of other products, when this was not true.

75.     Plaintiff was exposed to and/or relied upon Wells Fargo's unfair, deceptive, and/or unlawful marketing practices.

76.     As described above, Wells Fargo also engaged in unfair or deceptive acts or practices by opening accounts and financial products in the names of customers without their knowledge or consent.

77.     Plaintiff and the Class have lost money and incurred significant, unreasonable stress as a result of Wells Fargo's unfair, deceptive, and/or unlawful practices pursuant to Cal. Civ. Code § 1770(a).

78.     The conduct described herein by Wells Fargo is continuing.  Plaintiff will promptly demand the conduct cease in a Consumer Legal Remedies Act letter.  The conduct was done for profit as a deliberate corporate policy rather than an isolated incident, and was morally wrong, callous, and/or oppressive.

79.     As a result of Wells Fargo's violations of the California's Consumer Legal Remedies Act, Plaintiff seeks an order of this Court permanently enjoining Wells Fargo from perpetrating its unfair, deceptive, and/or unlawful practices.  If Wells Fargo does not take action to cease its unfair, deceptive, and/or unlawful practices within thirty days of being served with the notice letter, Plaintiff will seek leave to amend this Complaint to request, in addition to an order enjoining Wells Fargo from continuing its unfair, deceptive, and/or unlawful practices, an order awarding, *inter alia*, Plaintiff and the Class actual damages, restitution, attorneys' fees and costs, and for such other relief as set forth below.

80.     Plaintiff reserves the right to amend this Complaint to seek punitive damages.

**SECOND CAUSE OF ACTION**
**Asserted on Behalf of Plaintiff and the Class**
**Violations of California's Unfair Competition Law Cal. Bus. & Prof. Code §§ 17200, *et seq*.**

81.     Plaintiff incorporates by reference each and every prior and subsequent allegation of this Complaint as if fully restated here.

82.     California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, et seq., protects both consumers and competitors by promoting fair competition in commercial markets for goods and services.  California's Unfair Competition Law is interpreted broadly and provides a cause of action for any unlawful, unfair, or fraudulent business act or practice.  Any unlawful, unfair, or fraudulent business practice that causes injury to consumers falls within the ambit of California's Unfair Competition Law.

83.     Wells Fargo engages in substantial sales and marketing of its financial products and services within the State of California.

84.     Because of Wells Fargo unlawful and unfair business practices, Plaintiffs and the California Subclass were unfairly, unlawfully, and/or fraudulently misled into purchasing and/or maintaining more Wells Fargo products than they would otherwise have purchased and/or maintained. Plaintiff relied, to his detriment, on Wells Fargo's false representations, detailed above, regarding the costs, benefits, and policies governing Wells Fargo's products and accounts.  The Class was uniformly exposed to Wells Fargo's unlawful and unfair business practices.

85.     Additionally, as detailed above, Wells Fargo also engaged in unfair, unlawful, and/or fraudulent acts or practices by opening accounts and financial products in the names of customers without their knowledge or consent.

**THIRD CAUSE OF ACTION**
**Asserted on Behalf of Plaintiff and the Class**
**Violations of Fair Credit Reporting Act § 1681 *et seq*.**

86.     Plaintiff incorporates by reference each and every prior and subsequent allegation of this Complaint as if fully restated here.

COMPLAINT – CLASS ACTION

87.     Each time that Wells Fargo opens a new credit card account, it obtains, reviews, and uses a consumer credit report about the consumer for whom the account is opened in order to assess the consumer's creditworthiness for the new credit product.

88.     Wells Fargo agreed and represented in its agreements with the national consumer reporting agencies (CRAs) from which it obtains consumer credit reports that Defendant would obtain and use consumer reports which were procured from said agencies only for purposes which are lawful under the FCRA as defined under 15 U.S.C. § 1681b.

89.     Defendant was required by 15 U.S.C. §§ 1681b, 1681n, and 1681q to refrain from obtaining or using consumer credit reports from CRAs under false pretenses, and without proper authorization from the consumer who is the subject of the report.

90.     Defendant has an affirmative duty to follow reasonable procedures, including those that would prevent the impermissible accessing of consumer credit reports. 15 U.S.C. § 1681b(f).

91.     Despite these clear and unambiguous requirements of the FCRA, Defendant regularly pulls consumer credit reports regarding consumers without their knowledge or consent in order to open new credit card accounts as part of its cross-selling practices, in violation of FCRA.

92.     Pursuant to sections 1681n and 1681o, Defendant is liable for negligently and willfully violating the FCRA by accessing the credit reports of consumers without a permissible purpose or authorization under FCRA.

**FOURTH CAUSE OF ACTION**
**Asserted on Behalf of Plaintiff and the Class**
**Unjust Enrichment**

93.     Plaintiff incorporates by reference each and every prior and subsequent allegation of this Complaint as if fully restated here.

94.     As a result of Defendants' unlawful and deceptive actions described above, Defendants were enriched at the expense of Plaintiff and the Class through the payment of fees, penalties, and other

charges resulting from accounts, products, and services that Wells Fargo unlawfully and/or deceptively sold to or opened for customers.

