Matthew J. Preusch (Bar No. 298144)
mpreusch@kellerrohrback.com
Khesraw Karmand (Bar No. 280272)
kkarmand@kellerrohrback.com
**KELLER ROHRBACK L.L.P.**
1129 State Street, Suite 8
Santa Barbara, CA 93101
(805) 456-1496, Fax (805) 456-1497

***Attorneys for Plaintiffs***
***(Additional Counsel on Signature Page)***

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| SHAHRIAR JABBARI and KAYLEE HEFFELFINGER, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>WELLS FARGO & COMPANY AND WELLS FARGO BANK, N.A.,<br><br>Defendants. | No. 15-cv-02159-VC<br><br>**CONSOLIDATED AMENDED COMPLAINT CLASS ACTION**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs Shahriar Jabbari and Kaylee Heffelfinger, on behalf of themselves and all others similarly situated nationwide, hereby file this Consolidated Amended Class Action Complaint against Defendants, Wells Fargo & Company, a Delaware Corporation, and Wells Fargo Bank, N.A., a National Banking Association (collectively "Wells Fargo"). Plaintiffs state the following based on information and belief and investigation of counsel:

## I.    INTRODUCTION

1.    Across the nation, Wells Fargo customers have been discovering a troubling fact: The bank they relied on to hold and protect their money had opened accounts for them about which they

CONSOLIDATED AMENDED COMPLAINT

were not aware, did not authorize, or both. While those accounts are shocking to affected customers, they are not to Wells Fargo.

2.     The bank's business model is based in part on enrolling its customers in multiple banking products, which Wells Fargo calls "solutions." The more "solutions" Wells Fargo sells to its customers, the more opportunities the bank has to make money from them through fees, interest, and other transactions.

3.     In order to maximize the number of solutions per customer, and thus maximize its profits, Wells Fargo routinely opens customer accounts and issues credit cards *without the customer's authorization or knowledge*. Then, when customers fail to maintain mandatory account balances, pay fees for accounts they did not know existed, or comply with some other undisclosed policy, Wells Fargo charges the customer a fee. Often Wells Fargo simply "pays" this resulting fee by taking money from the clients' existing accounts. Or Wells Fargo sends the "debt" the customers "owe" to a debt collection agency.

4.     Wells Fargo promotes this "sales" system by imposing unrealistic sales quotas on its employees. The bank has adopted policies that have, unsurprisingly and naturally, driven its bankers to engage in fraudulent behavior, including forging customers' signatures on account applications, to meet those unreachable goals. Wells Fargo has known about those practices for years, but it has not stopped them.

5.     Wells Fargo has every incentive not to stop them: By enrolling customers in multiple unauthorized accounts, the bank has engineered a fee-generating machine that produces extraordinary profits for the corporation at the significant expense of its customers. While its customers must contend with excessive fees and calls from collection agencies, Wells Fargo has grown into the world's most valuable bank.

CONSOLIDATED AMENDED COMPLAINT

6.      Signing individuals up for many different financial products is at the heart of Wells Fargo's business model. Indeed, Wells Fargo routinely touts the fact that its customers, on average, hold a high number of Wells Fargo financial products—currently approximately six bank accounts or financial products per customer. Wells Fargo seeks to increase this to an average of eight accounts or financial products per customer, through its "Gr-eight" or "Great Eight" initiative.

7.      Wells Fargo's "success" at cross-selling has come in large part because of its strictly enforced sales quota system. Wealth managers, financial advisors, bankers, and others at Wells Fargo must meet high quotas of generating new accounts, or else lose pay or their jobs. Because the stakes are so high for the employees, and the quotas so demanding, Wells Fargo employees often resort to using the abusive and illegal tactics described further below.

8.      Moreover, Wells Fargo enforces its sales quotas by constant monitoring. Sales figures for each branch and each sales employee are reported and discussed by Wells Fargo's District Managers multiple times every day. Employees who fail to meet daily sales quotas are approached by management, and often reprimanded or told to "do whatever it takes" to meet their unrealistic quotas. As a direct and expected result of this quota system, Wells Fargo knows its employees must engage in the illegal activity described herein.

9.      So engrained is this practice of using illegal tactics to cross sell financial products, it is known as "gaming" within the company. Wells Fargo's managers and bankers have for years engaged in such gaming practices. Gaming consists of, among other things, opening and manipulating fee-generating customer accounts through unfair, fraudulent, and unlawful means, such as omitting signatures and adding unwanted secondary accounts to primary accounts without permission.

10.     Not only does Wells Fargo know of and encourage gaming, its systems enable it. On information and belief, Wells Fargo maintains internal systems or databases, including the Store Vision Platform (SVP), that allow certain employees to access customer information needed to open new

CONSOLIDATED AMENDED COMPLAINT

accounts. Those Wells Fargo employees use this information to create unauthorized accounts for customers without the customers' knowledge. Those employees then receive credit for having "sold" a customer a new solution.

11. Wells Fargo's gaming practices have caused significant stress to, and hardship and financial loses for, its customers. Specifically, Wells Fargo has: (a) withdrawn money from customers' authorized accounts to pay for the fees assessed by Wells Fargo on unauthorized accounts opened in customers' names; (b) placed customers into collections when the unauthorized withdrawals from customer accounts went unpaid; (c) placed or caused to be placed derogatory information in credit reports when unauthorized fees went unpaid; (d) denied customers access to their funds while Wells Fargo stockpiled account applications; and (e) caused customers to purchase identity theft protection.

12. While Wells Fargo has ostensibly terminated a small number of employees who have engaged in gaming, other employees have been rewarded for these practices, and even promoted, perpetuating the problem. Moreover, Wells Fargo has continued to impose the same companywide goals of attaining as many accounts as possible at any expense, thereby fostering the practice of gaming. Wells Fargo thus puts its employees between a rock and a hard place, forcing them to choose between keeping their jobs and opening unauthorized accounts.

