BART H. WILLIAMS (State Bar No. 134009)
bart.williams@mto.com
MANUEL F. CACHÁN (State Bar No. 216987)
manuel.cachan@mto.com
MUNGER, TOLLES & OLSON LLP
355 South Grand Avenue
Thirty-Fifth Floor
Los Angeles, California 90071-1560
Telephone: (213) 683-9100
Facsimile: (213) 687-3702

DAVID H. FRY (State Bar No. 189276)
david.fry@mto.com
JESLYN A. MILLER (State Bar No. 274701)
jeslyn.miller@mto.com
MUNGER, TOLLES & OLSON LLP
560 Mission Street
Twenty-Seventh Floor
San Francisco, California 94105-2907
Telephone: (415) 512-4000
Facsimile: (415) 512-4077

Attorneys for Defendants,
WELLS FARGO & COMPANY and
WELLS FARGO BANK, N.A.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHARIAR JABBARI and KAYLEE HEFFELFINGER, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>WELLS FARGO & COMPANY and WELLS FARGO BANK, N.A.,<br><br>Defendants. | Case No. 15-cv-02159-VC<br><br>**DEFENDANTS' NOTICE OF MOTION AND MOTION TO COMPEL ARBITRATION OF PLAINTIFF KAYLEE HEFFELFINGER'S CLAIMS**<br><br>[Declaration of Connie Kotzman and Proposed Order filed concurrently herewith]<br><br>Judge: Hon. Vince Chhabria<br>Ctrm.: 4<br>Date: September 10, 2015<br>Time: 10:00 a.m. |

## TABLE OF CONTENTS

**Page**

STATEMENT OF RELIEF SOUGHT ................................................................................. 1

ISSUE TO BE DECIDED ....................................................................................................... 1

MEMORANDUM OF POINTS AND AUTHORITIES ...................................................... 1

I. INTRODUCTION ....................................................................................................... 1

II. BACKGROUND .......................................................................................................... 2

    A. Heffelfinger's January 2012 Accounts ................................................................ 2

    B. Heffelfinger's March 2012 Accounts ................................................................. 2

    C. Heffelfinger's October 2012 Accounts and March 2013 Savings Account ........ 4

    D. Heffelfinger's Online Banking ............................................................................ 5

III. ARGUMENT ................................................................................................................ 6

    A. Heffelfinger Agreed to Arbitration With Wells Fargo. ....................................... 6

    B. The Dispute is Arbitrable, But the Court Should Not Reach that Question. ...... 7

        1. Interpretation of the Arbitration Agreement Has Been Clearly and Unmistakably Assigned to the Arbitrator. ................................................ 7

        2. If the Court Were To Reach the Question of Arbitrability, Heffelfinger's Claims Should Be Arbitrated. ......................................... 8

    C. Heffelfinger Should Be Compelled to Arbitrate on an Individual Basis ........... 10

    D. The Case Should Dismissed or Stayed Pending the Outcome of The Arbitration ......................................................................................................... 10

IV. CONCLUSION .......................................................................................................... 10

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Ackerberg v. Citicorp USA, Inc.*,
   898 F. Supp. 2d 1172 (N.D. Cal. 2012) ................................................................................ 7

*AT&T Mobility LLC v. Concepcion*,
   131 S. Ct. 1740 (2011) ....................................................................................................... 10

*AT&T Techs., Inc. v. Commc'ns Workers of Am.*,
   475 U.S. 643 (1986) .................................................................................................... 6, 8, 9

*Dean Witter Reynolds, Inc. v. Byrd*,
   470 U.S. 213 (1985) ............................................................................................................. 6

*Nguyen v. Barnes & Noble Inc.*,
   763 F.3d 1171 (9th Cir. 2014) ............................................................................................. 7

*Oracle Am., Inc. v. Myriad Grp. A.G.*,
   724 F.3d 1069 (9th Cir. 2013) ............................................................................................. 8

*Paracor Fin., Inc. v. Gen. Elec. Capital Corp.*,
   96 F.3d 1151 (9th Cir. 1996) ............................................................................................... 6

