Derek W. Loeser, *admitted pro hac vice*
Gretchen Freeman Cappio, *admitted pro hac vice*
KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
(206) 623-1900; Fax: (206) 623-3384
dloeser@kellerrohrback.com
gcappio@kellerrohrback.com

Jeffrey Lewis (Bar No. 66587)
KELLER ROHRBACK L.L.P.
300 Lakeside Drive, Suite 1000
Oakland, CA 94612
(510) 463-3900; Fax: (510) 463-3901
jlewis@kellerrohrback.com

***Attorneys for Plaintiffs***
***Additional Counsel Listed on Signature Page***

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| SHAHRIAR JABBARI and KAYLEE HEFFELFINGER, on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> WELLS FARGO & COMPANY and WELLS FARGO BANK, N.A., <br><br> Defendants. | No. 15-cv-02159-VC <br><br> **PLAINTIFFS' NOTICE OF MOTION, MOTION, AND MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT AND FOR CERTIFICATION OF A SETTLEMENT CLASS** <br><br> Date:          May 18, 2017 <br> Time:          10:00 a.m. <br> Courtroom:  4, 17th Floor <br><br> Judge:  Hon. Vince Chhabria |

## TABLE OF CONTENTS

I. INTRODUCTION ............................................................................................. 1

II. BACKGROUND AND PROCEDURAL HISTORY ....................................... 2

III. THE TERMS OF THE SETTLEMENT ......................................................... 3

    A. The Class Definition, Notice, and Claims Process ................................ 3

    B. Benefits to Class Members ..................................................................... 5

    C. Fees, Costs, and Service Awards ............................................................ 5

    D. Release of Claims ................................................................................... 6

IV. THE SETTLEMENT MERITS PRELIMINARY APPROVAL ...................... 6

    A. The Settlement Meets This Court's Standard for Preliminary Approval. ........... 6

        1. While strong on its merits, Plaintiffs' case faces substantial procedural barriers. .................................................................. 7

        2. The results of litigation or arbitration are uncertain and would delay recovery. ......................................................................... 7

            a. An appeal of this Court's order on delegation would face formidable barriers. ........................................................ 7

            b. Arbitrating arbitrability would also be risky and time-consuming. ...................................................................... 10

        3. Even in the absence of arbitration, class certification would be uncertain—and if Plaintiffs were sent to arbitration, certification might become more difficult. .................................................... 10

            a. Wells Fargo would have arguments against certification even if Plaintiffs did not have to go to arbitration. .................... 10

            b. If Plaintiffs were sent to arbitration—even if only to arbitrate arbitrability—class certification might become more difficult. ................................................................. 11

        4. The amount offered in settlement is more than adequate. ...................... 12

        5. The extent of discovery completed and the stage of the proceedings ..... 16

        6. The experience and views of counsel ................................................. 17

        7. The presence of a governmental participant. ........................................ 18

i

B.      The Settlement Satisfies the Bluetooth Factors ................................................ 18

V.      THE COURT SHOULD CERTIFY THE PROPOSED CLASS ................................... 19

    A.      The Class Meets the Prerequisites of Rule 23(a). ................................................ 19

        1.      The Class is sufficiently numerous. ........................................................ 19

        2.      There are common questions of both law and fact. ............................... 19

        3.      The Settlement Class Representatives' claims are typical of other Class Members' claims. ........................................................................ 20

        4.      The Named Plaintiffs and Class Counsel will fairly and adequately protect the interests of the Settlement Class. ......................................... 21

    B.      The Requirements of Rule 23(b)(3) Are Met. ..................................................... 22

        1.      Common issues of law and fact predominate. ........................................ 22

        2.      Class treatment is superior in this case. ................................................. 23

VI.     THE PROPOSED NOTICE PROGRAM AND SETTLEMENT ADMINISTRATOR SHOULD BE APPROVED ........................................................ 23

VII.    THE PROPOSED FINAL APPROVAL HEARING SCHEDULE ............................... 24

VIII.   CONCLUSION ................................................................................................................ 24

## **TABLE OF AUTHORITIES**

**Cases**                                                                                          **Page(s)**

*Amchem Prods. v. Windsor*,
    521 U.S. 591 (1997) ................................................................................................19

*Baltazar v. Forever 21, Inc.*,
    367 P.3d 6 (Cal. 2016) ...........................................................................................9

*Banga v. First USA, N.A.*,
    29 F. Supp. 3d 1270 (N.D. Cal. 2014) ............................................................15, 21

*Belnap v. Iasis Healthcare*,
    844 F.3d 1272 (10th Cir. 2017) ............................................................................8

*In re Bluetooth Headset Prod. Liab. Litig.*,
    654 F.3d 935 (9th Cir. 2011) ...............................................................................18

*In re Bridgestone/Firestone, Inc.*,
    288 F.3d 1012 (7th Cir. 2002) ............................................................................15

*Carnes v. Atria Senior Living, Inc.*,
    No. 14-CV-02727-VC (N.D. Cal. Jul. 12, 2016) .................................................6

*In re Checking Account Overdraft Litig.*,
    307 F.R.D. 656 (S.D. Fla. 2015) ........................................................................23

*Chernavsky v. Wells Fargo Bank, N.A.*,
    No. 3:16-CV-06326-VC (N.D. Cal. Nov. 14, 2016) ......................................13, 17

*Clemens v. Hair Club for Men, LLC*,
    2016 WL 1461944 (N.D. Cal. Apr. 14, 2016) ....................................................21

*Cohen v. Trump*,
    303 F.R.D. 376 (S.D. Cal. 2014) .........................................................................20

*Concrete Spaces, Inc. v. Sender*,
    2 S.W.3d 901 (Tenn. 1999) .................................................................................14

*Cotter v. Lyft, Inc.*,
    193 F. Supp. 3d 1030 (N.D. Cal. 2016) .......................................................6, 7, 18

*Cotter v. Lyft, Inc.*,
    2017 WL 1033527 (N.D. Cal. Mar. 16, 2017) ....................................................13

*Destefano v. Zynga, Inc.*,
    2016 WL 537946 (N.D. Cal. Feb. 11, 2016) ...................................................18, 24

*Ebarle v. Lifelock, Inc.*,
    2016 WL 5076203 (N.D. Cal. Sept. 20, 2016) ................................................. 19

*In re First Alliance Mortg. Co.*,
    471 F.3d 977 (9th Cir. 2006) .......................................................................... 22

*Gonzales v. Arrow Fin. Servs., LLC*,
    660 F.3d 1055 (9th Cir. 2001) ........................................................................ 14

*Guilbaud v. Sprint Nextel Corp.*,
    2016 WL 7826649 (N.D. Cal. Apr. 15, 2016) ................................................ 18

*Hanlon v. Chrysler Corp.*,
    150 F.3d 1011 (9th Cir. 1998) ................................................................... 22, 23

*Hart v. Colvin*,
    2016 WL 6611002 (N.D. Cal. Nov. 9, 2016) .................................................. 17

*Lexton-Ancira Real Estate Fund, 1972 v. Heller*,
    826 P.2d 819 (Colo. 1992) .............................................................................. 14

*Lozano v. AT&T Wireless Servs., Inc.*,
    504 F.3d 718 (9th Cir. 2007) .......................................................................... 10

*Mass. Mut. Life Ins. Co. v. Superior Court*,
    119 Cal. Rptr. 2d 190 (Ct. App. 2002) .......................................................... 14

*In re Mego Fin. Corp. Securities Litig.*,
    213 F.3d 454 (9th Cir. 2000) .......................................................................... 17

*Mix v. Asurion Ins. Servs. Inc.*,
    2016 WL 7229140 (D. Ariz. Dec. 14, 2016), *reconsid. den.*, 2017 WL 131566 (D.
    Ariz. Jan. 13, 2017) ........................................................................................ 11

*Mohamed v. Uber Technologies, Inc.*,
    848 F.3d 1201 (9th Cir. 2016) ....................................................................... 7, 9

*Mullane v. Cent. Hanover Bank & Trust Co.*,
    339 U.S. 306 (1950) ........................................................................................ 23

*Murray v. GMAC Mortg. Corp.*,
    434 F.3d 948 (7th Cir. 2006) .......................................................................... 23

*Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*,
    221 F.R.D. 523 (C.D. Cal. 2004) ................................................................... 16

*Negrete v. Allianz Life Ins. Co. of N. Am.*,
    238 F.R.D. 482 (C.D. Cal. 2006) ................................................................... 20

*In re Netflix Privacy Litig.*,
   2013 WL 1120801 (N.D. Cal. Mar. 18, 2013) ...................................................................17

*In re Omnivision Techs., Inc.*,
   559 F. Supp. 2d 1036 (N.D. Cal. 2008) .............................................................................12