95.     Under the circumstances, it would be against equity and good conscience to permit Defendants to retain the ill-gotten benefits that they received from Plaintiff and the Class, in light of the fact that Wells Fargo used illegal, deceptive, and/or unfair practices to induce or force customers to open, purchase, and/or maintain the banking services, accounts, and products.  Thus, it would be unjust and inequitable for Defendants to retain the benefit without restitution to the Plaintiffs and the Class for the monies paid to Defendants as a result of the unfair, deceptive, and/or illegal practices.

**FIFTH CAUSE OF ACTION**
**On Behalf of California Members of the Class**
**Violation of the California Customer Records Act**
**California Civil Code Section 1798.80 *et seq*.**

96.     Plaintiff incorporates by reference each and every prior and subsequent allegation of this Complaint as if fully restated here.

97.     Plaintiffs bring this cause of action on behalf of California members of the Class

98.     The California Legislature enacted Civil Code section 1798.81.5 "to ensure that personal information about California residents is protected."  The statute requires that any business that "owns, licenses, or maintains personal information about a California resident  . . . implement and maintain reasonable security procedures and practices appropriate to the nature of the information, to protect the personal information from unauthorized access, destruction, use, modification, or disclosure."

99.     Wells Fargo is a "business" as defined by Civil Code section 1798.80(a).

100.    Each Plaintiff and member of the class is an "individual" as defined by Civil Code section 1798.80(d) and a "customer" as defined by Civil Code section 1798.80(c).

101.    The information that Wells Fargo used in the gaming described in this Complaint was "personal information" as defined by Civil Code sections 1798.80(e) and 1798.81.5(d), which includes "information that identifies, relates to, describes, or is capable of being associated with, a particular

individual, including, but not limited to, his or her name, signature, Social Security number, physical characteristics or description, address, telephone number, passport number, driver's license or state identification card number, insurance policy number, education, employment, employment history, bank account number, credit card number, debit card number, or any other financial information, medical information, or health insurance information."

102.   The misuse of that personal information by Wells Fargo and its employees to open unauthorized accounts or other "sales" was a "breach of the security system" of as defined by Civil Code section 1798.82(g).

103.   By failing to ensure that its employees did not misuse customers' personal information, Wells Fargo violated Civil Code section 1798.81.5(b), which requires businesses to implement and maintain reasonable security procedures for "personal information about California residents."

104.   By failing to immediately notify all affected Wells Fargo customers that their personal information had been misused by unauthorized persons to open unauthorized accounts, Wells Fargo violated Civil Code section 1798.82.  Wells Fargo's failure to immediately notify customers of that misuse caused class members to suffer damages by, for example, forcing them to pay unauthorized fees or respond to collection agents.

105.   Plaintiffs seek all remedies available under Civil Code section 1798.84, including actual and statutory damages, equitable relief, and reasonable attorneys' fees. Because Wells Fargo encouraged violations of the Act, or was aware of the violations and did nothing, it acted willfully, intentionally, or recklessly, and Plaintiff and the Class may recover a civil penalty of $3,000 per violation.

106.    Plaintiffs also seek reasonable attorneys' fees and costs under applicable law including Federal Rule of Civil Procedure 23 and California Code of Civil Procedure § 1021.5.

## VII.   REQUEST FOR RELIEF

Plaintiffs, individually and on behalf of all others similarly situated, requests judgments against Defendants as follows:

A.     For an order certifying the Class and, under Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3), and appointing Plaintiff as representative of the Class and appointing the lawyers and law firm representing Plaintiff as counsel for the Class;

B.     Declaring Wells Fargo's actions to be false, misleading, and/or deceptive;

C.     Permanently enjoining Wells Fargo from performing further unfair and unlawful acts as alleged herein;

D.     For all recoverable compensatory, statutory, and other damages sustained by Plaintiff and the Class, including disgorgement, unjust enrichment, and all other relief allowed under applicable law;

E.     Granting Plaintiff and the Class awards of restitution and/or disgorgement of Wells Fargo's profits from its unfair and unlawful practices described above;

F.     For costs;

G.     For both pre-judgment and post-judgment interest on any amounts awarded;

H.     For appropriate injunctive relief;

I.     For treble damages insofar as they are allowed by applicable laws;

J.     For appropriate individual relief as request above;

K.     For payment of attorneys' fees and expert fees as may be allowable under applicable law; and

L.     For such other and further relief, including declaratory relief, as the Court may deem proper.

## VIII.   DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all issues so triable.

COMPLAINT – CLASS ACTION

DATED this 14th day of May, 2015.

KELLER ROHRBACK L.L.P.


By /s/ Matthew J. Preusch
     Matthew J. Preusch (Bar No. 298144)
     1129 State Street, Suite 8
     Santa Barbara, California 93101
     Tel: (805) 456-1496
     Fax: (805) 456-1497
     mpreusch@kellerrohrback.com

     Gretchen Freeman Cappio*
     Daniel P. Mensher*
     **KELLER ROHRBACK L.L.P.**
     1201 Third Avenue, Suite 3200
     Seattle, WA 98101-3052
     Tel: (206) 623-1900
     Fax: (206) 623-3384
     gcappio@kellerrohrback.com
     dmensher@kellerrohrback.com

     Attorneys for Plaintiff Jabbari

     *pro hac vice forthcoming*

COMPLAINT – CLASS ACTION