13. Wells Fargo has also failed to inform its customers when their personal information has been accessed or compromised as a result of Wells Fargo's gaming practices, in breach of its statutory duties to do so, thus causing its customers additional harm.

## II.     JURISDICTION AND VENUE

14. This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because at least one Class member is of diverse citizenship from one defendant, there are 100 or more Class members nationwide, and the aggregate amount in controversy exceeds $5,000,000.

CONSOLIDATED AMENDED COMPLAINT

15.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(3) because the Court has personal jurisdiction over Defendants, a substantial portion of the alleged wrongdoing occurred in this District and California, and Defendants have sufficient contacts with this District and California.

16.     Venue is proper in the Northern District of California pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims at issue in this Complaint arose in this District.

### III.     INTRADISTRICT ASSIGNMENT

17.     This case is properly brought in the San Francisco Division of the Northern District of California. Pursuant to Local Rule 3-2(c), cases are to be filed in the Division "in which a substantial part of the events or omissions which give rise to the claim occurred." Defendant Wells Fargo & Company has its principal place of business in San Francisco. Wells Fargo's consumer banking website lists the address of the bank's "Corporate Offices" as 420 Montgomery Street, which is less than two miles from this Court.

18.     As Plaintiffs allege that Defendants have engaged in illegal activity related to Plaintiffs' bank accounts and other financial products, and that such illegal activity was pursuant to nationwide policies, a substantial part of the events or omissions about which Plaintiffs complain took place at Defendants' offices in San Francisco. Thus, pursuant to Local Rule 3-2(d), the proper venue for this case is the San Francisco Division of the Northern District of California.

### IV.     PARTIES

19.     Plaintiff Jabbari is and at all relevant times was a resident and citizen of California.

20.     Plaintiff Heffelfinger is and at all relevant times was a resident and citizen of Arizona.

21.     Defendant Wells Fargo & Company is incorporated in Delaware with its principal place of business in San Francisco, California. Wells Fargo & Company is a financial services company with $1.5 trillion in assets, and provides banking, insurance, investments, mortgage, and consumer and

CONSOLIDATED AMENDED COMPLAINT

commercial finance through more than 9,000 locations, 12,000 ATMs, and the Internet. It has approximately 265,000 full-time employees, and is ranked 29th on Fortune Magazine's 2014 rankings of America's 500 largest corporations.

22.     Defendant Wells Fargo Bank, N.A. is a national banking association chartered under the laws of the United States with its primary place of business in Sioux Falls, South Dakota. Wells Fargo Bank, N.A. provides Wells Fargo & Company personal and commercial banking services, and is Wells Fargo & Company's principal subsidiary.

23.     Wells Fargo & Company is the largest bank headquartered in California. Wells Fargo Bank, N.A. a subsidiary of Wells Fargo & Company, provides most of the banking products and services that are the subject of this action.

## V.     FACTUAL ALLEGATIONS

24.     Wells Fargo has built its retail banking business by cross-selling its products and encouraging its customers to maintain numerous accounts with the bank. Its drive to maximize accounts per customer has led Wells Fargo to promote and tolerate illegal practices that harm customers while inflating the bank's bottom line.

### A.     Wells Fargo Requires its Employees to Reach Unreasonable Quotas

25.     Wells Fargo's business model is built in part on signing its customers up for multiple accounts. In a brochure published by Wells Fargo called "The Vision & Values of Wells Fargo," Wells Fargo states: "'Going for gr-eight.' Our average retail banking household has about six products with us. We want to get to eight . . . and beyond. One of every four already has eight or more. Four of every 10 have six or more."

26.     In its 2014 Annual Report to the U.S. Securities and Exchange Commission ("SEC"), Wells Fargo boasts about its "products" per customer and its "cross-sell strategy": "Our vision is to satisfy all our customers' financial needs, help them succeed financially, be recognized as the premier

CONSOLIDATED AMENDED COMPLAINT

financial services company in our markets and be one of America's great companies. Important to our strategy to achieve this vision is to increase the number of our products our customers use and to offer them all of the financial products that fulfill their financial needs." That report further states: "Our cross-sell strategy is to increase the number of products our customers use by offering them all of the financial products that satisfy their financial needs."

27.     Wells Fargo further stated in its 2014 Annual Report to the SEC: "we continued to maintain our solid customer relationships across the Company, with retail banking household cross-sell of 6.17 products per household (November 2014); Wholesale Banking cross-sell of 7.2 products per relationship (September 2014); and Wealth, Brokerage and Retirement cross-sell of 10.49 products per retail banking household (November 2014)." Wells Fargo further stated in that same filing: "We believe there is more opportunity for cross-sell as we continue to earn more business from our customers. Our goal is eight products per household . . . ."

28.     In order to achieve its goal of eight accounts per household, Wells Fargo puts unrelenting pressure on its bankers to open numerous accounts per customer.

29.     Wells Fargo has strict quotas regulating the number of daily "solutions" its bankers must reach. Those "solutions" include the opening of new banking and credit card accounts. Bankers are under intense pressure to meet those quotas; managers hound, berate, demean, and threaten those who do not. Employees who do not reach their quotas are often required to work hours beyond their typical work schedule without being compensated for that extra work time, are threatened with termination, or both.

30.     A current employee of Wells Fargo who spoke to Plaintiffs' counsel on the condition of anonymity and is referred to in this Complaint as a Confidential Informant explained that Wells Fargo's sales quota system "creates a culture of doing what you have to do to meet numbers." This employee,

CONSOLIDATED AMENDED COMPLAINT

who has worked as a teller and Personal Banker in multiple Wells Fargo branches, said employees were threatened or embarrassed during morning meetings if they did not meet the previous day's quota.

31.     Those quotas are often unattainable because there simply are not enough customers who enter a branch on a daily basis for employees to meet their quotas through traditional means.