*Rent-A-Ctr., W., Inc. v. Jackson*,
   561 U.S. 63 (2010) ............................................................................................................... 8

*Sparling v. Hoffman Constr. Co.*,
   864 F.2d 635 (9th Cir. 1988) ............................................................................................. 10

*Swift v. Zynga Game Network, Inc.*,
   805 F. Supp. 2d 904 (N.D. Cal. 2011) ................................................................................. 7

*Tuminello v. Richards*,
   504 F. App'x 557 (9th Cir. 2013) ........................................................................................ 8

*United Steelworkers v. Warrior & Gulf Navigation Co.*,
   363 U.S. 574 (1960) ............................................................................................................. 9

*World Grp. Secs., Inc. v. Allen*,
   No. CV 07-1657-PHX-JAT, 2007 WL 4168572 (D. Ariz. Nov. 20, 2007) .......................... 9

**STATE CASES**

*Carroll v. Lee*,
   148 Ariz. 10 (1986) .............................................................................................................. 6

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Nedlloyd Lines B.V. v. Superior Court*,
   3 Cal. 4th 459 (1992) ................................................................................................. 6

*Scott Patrick, Inc. v. McMurdie*,
   No. 1 CA-SA 07-0118, 2007 WL 5517488 (Ariz. Ct. App. Aug. 30, 2007) ............................ 8

*Sovereign Camp, W.O.W. v. Daniel*,
   48 Ariz. 479 (1936) ............................................................................................. 6, 7

**FEDERAL STATUTES**

9 U.S.C. § 1 .................................................................................................................. 2, 4

9 U.S.C. § 3 ................................................................................................................... 10

**OTHER AUTHORITIES**

9A Ariz. Prac., Business Law Deskbook §35:77 (2014-2015 ed.) ................................... 7

RESTATEMENT (SECOND) OF CONTRACTS § 4 cmt. a (1981) ............................................ 6

AAA Commercial Arbitration Rules, Rule 7(a) .............................................................. 8

**PLEASE TAKE NOTICE THAT** at 10:00 am on September 10, 2015, or as soon thereafter as the parties may be heard, in Courtroom 4 of the United States District Court for the Northern District of California, located at 450 Golden Gate Avenue, San Francisco, California, Defendants Wells Fargo & Company and Wells Fargo Bank, N.A., will and hereby do move the Court for an order compelling Plaintiff Kaylee Heffelfinger to submit her claims in this action to binding individual arbitration.

## STATEMENT OF RELIEF SOUGHT

Wells Fargo seeks an order compelling Heffelfinger to arbitrate her claims on an individual basis, consistent with the terms of her arbitration agreement with Wells Fargo Bank, N.A.

## ISSUE TO BE DECIDED

Should Heffelfinger be compelled to resolve her dispute with Wells Fargo Bank in individual arbitration, pursuant to the terms of the arbitration agreement that governed her relationship with the bank?

## MEMORANDUM OF POINTS AND AUTHORITIES

### I. INTRODUCTION

Plaintiff Kaylee Heffelfinger's claims must be submitted to binding arbitration. When Heffelfinger opened her Wells Fargo bank accounts in March 2012, she signed an account application form certifying that she would arbitrate all disputes with the bank—including the claims she makes in this lawsuit. At that time, Heffelfinger also received a Consumer Account Agreement ("CAA"), which provided in its first substantive provision that "you and the Bank agree, at your or the Bank's request, to submit to binding arbitration all claims, disputes, and controversies between or among you and the Bank." Heffelfinger was again informed of her agreement to arbitrate all disputes with Wells Fargo in August 2012, when she enrolled in online banking, and then again in March 2013, when she opened a new savings account. In addition, Heffelfinger's use of Wells Fargo's banking services after being informed of the arbitration agreement constitutes her acceptance, by conduct, of the terms of the agreement.

The Federal Arbitration Act, 9 U.S.C. § 1, *et seq.*, requires enforcing Heffelfinger's agreement to arbitrate her disputes with Wells Fargo.