*In re Online DVD-Rental Antitrust Litig.*,
   779 F.3d 934 (9th Cir. 2015) .............................................................................................19

*Parsons v. Ryan*,
   754 F.3d 657 (9th Cir. 2014) .............................................................................................20

*Rent-A-Center W., Inc. v. Jackson*,
   561 U.S. 63 (2010) ...............................................................................................................8

*Rodriguez v. Hayes*,
   591 F.3d 1105 (9th Cir. 2010) ...........................................................................................20

*Satchell v. Fed. Express Corp.*,
   2007 WL 1114010 (N.D. Cal. Apr. 13, 2007) ...................................................................18

*Schramm v. JPMorgan Chase Bank, N.A.*,
   2011 WL 5034663 (C.D. Cal. Oct. 19, 2011) ....................................................................11

*Slaven v. BP Am., Inc.*,
   190 F.R.D. 649 (C.D. Cal. 2000) .......................................................................................19

*Smith v. Cardinal Logistics Mgmt. Corp.*,
   2008 WL 4156364 (N.D. Cal. Sept. 5, 2008) .....................................................................23

*Smith v. Greystone Alliance LLC*,
   772 F.3d 448 (7th Cir. 2014) .............................................................................................16

*Spokeo, Inc. v. Robins*,
   136 S. Ct. 1540 (2016) .......................................................................................................16

*Staton v. Boeing*,
   327 F.3d 938 (9th Cir. 2003) .............................................................................................21

*Stillmock v. Weis Markets, Inc.*,
   385 F. App'x 267 (4th Cir. 2010) .......................................................................................15

*Stockwell v. City & County of San Francisco*,
   749 F.3d 1107 (9th Cir. 2014) ...........................................................................................19

*Svenson v. Google Inc.*,
   65 F. Supp. 3d 717 (N.D. Cal. 2014) .................................................................................14

*Sykes v. Mel Harris & Assocs. LLC*,
   285 F.R.D. 279 (S.D.N.Y. 2012) .......................................................................................20

*Tasion Commc'ns, Inc. v. Ubiquiti Networks, Inc.*,
   308 F.R.D. 630 (N.D. Cal. 2015) ........................................................................10

*Trosper v. Styker Corp.*,
   2014 WL 4145448 (N.D. Cal. Aug. 21, 2014) ...................................................22

*Tyson Foods, Inc. v. Bouaphakeo*,
   136 S. Ct. 1036 (2016) ......................................................................................22

*Uppal v. CVS Pharmacy, Inc.*,
   2015 WL 10890652 (N.D. Cal. Sept. 11, 2015) ...........................................9, 13

*Vinh Nguyen v. Radient Pharm. Corp.*,
   2014 WL 1802293 (C.D. Cal. May 6, 2014) .....................................................13

*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011) .....................................................................................19, 20

*In re Wells Fargo Bank, N.A.*,
   No. 2016-CFPB-0015, (Sept. 8, 2016) ...........................................................4, 5

*Yarish v. Downey Fin. Corp.*,
   2009 WL 1208178 (E.D. Va. Apr. 28, 2009) ...................................................15

**Statutes**

15 U.S.C. § 1681 .................................................................................... *passim*

15 U.S.C. § 1692 .............................................................................................14

15 U.S.C. §§ 1693–1693r ...............................................................................14

18 U.S.C. §§ 2701–2702 ...........................................................................13, 14

Cal. Bus. & Prof. Code §§ 17200–17210 ......................................................14

Cal. Civ. Code §§ 1750–1784 ........................................................................14

Cal. Civ. Code §§ 1798.80–1798.84 ..............................................................14

**Other Authorities**

Fed. R. Civ. P. 23(a) ............................................................................... *passim*

Fed. R. Civ. P. 23(b) .......................................................................20, 21, 22, 23

Fed. R. Civ. P. 23(c) .......................................................................................23

Fed. R. Civ. P. 23(e) .........................................................................................6

*Restatement (Second) of Contracts* § 347 (1981) ........................................................................14

**SHORT CITATION FORMS FOR FILINGS**

| FULL TITLE OF THE FILING | CITATION OF FILING |
|---|---|
| Consolidated Amended Complaint, July 30, 2015, ECF 37 | Compl. |
| Declaration of Proposed Settlement Class Representative Antonette Brooks in Support of Plaintiffs' Motion for Preliminary Approval of Class Action Settlement and for Certification of a Settlement Class | Brooks Decl. |
| Declaration of Plaintiff Kaylee Heffelfinger in Support of Plaintiffs' Motion for Preliminary Approval of Class Action Settlement and for Certification of a Settlement Class | Heffelfinger Decl. |
| Declaration of Plaintiff Shahriar Jabbari in Support of Plaintiffs' Motion for Preliminary Approval of Class Action Settlement and for Certification of a Settlement Class | Jabbari Decl. |
| Declaration of Derek W. Loeser in Support of Plaintiffs' Motion for Preliminary Approval of Class Action Settlement and for Certification of a Settlement Class | Loeser Decl. |
| Declaration of James M. Parks in Support of Motion for Preliminary Approval of Class Action Settlement and for Certification of a Settlement Class | Parks Decl. |
| Declaration of Layn R. Phillips in Support of Motion for Preliminary Approval of Class Action Settlement and for Certification of a Settlement Class | Phillips Decl. |
| Declaration of Proposed Settlement Class Representative Jose Rodriguez in Support of Plaintiffs' Motion for Preliminary Approval of Class Action Settlement and for Certification of a Settlement Class | Rodriguez Decl. |

| | |
|---|---|
| Declaration of Thomas J. Stipanowich in Support of Plaintiffs' Motion for Preliminary Approval of Class Action Settlement and for Certification of a Settlement Class | Stipanowich Decl. |
| Declaration of Ted Stockton in Support of Motion for Preliminary Approval of Class Action Settlement and for Certification of a Settlement Class | Stockton Decl. |
| Declaration of Shannon R. Wheatman, Ph.D., in Support of Plaintiffs' Motion for Preliminary Approval of Class Action Settlement and for Certification of a Settlement Class | Wheatman Decl. |
| Order Granting Defendants' Motions to Compel Arbitration, Sept. 23, 2015, ECF 69 | Arb. Order |
| Stipulation and Agreement of Class Action Settlement Release ("Settlement" or "Settlement Agreement") | SA |

PLAINTIFFS' MOTION FOR
PRELIMINARY APPROVAL OF
SETTLEMENT

## NOTICE OF MOTION AND MOTION

TO ALL PARTIES AND COUNSEL OF RECORD:

PLEASE TAKE NOTICE that on May 18, 2017, at 10:00 a.m., or at such other date as may be agreed upon, and in Courtroom 4 of the United States District Court for the Northern District of California, located at 450 Golden Gate Avenue, San Francisco, California, Plaintiffs, on behalf of a proposed Settlement Class (or "Class")[1], will and hereby do move for an order granting preliminary approval of the Class Action Settlement, conditionally certifying the Class, appointing Named Plaintiffs as Settlement Class Representatives and their counsel as Class Counsel, directing Class notice, scheduling a fairness hearing, and for other relief explained in the accompanying Memorandum.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    INTRODUCTION

In May 2015, Plaintiff Shahriar Jabbari filed this proposed nationwide class action, alleging that Wells Fargo[2] opened several unauthorized accounts in his name. Plaintiff Kaylee Heffelfinger later joined her similar claims to Jabbari's in a Consolidated Amended Complaint. *See* Compl. ¶¶ 64–78. Plaintiffs alleged that, for years, Wells Fargo opened checking, savings, and credit card accounts without customer consent—a practice that Plaintiffs will call "unauthorized accounts" for short.

The scheme gained notoriety when, last year, several government agencies announced settlements with Wells over the unauthorized accounts (the "Government Settlements"). These agencies fined Wells $185 million—with $100 million going to the Consumer Financial Protection Bureau ("CFPB"), $50 million to the City and County of Los Angeles, $35 million to the Office of the Comptroller of the Currency ("OCC"), and $5 million as restitution to customers.

---

[1] The capitalized terms in this Motion have the meanings ascribed to them in the Stipulation and Agreement of Class Action Settlement and Release ("Settlement," "Settlement Agreement," or "SA"), filed concurrently.

[2] The Defendants—the holding company Wells Fargo & Co. and its banking subsidiary Wells Fargo, N.A.—are referred to collectively as "Wells" or "Wells Fargo."

This proposed $142 million non-reversionary Class Action Settlement now aims to bring full relief to Wells Fargo's customers. It expands the class of customers covered by the Government Settlements by nine years, well past the statute of limitations period that may be applicable to many claims. It reimburses wrongly paid fees. It provides relief for damaged credit. And, after providing this compensatory relief, the Settlement fairly allots the remaining funds to the Class.