32.     Wells Fargo's bankers are thus naturally and predictably forced to resort to alternative means to meet quotas, including using high pressure sales tactics to coerce customers into opening additional accounts or using inaccurate or misleading information about potential accounts to induce customers to open them. Wells Fargo bankers even report opening accounts in the names of their own family members, without their consent, in order to "meet numbers."

33.     When Wells Fargo opens a new account or commences new banking services for a customer it receives a "consumer report," as that term is defined in 15 U.S.C. § 1681a(d)(1), on the customer.

34.     On information and belief, Wells Fargo obtains consumer reports via ChexSystem, Inc. According to ChexSystems' website, it "is a consumer-reporting agency governed by the federal Fair Credit Reporting Act (FCRA) and other laws."[1]

35.     This "gaming" is so commonplace in Wells Fargo's business that many of the tactics employed to meet these sky-high quotas have commonly-used names. Below are descriptions of some of the many tactics Wells Fargo has employed.

**1.      Bundling**

36.     In the practice known at Wells Fargo as "bundling," Wells Fargo will simply add numerous products to customers' names without asking the customer. In this context, when a customer opens an account, Wells Fargo simply opens a series of other accounts at the same time, including, but

---

[1] www.consumerdebit.com/consumerinfo/us/en/chexsystems/faqs.htm#FAQ_01.

CONSOLIDATED AMENDED COMPLAINT

not limited to, savings accounts, credit cards, or other products such as life insurance, and "Express Send" (an online program that allows customers to send money to foreign countries).

37.     When customers discover an unauthorized account and inquire of Wells Fargo about it, they are often informed that the products and services came with the authorized accounts automatically. Even in the face of customer complaints, the "bundling" continues.

38.     Customers who complain about receiving credit cards they did not request are advised by Wells Fargo to simply destroy the unrequested and unauthorized cards. However, simply destroying these unauthorized cards does not close the account nor repair the impact to a customer's credit profile.

### 2.     Pinning

39.     In the practice known at Wells Fargo as "pinning," a Wells Fargo banker obtains a debit card number, and personally sets the PIN, often to 0000, without customer authorization. "Pinning" permits a banker to enroll a customer in online banking, for which the banker would receive a sales credit. To bypass computer prompts requiring customer contact information, bankers impersonate the customer online, and input false generic email addresses such as 1234@wellsfargo.com, noname@wellsfargo.com, or none@wellsfargo.com to ensure that the transaction is completed, and that the customer remains unaware of the unauthorized activity.

### 3.     "Free" Accounts

40.     The Confidential Informant described another common practice Wells Fargo employees use to open unauthorized accounts on a "nearly daily basis" as follows: usually, a customer will come into a branch asking to convert their existing checking or savings account to a free account. According to the Confidential Informant, the appropriate practice would be to convert that person's account. That is not what happens.

41.     Instead, the banker will open an entirely new account in order to create a "sale" and then will not close the old account. If the banker were to close the old account, they would not get credit for

CONSOLIDATED AMENDED COMPLAINT

the sale. "That's why bankers are not closing [the old accounts]. Some good bankers will set reminders to close it on 31 days after, but most just leave it open," said the Confidential Informant. The end result is that the customer still has the old account, which continues to generate fees, and a new account, which is a "sale" for the banker.

42. In other cases, bankers may simply forge signatures, as shown below.

**B. Wells Fargo's Practices Cause Serious Harm to Consumers**

43. Customers who have discovered unauthorized accounts often make the discovery inadvertently. Those customers confront, for instance, (a) money inexplicably being withdrawn from authorized accounts to fund unauthorized accounts; (b) mailings from Wells Fargo congratulating a customer on opening a new account the customer does not recognize, or asking a customer to update account information for accounts that the customer does not recognize; (c) calls from collection agencies stating the customer is overdrawn on an account that the customer does not recognize; (d) receiving new unrequested debit cards; and (e) discovering that checks a customer intended to be deposited into an authorized account do not appear in monthly statements because the checks had instead been deposited into an unauthorized account.

44. Customers suffer significant harm in numerous ways from Wells Fargo's illegal gaming practices, including but not limited to the following: (a) customers lose money to monthly service fees charged for unauthorized accounts; (b) customer accounts are placed into collection, forcing customers to fight with debt collection agencies for fees charged by Wells Fargo on unauthorized accounts; (c) customers' credit reports are affected, affecting job applications, loans for automobiles, and mortgage applications; and (d) customers are forced to purchase costly identity theft protection services to ensure against further fraudulent activities. But for Wells Fargo's quota-based business model, its customers would not have incurred wrongful fees, been put into collections, suffered derogatory references on their credit reports, or been forced to purchase identity theft protection.

CONSOLIDATED AMENDED COMPLAINT

45.     Astonishingly, customers' unauthorized accounts routinely remain open even after repeated customer requests to Wells Fargo to close those accounts.

46.     Customers have difficulty reporting unauthorized activity. Reaching the correct representative is no guarantee the unauthorized account will be remedied, as complaining customers often never receive return calls from Wells Fargo.

**C.     Wells Fargo Knows of and Promotes the Gaming Practices**

47.     Wells Fargo knew or should have known that its employees routinely open unauthorized accounts. When the Confidential Informant and other employees complained about unethical practices they were written up and chastised by their manager for having poor "numbers." "Our sales goals are extremely lofty, and that creates a culture of doing what you have to do to meet numbers," the Confidential Informant said.

48.     Also, based on information and belief and investigation of counsel, Wells Fargo tracked or tracks unauthorized accounts in daily reports. Those reports, known as the Quality Sales Report Card (QSRC), Unfunded Accounts report, or a similar name, are available to local and regional Wells Fargo managers. While those managers have the ability to correct those unauthorized accounts, they are incentivized not to because doing so would make it more difficult to meet their sales quotas.