## II. BACKGROUND

### A. Heffelfinger's January 2012 Accounts

Checking (0051) and savings (7957) accounts were opened for Heffelfinger on January 21, 2012.[1] Declaration of Connie Kotzman ("Kotzman Decl.") ¶ 13, Ex. 3. Statements were sent to Heffelfinger's home address beginning on January 31, 2012, for account 7957, and February 6, 2012, for account 0051. *Id.* Exs. 8-11. Heffelfinger asserts that the signature on the application for these accounts was forged. Consolidated Amended Complaint ("CAC") ¶ 65.[2] The accounts were closed on February 28, 2012 without incurring bank fees. Kotzman Decl. Ex. 9, 11.

### B. Heffelfinger's March 2012 Accounts

On March 16, 2012, Heffelfinger opened two accounts with Wells Fargo Bank, a checking account (4427) and a savings account (6918). CAC ¶ 64; Kotzman Decl. ¶ 16, Ex. 4. Statements were sent to the address provided by Heffelfinger beginning on March 21, 2012, for account 4427, and March 31, 2012, for account 6918. *Id.* Exs. 12-23. Heffelfinger never used savings account 6918, and the account was closed on May 31, 2012 with a zero balance. *Id.* Ex. 23. Heffelfinger deposited money into checking account 4427 on April 4, 2012 and proceeded to engage in routine banking transactions, such as ATM withdrawals and debit card purchases. *Id.* Exs. 13-19.

In the course of opening these accounts, Heffelfinger signed a "Consumer Account Application" certifying:

> I have received a copy of the applicable account agreement and privacy brochure and agree to be bound by them . . . **I also agree to the terms of the dispute resolution program described in the account agreement**

---

[1] Heffelfinger's Wells Fargo accounts are referred to here by their last four digits.

[2] Wells Fargo has submitted the applications for Heffelfinger's various personal accounts together with this motion. Although these are true and correct copies of its business records, Wells Fargo is not by submitting them making any representation as to the genuineness of Heffelfinger's signatures, which she disputes. None of Wells Fargo's arguments is premised on the assertion that Heffelfinger signed the 0051 and 7957 account application. Wells Fargo *does* assert that Heffelfinger signed the account applications for account numbers 4427, 6918, and 9417.

> **. . . . Under this program our disputes will be decided before one or more neutral persons in an arbitration proceeding and not by a jury trial or a trial before a judge**.

*Id.* Ex. 4 at 2-3 (emphasis in orig.).

Each time a Wells Fargo customer opens a new account, he or she receives a CAA, which provides the terms that govern the account. Kotzman Decl. ¶ 8. The CAA that Heffelfinger received when she opened her March 2012 accounts was dated effective October 15, 2011. *Id.* ¶ 9, Ex. 1. It was part of a shrink-wrapped package of information that she was given, called a "New Account Kit." *Id.* ¶ 8.

Prominently featured in the CAA is an arbitration provision entitled, "Dispute resolution program: arbitration agreement." *Id.* Ex. 1 at 4. It states that "[i]f you have a dispute with the Bank, and you are not able to resolve the dispute informally, you and the Bank agree that upon demand by either you or the Bank, the dispute will be resolved through the arbitration process as set forth in this part." *Id.* "Dispute" is defined as follows:

> [A]ny unresolved disagreement between you and the Bank. It includes any disagreement relating in any way to services, accounts or matters; to your use of any of the Bank's banking locations or facilities; or to any means you may use to access your account(s). It includes claims based on broken promises or contracts, torts, or other wrongful actions. It also includes statutory, common law, and equitable claims.

*Id.* "Dispute" also includes any "disagreements about the meaning, application or enforceability of this arbitration agreement." *Id.*; *see also id.* (providing that "[t]he arbitrator shall decide any dispute regarding the enforceability of this arbitration agreement").