Plaintiffs achieved all this despite the substantial barriers to classwide relief they might have encountered in further litigation. In its customer contracts, Wells places broad arbitration clauses, which contain an equally broad delegation provision, plus a bar to classwide arbitration. The arbitration clause—and particularly its delegation provision—may very well have ended up barring classwide relief.

Plaintiffs secured this Settlement after scouring the merits of every other option, prying key information out of Wells about the unauthorized accounts, and fighting over almost every Settlement provision. The value the Settlement delivers, the diligence that counsel exercised in negotiating it, and the barriers to classwide relief in its absence all make this Settlement an outstanding result for consumers.

## II.     BACKGROUND AND PROCEDURAL HISTORY

As part of a years-long, nationwide push to maximize the number of accounts per customer, Compl. ¶¶ 24–42, Wells Fargo opened accounts in Plaintiffs' names without their knowledge, *id.* ¶¶ 52–78. Plaintiffs sued. Invoking an arbitration clause in an agreement Plaintiffs signed when they opened legitimate accounts, Wells moved to compel arbitration. The Court granted the motion and dismissed the Complaint. *See* Arb. Order 2–3.

After Plaintiffs filed a notice of appeal, the parties began settlement discussions, and exchanging information, with the assistance of Circuit Mediator Ann Julius. Loeser Decl. ¶ 11. The parties could not reach agreement, however, and thereafter engaged retired U.S. District Court Judge Layn Phillips to assist with further settlement discussions, which resulted in a settlement in principle and a dismissal of Plaintiffs' appeal without prejudice. *Id.* ¶ 12.

2                    PLAINTIFFS' MOTION FOR
PRELIMINARY APPROVAL OF
SETTLEMENT

On September 8, 2016, federal regulators and the Los Angeles City Attorney announced the Government Settlements with Wells, resolving similar claims. *Id.* ¶ 13. Wells Fargo made a number of statements in the aftermath of the Government Settlements that raised significant concerns about the scope of Defendants' conduct. *Id.* Believing that a broader, more extensive settlement would serve the Class's best interest, Plaintiffs pushed back against Wells Fargo, and engaged in further extensive, detailed discussions and negotiations. *Id.* Over the next several months, the parties exchanged still more information, attended a second mediation overseen by Judge Phillips, and conducted numerous telephone conferences. *Id.* ¶ 14. They reached agreement on key terms of the settlement, but came to an impasse on the total settlement amount until Judge Phillips made a mediator recommendation of $110 million, which both Plaintiffs and Wells Fargo accepted. *Id.* ¶ 15. Even then, Class Counsel continued pushing Wells Fargo based on new information and confirmatory discovery, and, with more assistance from Judge Phillips and co-mediator Michelle Yoshida, expanded the period of recovery and, correspondingly, increased the settlement amount to $142 million. *Id.* ¶ 18; *see also* Phillips Decl. ¶¶ 4–16 (attesting to the contentious, arms'-length negotiations that Judge Phillips guided over many months).

### III.    THE TERMS OF THE SETTLEMENT

**A.  The Class Definition, Notice, and Claims Process**

The Settlement Class is defined in the Stipulation as "all Persons for whom Wells Fargo or Wells Fargo's current or former subsidiaries, affiliates, principals, officers, directors, or employees opened an account in their name without consent, enrolled them in a product or service without consent, or submitted an application for a product or service in their name without consent during the period from May 1, 2002 to April 20, 2017, inclusive." SA ¶ 2.52. Excluded from the Class are Defendants' officers, directors, and employees; judicial officers and court staff assigned to this case, along with their immediate family members; and those who opt out of the Settlement Class. *Id.* The Settlement calls for a comprehensive, multimedia program of notice to the Class. SA Exs. A-1, A-2, A-3 and A-4; Wheatman Decl. ¶¶ 34–47.

Wells Fargo has already identified many customers with potentially unauthorized accounts. It hired PricewaterhouseCoopers ("PwC") to perform an independent assessment to identify unauthorized accounts. SA ¶¶ 1.17–1.18. PwC's assessment was relied on by the CFPB when it determined the scope of Wells Fargo's impropriety. *See In re Wells Fargo Bank, N.A.*, No. 2016-CFPB-0015, Consent Order ¶¶ 15, 16, 23 (Sept. 8, 2016), *available at* http://files.consumerfinance.gov/f/documents/092016_cfpb_WFBconsentorder.pdf ("CFPB Consent Order"). But PwC's assessment is not the only way in which Wells Fargo has been able to identify potentially unauthorized accounts: Complaints made directly to Wells Fargo or to federal agencies have enabled Wells to identify still more potentially unauthorized accounts.  SA ¶ 2.16.

This Class Action Settlement, however, is not content to confine its relief to those customers that have already been identified. It recognizes that some customers with unauthorized accounts have not yet come to light, and it gives them a chance to be compensated for their injury. Accordingly, the claims process will include already identified customers, but is designed to bring in many others, too:

- Claim forms sent to persons identified by PwC will list their suspicious accounts and simply ask the Class Member to check off which accounts they believe were unauthorized. SA Ex. A-4.

- Where possible, based on data maintained by Wells Fargo, Class Members who previously complained to Wells Fargo or federal agencies about unauthorized accounts will be automatically enrolled in the Settlement. SA ¶¶ 2.3, 2.15.

- Other Class Members can identify themselves and receive compensation by submitting a simple claim form that asks them to provide identifying information so that the Settlement Administrator can verify their claims. SA Ex. A-4.

- To seek compensation for damage to their credit, Class Members need simply check a couple of boxes and identify the approximate year(s) that their cost of credit was increased. SA ¶ 9.7.1.1.

4

PLAINTIFFS' MOTION FOR
PRELIMINARY APPROVAL OF
SETTLEMENT

**B. Benefits to Class Members**

This Settlement reaches broadly and compensates generously. The Class Period extends back to May 2002—the earliest period for which Wells Fargo has any data—even though the limitations period for most claims might bar relief for many accounts.[3] The Settlement also creates a $142 million common fund on top of the $5 million in customer restitution that the Government Settlements have already mandated. The $142 million Settlement Fund will be used to reimburse class members for hitherto unreimbursed[4] fees charged by Wells Fargo for unauthorized accounts. Fees charged during the 2009-to-2017 period, for which Wells Fargo has the necessary records, will be refunded in full. SA ¶ 9.7.1.2. For the 2002-to-2008 period, for which Wells Fargo lacks the necessary records, fee reimbursement will take the form of a payment equivalent to the average of the fee damages for 2009-to-2017 accounts, calculated by dividing the total 2009-to-2017 fee damages by the total number of claimants claiming out of pocket fees for an account opened between January 1, 2009 and April 20, 2017. *Id*. In addition, Class Members who suffered credit damage as a result of Wells Fargo's conduct will be reimbursed for the financial impact of this damage, using an expert-designed and -directed method. *See id*. ¶ 9.7.1.1. And Wells Fargo will pay for the credit bureau information necessary to calculate Credit Impact Damages, as well as up to $1 million for the expert and administrative costs associated with calculating the Credit Impact Damages. The remaining settlement funds will be allocated as Non-Compensatory Damages to Class Members based generally on how many unauthorized accounts each Class Member has or had. *Id*. ¶ 9.7.2.

**C. Fees, Costs, and Service Awards**

Although the Settlement Agreement allows Class Counsel to seek fees of up to 25% of the Settlement, Class Counsel will cap their request at 15%, well below this Circuit's 25% "benchmark" in

---

[3] For the Court's convenience, attached as an Appendix is a table of representative claims Plaintiffs' Counsel considered, along with their statutes of limitations and/or repose, and available remedies.

[4] Class Members already reimbursed for fees under the Government Settlements will not receive fees under this Settlement. This Settlement will not affect Wells Fargo's duties under the Government Settlements.

5                    PLAINTIFFS' MOTION FOR
PRELIMINARY APPROVAL OF
SETTLEMENT

class settlements. The Settlement allows the four Named Plaintiffs to seek service awards to be approved by the Court, *see* SA ¶ 6.1.2; these awards fall well within the range approved by courts within the Ninth Circuit. *See Carnes v. Atria Senior Living, Inc.*, No. 14-CV-02727-VC, Order Grant. Mot. for Attorneys' Fees, Costs, and Service Award at 7–9, ECF 115 (N.D. Cal. Jul. 12, 2016) (citing cases).

**D.  Release of Claims**

In exchange for Class benefits, the Settlement provides a release of claims for all defendants, parents, subsidiaries, officers, employees, and affiliates. SA ¶ 5. The release will encompass claims stemming from unauthorized accounts, and from authorized enrollment in Identity Theft Protection Services.[5] Because the release does not reduce Wells Fargo's obligations under the Government Settlements, Class Members will not waive their right to relief under those Settlements—including mediation with an independent third-party mediator.