49.     Also, Wells Fargo requires that all new customer accounts be approved by a branch manager or assistant manager, thereby providing Wells Fargo management with a clear record of the number and types of accounts opened for each customer.

50.     Below is a list of some other reasons Wells Fargo is or should be familiar with the gaming practices used to "cross-sell" Wells Fargo products:

A.     Wells Fargo customers have complained in person and over the phone to Wells Fargo management and representatives.

CONSOLIDATED AMENDED COMPLAINT

B.      Wells Fargo has access to, and frequently monitors, actions taken on its computers by employees. Wells Fargo has been put on notice by unusual activity such as: numerous accounts being opened on January 1, a bank holiday; numerous unfunded accounts; frequent reopening of closed accounts; and customer accounts in which the only activity are fees charged by Wells Fargo.

C.      Wells Fargo is also aware its quotas are unrealistic for employees during normal working hours, since they have generated numerous complaints and lawsuits by employees.

D.      Online banking accounts are opened by Wells Fargo with obviously false customer contact information, such as "noname@wellsfargo.com".

E.      Wells Fargo allows all bank employees to access sensitive client data–access to which would allow the creation of a new account–and can and does monitor employees' access to such data.

F.      Wells Fargo has terminated and/or otherwise disciplined a number of employees for gaming practices, but far fewer than have actually engaged in such practices.

51.     Despite Wells Fargo's knowledge of gaming by its employees, it has done little, if anything, to terminate these practices, nor to reform the quota-based business model it created that has fostered them. While Wells Fargo has made a few minor changes to its policies, and has terminated a handful of employees, those efforts have been, at most, cosmetic, and ultimately benefit Wells Fargo by creating the illusion that it had taken some action to address the problem when, in fact, it had not. The policies that encourage these tactics continue, and employees who engage in them continue to be rewarded monetarily, and even promoted. On information and belief, Wells Fargo has not altered its quota system, nor has it reduced the pressure it has applied to its management and employees to reach their unrealistic quotas, and the gaming that has been its inevitable result.

CONSOLIDATED AMENDED COMPLAINT

**D.     Plaintiff Jabbari's Experience**

52.     Plaintiff Jabbari first opened an account with Wells Fargo in 2011. Like many people, he only wanted two accounts from Wells Fargo: checking and savings. Within two years, however, Mr. Jabbari had seven additional Wells Fargo accounts that he did not authorize and was not aware of.

53.     The account application for the two accounts opened in Mr. Jabbari's name in January 2011 include an apparently forged signature:



54.     That same month, a Wells Fargo employee enrolled Mr. Jabbari in Wells Fargo's ExpressSend service, which customers may use to send funds abroad. Mr. Jabbari did not request that service, did not authorize his enrollment in it, and has never used it. This is the blank signature field from that January 14, 2011 remittance service agreement he did not authorize:

55.     Four months later, Wells Fargo opened two more accounts in Mr. Jabbari's name that he did not authorize and was not aware of. The application for those accounts, opened April 6, 2011, has no signature at all:

CONSOLIDATED AMENDED COMPLAINT

Customer 1 Name

SHAHRIAR JABBARI

Customer 1 Signature

56.     At that point, however, Wells Fargo was just getting warmed up. Less than one month later, on May 2, 2011, Wells Fargo and its employee or employees opened two more accounts—a PMA Prime Checking account and a High Yield Savings account—in Mr. Jabbari's name without his knowledge or consent. That application also did not include a signature:

Customer 1 Name

SHAHRIAR JABBARI

Customer 1 Signature

57.     Less than two weeks later, Wells Fargo opened two *more* accounts in Mr. Jabbari's name: a Complete Advantage Checking account and Money Market Savings account. As before, Mr. Jabbari did not know of and did not consent to those accounts. That account application included different signatures purporting to be Mr. Jabbari's when, in fact, they are not:





58.     Less than one month after that, on June 25, 2011, Wells Fargo struck again, opening another savings account in Mr. Jabbari's name, using two more signatures that do not belong to him:



CONSOLIDATED AMENDED COMPLAINT



SHAHRIAR JABBARI

**Customer 1 Signature**

59.   Wells Fargo opened those two final accounts without Mr. Jabbari's authorization from a branch in Northern California on a day when Mr. Jabbari was in Los Angeles.

60.   During this period, Wells Fargo periodically sent new debit or other cards attached to these new accounts to Mr. Jabbari. Mr. Jabbari reasonably believed that those cards related to his original accounts, and were intended to replace his existing debit card. He had no reason to suspect they were attached to accounts he had no knowledge of.

61.   At one point, after he received three debit cards during a relatively short period of time, he contacted Wells Fargo, which essentially told him to disregard the additional cards and dispose of them.

62.   Mr. Jabbari believes he has been charged fees for many or all of the unauthorized accounts of which he is now aware, and that Wells Fargo may still be assessing fees for those and other accounts of which he is unaware.

63.   As a result of the unauthorized accounts, Mr. Jabbari has received notices from collection agencies seeking to collect unpaid fees allegedly owed to Wells Fargo. He has also been assessed an unknown amount in unauthorized fees. Moreover, he believes his credit score has been harmed as a result of Wells Fargo's effort to collect on unpaid fees; because of the damage Wells Fargo has done to his credit, Mr. Jabbari has been unable to open a new bank account.

CONSOLIDATED AMENDED COMPLAINT

**E.    Plaintiff Heffelfinger's Experience**

64.    To her knowledge, Plaintiff Heffelfinger first opened an account with Wells Fargo in March 2012. At that time, she opened two accounts – a checking and a savings account – because she was told she needed both in order to receive a debit card. This is Ms. Heffelfinger's signature from that account application:



65.    Three months earlier, however, before Ms. Heffelfinger ever requested an account with Wells Fargo, Wells Fargo and its employee or employees opened two accounts—a checking account and a savings account—in her name without her consent or knowledge, using this apparently forged signature:



66.    That was not the end of things. In October 2012, Wells Fargo and its employee or employees opened two more accounts—"Way2Save" checking and savings accounts—in Ms.