The CAA's arbitration provision states in bold-faced, capital letters that "**YOU AGREE THAT YOU AND THE BANK ARE WAIVING THE RIGHT TO A JURY TRIAL OR TRIAL BEFORE A JUDGE IN A PUBLIC COURT**." The provision emphasizes the following provision:

> **NEITHER YOU NOR THE BANK SHALL BE ENTITLED TO JOIN OR CONSOLIDATE DISPUTES BY OR AGAINST OTHERS IN ANY ARBITRATION, OR TO INCLUDE IN ANY ARBITRATION ANY DISPUTE AS A REPRESENTATIVE OR MEMBER OF A CLASS**.

*Id.*

1  Finally, the CAA's arbitration provision states that arbitrations "shall be administered by
the American Arbitration Association (AAA) . . . according to the Commercial Arbitration Rules
and the Supplemental Procedures for Consumer Related Disputes" and that the agreement is
"governed by the provisions of the Federal Arbitration Act." *Id.*

### C. Heffelfinger's October 2012 Accounts and March 2013 Savings Account

On October 4, 2012, two additional accounts were opened for Heffelfinger—a checking account (0021) and a savings account (2341)—but no money was deposited in them at first. Kotzman Decl. ¶ 19, Ex. 5. A week later, on October 11, 2012, Heffelfinger overdrew the checking account she had opened in March 2012 (4427) by $3.85 when she made a purchase of $35 at a nail salon. She made one additional charge the following day, for $4.90, and then never used the account again. With the addition of a monthly service fee of $3, the final negative balance on the account was minus $11.75. *Id.* Ex. 19 at 2. The account was closed on December 11, 2012. At that time, the bank partially offset the negative $11.75 balance with a transfer of $6.11 from account 0021. *Id.* Ex. 21.

Six days after she used her checking account 4427 for the last time, on October 18, 2012, Heffelfinger deposited $165.59 into her account 0021. *Id.* Ex. 24 at 2. She made dozens of deposits, ATM withdrawals, and purchases on account 0021 each month through July 2013. *Id.* Exs. 24-33; *see also* CAC ¶ 67 (stating that Heffelfinger stopped actively using her accounts in July 2013). Heffelfinger never used savings account 2341, and the account was closed on December 31, 2012. Kotzman Decl. Ex. 37 at 1.

On March 6, 2013, an additional savings account (9417) was opened for Heffelfinger. *Id.* ¶ 20, Ex. 6-7. Heffelfinger signed an account application certifying:

> **I have received a copy of the applicable account agreement . . . (as each may be amended from time to time) and agree to be bound by their terms**. I also agree to the terms of the dispute resolution program described in the foregoing agreements. Under the dispute resolution program, our disputes will be decided before one or more neutral persons in an arbitration proceeding and not by a jury trial or a trial before a judge.

*Id.* Ex. 6 at 5 (emphasis in orig.).

-4-

Heffelfinger received monthly statements at her home address for checking account 0021 beginning on November 2, 2012. *Id*. Exs. 24-36. Her new savings account (9417) was combined in the same monthly statement beginning on April 3, 2013. *Id.* Exs. 29-36. Heffelfinger's last deposit into account 0021 was dated July 10, 2013. *Id.* Ex. 33 at 2. At this time, Heffelfinger had only two open accounts in her name—a checking account (0021), which she had been actively using, and a savings account (9417) with a zero dollar balance. *Id.* at 1. In the month of July, Heffelfinger had several expenditures that left her checking account with a balance of only $0.42. *Id.* at 2. In her bank statement dated August 2, 2012, she was assessed a $12 monthly service fee on the checking account because, unlike in prior months, Heffelfinger had not in that month made the ten debit card purchases and payments that were required for Wells Fargo to waive its account service fee. This resulted in a negative balance of $11.58 on the account. *Id.* at 2. In the following months, Heffelfinger's account was used to make two recurring payments of $9.99 to Xbox Live, and she was assessed overdraft fees of $35 for each occurrence. *Id.* Exs. 34, 36. She also incurred an additional $12 service fee in the statement dated August 30, 2013. *Id.* Ex. 34. When she did not respond to letters concerning the overdrawn status of account 0021, the account was closed on October 3, 2013, with an unpaid balance of $113.56. Heffelfinger's savings account 9417 was also closed on October 3, 2013 with a zero balance. *Id.* Ex. 36.