## IV.      THE SETTLEMENT MERITS PRELIMINARY APPROVAL

**A.  The Settlement Meets This Court's Standard for Preliminary Approval.**

To approve a class settlement, *see* Fed. R. Civ. P. 23(e), a court must determine that the settlement is "fair, reasonable, and adequate." *Cotter v. Lyft, Inc.*, 193 F. Supp. 3d 1030, 1035 (N.D. Cal. 2016) (quoting Fed. R. Civ. P. 23(e)(2)). Preliminary approval of a proposed settlement is the first step in making this determination. *See generally* U.S. Dist. Court, N. Dist. of Cal., *Procedural Guidance for Class Action Settlements*, http://www.cand.uscourts.gov/ClassActionSettlementGuidance (last visited Apr. 20, 2017).

This Court "review[s] class action settlements just as carefully at the initial stage" as it does "at the final stage." *Cotter*, 193 F. Supp. 3d at 1037. In examining the settlement as a whole, the Court looks at a number of factors: (1) the strength of the plaintiffs' case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the

---

[5] While Wells Fargo has confirmed that its Identity Theft Protection Service functioned as intended, it has agreed to provide some relief to class members who purchased the service during the class period. SA ¶ 9.7.2.

PLAINTIFFS' MOTION FOR
PRELIMINARY APPROVAL OF
SETTLEMENT

1   amount offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6)

2   the experience and views of counsel; (7) the presence of a governmental participant; (8) and the reaction

3   of the class members to the proposed settlement. *Id.* at 1035 (citing *Hanlon v. Chrysler Corp.*, 150 F.3d

4   1011, 1026 (9th Cir. 1998)). Each of these factors is discussed in turn below.[6]

5       ***1.   While strong on its merits, Plaintiffs' case faces substantial procedural barriers.***

6           On their merits, many of Plaintiffs' claims are strong: Wells Fargo has publicly admitted that its

7   employees opened as many as two million accounts without its customers' authorization.[7] Nonetheless,

8   Plaintiffs would need to surmount numerous procedural barriers before they could reach the merits. *See*

9   *infra* §§ IV.A.2–3.

10      ***2.   The results of litigation or arbitration are uncertain and would delay recovery.***

11              a.   An appeal of this Court's order on delegation would face formidable barriers.

12          Wells Fargo has argued that the broad arbitration clause in its Customer Account Agreement

13  governs any customer dispute over unauthorized accounts—and that this clause delegates decisions about

14  arbitrability to the arbitrator, not a court.[8] Plaintiffs believe they have strong arguments against Wells

15  Fargo's motion to compel arbitration, but they also acknowledge that there are significant

16  counterarguments—the most important of which they explore here.

17          This Court, citing the delegation provision in Wells Fargo's arbitration agreement, granted the

18  motion to compel arbitration. This delegation provision would have been the subject of Plaintiffs' appeal

19  to the Ninth Circuit. But in light of *Mohamed v. Uber Technologies, Inc*., 848 F.3d 1201 (9th Cir. 2016),

---

[6] The exception, of course, is the last factor, since no class members have yet had a chance to weigh in.

[7] The claims that Plaintiffs asserted or could have asserted in their Complaint do not share exactly the same strengths and weaknesses. A more detailed discussion of the claims can be found below. *See infra* § IV.A.4.

[8] Plaintiff Heffelfinger's Agreement, for example, said that any "dispute" was arbitrable, and that a dispute was "any unresolved disagreement between you and the Bank," including "any disagreement relating in any way to *services*, accounts, or matters." Decl. of Connie Kotzman in Supp. of Defs.' Mot. to Compel Arb., Ex. 1, at 4, ECF No. 49-3. The Agreement also provided that "disputes" included "disagreements about the meaning, application or enforceability of this arbitration agreement." *Id.*

1   Plaintiffs would now be hard put to argue that a court should decide arbitrability because the delegation
2   provision is not "clear and unmistakable." *See* Stipanowich Decl. ¶ 24.

3          This leaves Plaintiffs with the argument that no agreement to delegate arbitrability was properly
4   formed. Such an agreement requires free consent, and here there was no such consent. Plaintiffs signed
5   the agreement under the false understanding that Wells Fargo did not have a practice of opening
6   unauthorized accounts. This unilateral mistake, about which Wells Fargo had every reason to know,
7   invalidates the delegation clause. A closely related argument for rescission of the clause is that Wells
8   Fargo, by concealing its practice of opening unauthorized accounts, committed actual fraud.
9

10         Wells Fargo, however, has a response to these arguments about mistake and fraud. Where an
11  arbitration clause contains a delegation provision, a court may hear and decide only those arguments that
12  attack the validity of the delegation provision. *Rent-A-Center W., Inc. v. Jackson*, 561 U.S. 63, 70–72
13  (2010). And here, Wells Fargo could argue that Plaintiffs' arguments about mistake and fraud are aimed
14  at the whole contract, rather than simply the delegation provision. *See* Stipanowich Decl. ¶ 27.
15

16         Wells might also assert that Plaintiffs' arguments about fraud and mistake just disguise an
17  argument about the scope of the arbitration clause accepted by Plaintiffs when they opened legitimate
18  accounts—i.e., an argument that no consumer at the time of signing the arbitration clause would have
19  interpreted the clause as reaching the creation of unauthorized accounts. This, Wells might say, is an
20  argument not about the existence of an agreement to arbitrate, but an argument about its scope. And (the
21  argument would continue) since the arbitration clause's language is extraordinarily broad—covering
22  "disagreements about the meaning, application or enforceability of th[e] arbitration agreement"—Wells'
23  interpretation of that language to cover unauthorized accounts is far from "wholly groundless," and, Wells
24  would argue, its motion to compel arbitration must be granted. *See also* Arb. Order 2.[9]
25

26
27  _____
28  [9]  Some courts, however, have rejected even the "wholly groundless" standard. *See Belnap v. Iasis*
       *Healthcare*, 844 F.3d 1272, 1286 (10th Cir. 2017) (declining to adopt "wholly groundless" standard and

1    Plaintiffs would have one more arrow in their quiver on appeal: They could also argue that the

2    delegation clause itself is unconscionable. *See Mohamed*, 848 F.3d at 1210. First, the delegation clause is

3    *procedurally* unconscionable because Wells triggered the delegation clause through its surprise creation

4    of unauthorized accounts.[10] *See* Stipanowich Decl. ¶ 28.A. Next, the clause is *substantively*

5    unconscionable because its results are one-sided. *See, e.g.*, *Baltazar v. Forever 21, Inc*., 367 P.3d 6, 11

6    (Cal. 2016) (substantively unconscionable contracts are "manifestly unfair or one-sided" (quotation marks

7    and citation omitted)). For, as Plaintiffs explain below, if they were forced to go to arbitration, class

8    certification—and thus a meaningful incentive to litigate—would be far more difficult to secure. *See infra*

9    Argument § IV.A.3.b. Once again, however, there is a risk that Wells Fargo could convince the Ninth

10   Circuit that Plaintiffs' arguments about procedural and substantive unconscionability attack the arbitration

11   agreement as a whole, rather than the delegation clause specifically. *See* Stipanowich Decl. ¶ 28.

12        Finally, even if, despite these hurdles, Plaintiffs were ultimately to succeed in convincing the Ninth

13   Circuit that the delegation provision was invalid or unenforceable, months or years may have passed. And

14   they would still have to convince the Court that their dispute is not arbitrable. If they cleared that hurdle,

15   they would still face discovery and have to achieve class certification. All of these steps—the delay of

16   appeal, the need to litigate arbitrability, the further motions practice, extensive discovery, and class

17   certification—would make ultimate classwide victory an uncertain and distant prospect. *See Uppal v. CVS*

18   *Pharmacy, Inc.*, No. 3:14-CV-02629-VC, 2015 WL 10890652, at *1 (N.D. Cal. Sept. 11, 2015)

19   (preliminarily approving settlement where it appeared settlement would avoid "substantial costs, delay

20   and risks that would be presented by the further prosecution of the litigation").

---

holding that where there is a valid delegation clause, the court "must compel the arbitration of arbitrability issues in *all* instances in order to effectuate the parties' intent regarding arbitration").

[10] Note that, unlike in *Mohamed*, the arbitration clauses signed by Plaintiffs did not include an opt-out provision. *Cf. Mohamed*, 848 F.3d at 1211.

b.   Arbitrating arbitrability would also be risky and time-consuming.

If Plaintiffs lost their appeal on the delegation issue, they would each enter into individual arbitration to decide whether their disputes are arbitrable. They would then argue that their disputes are not arbitrable—despite the broad language of the arbitration clause. To support this position, Plaintiffs would advance arguments about unilateral mistake, fraud, and unconscionability—arguments similar to the ones canvassed above. Again, while potentially strong, the arguments would not be sure to succeed. An arbitrator might conclude that the contract is not substantively unconscionable. *See* Stipanowich Decl. ¶ 28.B.  And, in response to Plaintiffs' arguments about unilateral mistake and fraud, Wells Fargo might argue that contracts cannot be invalidated by concealment or ignorance of a contracting party's general practices, or that even if they can be so invalidated, Plaintiffs could have discovered those practices with due diligence. Although Plaintiffs think these arguments in favor of arbitrability are utterly unpersuasive, opposing them would take up more time and create more uncertainty.