CONSOLIDATED AMENDED COMPLAINT

Heffelfinger's name, again without her authorization or awareness. That account application had no signature at all:

Customer 1 Name

KAYLEE HEFFELFINGER

Customer 1 Signature

67.     In July of 2013, Ms. Heffelfinger discontinued actively using her Wells Fargo accounts, and only checked their balances occasionally.

68.     Sometime in 2014 a collection agency called Ms. Heffelfinger, claiming she owed Wells Fargo approximately $115. As she had not used her Wells Fargo accounts in some time, she thought this was simply an error and did not investigate the matter further.

69.     On May 16, 2015, Ms. Heffelfinger visited a Wells Fargo branch. There, the personal banker contacted the collections department, which told her she had two accounts in collections. On one account, she purportedly owed Wells Fargo $97 and on another $113. When she asked to see which accounts were in collections, the personal banker was able to find only one of the accounts—the one on which she apparently owed $113.

70.     Ms. Heffelfinger asked for details about the one account purportedly in collections that Wells Fargo was able to find. When she reviewed the account, it was unfamiliar to her, and she has no recollection of having opened this account or ever having received a statement for this account.

71.     Ms. Heffelfinger was now, understandably, quite concerned. Not only did Wells Fargo claim she owed it money, but the bank had an account in her name that she had not authorized and the bank claimed to have yet another account in her name that it could not locate.

CONSOLIDATED AMENDED COMPLAINT

72.     Ms. Heffelfinger called Wells Fargo to speak with a bank manager in order to get to the bottom of this extraordinary and worrisome situation.

73.     When the manager first searched for Ms. Heffelfinger's accounts, using her Social Security number, she was unable to find any account that was in collections. Ms. Heffelfinger then suggested she search by her name, which produced some astonishing results. According to Wells Fargo, she now had seven accounts in her name, at least one of which was in collections. The manager was unable to tell her why the collection department believed she had two accounts in collections.

74.     Ms. Heffelfinger, who believed she had only two accounts at Wells Fargo, asked to see applications for the newly disclosed accounts. The manager told her she could not send them to her, but had to send them to a Wells Fargo branch, where she could pick them up.

75.     When she finally picked up her application forms she was astonished to find accounts she did not open or authorize. Not only had she never seen these applications before, there were obvious errors, missing information, and signatures that are not hers.

76.     During a telephone call with a personal banker, Ms. Heffelfinger asked how these unauthorized accounts could have been opened. The personal banker told her it appeared to be a "sale integrity" issue, which she understood to mean that Wells Fargo personnel had been intentionally opening these accounts in her name in order to increase their sales numbers. Ms. Heffelfinger believes those unauthorized accounts may have been opened using funds from her authorized accounts.

77.     Ms. Heffelfinger learned of two additional accounts—a checking and a savings account opened in her name on October 4, 2012, only after initiating this litigation.

78.     As a result of the unauthorized accounts, Ms. Heffelfinger has received notices from collection agencies seeking to collect unpaid fees allegedly owed to Wells Fargo. She has also been assessed an unknown amount in unauthorized fees. Moreover, she believes her credit score has been harmed as a result of Wells Fargo's effort to collect on unpaid fees.

CONSOLIDATED AMENDED COMPLAINT

**F.     Other Online Complaints**

79.     While Mr. Jabbari's and Ms. Heffelfinger's experiences may sound egregious, a review of online complaints against Wells Fargo shows the practices they experienced are widespread. The Consumer Product Safety Commission's complaint database includes over 3,000 complaints against Wells Fargo nationwide for "Account opening, closing, or management."

80.     Recently, readers of the *Los Angeles Times* provided the following additional examples:

A.     "At one time, I had at least 12 accounts open with them when I only needed & wanted 2."

B.     "Yep, they talked me into having 6 accounts I don't need. Once I called about fees, they asked me to open more accounts to avoid the fees."

C.     "They will open and reopen accounts they do not need as well as talk them into CDs and other products that hold their money hostage."

D.     "They've been doing this for years. They opened an unauthorized account in my name 10 years ago."

81.     In sum, Wells Fargo has engaged in a long-running and widespread pattern of unlawful behavior that has harmed Plaintiffs and others like them.

## VI.     CLASS ACTION ALLEGATIONS

82.     This matter is brought by Plaintiffs on behalf of themselves and those similarly situated, under Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3).

83.     The Class that Plaintiffs seek to represent is defined as follows:

All persons in the United States for whom Wells Fargo or a Wells Fargo employee opened a financial account or product in the person's name without that person's lawfully-obtained authorization.

84.     **Numerosity/Impracticability of Joinder:** The members of the Class are so numerous that joinder of all members would be impractical. The proposed Class likely contains thousands of

CONSOLIDATED AMENDED COMPLAINT

members. The precise numbers of members can be ascertained through discovery, which will include Defendants' sales and other records.

85.     **Commonality and Predominance:** There are common questions of law and fact that predominate over any questions affecting only individual members of the Class.

86.     For Plaintiffs and the Class, the common legal and factual questions include, but are not limited to the following:

A.     Whether and how Wells Fargo and its employees engaged in unlawful practices in order to get each customer to maintain numerous accounts with Wells Fargo;

B.     Whether Wells Fargo knew or should have known of its employees' unlawful "gaming" practices;

C.     Whether Wells Fargo omitted and concealed material facts from its communications and disclosures to Plaintiffs and the Class regarding the costs, benefits, and policies regarding bank accounts and other financial products;

D.     Whether Wells Fargo has engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices with the sale of its financial products;

E.     Whether Wells Fargo violated California, Arizona, and/or other states' consumer protection statutes;

F.     Whether Wells Fargo violated the federal statutes enumerated in the causes of action below;

G.     Whether Wells Fargo has been unjustly enriched or is liable for conversion;

H.     Whether, as a result of Wells Fargo's conduct, Plaintiffs and the Class have suffered damages; and if so, the appropriate amount thereof; and

CONSOLIDATED AMENDED COMPLAINT

I.       Whether as a result of Wells Fargo's misconduct, Plaintiffs and the Class are entitled to equitable and declaratory relief, and, if so, the nature of such relief.