### D. Heffelfinger's Online Banking

Heffelfinger enrolled in online banking on August 7, 2012. Kotzman Decl. ¶ 11. As a condition to her enrollment, H effelfinger agreed to the terms of Wells Fargo's Online Account Agreement (the "OAA"). *Id*. ¶ 10, Ex 2. The OAA in effect when Heffelfinger enrolled in online banking provided:

> By clicking "I Agree" below or using the Service, you are agreeing to the terms of this Agreement. This Agreement includes, among other things . . . your agreement with us to use binding arbitration for most disputes arising under this Agreement or concerning the Service and to waive the right to a trial by jury; your waiver of class-action rights . . .

*Id.* Ex. 2 at 1.

-5-

The OAA's arbitration provision requires arbitration of any dispute concerning Wells Fargo's online services and the "interpretation of this Agreement (including the meaning of this arbitration agreement and whether a disagreement is a 'dispute' subject to binding arbitration as provided for in this arbitration agreement)." *Id*. Ex. 2 at 32. The OAA explains that "[d]isputes arising under any separate agreement governing your other Eligible Accounts will be governed by the dispute resolution and governing law provisions of that agreement, which also take precedence over this section." *Id.* Heffelfinger used online banking services regularly between August 2012 and October 2013. *Id.* ¶ 11.

## III. ARGUMENT

### A. Heffelfinger Agreed to Arbitration With Wells Fargo.

The FAA "mandates that district courts *shall* direct parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985). The threshold question for the court to decide is whether the parties entered into an agreement to arbitrate. *See AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649 (1986).

A person who signs a contract is bound by its provisions, whether or not he reads them. *See Sovereign Camp, W.O.W. v. Daniel*, 48 Ariz. 479, 487 (1936).[3] A person may also assent to a contract through action or inaction. *See, e.g.*, *Carroll v. Lee*, 148 Ariz. 10, 13-14 (1986); *see also* RESTATEMENT (SECOND) OF CONTRACTS § 4 cmt. a (1981) ("Just as assent may be manifested by words or other conduct, sometimes including silence, so intention to make a promise may be

---

[3] The 2011 CAA contains a contractual choice-of-law provision stating: "Your account is governed by the laws and regulations of the United States and, to the extent applicable, the laws of the state in which the office of the Bank that maintains your account is located . . . without regard to conflicts of laws principles." Kotzman Decl. ¶ 9, Ex. 1 at 40. Under this provision, Arizona substantive law applies because Heffelfinger's accounts were opened and maintained by offices in Phoenix, Arizona. *See Paracor Fin., Inc. v. Gen. Elec. Capital Corp.*, 96 F.3d 1151, 1164 (9th Cir. 1996) (under California choice-of-law analysis, a choice-of-law clause is binding on the parties to a contract unless "(1) the chosen state does not have a substantial relationship to either the parties or the transaction; or (2) application of the chosen state's law would be contrary to a fundamental policy of a state with a materially greater interest in the particular issue.") (quoting *Nedlloyd Lines B.V. v. Superior Court*, 3 Cal. 4th 459 (1992)).

manifested in language or by implication from other circumstances, including course of dealing or usage of trade or course of performance.").

Heffelfinger assented to the arbitration provision contained in the CAA when she opened and used her accounts. She admits that she opened two accounts with Wells Fargo in 2012, *see* CAC ¶ 64, at which time she signed an account application stating that she had received a copy of the CAA and agreeing to be bound by its terms, including "the terms of the dispute resolution program described in the account agreement." Kotzman Decl. Ex. 4 at 2. Heffelfinger also received a copy of the CAA that included an arbitration clause. *Id*. ¶¶ 8-9, Ex. 1. The CAA in turn provides that "[b]y signing the Bank's signature card for your account or using your account or service, you will be considered to have received and agreed to this Agreement." *Id.* Ex. 1 at 1.