3.   *Even in the absence of arbitration, class certification would be uncertain—and if Plaintiffs were sent to arbitration, certification might become more difficult.*

a.   Wells Fargo would have arguments against certification even if Plaintiffs did not have to go to arbitration.

Certifying a nationwide class in federal court—if Plaintiffs were to reach that stage—would entail its own set of risks. If Plaintiffs prevailed on appeal by convincing the Ninth Circuit that the delegation provision was unconscionable, Wells Fargo could argue that determining unconscionability under many different states' laws would mean that individual questions predominate. *See Lozano v. AT&T Wireless Servs., Inc.*, 504 F.3d 718, 728 (9th Cir. 2007).

Class certification might be more difficult if Plaintiffs prevailed on appeal by convincing the Ninth Circuit that the delegation provision is invalid on grounds of fraudulent inducement or mistake. Wells Fargo could then argue fraudulent inducement raises individualized factual issues unfit for classwide resolution. *Tasion Commc'ns, Inc. v. Ubiquiti Networks, Inc.*, 308 F.R.D. 630, 639 (N.D. Cal. 2015). It

could make the same argument about mistake. *Schramm v. JPMorgan Chase Bank, N.A.*, No. 09-CV-09442-JAK (FFMx), 2011 WL 5034663, at *11 (C.D. Cal. Oct. 19, 2011). Moreover, efforts to bypass arbitration based on purportedly older, more limited versions of Wells Fargo's arbitration clause could likewise raise individualized issues. While Wells Fargo's common course of conduct—the fact that it universally failed to disclose its practice of creating unauthorized accounts—strongly militates in favor of class certification, certification would not be a sure thing.

In addition to those challenges, Wells would surely contest certification on other grounds, especially predominance. *See, e.g.*, Defs.' Mot. to Dismiss Second Through Seventh Causes of Action at 13, ECF No. 61 (arguing that Plaintiffs face "intractable issues" under Rule 23); *see also Mix v. Asurion Ins. Servs. Inc.*, No. 14-CV-02357-PHX-GMS, 2016 WL 7229140, at *13 (D. Ariz. Dec. 14, 2016), *reconsid. den.*, No. 14-CV-02357-PHX-GMS, 2017 WL 131566 (D. Ariz. Jan. 13, 2017) (finding "problem of typicality" in FCRA case for statutory damages because "any individual plaintiff's actual injury may be relevant to calculating their statutory damage amount"). Wells Fargo would no doubt maintain—as it has throughout this case—that determining whether an account is actually unauthorized raises an individualized issue, requiring each account to be analyzed separately, the documents associated with it to be reviewed, and the employee who opened the account to testify under oath.

> b.  If Plaintiffs were sent to arbitration—even if only to arbitrate arbitrability—class certification might become more difficult.

If Plaintiffs were sent to arbitration under the delegation provision, arbitrators could decide that the dispute here is arbitrable or that it is not arbitrable. Each possibility and its consequences is discussed in turn.

**1.** If Plaintiffs convinced arbitrators that their disputes are not arbitrable, they would face potential barriers to class certification once they returned to court.[11] As noted above, if the arbitrators ruled that the

---

[11] Note that one of these barriers would *not* be an explicit prohibition against class actions in the arbitration agreements. Those agreements prohibit class *arbitration*, not class *actions*.

arbitration clause was invalid due to fraud or mistake, Wells Fargo could argue that fraud and mistake raise individual issues.

But Wells Fargo would have arguments against class certification no matter why the arbitrators decided that Plaintiffs' disputes were not arbitrable. Wells could argue that a class could not be certified because it has a unique defense against absent class members: Those class members had not yet gone to arbitration pursuant to the contractual delegation clause. This argument has some force, because there is some risk that the class might not be able to assert that Wells Fargo was collaterally estopped by the arbitrator's decision on arbitrability. *See generally* Stipanowich Decl. ¶¶ 30–34. To be very clear: Plaintiffs think that they would have compelling arguments in favor of collateral estoppel. But they must also acknowledge that this is a novel legal issue whose resolution is uncertain.

**2.** Next consider the classwide consequences if Plaintiffs were sent to arbitration and the arbitrators decided that their disputes *were* arbitrable. Even if Plaintiffs prevailed on the merits in their individual arbitrations and came back to this Court to confirm their awards, Wells Fargo could argue that certification would be impermissible because nearly all the absent class members had not arbitrated their claims in accordance with the arbitration agreement—in short, that it had a defense against all absent class members. This would appear to be a cogent argument.

Class Counsel carefully studied the avenues for success when considering whether to resolve this litigation. As the above discussion demonstrates, Plaintiffs faced serious risks because of existing arbitration case law, and the dearth of clear precedent providing a clean way to classwide relief.

### 4. *The amount offered in settlement is more than adequate.*

As much as possible given data constraints, the Settlement reimburses fees that Class Members were charged in connection with unauthorized accounts. SA ¶ 9.7.1.2. It provides reasonable compensation for estimated credit damage. *Id*. ¶ 9.7.1.1. It also ensures a reasonable allocation of Non-Compensatory Damages. *Id*. ¶ 9.7.2. This allocation plan is fair, reasonable, and adequate. *See In re*

*Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036, 1045 (N.D. Cal. 2008); *see also Vinh Nguyen v. Radient Pharm. Corp.*, No. 11-CV-00406-DOC, 2014 WL 1802293, at *5 (C.D. Cal. May 6, 2014) ("[C]ourts recognize that an allocation formula need only have a reasonable, rational basis, particularly if recommended by experienced and competent counsel."). The value of the monetary benefits this Settlement provides to class members is exemplary, particularly given the risks and the maximum plausible recovery. *See Uppal*, 2015 WL 10890652, at *1 (settlement would avoid "substantial costs, delay and risks that would be presented by the further prosecution of the litigation").

In reaching this conclusion about the Settlement, Class Counsel assessed the value of the claims asserted in the Complaint. It also weighed the value of other potential claims that were *not* included in the operative Complaint, but were asserted in subsequently filed actions. *See Cotter v. Lyft, Inc.*, No. 13-CV-04065-VC, 2017 WL 1033527, at *2 (N.D. Cal. Mar. 16, 2017) ("What matters is that the settlement terms are fair and reasonable in light of all the claims being released (asserted or not), that class members receive appropriate notice of the proposed settlement, and that class members be given the chance to opt out of the class if they wish to preserve their own claims.").

Certain claims face considerable risks on their merits. The Stored Communications Act (SCA), 18 U.S.C. §§ 2701–2702, for example, prohibits "electronic communication service[s]" from disclosing "the contents of a communication while in electronic storage by that service." *Id.* § 2702(a). Several potential problems would confront a claim that Wells Fargo violated this prohibition by allowing their customers' account information to be compromised by its employees.[12] Although there is no case expressly addressing the question, Plaintiffs might face an uphill battle in arguing that bank accounts are an "electronic communication service*." See id.* § 2510(15) (defining the term). Moreover, the SCA prohibits the disclosure only of the "contents" of an electronic communication, and it seems difficult to argue that basic

---

[12] *See Chernavsky v. Wells Fargo Bank, N.A.*, No. 3:16-CV-06326-VC, Am. Class Action Compl. ¶¶ 77–89, (N.D. Cal. Nov. 14, 2016).

PLAINTIFFS' MOTION FOR
                                                                                                                   PRELIMINARY APPROVAL OF
                                                                                                                   SETTLEMENT

information regarding Plaintiffs' bank accounts qualifies as "content." *See Svenson v. Google Inc.*, 65 F. Supp. 3d 717, 727–30 (N.D. Cal. 2014) (distinguishing between "record information" and "content"). And, finally, Wells Fargo might argue that the SCA allows disclosure to employees—a possible, albeit contestable, reading of the disclosure allowed in 18 U.S.C. § 2702(b)(4). After considerable analysis, Plaintiffs have also determined that claims under the Electronic Funds Transfer Act, 15 U.S.C. §§ 1693–1693r, the California Consumer Records Act, Cal. Civ. Code §§ 1798.80–.84, the California Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750–1784, and common-law conversion claims would need to surmount serious arguments to their merits.

Other claims, while highly meritorious, have built-in limitations on damages. California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200–17210, allows restitution, but it does not permit actual or punitive damages. *Mass. Mut. Life Ins. Co. v. Superior Court*, 119 Cal. Rptr. 2d 190, 197 (Ct. App. 2002). Contract claims could recover only actual damages. *See generally Restatement (Second) of Contracts* § 347 (1981).