87.     **Typicality:** The representative Plaintiffs' claims are typical of the claims of the members of the Class. Plaintiffs and all the members of the Class have been injured by the same wrongful practices of Wells Fargo. Plaintiffs' claims arise from the same practices and course of conduct that give rise to the claims of the members of the Class and are based on the same legal theories.

88.     **Adequacy:** Plaintiffs are representatives who will fully and adequately assert and protect the interests of the Class, and have retained class counsel who are experienced and qualified in prosecuting class actions. Neither Plaintiffs nor their attorneys have any interests contrary to or in conflict with the Class.

89.     **Superiority:** A class action is superior to all other available methods for the fair and efficient adjudication of this lawsuit, because individual litigation of the claims of all members of the Class is economically unfeasible and procedurally impracticable. While the aggregate damages sustained by the Class are likely in the millions of dollars, the individual damages incurred by each Class member are too small to warrant the expense of individual suits. The likelihood of individual Class members prosecuting their own separate claims is remote, and even if every member of the Class could afford individual litigation, the court system would be unduly burdened by individual litigation of such cases. Further, individual members of the Class do not have a significant interest in individually controlling the prosecution of separate actions, and individualized litigation would also result in varying, inconsistent, or contradictory judgments and would magnify the delay and expense to all of the parties and the court system because of multiple trials of the same factual and legal issues. Plaintiffs know of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action. In addition, Wells Fargo has acted or refused to act on grounds generally applicable to the

CONSOLIDATED AMENDED COMPLAINT

Class and, as such, final injunctive relief or corresponding declaratory relief with regard to the members of the Class as a whole is appropriate.

90.     Plaintiffs do not anticipate any difficulty in the management of this litigation.

91.     Wells Fargo has, or has access to, address and/or other contact information for the members of the Class, which may be used for the purpose of providing notice of the pendency of this action.

## VII.   CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**Asserted on Behalf of Plaintiffs and the Class**
**Violations of California's Unfair Competition Law Cal. Bus. & Prof. Code §§ 17200, *et seq.***

92.     Plaintiffs incorporate by reference every prior and subsequent allegation of this Complaint as if fully restated here.

93.     California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.*, protects both consumers and competitors by promoting fair competition in commercial markets for goods and services. California's Unfair Competition Law is interpreted broadly and provides a cause of action for any unlawful, unfair, or fraudulent business act or practice. Any unlawful, unfair, or fraudulent business practice that causes injury to consumers falls within the ambit of California's Unfair Competition Law.

94.     Wells Fargo engages in substantial sales and marketing of its financial products and services within the State of California.

95.     Wells Fargo's acts and practices, as described herein, constitute unlawful, fraudulent, or unfair business practices, in that (1) Wells Fargo's practices violate numerous statutes as described in this Complaint; (2) the justification for Wells Fargo's conduct is outweighed by the gravity of the consequences to Plaintiffs and the Class members; (3) Defendants' conduct is immoral , unethical, oppressive, unconscionable, or substantially injurious to Plaintiffs and Class members, and/or; (4) the uniform conduct of Wells Fargo has a tendency to deceive Plaintiffs and Class members.

CONSOLIDATED AMENDED COMPLAINT

96.     Wells Fargo's unlawful, unfair, and fraudulent business acts and practices, as described above, include, but are not limited to, wrongfully opening accounts without customer authorization, starting services without customer approval or authorization, and using customers' money in legitimate accounts to pay for fees, costs, and other penalties related to accounts that Wells Fargo opened without the consent, knowledge, or authorization of Plaintiffs and Class members.

97.     Wells Fargo's actions are also unlawful because, *inter alia*, they violate the Truth in Savings Act ("TISA").

98.     Through TISA, Congress required banks to make clear and uniform disclosures of interest rates and fees associated with deposit accounts. 12 U.S.C. § 4301.

99.     To further that goal, TISA mandates "before an account is opened or a service is rendered," the financial institution must provide the potential customer with a schedule of interest rates and fees applicable to the account or service. 12 U.S.C. § 4305.

100.    When Wells Fargo opens accounts and commences services without authorization from customers, it does not provide those customers with the required schedules of interest rates and fees applicable to those accounts, in violation of TISA.

101.    In addition, Wells Fargo provides inaccurate statements regarding its deposit accounts, in violation of 12 U.S.C. § 4302(d) and (e) by, among other things, stating that those accounts are free, by stating that customers must have multiple accounts in order to get a free account, or by stating that it will not open additional deposit accounts without customers' authorization.

102.    Plaintiffs and Class members have been damaged by these practices.

103.    Wells Fargo's conduct, as described herein, violates California's Unfair Competition Law Cal. Bus. & Prof. Code §§ 17200, *et seq.*, and other similar state unfair competition and unlawful business practice statutes.

### SECOND CAUSE OF ACTION

CONSOLIDATED AMENDED COMPLAINT

<strong>On Behalf of California Members of the Class<br>
Violation of the California Customer Records Act<br>
California Civil Code Section 1798.80, <em>et seq</em>.</strong>

104.    Plaintiffs incorporate by reference every prior and subsequent allegation of this Complaint as if fully restated here.

105.    Plaintiffs bring this cause of action on behalf of the California members of the Class.

106.    Wells Fargo is a "business" as defined by Civil Code section 1798.80(a).

107.    Each Plaintiff and member of the Class is an "individual" as defined by Civil Code section 1798.80(d) and a "customer" as defined by Civil Code section 1798.80(c).