Thus, Heffelfinger had both actual and constructive notice of the CAA. She agreed to the arbitration provision it contained by signing the consumer account applications and using the accounts. *See Sovereign Camp*, 48 Ariz. at 487; *Ackerberg*, 898 F. Supp. 2d at 1176.

Heffelfinger was further informed of her agreement to arbitrate all disputes with the bank in August 2012, when she enrolled in online banking,[4] and in March 2013, when she signed an additional account application certifying that she agreed to arbitrate disputes with the bank. *See* Kotzman Decl. ¶¶ 10-12, 20, Ex. 2, 6.

**B.** **The Dispute is Arbitrable, But the Court Should Not Reach that Question.**

**1.** **Interpretation of the Arbitration Agreement Has Been Clearly and Unmistakably Assigned to the Arbitrator.**

The "arbitrability" question—*i.e.*, whether a particular dispute is subject to an agreement to arbitrate—may be decided by either the court or the arbitrator, depending on the parties'

---

[4] The OAA is a type of "clickwrap" agreement. "Clickwrap" agreements "have been routinely upheld by circuit and district courts" as enforceable contracts because they put users on notice of the terms to which they are assenting. *See, e.g.*, *Nguyen v. Barnes & Noble Inc*., 763 F.3d 1171, 1175-76 (9th Cir. 2014); *Swift v. Zynga Game Network, Inc*., 805 F. Supp. 2d 904 (N.D. Cal. 2011); 9A Ariz. Prac., Business Law Deskbook § 35:77 (2014-2015 ed.) (noting that "clickwrap agreements have been held to be generally valid and enforceable contracts"). Under the OAA, Heffelfinger consented to arbitrating all disputes concerning Wells Fargo's online services and was expressly informed that her personal accounts were governed by the dispute resolution provision of the CAA. Kotzman Decl. Ex. 1 at 32-33.

agreement. *See Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 68 (2010). If the agreement "clearly and unmistakably" provides that the arbitrator should decide questions of arbitrability, then the court must honor that agreement. *AT&T Tech.*, 475 U.S. at 649.

The arbitration agreement here clearly and unmistakably assigns those questions to the arbitrator. The agreement provides that "disputes" will be arbitrated and states that disputes "include disagreements about the meaning, application or enforceability of this arbitration agreement." Kotzman Decl. Ex. 1 at 4. It further states that "[a] dispute also includes any disagreement about the meaning of this Arbitration Agreement, and whether a disagreement is a 'dispute' subject to binding arbitration as provided for in this Arbitration Agreement." *Id.* The agreement also makes clear that "[t]he arbitrator shall decide any dispute regarding the enforceability of this arbitration agreement." *Id.*

That language could not be more clear. *See Tuminello v. Richards*, 504 F. App'x 557, 558 (9th Cir. 2013) (holding that a contract providing that "the arbitrator shall decide 'any and all controversies . . . concerning any account(s), transaction, dispute or the construction, performance, or breach of this or any other Agreement' . . . provides clear and unmistakable evidence that the parties intended the question of arbitrability to be decided in arbitration"). Even without it, however, the issue of arbitrability would still be one for the arbitrator because the agreement incorporates the AAA Commercial Arbitration Rules, Rule 7(a) of which provides that the arbitrator shall decide the validity of the arbitration agreement and the arbitrability of any claim. Kotzman Decl. Ex. 1 at 4. *See, e.g.*, *Oracle Am., Inc. v. Myriad Grp. A.G.*, 724 F.3d 1069, 1074 (9th Cir. 2013); *see also Scott Patrick, Inc. v. McMurdie*, No. 1 CA-SA 07-0118, 2007 WL 5517488, at *5 (Ariz. Ct. App. Aug. 30, 2007) (same). The Court should therefore compel arbitration, leaving for the arbitrator to decide (to the extent the matter is disputed) whether Heffelfinger's claims are within the scope of the agreement.

### 2. If the Court Were To Reach the Question of Arbitrability, Heffelfinger's Claims Should Be Arbitrated.

If the Court were to reach the question whether Heffelfinger's claims fall within the arbitration agreement, the answer would be that they do.