Still other meritorious claims authorize statutory and exemplary damages, although even here there are limitations on overlapping damages and potential procedural problems. The Fair Credit Reporting Act (FCRA) authorizes statutory damages from $100 to $1000 if plaintiffs can prove the willful misuse of credit reports, and also provides for punitive damages in the factfinder's discretion. 15 U.S.C. § 1681n(a)(1)(A), (a)(2). Some state consumer-protection laws allow exemplary damages if the defendant has behaved with special culpability, but most of these states do not allow plaintiffs to recover exemplary damages under their consumer-protection law *in addition to* punitive damages under another claim.[13] Thus, to the extent Class Members were to recover punitive damages under FCRA, they likely could not

---

[13] *See, e.g.*, *Concrete Spaces, Inc. v. Sender*, 2 S.W.3d 901, 906–08 (Tenn. 1999) (arguing that this is the rule in "[a]lmost every jurisdiction," and citing cases); *Lexton-Ancira Real Estate Fund, 1972 v. Heller*, 826 P.2d 819, 822 (Colo. 1992) (same, and citing state and federal cases). *But cf. Gonzales v. Arrow Fin. Servs., LLC*, 660 F.3d 1055, 1066–1068 (9th Cir. 2001) (interpreting the Fair Debt Collection Practices Act to allow for cumulative statutory damages with a state statute).

recover exemplary damages under state consumer-protection laws. In addition, asserting state consumer-protection claims on behalf of a nationwide class could raise manageability and predominance concerns. *See In re Bridgestone/Firestone, Inc.*, 288 F.3d 1012, 1017–18 (7th Cir. 2002) (noting that "[s]tate consumer-protection laws vary considerably").

Still, Plaintiffs strongly believe that Wells Fargo would face very substantial liability under federal law if this case could be pursued successfully as a class action. If a jury assessed the maximum penalty for willful violations of FCRA, liability could reach into the hundreds of millions or more. The CFPB identified approximately 2 million accounts which may have been unauthorized, over 600,000 of which potentially involve the misuse of credit reports (unauthorized credit cards and lines of credit). CFPB Consent Order at 5, 7. If a jury awarded a class the statutory maximum of $1,000 per account, that would be a $600 million award—a figure that could be higher if credit reports were willfully misused in opening accounts other than credit cards and lines of credit. Punitive damages might add substantially, if unpredictably, to that award. On the other hand, if the statutory penalty were calculated *per consumer* instead of *per account*, that would result in a substantially smaller judgment. *See Stillmock v. Weis Markets, Inc.*, 385 F. App'x 267, 272 (4th Cir. 2010) ("[W]e agree with the district court's implicit holding that statutory damages under § 1681n(a)(1)(A) are to be awarded on a per consumer basis . . . .").

Wells Fargo, however, would likely take the position that any claims based on FCRA violations that are more than five years old are time-barred. Under FCRA, an action may be brought "no later than the earlier of" either two years from discovery of the violation, or five years from the "date on which the violation . . . occur[red]." 15 U.S.C § 1681p. "Thus, the statute creates an absolute limitations period whereby a claim may not be brought more than five years after the violation." *Yarish v. Downey Fin. Corp.*, No. 08-CV-00380-HEH, 2009 WL 1208178, at *2 (E.D. Va. Apr. 28, 2009); *see also, e.g.*, *Banga v. First USA, N.A.*, 29 F. Supp. 3d 1270, 1277 n.4 (N.D. Cal. 2014) (lawsuit filed on August 17, 2009 based on FCRA violations from July 6, 2004 to August 12, 2004 was time-barred, even though plaintiff

did not discover violations until May and/or June 2009). Wells Fargo could argue the effect of that is to bar any FCRA claims for unauthorized accounts opened more than five years ago, even if the class member only learned of those accounts in the last two years, when the extent of the problem became well known.

In addition, because Wells Fargo has already begun refunding Class Members for out-of-pocket charges, it could argue that some Class Members face Article III justiciability problems in pursuing FCRA claims. Class Members would then have to show not only that their claims were not moot, *see Smith v. Greystone Alliance LLC*, 772 F.3d 448, 449 (7th Cir. 2014) (case is moot when defendant satisfies all of plaintiff's claimed damages), but also that they had suffered an injury-in-fact, and thus had standing, apart from their already-compensated monetary losses. It is this second issue that could present the most difficulty. *See Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1550 (2016) (a bare statutory violation of the FCRA does not create Article III standing, since a "violation of one of the FCRA's procedural requirements may result in no harm"); *see also* CFPB Consent Order at 5, 7 (of estimated 1.5 million unauthorized deposit accounts and 565,443 unauthorized credit cards, only about 85,000 and 14,000, respectively, incurred fees, totaling $2.4 million).

There are thus significant barriers to proceeding as a class or prevailing over Wells Fargo on the merits, and "it is well-settled law that a proposed settlement may be acceptable even though it amounts to only a fraction of the potential recovery that might be available to the class members at trial." *Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 527 (C.D. Cal. 2004).

### 5. *The extent of discovery completed and the stage of the proceedings*

Though this case did not proceed beyond Defendants' arbitration motion in this Court, Plaintiffs strenuously contested Wells Fargo's arbitration motion, which included factual submissions to this Court. When this Court granted that motion, Plaintiffs did not simply fold up their tent; they appealed the ruling to the Ninth Circuit, where they faced an uncertain path that became more difficult with recent rulings.

PLAINTIFFS' MOTION FOR
                                                                                              PRELIMINARY APPROVAL OF
                                                                                              SETTLEMENT

Plaintiffs' Counsel also engaged in significant factual discovery and research as part of the litigation and negotiation process. *See* Loeser Decl. ¶¶ 4–7; *see also In re Mego Fin. Corp. Securities Litig.*, 213 F.3d 454, 459 (9th Cir. 2000) (holding "significant investigation, discovery and research" supported "district court's conclusion that the Plaintiffs had sufficient information to make an informed decision").

What is more, under the terms of the Settlement, Wells Fargo provided additional confirmatory discovery to Plaintiffs beyond what was revealed during settlement negotiations under FRE 408, allowing Plaintiffs to further scrutinize the deal. *See* Loeser Decl. ¶¶ 7, 17; *see also Hart v. Colvin*, No. 15-CV-00623-JST, 2016 WL 6611002, at *8 (N.D. Cal. Nov. 9, 2016) ("While no formal discovery has taken place, the parties exchanged some documents and information that allowed the parties to draft and refine the terms of the Settlement Agreement, and Plaintiffs' own investigation resulted in useful documents[.]") (internal quotation omitted). Given the posture of this case, the amount of discovery weighs in favor of approval.

### 6. *The experience and views of counsel*

Plaintiffs' Counsel are experienced class action lawyers who have litigated some of the country's largest consumer class actions. *See* Loeser Decl. ¶ 3; *see also* Plaintiff Alex Chernavsky's Supplemental Case Management Conference Statement at 3 n.4, ECF No. 80 ("[T]he *Chernavsky* Plaintiffs believe that the Keller Rohrback firm is a top notch plaintiff's firm, with the highest ethical standards."). Plaintiffs' counsel engaged in arm's-length settlement discussions with Wells Fargo's likewise experienced counsel at Munger Tolles & Olsen. *See In re Netflix Privacy Litig.*, No. 11-CV-00379-EJD, 2013 WL 1120801, at *4 (N.D. Cal. Mar. 18, 2013) (applying at preliminary approval a "presumption" of fairness to settlement that was "the product of non-collusive, arms' length negotiations conducted by capable and experienced counsel"). Plaintiffs also pressed for—and received—additional relief for the class as more information became available due to the congressional hearings and their own investigations of Wells Fargo's

17

practices.

In addition, the parties benefitted from the guidance and assistance of two mediators, reinforcing the procedural fairness of the Settlement. Loeser Decl. ¶¶ 11–12. "The assistance of an experienced mediator in the settlement process confirms that the settlement is non-collusive." *Satchell v. Fed. Express Corp.*, No. 03-CV-2659-SI, 2007 WL 1114010, at *4 (N.D. Cal. Apr. 13, 2007); *see also Guilbaud v. Sprint Nextel Corp.*, No. 3:13-CV-04357-VC, 2016 WL 7826649, at *1 (N.D. Cal. Apr. 15, 2016) (approving settlement where after "initial exchanges of information and discovery, the Parties entered into private mediation before respected neutral mediator . . . to try to resolve the claims").

### 7. *The presence of a governmental participant.*

The Los Angeles City Attorney, OCC and CFPB pursued separate, parallel litigation, and investigation, respectively. The work of the government resulted in substantial penalties, and $5 million of consumer restitution. The Settlement provides substantially more relief for consumers both because it covers a broader time period, and because it creates a much larger fund for consumers.