108.    The information that Wells Fargo used in the gaming described in this Complaint was "personal information" as defined by Civil Code sections 1798.80(e) and 1798.81.5(d), which includes "information that identifies, relates to, describes, or is capable of being associated with, a particular individual, including, but not limited to, his or her name, signature, Social Security number, physical characteristics or description, address, telephone number, passport number, driver's license or state identification card number, insurance policy number, education, employment, employment history, bank account number, credit card number, debit card number, or any other financial information, medical information, or health insurance information."

109.    The misuse of that personal information by Wells Fargo and its employees to open unauthorized accounts or other "sales" was a "breach of the security system" as defined by Civil Code section 1798.82(g).

110.    By failing to immediately notify all affected Wells Fargo customers that their personal information had been misused by unauthorized persons to open unauthorized accounts, Wells Fargo violated Civil Code section 1798.82. Wells Fargo's failure to immediately notify customers of that misuse caused class members to suffer damages by, for example, forcing them to pay unauthorized fees or respond to collection agencies.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### THIRD CAUSE OF ACTION
#### Asserted on Behalf of Plaintiffs and the Class
#### Violations of the Arizona Consumer Fraud Act

111.    Plaintiffs incorporate by reference every prior and subsequent allegation of this

Complaint as if fully restated here.

112.    The Arizona Consumer Fraud Act ("Act") prohibits a variety of deceptive and fraudulent

practices in connection with the sale or advertisement of merchandise or products. The Act specifically

provides:

> The act, use or employment by any person of any deception, deceptive act or practice, fraud,
> false pretense, false promise, misrepresentation, or concealment, suppression or omission of any
> material fact with intent that others rely upon such concealment, suppression or omission, in
> connection with the sale or advertisement of any merchandise whether or not any person has in
> fact been misled, deceived or damaged thereby, is declared to be an unlawful practice.

A.R.S § 44-1522(A).

113.    As alleged throughout this Complaint, Wells Fargo engaged in unfair, deceptive, and/or

unlawful marketing in violation of A.R.S. § 44-1522(A), by providing customers with false, misleading,

deceptive, and/or unlawful statements about the costs, benefits, and policies regarding Wells Fargo

financial products.

114.    As described above, Wells Fargo also engaged in unfair or deceptive acts or practices by

opening accounts and financial products in the names of customers without their knowledge or consent.

115.    Plaintiffs and the Class have lost money and incurred significant, unreasonable stress as a

result of Wells Fargo's unfair, deceptive, and/or unlawful practices pursuant to A.R.S. § 44-1522(A).

116.    The conduct described herein by Wells Fargo is continuing. The conduct was done for

profit as a deliberate corporate policy rather than an isolated incident, and was morally wrong, callous,

and/or oppressive.

### FOURTH CAUSE OF ACTION
#### Asserted on Behalf of Plaintiffs and the Class
#### Violations of Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq*.

CONSOLIDATED AMENDED COMPLAINT

117.   Plaintiffs incorporate by reference every prior and subsequent allegation of this Complaint as if fully restated here.

118.   Each time that Wells Fargo opens a new account or starts a new financial service, it obtains, reviews, and uses a "consumer report," as that term is defined in 15 U.S.C § 1681a(d), about the consumer for whom the account is opened or the service started.

119.   Wells Fargo is required by 15 U.S.C. §§ 1681b, 1681n, and 1681o to refrain from obtaining or using consumer reports from CRAs under false pretenses, and without proper authorization from the consumer who is the subject of the report.

120.   Obtaining and using consumer reports in the process of opening unauthorized accounts or services is not allowed pursuant to FCRA, and thus is a violation of federal law.

121.   Wells Fargo has a mandatory duty to use or obtain consumer reports only for permissible purposes. 15 U.S.C. § 1681b(f).

122.   Despite these clear and unambiguous requirements of the FCRA, Defendants regularly pull consumer reports regarding consumers without their knowledge or consent in order to open new unauthorized accounts and services as part of its cross-selling practices, in violation of FCRA.

123.   Pursuant to 15 U.S.C. §§ 1681n and 1681o, Wells Fargo is liable for negligently and willfully violating FCRA by accessing the consumer reports without a permissible purpose or authorization under FCRA.

**FIFTH CAUSE OF ACTION**
**Asserted on Behalf of Plaintiffs and the Class**
**Violations of Electronic Funds Transfer Act, 15 U.S.C. § 1693,** *et seq.*

124.   Plaintiffs incorporate by reference every prior and subsequent allegation of this Complaint as if fully restated here.

CONSOLIDATED AMENDED COMPLAINT

125.    Congress created the Electronic Funds Transfers Act ("EFTA"), 15 U.S.C. § 1693, *et seq.*, in order to establish a framework to regulate electronic fund and remittance transfer systems, and to establish individual consumer rights related to electronic fund transfers.

126.    Pursuant to the EFTA, "No person may issue to a consumer any card, code, or other means of access to such consumer's account for the purpose of initiating an electronic fund transfer other than—(1) in response to a request or application therefor; or (2) as a renewal of, or in substitution for, an accepted card, code, or other means of access, whether issued by the initial issuer or a successor." 15 U.S.C.A. § 1693i(a).

127.    Wells Fargo has and continues to violate this prohibition every time it opens new unauthorized accounts, issues debit and/or credit cards, and facilitates other means of access to the unauthorized accounts allowing for electronic funds transfers.

128.    Plaintiffs and Class members have received debit cards from Wells Fargo when Plaintiffs and Class members have not requested or applied for such cards.

129.    Plaintiffs and Class members have received other means of accessing unauthorized accounts, such as online banking access, that would allow them to initiate an electronic fund transfers.

130.    Pursuant to 15 U.S.C. § 1693m, Wells Fargo is liable for actual damages, an amount to be determined by the Court related to the frequency, persistence, and other factors of Defendants' violations, plus attorneys' fees and costs.