1     "An order to arbitrate the particular grievance should not be denied unless it may be said
2 with positive assurance that the arbitration clause is not susceptible of an interpretation that covers
3 the asserted dispute." *AT&T Techs.*, 475 U.S. at 650 (1986) (quoting *United Steelworkers v.*
4 *Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582-83 (1960). And where the arbitration clause is
5 sufficiently broad, as is the case here, there is a heightened presumption of arbitrability such that
6 "[i]n the absence of any express provision excluding a particular grievance from arbitration, we
7 think only the most forceful evidence of a purpose to exclude the claim from arbitration can
8 prevail." *Id.*; *see also World Grp. Secs., Inc. v. Allen*, No. CV 07-1657-PHX-JAT, 2007 WL
9 4168572, at *5 (D. Ariz. Nov. 20, 2007) (applying Arizona contract law to find that successor-
10 liability claims fell within the parties' agreement to arbitrate all disputes concerning the accounts).

The CAA states that "[i]f you have a dispute with the Bank, and you are not able to resolve the dispute informally, you and the Bank agree that upon demand by either you or the Bank, the dispute will be resolved through the arbitration process as set forth in this part." Kotzman Decl. Ex. 1 at 4. It then defines "dispute" as broadly as possible to include any disagreement between the customer and the bank: "A 'dispute' is any unresolved disagreement between you and the Bank." *Id.* The agreement provides examples of things that would come within that expansive scope: "It includes any disagreement relating in any way to services, accounts or matters; to your use of any of the Bank's banking locations or facilities; or to any means you may use to access your account(s). It includes claims based on broken promises or contracts, torts, or other wrongful actions. It also includes statutory, common law, and equitable claims." *Id.*

Heffelfinger's claims are, obviously, a disagreement with the bank. Moreover, they concern her accounts. She alleges that Wells Fargo used her personal information to open unauthorized accounts in her name, CAC ¶ 64-66, and persuaded her to open accounts she did not want by representing that she needed two accounts to receive a debit card, CAC ¶ 64. If Heffelfinger is complaining about fees charged to her account, or about her accounts being sent to collections, that is obviously a dispute related to her account. The Amended Complaint specifically seeks restitution on behalf of Heffelfinger. *Id.* at 31. Any amount that Wells Fargo

might have received from Heffelfinger that could possibly be owed in restitution would have come from money Heffelfinger deposited in her accounts. Heffelfinger also complains of Wells Fargo's business model "built in part on signing its customers up for multiple accounts," *id.* ¶ 25, and alleges that Wells Fargo's bankers use inaccurate or misleading information to induce customers to open additional accounts, *id.* ¶¶ 32, 86(C), bundle services so that unauthorized accounts are opened at the same time as authorized accounts, *id.* ¶ 36, and do not close preexisting accounts in order to get credit for a new "sale," *id.* ¶ 41. On their face, these claims relate to Heffelfinger's accounts.

### C. Heffelfinger Should Be Compelled to Arbitrate on an Individual Basis

The CAA's arbitration provision prohibits class arbitration, Kotzman Decl. Ex. 1 at 4, and must be enforced. *AT&T Mobility LLC v. Concepcion*, 131 S. Ct. 1740, 1748-53 (2011).

### D. The Case Should Dismissed or Stayed Pending the Outcome of The Arbitration

The Court may dismiss the Amended Complaint without prejudice. *Sparling v. Hoffman Constr. Co.*, 864 F.2d 635, 638 (9th Cir. 1988). Alternatively, the Court may stay this pending action, including all discovery, until the conclusion of the arbitration. 9 U.S.C. § 3.

## IV. CONCLUSION

For the foregoing reasons, Wells Fargo respectfully requests that the Court grant this motion to compel arbitration and dismiss this action or stay it pending completion of the arbitration.

DATED: August 13, 2015                MUNGER, TOLLES & OLSON LLP

                                      By: ___*/s/ David H. Fry*___
                                           DAVID H. FRY
                                      Attorneys for Defendants,
                                      WELLS FARGO & COMPANY and
                                      WELLS FARGO BANK, N.A.