### B. The Settlement Satisfies the *Bluetooth* Factors

Where the parties reach a settlement prior to formal class certification, courts often go beyond the usual fairness factors at the final approval phase to sniff out possible collusion. *E.g.*, *Destefano v. Zynga, Inc.*, No. 12-CV-04007-JSC, 2016 WL 537946, at *8 (N.D. Cal. Feb. 11, 2016). Rather than "kick[] the can down the road," *Cotter*, 193 F. Supp. 3d at 1037, this Court should at this stage analyze the "*Bluetooth*" factors: whether class counsel receives a disproportionate distribution of the settlement, whether the parties negotiated a "clear sailing" arrangement for attorneys' fees, and whether the parties negotiated for fees not awarded to revert to defendants rather than be added to the class fund. *In re Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d 935, 947 (9th Cir. 2011).

Proposed Class Counsel have not "allowed pursuit of their own self-interests and that of certain class members to infect the negotiations." *Id.* First, while Plaintiffs' counsel have not yet requested

attorneys' fees, the requested amount will not exceed 15% of the settlement amount obtained for the Class, significantly below the Ninth Circuit's 25% benchmark. *See In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 949 (9th Cir. 2015). Second, the Settlement Agreement contains no "clear sailing" provision. Third, the Settlement Agreement provides that any funds not awarded will be added to the class fund to be redistributed to the Class or to a *cy pres* beneficiary; none will revert to Wells Fargo. *Cf., e.g.*, *Ebarle v. Lifelock, Inc.*, No. 15-CV-00258-HSG, 2016 WL 5076203, at *11 (N.D. Cal. Sept. 20, 2016).

## V.      THE COURT SHOULD CERTIFY THE PROPOSED CLASS

Plaintiffs respectfully request that the Court certify the Class defined in the Settlement Agreement. Rule 23 governs class certification, including in settlements. However, when "[c]onfronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems . . . for the proposal is that there [will] be no trial." *Amchem Prods. v. Windsor*, 521 U.S. 591, 620 (1997).

**A.  The Class Meets the Prerequisites of Rule 23(a).**

   *1.   The Class is sufficiently numerous.*

Rule 23(a)(1) requires a class to be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Numerosity is generally satisfied when the class exceeds forty members. *See, e.g.*, *Slaven v. BP Am., Inc.*, 190 F.R.D. 649, 654 (C.D. Cal. 2000). Here it is easily established: Wells Fargo has identified over 2 million accounts that are or may be unauthorized, and thus the Class consists of hundreds of thousands of members.

   *2.   There are common questions of both law and fact.*

"Federal Rule of Civil Procedure 23(a)(2) conditions class certification on demonstrating that members of the proposed class share common 'questions of law or fact.'" *Stockwell v. City & County of San Francisco*, 749 F.3d 1107, 1111 (9th Cir. 2014). "Even a single [common] question" will do. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 359 (2011) (quotation and citation omitted).

Here, the Class claims directly derive from Wells Fargo's drive to increase the number of accounts per customer—exemplified in its "Great Eight" initiative, Compl. at 3, 6—and the resulting pressure on employees to open unauthorized accounts. Wells Fargo's common course of conduct raises common questions, the resolution of which will generate common answers "apt to drive the resolution of the litigation" for the Class as a whole. *Dukes*, 564 U.S. at 350. And as Plaintiffs allege that their and the Class's "injuries derive from [D]efendants' alleged 'unitary course of conduct,'" they have "'identified a unifying thread that warrants class treatment.'" *Sykes v. Mel Harris & Assocs. LLC*, 285 F.R.D. 279, 290 (S.D.N.Y. 2012) (citations omitted). Indeed, courts routinely find commonality where the class's claims arise from a defendant's uniform course of conduct.[14] Rule 23's commonality requirement is thus satisfied here.

### 3. The Settlement Class Representatives' claims are typical of other Class Members' claims.

"Rule 23(a)(3) requires that 'the claims or defenses of the representative parties'" be "'typical of the claims or defenses of the class.'" *Parsons v. Ryan*, 754 F.3d 657, 685 (9th Cir. 2014) (quoting Fed. R. Civ. P. 23(a)(3)). "[T]he typicality requirement is 'permissive' and requires only that the representative's claims are 'reasonably co-extensive with those of absent class members; they need not be substantially identical.'" *Rodriguez v. Hayes*, 591 F.3d 1105, 1124 (9th Cir. 2010) (quoting *Hanlon*, 150 F.3d at 1020). Where a plaintiff suffered a similar injury and other class members were injured by the same course of conduct, typicality is satisfied. *See Parsons*, 754 F.3d at 685.

Here, the experiences of the Settlement Class Representatives match the experiences of hundreds of thousands of other Americans: Wells Fargo opened accounts in their names they did not ask for. *See*

---

[14] *See, e.g.*, *Negrete v. Allianz Life Ins. Co. of N. Am.*, 238 F.R.D. 482, 488 (C.D. Cal. 2006) ("The Court finds that the class members' claims derive from a common core of salient facts, and share many common legal issues. . . . The commonality requirement of Rule 23(a)(2) is met."); *Cohen v. Trump*, 303 F.R.D. 376, 382 (S.D. Cal. 2014) ("Here, Plaintiff argues his RICO claim raises common questions as to 'Trump's scheme and common course of conduct, which ensnared Plaintiff[] and the other Class Members alike.' The Court agrees.").

20

PLAINTIFFS' MOTION FOR
PRELIMINARY APPROVAL OF
SETTLEMENT

*generally* Compl. ¶¶ 52–78; Rodriguez Decl. ¶¶ 3–5; Brooks Decl. ¶¶ 3–4. The Settlement Class Representatives, like other Class Members, were the victims of Wells Fargo's drive to maximize the number of accounts per customers. The Settlement Class Representatives, like other Class Members, were charged unwanted fees and faced the misuse of their personal information. Rule 23's typicality requirement is thus satisfied here.

### 4. The Named Plaintiffs and Class Counsel will fairly and adequately protect the interests of the Settlement Class.

Rule 23(a)(4) requires "the representative parties [to] fairly and adequately protect the interests of the class." To determine adequacy, courts ask two questions: "(1) Do the representative plaintiffs and their counsel have any conflicts of interest with other class members, and (2) will the representative plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Staton v. Boeing*, 327 F.3d 938, 957 (9th Cir. 2003).

*First*, Plaintiffs do not have any interests antagonistic to the other Class Members and will continue to vigorously protect their interests. *See, e.g.*, *Clemens v. Hair Club for Men, LLC*, 15-CV-01431-WHA, 2016 WL 1461944, at *3 (N.D. Cal. Apr. 14, 2016). The Named Plaintiffs and Settlement Class Members are entirely aligned in their interest in proving that Wells Fargo opened unauthorized accounts in their names, having Wells Fargo compensate them for any damages that resulted, and pursuing the maximum possible non-compensatory damages.

*Second*, the Named Plaintiffs understand their duties as class representatives, have agreed to consider and protect the interests of absent Settlement Class Members, and have actively participated in this litigation and settlement. *See generally* Heffelfinger Decl. ¶¶ 4–5; Jabbari Decl. ¶ 5; Rodriguez Decl. ¶ 7; Brooks Decl. ¶ 6. The Named Plaintiffs have provided their counsel with factual information, are aware of and willing to carry out their obligations as class representatives, and have regularly communicated with their counsel regarding various issues pertaining to this case, and will continue to do so until the case closes. *Id.* All of this together is more than enough to meet the adequacy requirement.

21

*See Trosper v. Styker Corp.*, No. 13-CV-0607-LHK, 2014 WL 4145448, at *43 (N.D. Cal. Aug. 21, 2014) ("All that is necessary is a rudimentary understanding of the present action and . . . a demonstrated willingness to assist counsel in the prosecution of the litigation.") (internal quotations and citations omitted). Moreover, Class Counsel are highly qualified lawyers who have successfully prosecuted high-stakes complex cases and consumer class actions, and have devoted the resources necessary to see this case through despite great risk. *See* Loeser Decl. ¶ 3.

**B.  The Requirements of Rule 23(b)(3) Are Met.**

Plaintiffs seek certification under Rule 23(b)(3). Courts certify Rule 23(b)(3) classes when: (i) "questions of law or fact common to class members predominate over any questions affecting only individual members"; and (ii) a class action is "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). This Class satisfies both prerequisites.

**1.  *Common issues of law and fact predominate.***

"The predominance inquiry 'asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues.'" *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016) (quoting 2 William B. Rubenstein, *Newberg on Class Actions* § 4:49, at 195–96 (5th ed. 2012)). "When 'one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members.'" *Id.* (quoting 7AA Charles Alan Wright et al., *Federal Practice & Procedure* § 1778, at 123–24 (3d ed. 2005)).