**SIXTH CAUSE OF ACTION**
**Asserted on Behalf of Plaintiffs and the Class**
**Unjust Enrichment**

131.    Plaintiffs incorporate by reference every prior and subsequent allegation of this Complaint as if fully restated here.

132.    As a result of Defendants' unlawful and deceptive actions described above, Defendants were enriched at the expense of Plaintiffs and the Class through the payment of fees, penalties, and other

CONSOLIDATED AMENDED COMPLAINT

charges resulting from accounts, products, and services that Wells Fargo unlawfully and/or deceptively sold to or opened for customers.

133.    Under the circumstances, it would be against equity and good conscience to permit Defendants to retain the ill-gotten benefits that they received from Plaintiffs and the Class, in light of the fact that Wells Fargo used illegal, deceptive, and/or unfair practices to induce or force customers to open, purchase, and/or maintain the banking services, accounts, and products. Thus, it would be unjust and inequitable for Defendants to retain the benefit without restitution to Plaintiffs and the Class for the monies paid to Defendants as a result of the unfair, deceptive, and/or illegal practices.

## SEVENTH CAUSE OF ACTION
### Asserted on Behalf of Plaintiffs and the Class
### Conversion

134.    Plaintiffs incorporate by reference every prior and subsequent allegation of this Complaint as if fully restated here.

135.    Plaintiffs and Class members own and have the right to possess the money that is in their checking, savings, and other accounts.

136.    Defendants interfered with Plaintiffs' and Class members' possession of this money by wrongfully taking money directly from their accounts to cover fees, costs, and other penalties Defendants charged to Plaintiffs and Class members, despite the fact that the purported fees, costs, and other penalties were related to accounts that Defendants had opened without the consent, knowledge, or authorization of Plaintiffs and Class members.

137.    Plaintiffs and Class members never consented to Defendants taking money directly from their accounts as a result of fees, costs, and other penalties related to accounts that Plaintiffs and Class members had neither opened nor authorized.

CONSOLIDATED AMENDED COMPLAINT

138.    Defendants' wrongful taking of fees, costs, and other penalties from Plaintiffs' and Class members' accounts damaged Plaintiffs and Class members in an amount that is capable of identification through Defendants' records.

**EIGHTH CAUSE OF ACTION**
**Asserted on Behalf of Plaintiffs and the Class**
**Declaratory Relief**

139.    Plaintiffs incorporate by reference every prior and subsequent allegation of this Complaint as if fully restated here.

140.    The Declaratory Judgment Act, 28 U.S.C. § 2201(a), provides that in "a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a).

141.    As described above, this Court has jurisdiction over this matter, and therefore may declare the rights of Plaintiffs and the Class.

142.    Plaintiffs and the Class therefore seek an order declaring Wells Fargo's practice of opening unauthorized accounts unlawful, and that Wells Fargo is liable to Plaintiffs and the Class for damages caused by that practice.

**VIII.   REQUEST FOR RELIEF**

Plaintiffs, individually and on behalf of all others similarly situated, request judgments against Defendants as follows:

A.    For an order certifying the Class and, under Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3), and appointing Plaintiffs as representatives of the Class and appointing the lawyers and law firm representing Plaintiffs as counsel for the Class;

B.    Declaring Wells Fargo's actions to be unlawful;

CONSOLIDATED AMENDED COMPLAINT

C.      Permanently enjoining Wells Fargo from performing further unfair and unlawful acts as alleged herein;

D.      For all recoverable compensatory, statutory, and other damages sustained by Plaintiffs and the Class, including disgorgement, unjust enrichment, and all other relief allowed under applicable law;

E.      Granting Plaintiffs and the Class awards of restitution and/or disgorgement of Wells Fargo's profits from its unfair and unlawful practices described above;

F.      For costs;

G.      For both pre-judgment and post-judgment interest on any amounts awarded;

H.      For appropriate injunctive relief, including public injunctive relief, *i.e.* an order compelling Wells Fargo to correct its nationwide policies that promote and condone the opening of unauthorized accounts;

I.      For treble damages insofar as they are allowed by applicable laws;

J.      For appropriate individual relief as requested above;

K.      For payment of attorneys' fees and expert fees as may be allowable under applicable law; and

L.      For such other and further relief, including declaratory relief, as the Court may deem proper.

## IX.      DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all issues so triable.

CONSOLIDATED AMENDED COMPLAINT

DATED this 30th day of July, 2015.

KELLER ROHRBACK L.L.P.


By */s/ Matthew J. Preusch*
    Matthew J. Preusch (Bar No. 298144)
    Khesraw Karmand (Bar No. 280272)
    1129 State Street, Suite 8
    Santa Barbara, CA 93101
    Tel: (805) 456-1496
    Fax: (805) 456-1497
    mpreusch@kellerrohrback.com
    kkarmand@kellerrohrback.com

    Gretchen Freeman Cappio, *admitted pro hac vice*
    Daniel P. Mensher, *admitted pro hac vice*
    **KELLER ROHRBACK L.L.P.**
    1201 Third Avenue, Suite 3200
    Seattle, WA 98101-3052
    Tel: (206) 623-1900
    Fax: (206) 623-3384
    gcappio@kellerrohrback.com
    dmensher@kellerrohrback.com

    ***Attorneys for Plaintiffs Jabbari and Heffelfinger***

1

2

**<u>CERTIFICATE OF SERVICE</u>**

3        I, Matthew J. Preusch, hereby certify that on this 30th day of July, 2015, I electronically filed

4   CONSOLIDATED AMENDED COMPLAINT with the Clerk of the United States District Court for the

5   Northern District of California using the CM/ECF system, which shall send electronic notification to all

6   counsel of record.

7

8

9                                        */s/ Matthew J. Preusch*
                                         Matthew J. Preusch

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CONSOLIDATED AMENDED COMPLAINT