The Ninth Circuit favors 23(b)(3) treatment of claims stemming from a "common course of conduct," like the scheme Plaintiffs allege here. *See In re First Alliance Mortg. Co.*, 471 F.3d 977, 990 (9th Cir. 2006); *Hanlon*, 150 F.3d at 1022–23. Moreover, Plaintiffs' reliance primarily on federal causes of action, and the proposal of a settlement class, together avoid any difficulties that may arise from

certifying a nationwide class for litigation based on a variety of state-law claims. *See Murray v. GMAC Mortg. Corp.*, 434 F.3d 948, 953 (7th Cir. 2006) ("Reliance on federal law avoids the complications that can plague multi-state classes under state law . . . ."). While the Complaint includes state-law claims, the most potent claims are federal, most notably the FCRA.

### 2. *Class treatment is superior in this case.*

Rule 23(b)(3)'s "superiority" element "requires determination of whether the objectives of the particular class action procedure will be achieved in the particular case." *Hanlon*, 150 F.3d at 1023.

Here, class treatment is superior to the litigation—or mediation or arbitration—of hundreds or thousands of individual, largely low-value claims. "From either a judicial or litigant viewpoint, there is no advantage in individual members controlling the prosecution of separate actions. There would be less litigation or settlement leverage, significantly reduced resources and no greater prospect for recovery." *Id.* The damages sought by each Class Member are not so large as to weigh against certification. *See Smith v. Cardinal Logistics Mgmt. Corp.*, No. 07-CV-02104-SC, 2008 WL 4156364, at *11 (N.D. Cal. Sept. 5, 2008). The sheer number of separate trials that would be required also favors certification. *Id.*

Additionally, the Class is defined by objective, transactional facts: accounts opened without valid customer consent. Most Class Members will be identified by reference to the methodology PwC has already developed, and on which multiple government agencies have relied to resolve their own matters with Wells Fargo. Accordingly, identifying the class will not present undue management challenges. *See In re Checking Account Overdraft Litig.*, 307 F.R.D. 656, 678 (S.D. Fla. 2015) ("Class Members are readily ascertainable through objective criteria: Wachovia's own records of individuals who were assessed overdraft fees. . . . Such work will be merely ministerial in nature . . . .").

## VI.   THE PROPOSED NOTICE PROGRAM AND SETTLEMENT ADMINISTRATOR SHOULD BE APPROVED

Rule 23 requires the Court to direct the best notice practicable to all class members who would be bound by the proposed Settlement. *See* Fed. R. Civ. P. 23(c)(2)(B), (e)(1); *see also Mullane v. Cent.*

1   *Hanover Bank & Trust Co*., 339 U.S. 306, 314 (1950). The proposed notice program meets these

2   standards. *See generally* Wheatman Decl.

3         The Parties propose Rust Consulting as a settlement administrator.  *See generally* Parks Decl.¶¶ 4–

4   13.  At this time, the total estimated costs of mailed notice, publication notice, and administration will be

5   $4.3 million and will be paid for out of the Settlement Fund. Parks Decl. ¶ 16; Wheatman Decl. ¶ 50. The

6   estimated costs of administering this Settlement involving millions of accounts are more than reasonable

7   in relation to the value of the settlement. *Cf., e.g*., *Destefano v. Zynga, Inc*., No. 12-CV-04007-JSC, 2016

8   WL 537946, at *14 (N.D. Cal. Feb. 11, 2016) (approving up to $900,000 in administration expenses where

9   the settlement fund was $23 million).

10

## VII.   THE PROPOSED FINAL APPROVAL HEARING SCHEDULE

11         Plaintiffs' [Proposed] Order Granting Preliminary Approval of Class Action Settlement, filed

12   herewith, includes a proposed schedule for the approval process.

13

## VIII.   CONCLUSION

14         For all of the foregoing reasons, Plaintiffs respectfully request that the Court preliminarily approve

15   this $142 million non-reversionary Settlement, provisionally certify the Class, conditionally appoint the

16   undersigned as Settlement Class Counsel and the Plaintiffs as the Settlement Class Representatives, order

17   dissemination of notice to Class Members, set a date for the final approval hearing, and stay all pending

18   related cases until and if the Court denies approval of this Settlement.

19         //

20

21         //

22

23         //

1

Respectfully submitted,

2

DATED this 20th day of April, 2017.

3

KELLER ROHRBACK L.L.P.

4

5

By   */s/ Derek W. Loeser*
Derek W. Loeser, *admitted pro hac vice*

6

Gretchen Freeman Cappio, *admitted pro hac vice*
Daniel P. Mensher, *admitted pro hac vice*

7

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200

8

Seattle, WA 98101-3052

9

(206) 623-1900; Fax: (206) 623-3384
dloeser@kellerrohrback.com

10

gcappio@kellerrohrback.com
dmensher@kellerrohrback.com

11

12

Jeffrey Lewis
KELLER ROHRBACK L.L.P.

13

300 Lakeside Drive, Suite 1000
Oakland, CA 94612

14

(510) 463-3900; Fax: (510) 463-3901
jlewis@kellerrohrback.com

15

16

Matthew J. Preusch (Bar No. 298144)
KELLER ROHRBACK L.L.P.

17

801 Garden Street, Suite 301
Santa Barbara, CA 93101

18

(805) 456-1496; Fax: (805) 456-1497
mpreusch@kellerrohrback.com

19

**Attorneys for Plaintiffs**

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

I, Derek W. Loeser, hereby certify that on this 20th day of April, 2017, I electronically filed Plaintiffs' Notice of Motion, Motion, and Memorandum in Support of Motion for Preliminary Approval of Class Action Settlement and for Certification of a Settlement Class with the Clerk of the United States District Court for the Northern District of California using the CM/ECF system, which shall send electronic notification to all counsel of record.

*/s/ Derek W. Loeser*
Derek W. Loeser

**TABLE OF REPRESENTATIVE CLAIMS**

| Cause of Action | Statute of Limitation | Damages Available |
|---|---|---|
| Ariz. Consumer Fraud Act* | One year. Ariz. Rev. Stat. § 12-541(5) | Actual and punitive damages. *See Dunlap v. Jimmy GMC of Tucson, Inc.*, 136 Ariz. 338, 342 (Ct. App. 1983). |
| Bank Holding Company Act | Four years. 12 U.S.C. § 1977(1) | Trebled actual damages. 12 U.S.C. § 1975 |
| Breach of Contract | Four years for written contracts, two for oral contract. Cal. Code Civ. Proc. §§ 337, 339. | Actual damages. Cal. Civ. Code § 3300 |
| Cal. Consumer Legal Remedies Act[1] | Three years. Cal. Civ. Code § 1783 | Actual and punitive damages, and statutory damages up to $5,000 for a "consumer who is a senior citizen or a disabled person[.]" Cal. Civ. Code § 1780 |
| Cal. Consumer Records Act* | Four years. Cal. Civ. Code § 1798.96 | Actual damages, civil penalties. *See* Cal. Civ. Code § 1798.84(c). |
| Cal. Unfair Competition Law* | Four years. Cal. Bus. & Prof. Code § 17208. | Restitution. Cal. Bus. & Prof. Code § 17203. |
| Conversion* | Three years. Cal. Code Civ. Proc. § 338(c) | Actual damages. Cal. Civ. Code § 3336. |
| Electronic Funds Transfer Act* | One year. 15 U.S.C. § 1693m(g). | Statutory damages of $100 to $1,000 per violation; total liability cap in class actions of "lesser of $500,000 or 1 per centum of the net worth of the defendant." 15 U.S.C. § 1693m(a). |
| Fair Credit Reporting Act* | Five years from violation or two years from discovery, whichever is earlier. 15 U.S.C § 1681p. | Statutory damages of $100 to $1,000 for willful violations. 15 U.S.C § 1681n. |
| Racketeer Influenced and Corrupt Organizations Act | Four years. *Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*, 483 U.S. 143, 156, 107 S. Ct. 2759, 2767(1987). | Trebled actual damages. 18 U.S.C. § 1964(c). |
| Stored Communications Act | Two years from discovery. 18 U.S.C. § 2707(f) | $1,000 minimum statutory damages, punitive damages. 18 U.S.C. § 2707(c). |
| Unjust Enrichment* | Two years. Cal. Code Civ. Proc. § 339(1) | Disgorgement. *See Am. Master Lease LLC v. Idanta Partners, Ltd.*, 225 Cal. App. 4th 1451, 1482, 171 Cal. Rptr. 3d 548, 572 (2014), *as modified* (May 27, 2014) |

*Claim included in Plaintiffs' Consolidated Amended Complaint. ECF 37.
[1] Claim included in Jabbari Complaint, ECF 1, but not Plaintiffs' Consolidated Amended Complaint. ECF 37.