Derek W. Loeser, *admitted pro hac vice*
Gretchen Freeman Cappio, *admitted pro hac vice*
KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
(206) 623-1900; Fax: (206) 623-3384
dloeser@kellerrohrback.com
gcappio@kellerrohrback.com

Jeffrey Lewis (Bar No. 66587)
KELLER ROHRBACK L.L.P.
300 Lakeside Drive, Suite 1000
Oakland, CA 94612
(510) 463-3900; Fax: (510) 463-3901
jlewis@kellerrohrback.com

*Attorneys for Plaintiffs*
*Additional Counsel Listed on Signature Page*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| SHAHRIAR JABBARI and KAYLEE HEFFELFINGER, on behalf of themselves and all others similarly situated,<br><br>        Plaintiffs,<br><br>  v.<br><br>WELLS FARGO & COMPANY and WELLS FARGO BANK, N.A.,<br><br>        Defendants. | No. 15-cv-02159-VC<br><br>**PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT AND FOR CERTIFICATION OF A SETTLEMENT CLASS**<br><br>Date:   May 18, 2017<br>Time:   10:00 a.m.<br>Courtroom: 4, 17th Floor<br><br>Judge:  Hon. Vince Chhabria |

## **TABLE OF CONTENTS**

I.    ARGUMENT ........................................................................................ 2

    A.    Plaintiffs Carefully Considered the Strength of Claims—and the Amount of Damages Available—Under State Identity-Theft Laws, the Stored Communications Act, and RICO. ......................................................... 2

        1.    Claims under state identity-theft laws face numerous problems. ............. 2

        2.    Establishing valid class claims under the Stored Communications Act would pose an enormous, and likely insuperable, problem. .............. 7

        3.    Plaintiffs have considered whether the discovery rule applies to FCRA. ................................................................................................ 8

        4.    RICO claims are problematic due to the difficulty of identifying a RICO enterprise. .................................................................................. 9

        5.    Given the many potential barriers to success, the total recovery under the proposed Settlement is a reasonable share of the maximum damages Plaintiffs could have conceivably recovered. ........... 9

    B.    Plaintiffs Have Carefully Analyzed the Risks Posed by the Arbitration Clauses. ........................................................................................... 10

        1.    The Wachovia agreement on which the Jeffries Objectors rely does not change the calculus. ................................................................. 10

        2.    The other arguments raised by the Mitchell and Jeffries Objectors against arbitration do not change the calculus. ........................................ 12

    C.    No Intraclass Conflict Makes the Settlement Unfair. ......................................... 13

    D.    Plaintiffs Had Access to Sufficient Information to Settle................................. 15

    E.    The Proposed Class Notice, Claims Process, and Opt-Out Deadline Are All Fair. ........................................................................................... 16

        1.    The Settlement keeps the claims forms as simple as possible, given the limitations of Wells Fargo's data. ..................................... 16

        2.    The claims process is fair......................................................................... 18

        3.    The proposed notice to Class Members is unobjectionable................... 18

        4.    The opt-out process is fair........................................................................ 19

    F.    The Scope of the Settlement Is Appropriate. ..................................................... 20

i

G.      The Proposed Method of Calculating Credit-Impact Damages Is Fair and
         Practicable. .................................................................................................... 20

II.      CONCLUSION ............................................................................................................. 20

# <u>TABLE OF AUTHORITIES</u>

**Cases** ................................................................................................................ **Page(s)**

*Aiken v. World Fin. Corp. of S.C.*,
  644 S.E.2d 705 (S.C. 2007) ...................................................................... 13

*Bateman v. Am. Multi-Cinema, Inc.*,
  623 F.3d 708 (9th Cir. 2010) ................................................................. 4, 8

*Cedric Kushner Promotions, Ltd. v. King*,
  533 U.S. 158 (2001) ................................................................................... 9

*Chemimetals Processing, Inc. v. Schrimsher*,
  535 S.E.2d 594 (N.C. Ct. App. 2000) ........................................................ 6

*Clay v. N.M. Title Loans, Inc.*,
  288 P.3d 888 (N.M. Ct. App. 2012) ......................................................... 13

*Corona v. Sony Pictures Entm't, Inc.*,
  2015 WL 12655592 (C.D. Cal. Nov. 24, 2015) .......................................... 3

*Cotter v. Lyft, Inc.*,
  193 F. Supp. 3d 1030, 1038 (N.D. Cal. 2016) ...................................... 3, 20

*Crowley v. CyberSource Corp.*,
  166 F. Supp. 2d 1263 (N.D. Cal. 2001) ..................................................... 7

*Fraley v. Facebook, Inc.*,
  966 F. Supp. 2d 939 (N.D. Cal. 2013), *aff'd sub nom. Fraley v. Batman*, 638 F. App'x
  594 (9th Cir. 2016) ..................................................................................... 3

*Glass v. UBS Fin. Servs., Inc.*,
  2007 WL 221862 (N.D. Cal. Jan. 26, 2007) ............................................ 16

*In the Matter of: Wells Fargo Bank, N.A.*,
  No. 2016-CFPB-0015 (Sept. 8, 2016) ........................................................ 3

*In re Volkswagen "Clean Diesel" Marketing, Sales Practices & Prods. Liab. Litig.*,
  MDL 2672 CRB (JSC) (N.D. Cal.) .............................................. 18, 19, 20

*Keithly v. Intelius Inc.*,
  764 F. Supp. 2d 1257 (W.D. Wash. 2011) .................................................. 7

*Lexton-Ancira Real Estate Fund, 1972 v. Heller*,
  826 P.2d 819 (Colo. 1992) .......................................................................... 6

*Low v. LinkedIn Corp.*,
  900 F. Supp. 2d 1010 (N.D. Cal. 2012) ..................................................... 7

*In re Mego Fin. Corp. Sec. Litig.*,
   213 F.3d 454 (9th Cir. 2000) ................................................................................15

*Munday v. Navy Fed. Credit Union*,
   2016 WL 7655807 (C.D. Cal. Sept. 15, 2016) ......................................................16

*Murray v. GMAC Mortg. Corp.*,
   434 F.3d 948 (7th Cir. 2006) ..................................................................................4

*Quon v. Arch Wireless Operating Co.*,
   529 F.3d 892 (9th Cir. 2008), *rev'd on other grounds sub nom. City of Ontario, Calif.
   v. Quon*, 560 U.S. 746 (2010) .................................................................................7

*Rent-A-Center W., Inc. v. Jackson*,
   561 U.S. 63 (2010) ................................................................................................12

*Rogers-Dabbs Chevrolet-Hummer, Inc. v. Blakeney*,
   950 So. 2d 170 (Miss. 2007) .................................................................................13

*Rosenthal v. Great W. Fin. Sec. Corp.*,
   926 P.2d 1061 (Cal. 1996) ....................................................................................12

*Safeco Ins. Co. of Am. v. Burr*,
   551 U.S. 47 (2007) ..................................................................................................5

*Schwartz v. Upper Deck Co.*,
   183 F.R.D. 672 (S.D. Cal. 1999) ............................................................................5

*Stanley v. Brooks*,
   436 S.E.2d 272 (N.C. Ct. App. 1993) .....................................................................5

*State v. Garcia*,
   788 N.W.2d 1 (Iowa Ct. App. 2010) ........................................................................4

*Stiener v. Apple Computer, Inc.*,
   2007 WL 4219388 (N.D. Cal. Nov. 29, 2007) ......................................................15

*Svenson v. Google Inc.*,
   65 F. Supp. 3d 717 (N.D. Cal. 2014) .......................................................................8

*Theofel v. Farey-Jones*,
   359 F.3d 1066 (9th Cir. 2004) .................................................................................8

*Three Valleys Mun. Water Dist. v. E.F. Hutton & Co.*,
   925 F.2d 1136 (9th Cir. 1991) ...............................................................................12

*Todd v. Tempur-Sealy Int'l, Inc.*,
   2016 WL 5746364 (N.D. Cal. Sept. 30, 2016) ......................................................14

iv

*Vaugh v. Diaz*,
  2013 WL 150487 (S.D. Cal. Jan. 14, 2013) .................................................9, 11

*Vista Mktg., LLC v. Burkett*,
  812 F.3d 954 (11th Cir. 2016) .............................................................8

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011) .........................................................................5

*Wells Fargo Bank, N.A. v. Jenkins*,
  744 S.E.2d 686 (Ga. 2013) ................................................................2

*Williams v. Costco Wholesale Corp.*,
  2010 WL 761122 (S.D. Cal. Mar. 4, 2010) .........................................16

**Statutes**

18 Pa. Cons. Stat. § 4210(a) ................................................................5

15 U.S.C. § 1681 .....................................................................4, 5, 6, 8

15 U.S.C. § 6801 ..............................................................................2

18 U.S.C. § 1961 ...........................................................................2, 9

18 U.S.C. §§ 2701–2712 ..........................................................1, 2, 7, 8

Ala. Code § 13A-8-192(a) ...................................................................4

Cal. Civ. Code § 1542 ..................................................................18, 19

Colo. Rev. Stat. § 13-21-109.5(1) .........................................................4

Colo. Rev. Stat. § 18-5-113 .................................................................6

Conn. Gen. Stat. § 53a-129a(a) ............................................................5

Ga. Code § 16-9-130 ........................................................................4

Iowa Code § 715A.8(2) .....................................................................4

Mo. Rev. Stat. § 570.223(1) ...............................................................4

N.C. Gen. Stat. § 14-113.20(a) ...........................................................4

N.D. Cent. Code § 32-03-52(1) ...........................................................4

N.H. Rev. Stat. Ann. § 359-I:2(I) .........................................................4

N.J. Rev. Stat. § 2C:21-17.4 ...............................................................4

v

Tenn. Code § 47-18-2104 ................................................................................................4

Wash. Rev. Stat. § 9.35.020(1) .......................................................................................4

vi

## SHORT CITATION FORMS FOR FILINGS

| FULL TITLE OF FILING | CITATION OF FILING |
|---|---|
| Plaintiffs' Appendix to Reply Memorandum in Support of Motion for Preliminary Approval of Class Action Settlement and for Certification of a Settlement Class | App. |
| Order Granting Defendants' Motions to Compel Arbitration, Sept. 23, 2015, ECF 69 | Arb. Order |
| Objections of William Cason and Others to Motion for Preliminary Approval of Class Action Settlement and Class Certification, ECF 114 | *Cason* Obj. |
| Alex Chernavsky and William Castro's Response in Opposition to Plaintiffs' Motion for Preliminary Approval of Class Action Settlement and for Certification of a Settlement Class, ECF 116 | *Chernavsky* Obj. |
| Consolidated Amended Complaint, ECF 37 | Complaint |
| Affidavit of Paul Dubow, ECF 118-3 | Dubow Aff. |
| Motion and Memorandum and Points of Authority of Douglas Jeffries and Others in Support of Intervention and Opposition to Mot. for Preliminary Approval of Class Settlement and for Certification of a Settlement Class, ECF 117 | *Jeffries* Obj. |
| Decl. of Connie Kotzman ISO Defendants' Motion to Compel Arbitration of Plaintiff Shahriar Jabbari's Claims, ECF 58-1 | Kotzmann Decl. |
| Declaration of Derek W. Loeser in Support of Plaintiffs' Motion for Preliminary Approval of Class Action Settlement and for Certification of a Settlement Class, ECF 102 | Loeser Decl. |
| Declaration of James F. McDonough, III, in Support of Motion and Memorandum and Points of Authority in Support of Intervention and Opposition to Motion for Preliminary Approval of Class Settlement and for Certification of a Settlement Class, ECF 117-1 | McDonough Decl. |
| Mitchell Plaintiffs' Objection to Proposed Settlement Agreement and Motion for Preliminary Approval, ECF 118 | *Mitchell* Obj. |

| | |
|---|---|
| Plaintiffs' Notice of Motion, Motion, and Memorandum in Support of Motion for Preliminary Approval of Class Action Settlement and for Certification of a Settlement Class, ECF 101 | Pls.' Mem. |
| Plaintiffs' Opposition to Defendants' Motions to Compel Arbitration, ECF 54 | Pls.' Opp'n to MTCA |
| Independent Directors of the Board of Wells Fargo & Company, Sales Practices Investigation Report (Apr. 10, 2017), *available at* https://www08.wellsfargomedia.com/assets/pdf/about/investor-relations/presentations/2017/board-report.pdf | Report |
| Declaration of Proposed Settlement Class Representative Jose Rodriguez in Support of Plaintiffs' Motion for Preliminary Approval of Class Action Settlement and for Certification of a Settlement Class, ECF 105 | Rodriguez Decl. |
| Stipulation and Agreement of Class Action Settlement Release ("Settlement" or "Settlement Agreement"), ECF 100 | SA |
| Declaration of Thomas J. Stipanowich in Support of Plaintiffs' Motion for Preliminary Approval of Class Action Settlement and for Certification of a Settlement Class, ECF 108 | Stipanowich Decl. |

## MEMORANDUM OF POINTS AND AUTHORITIES

Under the proposed $142 million non-reversionary Settlement, Class Members receive reimbursement of wrongly charged fees, credit damage relief, and additional cash compensation for each unauthorized account. Class Members also retain the right to seek further compensation by participating in the mediation program created by Wells Fargo's settlement with the Los Angeles City Attorney. As in any settlement, it is always possible that litigation through judgment may have yielded a different result, but it may also have entirely prevented class recovery. Plaintiffs' Counsel consistently oppose mandatory arbitration, but we—like most consumer class counsel—know too well the many real-world challenges it presents. In our professional judgment, the Settlement fairly balances the risks with the benefits it provides. We respectfully seek permission to give notice to Class Members of the substantial benefits achieved by the Settlement and the opportunity to participate in it if they choose.

When stripped of their invective, the Objections raise three major arguments:

**1.** The Settlement supposedly fails to account for state identity-theft claims. But Plaintiffs have considered those claims and found them wanting. *See infra* § I.A.1. Only a minority of states allow civil actions for identity theft at all. Of the states that allow civil actions for identity theft, half permit actual damages but do not allow statutory damages. This would create serious class-certification problems. It would also duplicate compensatory damages available elsewhere, creating an unlawful double recovery. Finally, the identity-theft statutes that authorize statutory damages require proof of intent or purpose. This level of culpability would be exceedingly difficult to prove using classwide evidence, and if Plaintiffs tried to prove it by attributing individual employees' culpability to Wells Fargo, that would hamper class certification and run into limits on vicarious liability.

**2.** The Settlement supposedly fails to account for a "Privacy Subclass" that has claims under the Stored Communications Act. The unique claim attributed to this purported subclass, however, would pose

PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL SETTLEMENT

the same legal problems for the subclass as it would for everyone else. *See infra* § I.A.2. Such tenuous claims cannot call the Settlement's fairness into question or conjure into existence an intraclass conflict.

**3.** The Settlement supposedly fails to account for Wachovia arbitration agreements. But because these agreements were replaced with Wells Fargo arbitration agreements when Wachovia accounts converted to Wells Fargo, former Wachovia customers are not differently situated from Plaintiffs. *See infra* § I.B.1.

The other arguments raised by the Objectors—discussed in detail below—are equally, if not more, meritless. Plaintiffs respectfully ask that the Court preliminarily approve the Settlement.

# I.   ARGUMENT

## A. Plaintiffs Carefully Considered the Strength of Claims—and the Amount of Damages Available—Under State Identity-Theft Laws, the Stored Communications Act, and RICO.

Government entities armed with subpoena power, and without the obstacles of arbitration clauses and class certification, reached combined settlements with Wells Fargo of $190 million.[1] Of that, $5 million was set aside as restitution to part of the Settlement Class. This Settlement greatly adds to that amount, benefitting the entire Class with a fund of $142 million. Despite that, the Objectors believe Plaintiffs did not recover enough, because they did not consider certain claims. The Objectors are incorrect.

### 1.   Claims under state identity-theft laws face numerous problems.

The *Jeffries* Objectors say the Settlement does not properly consider identity-theft claims. But Plaintiffs' counsel *have* considered these claims.[2] Indeed, Plaintiffs' counsel, who served as settlement

---

[1] Press Release, Wells Fargo, *Wells Fargo Issues Statement on Agreements Related to Sales Practices* (Sep. 8, 2016) https://www.wellsfargo.com/about/press/2016/sales-practices-agreements_0908/ (cited in ECF 117 at 31).

[2] Plaintiffs' Memorandum and accompanying Table was meant to touch on only the most tenable claims, not be an exhaustive discussion of every claim considered. For example, Plaintiffs also considered a claim under the Gramm-Leach-Bliley Act, 15 U.S.C. § 6801—a claim asserted in the *Cason* Complaint—but courts have held that the Act does not provide a private right of action. *E.g.*, *Wells Fargo Bank, N.A. v. Jenkins*, 744 S.E.2d 686, 687 (Ga. 2013). Even if counsel failed to consider some claims,

PLAINTIFFS' REPLY FOR
PRELIMINARY APPROVAL OF
SETTLEMENT

class counsel in the Sony data breach litigation, *see Corona v. Sony Pictures Entm't, Inc.,* No. CV 14-09600-RGK (EX), 2015 WL 12655592, at \*6 (C.D. Cal. Nov. 24, 2015), among many other similar class cases, are well aware of these claims' potential strengths and weaknesses. The *Jeffries* Objectors argue that the "expected recovery" under state identity-theft statutes "is almost $2 billion," *Jeffries* Obj. 4, but that is not so. The maximum conceivable recovery is far lower, and in determining whether the Settlement is fair, that recovery must be deeply discounted to account for the obstacles that class litigation of the claims would face. *Fraley v. Facebook, Inc.*, 966 F. Supp. 2d 939, 944 (N.D. Cal. 2013) ("[T]he adequacy of this settlement should not be evaluated against some theoretically available judgment, but against what plaintiffs could reasonably expect to recover."), *aff'd sub nom. Fraley v. Batman*, 638 F. App'x 594 (9th Cir. 2016).

First, the *Jeffries* Objectors' calculation of potential recovery is inaccurate even on its own terms. Their $2 billion estimate includes a remarkable $742 million in attorneys' fees. *Jeffries* Obj., App. A at 10. Such an award would be grossly disproportionate. The *Jeffries* Objectors also miscalculate "actual damages" as $43 million, reaching that figure by multiplying an estimated 2.1 million authorized accounts by an estimated $25 in average actual damages. *Jeffries* Obj., App. A at 1, 10. That calculation includes an erroneous assumption: that every unauthorized account suffered actual fee damages. As the *Jeffries* Objectors' source states, accounts that were charged fees represented a "fraction of one percent" of those reviewed."[3] Multiplying the estimated $25 figure by the number of unauthorized accounts between 2011 and 2016 that the CFPB determined to have incurred fees—about 99,000 of an estimated 2.1 million—results in an "actual damages" figure of $2.47 million.[4]

---

if those claims "are not particularly strong or valuable, such that they're not likely to have materially influenced the overall settlement, counsel's failure to consider the claim would not be a basis for rejecting the agreement." *Cotter v. Lyft, Inc.*, 193 F. Supp. 3d 1030, 1038 (N.D. Cal. 2016).

[3] Press Release, Wells Fargo, *supra* note 1.

[4] *See* Consumer Financial Protection Bureau, Admin. Proceeding No. 2016-CFPB-0015, *In the Matter of: Wells Fargo Bank, N.A.*, Consent Order at 5-7 (Sept. 8, 2016), *available at* http://files.consumerfinance.gov/f/documents/092016_cfpb_WFBconsentorder.pdf (finding that of the

*Second*, thirty states and the District of Columbia have criminal identity-theft statutes that do not provide a private right of action. App. Restitution might be possible after a criminal conviction—as part of a sentencing proceeding—but recovery in a civil action is just not possible under the law of these jurisdictions. Any maximum conceivable recovery cannot take these state laws into account.

*Third*, of the twenty states that do allow private identity theft civil actions, ten authorize recovery of actual damages and do not provide for statutory damages. App. Damages under these statutes should be excluded from a realistic estimate of maximum possible recovery, or at least should be sharply discounted. For one thing, a claim that requires quantification of actual injury may "preclude class treatment." *Murray v. GMAC Mortg. Corp.*, 434 F.3d 948, 953 (7th Cir. 2006) (holding that the class representative reasonably decided to seek statutory damages rather than actual damages under the FCRA, because an actual-damages claim could not be certified). Also, FCRA's statutory-damages maximum is awarded *in place of* actual damages. *See* 15 U.S.C. § 1681n(a)(1)(A) (allowing for actual damages *or* damages up to $1,000); *Bateman v. Am. Multi-Cinema, Inc.*, 623 F.3d 708, 718 (9th Cir. 2010) ("That Congress provided a consumer the option of recovering either actual or statutory damages, but not both, supports the presumption that they serve the same purpose."). The prohibition against double recovery likely bars an award of actual damages *in addition to* FCRA's statutory damages.[5]

*Fourth*, the remaining ten identity-theft statutes that allow statutory damages contain an explicit purpose or intent requirement—they require that the person committing identity theft have the purpose or intent to defraud or commit a crime.[6] These statutes thus require proof of a far more culpable mental state

---

1,534,280 deposit accounts Wells Fargo analyzed, "roughly 85,000" incurred fees, and that of the 565,443 credit-card accounts analyzed, "roughly 14,000" incurred fees).

[5] The only partial exceptions would be New Jersey and Tennessee, which triple a plaintiff's actual damages, N.J. Rev. Stat. § 2C:21-17.4; Tenn. Code § 47-18-2104, and Georgia, in which an intentional violation also receives mandatory treble damages, Ga. Code § 16-9-130.

[6] Ala. Code § 13A-8-192(a); Colo. Rev. Stat. § 13-21-109.5(1); Mo. Rev. Stat. § 570.223(1); N.H. Rev. Stat. Ann. § 359-I:2(I); N.C. Gen. Stat. § 14-113.20(a); N.D. Cent. Code § 32-03-52(1); Wash. Rev. Stat. § 9.35.020(1). The Iowa statute speaks of the offender acting "fraudulently," which requires an intentional mental state. Iowa Code § 715A.8(2); *State v. Garcia*, 788 N.W.2d 1, 2 (Iowa Ct. App. 2010).

than does FCRA. *See Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 57–60 (2007) ("willfulness" under FCRA includes recklessness). Classwide proof of that level of culpability may be hard to come by. Even the scathing report commissioned by Wells Fargo's independent directors did not find that the company as a whole *intended* for its employees to create unauthorized accounts. The unauthorized accounts were instead allegedly the by-product of an unrealistic sales model and a leadership that, despite warning signs, refused to change that model out of a combination of Pollyannaism, stubbornness, mindless deference, and simple incuriosity—in short, reckless disregard. *See* Report 4–18. Classwide proof of culpability may be difficult for another reason, too: as the Report describes, the scandal was carried out by a wide variety of employees and sprang from a "decentralized organizational structure," *id.* at 8, rather than from a company-wide policy. *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 354–56 (2011) (lack of company-wide policy prevented class certification). If Plaintiffs tried to get around these problems by attributing individual employees' mental states to Wells Fargo, still more problems would ensue. Employers are "seldom" held vicariously liable for the intentional torts of their employees, *Stanley v. Brooks*, 436 S.E.2d 272, 274 (N.C. Ct. App. 1993), and even if vicarious liability did not pose a problem, the need to prove that individual employees had the required state of mind would hamper class certification. *See, e.g.*, *Schwartz v. Upper Deck Co.*, 183 F.R.D. 672, 680 (S.D. Cal. 1999) (individual inquiries into state of mind prevent class certification).

*Fifth*, even if the necessary level of culpability could be proven on a classwide basis, it is unclear whether the laws of the relevant states would allow statutory damages under their identity-theft statutes to be "stacked" on top of damages from FCRA. The language of the statutes—like that of FCRA—treats statutory damages as a remedy that is offered in place of actual damages. App. In light of the prohibition

---

Likewise, the Pennsylvania identity-theft statute requires that the offender possess or use identifying information without consent and "to further any unlawful *purpose*." 18 Pa. Cons. Stat. § 4210(a) (emphasis added). Finally, while the Connecticut statute requires only a *mens rea* of knowledge with respect to the use of information, it appears to require a purpose to "obtain money, credit, goods, services, property or medical information." Conn. Gen. Stat. § 53a-129a(a).

5                              PLAINTIFFS' REPLY FOR
                                                                                                                    PRELIMINARY APPROVAL OF
                                                                                                                    SETTLEMENT

against double recovery, it seems doubtful courts would allow an award of statutory damages under identity-theft statutes in addition to an award of statutory damages under FCRA.[7]

Finally, while Plaintiffs lack the space to separately discuss each of the *Jeffries* Objectors' purported identity-theft claims, scratching at the surface of just one shows the problems they present. Take Colorado, the source of $644 million of the *Jeffries* Objectors' estimated $2 billion of expected recovery.

Plaintiffs have found no class actions brought, let alone certified, under the four Colorado statutes the *Jeffries* Objectors cite on page two of their Appendix A. There are good reasons for that. First, two of those statutes are part of Title 18, Colorado's criminal code. Colo. Rev. Stat. § 18-5-113; *id.* 18-5-901. Of the remaining two non-criminal statutes, one grants a civil action only to "a person who suffers damages as a result of a crime . . . in which personal identifying information was used in the commission of the crime." *Id.* § 13-21-122. That suggests that a conviction must precede the civil action—or at least that a plaintiff must prove the predicate crime. The remaining statute at first appears more promising, providing statutory damages of up to $10,000 when the plaintiff's social security number has been used, *inter alia*, to commit fraud. *Id.* § 13-21-109.5(2)(b)(ii). But again, Plaintiffs are not aware of any such claim receiving classwide treatment in the law's 19-year history, likely because of what Plaintiffs mentioned earlier: the problem of adducing classwide evidence to prove intent to commit fraud.

The *Jeffries* Objectors discuss none of this. Instead, their summary of Colorado's identity theft laws in their Appendix appears to have been copied from an identity theft pamphlet. *Compare Jeffries* Obj. App. A at 2 ("Victims of identity theft can file a private civil right of action against the perpetrator who committed the crime . . . ."), *with* Identity Theft Resource Center, *Colorado* at 5 (same, verbatim), *available at* http://www.idtheftcenter.org/images/states/Colorado.pdf. Their objection is unsubstantiated.

---

[7] *See, e.g.*, *Lexton-Ancira Real Estate Fund, 1972 v. Heller*, 826 P.2d 819, 823 (Colo. 1992) (citing cases for the proposition that plaintiffs are not entitled to compensatory damages under more than one claim); *Chemimetals Processing, Inc. v. Schrimsher*, 535 S.E.2d 594, 596 (N.C. Ct. App. 2000) (double recovery for same loss or injury is not allowed).

1

2

### 2. *Establishing valid class claims under the Stored Communications Act would pose an enormous, and likely insuperable, problem.*

The Stored Communications Act, 18 U.S.C. §§ 2701–2712 ("SCA"), prohibits an electronic communication service ("ECS") or remote computing service ("RCS") from divulging the contents of certain communications. *Id.* § 2702(a)(1)–(2). According to the *Chernavsky* Objectors, potential claims under the SCA were not "valued at all." *Chernavsky* Obj. 11-12. But Plaintiffs have already explained why they concluded that SCA claims face extraordinary challenges. Pls.' Mem. 13–14. The *Chernavsky* Objectors offer no response, while insisting without explanation that Class Members who had "unauthorized external accounts opened by Wells Fargo (credit cards)" have strong claims under the SCA. *Chernavsky* Obj. 11. But these Class Members face precisely the same problems as everyone else.

Because the SCA applies only to an RCS or ECS, *anyone* asserting an SCA claim would have to prove that Wells Fargo is either an RCS or ECS. An RCS, which provides "computer storage or processing services by means of an electronic communications system," 18 U.S.C. § 2711(2), has been interpreted narrowly, in ways that exclude Wells Fargo. *See generally Quon v. Arch Wireless Operating Co.*, 529 F.3d 892, 901–02 (9th Cir. 2008), *rev'd on other grounds sub nom. City of Ontario, Calif. v. Quon*, 560 U.S. 746 (2010); *Low v. LinkedIn Corp.*, 900 F. Supp. 2d 1010, 1023 (N.D. Cal. 2012). Similarly, courts have rejected the notion that a bank is an ECS, a category that is reserved for internet service providers, telecommunication firms, and the like—firms that *provide* wire or electronic communications services, rather than simply *use* those services. *See Keithly v. Intelius Inc.*, 764 F. Supp. 2d 1257, 1271–72 (W.D. Wash. 2011); *Crowley v. CyberSource Corp.*, 166 F. Supp. 2d 1263, 1270 (N.D. Cal. 2001).

Even if Wells Fargo were an RCS, anyone asserting an SCA claim against it would have to show that the content of the divulged communication was "received by means of electronic transmission from (or created by means of computer processing of communications received by means of electronic transmission from), a subscriber or customer." 18 U.S.C. § 2702(a)(2)(A). The *Chernavsky* Objectors would thus have to prove that the information that Wells Fargo divulged was received *electronically* from

its customers, rather than through some other means, like a paper form. Many customers likely did not share their identifying information with Wells Fargo through electronic means, and having to prove that customers *did* use electronic means could create individual issues that could prevent class certification.

Likewise, even if Wells Fargo were an ECS, anyone asserting an SCA claim would have to prove that the content of the divulged communication was "in electronic storage," *id.* § 2702(a)(1), a term of art referring to "temporary, intermediate storage . . . incidental" to transmission, or storage for "backup protection," *id.* § 2510(17); *see id.* § 2711(1). It seems highly unlikely that the identifying information that Wells Fargo divulged was in either kind of storage. *See Theofel v. Farey-Jones*, 359 F.3d 1066, 1075–76 (9th Cir. 2004). At any rate, proving that the information at myriad Wells Fargo branches was kept in temporary storage incidental to transmission, or especially that it was kept for purposes of backup protection, would likely create individual issues at the class-certification stage.

Also, because the SCA prohibits only the disclosure of the "contents" of an electronic communication, the *Chernavsky* Objectors would have to prove that the information that Wells Fargo divulged falls under that description. *See* 18 U.S.C. § 2702(a)(1)–(2). But basic identifying information likely does not count as the "content" of a communication. *See Svenson v. Google Inc.*, 65 F. Supp. 3d 717, 729 (N.D. Cal. 2014) (consumers' contact information was not the "contents" of a communication).

Finally, Wells Fargo would likely argue that anyone seeking statutory damages under the SCA must prove actual damages, which is not the case for FCRA claims. *Compare Vista Mktg., LLC v. Burkett*, 812 F.3d 954, 965 (11th Cir. 2016) (so holding), *with Bateman*, 623 F.3d at 711 (FCRA "allows a consumer to recover [statutory damages] . . . without having to prove actual damages").

### 3. *Plaintiffs have considered whether the discovery rule applies to FCRA.*

The *Cason* Objectors claim that Plaintiffs, in discussing FCRA, fail to account for the discovery rule. *Cason* Obj. 2. Plaintiffs have noted, however, that courts applying FCRA have ruled its five-year period is a statute of repose, not a statute of limitations. Pls.' Mem. 15.

8

1

### 4. *RICO claims are problematic due to the difficulty of identifying a RICO enterprise.*

2

The *Mitchell* Objectors fault Plaintiffs for not pleading a Racketeer Influenced and Corrupt

3

Organizations Act (RICO) claim. *Mitchell* Obj. 2. Plaintiffs' counsel considered but decided against

4

pleading RICO here. *See* Pls.' Mem., Table. Aside from the higher pleading standard RICO triggers, the

5

core difficulty here would be identifying a RICO enterprise that is separate and distinct from the Wells

6

Fargo defendants. *See Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 162 (2001) (RICO

7

defendant must be distinct from RICO enterprise). Understandably, the *Mitchell* Objectors themselves

8

have been unable to identify such an enterprise in their complaint. They simply alleged that "Defendants

9

and their co-conspirators" were an "ongoing criminal enterprise," without identifying the co-conspirators

10

or alleging anything about the enterprise's structure. *Mitchell* Second Am. Compl. ¶ 248, ECF 15. That

11

likely is insufficient. *See, e.g.*, *Vaugh v. Diaz*, No. 12-CV-1181-BEN (JMA), 2013 WL 150487, at *2

12

(S.D. Cal. Jan. 14, 2013). If the *Mitchell* Objectors cannot assert a viable RICO claim, Plaintiffs here

13

cannot be blamed for concluding that the claim would be difficult to assert.

14

15

### 5. *Given the many potential barriers to success, the total recovery under the proposed Settlement is a reasonable share of the maximum damages Plaintiffs could have conceivably recovered.*

16

17

Class Members have a range of potential claims that arise from Wells Fargo's conduct. FCRA

18

provides for statutory penalties. Other claims—such as consumer protection claims, breach of contract,

19

and unjust enrichment—provide for actual losses, and sometimes doubling or trebling of losses. In

20

addition, relief for the various claims in a number of instances overlaps such that it is redundant. Based

21

on public information, negotiations, and confirmatory discovery, the parties estimate the number of

22

unauthorized accounts for the period 2002-2017 is approximately 3.5 million. This number may well be

23

over-inclusive,[8] but provides a reasonable basis on which to estimate a maximum recovery. In the

24

following table, we consolidate our analysis into the following three main categories of classwide relief,

25

26

27

28

---

[8] *An Examination of Wells Fargo's Unauthorized Accounts and the Regulatory Response: Hearing Before the S. Comm. on Banking, Housing and Urban Affairs*, 114th Cong., 2016 WLNR 28620531.

acknowledging inevitable overlap and redundancy, based on the number of Class Members that are likely

entitled to each category of relief. For consumer protection claims, to generously estimate classwide relief,

we assume that treble damages are available:

| Cause of Action | Relief | Estimated Total |
|---|---|---|
| FCRA | Actual losses or penalty between $100-$1000 per consumer | $60-$600 million |
| Consumer Protection Acts | Actual/Treble Damages | $12.6 million[1] |
| State common law claims | Actual losses | Overlaps with above |

The value of the relief each Class Member will receive depends on the kinds of unauthorized

account(s) opened for him or her. At a minimum, each class member will receive (1) any unreimbursed

fees or average fees charged on their unauthorized accounts (depending on availability of data), and (2) a

pro rata share of the residual distribution remaining, according to the applicable formula in the Settlement

Agreement. *See* SA § 9.7. **As a practical matter, the per class member residual will be larger if fewer**

**people submit claims, since the Settlement is non-reversionary** for eligible Class Members for whom

Wells Fargo performed a hard credit pull, namely class members with unauthorized credit cards and lines

of credit, they will be eligible to receive credit damages. *See* SA § 9.7.1.1. Exact settlement amounts for

each class member depend on the number of total eligible claimants, and are to be determined. The parties

will be available to describe these categories in more detail at the upcoming May 18, 2017 hearing.

**B.  Plaintiffs Have Carefully Analyzed the Risks Posed by the Arbitration Clauses.**

*1.  The Wachovia agreement on which the **Jeffries** Objectors rely does not change the calculus.*

Arbitration clauses pose probably the most potent barrier to success in this litigation. Even

Congress has taken note of this serious obstacle.[9] And Wells Fargo's arbitration clauses discouraged many

---

[9] *See* Megan Leonhardt, *You Can't Sue Wells Fargo for Fraud—Unless This New Bill Goes Through*, Time (Dec. 2, 2016), http://time.com/money/4588453/legislation-gives-wells-fargo-customers-chance-

PLAINTIFFS' REPLY FOR
PRELIMINARY APPROVAL OF
SETTLEMENT

other attorneys from bringing claims altogether.[10] According to the *Jeffries* Objectors, however, Plaintiffs have failed to account for "an entire universe of [arbitration] agreements." *Jeffries* Obj. 6. Some Wells Fargo customers had agreements with Wachovia before Wachovia accounts were converted to Wells Fargo accounts, and the *Jeffries* Objectors assert that these agreements expressly excluded unauthorized accounts from their scope. *Id.* at 7-8. Plaintiffs have considered this argument, but it faces major problems.

When accounts were converted from Wachovia to Wells Fargo, the old agreements were replaced by broad arbitration clauses that are materially identical to the ones at issue here. In the *Stanton* case, for example, plaintiff Nadine Stanton signed an Access Agreement with Wachovia that incorporated the terms of a Deposit Agreement. McDonough Decl., Ex. 1-B, Access Agreement (bottom paragraph). This Deposit Agreement, which contained an expansive arbitration clause, allowed Wachovia to "change the terms of [the] Agreement," as well as the documents the Agreement incorporated. *Id.*, Ex. 1-E, Deposit Agreement ¶ D.31. After Wells Fargo acquired Wachovia, it converted Stanton's Wachovia accounts to Wells Fargo accounts as of June 11, 2011. Decl. of Timothy O. Merck. in Supp. of Mot. to Compel Arb. ¶¶ 12–13, *Stanton v. Wells Fargo & Co.*, No. 16-CV-03318, ECF 13 (M.D. Fla. Dec. 14, 2016). In advance of that date, Wells Fargo mailed Wachovia customers like Stanton a "conversion package" that included a Wells Fargo account agreement that "w[ould] govern" the converted accounts beginning on the date of conversion. *Id.*, Ex. 3, ECF 13-3. This agreement contained an arbitration clause that is word-for-word identical to the one governing Plaintiff Jabbari's accounts. *Compare id.*, Ex. 5 at 4–5, ECF 13-5, *with* Kotzman Decl., Ex. 1, at 4–6. Because this Wells Fargo arbitration clause applies to Wachovia customers

---

to-sue/ (noting that Senators introduced a bill for the express purpose of allowing Wells Fargo's customers to sue despite arbitration provisions).

[10] *See* Amanda Bronstad, *Wells Fargo Strikes 110M Settlement Deal in Fake Accounts Cases*, The Recorder (Mar. 28, 2017), *available at* http://www.law.com/sites/almstaff/2017/03/28/wells-fargo-strikes-110m-settlement-deal-in-fake-accounts-cases/ (noting that, according to counsel for the *Mitchell* Objectors Steven Christensen, arbitration "was one of the reasons that lawyers held back from filing more cases").

who, like Stanton, became Wells Fargo customers, they face the same litigation risks as Plaintiffs here.[11]

### 2. *The other arguments raised by the* Mitchell *and* Jeffries *Objectors against arbitration do not change the calculus.*

According to the *Mitchell* Objectors, Wells Fargo's fraud prevents it from compelling customers to arbitrate their claims. *Mitchell* Obj. 7. Plaintiffs wholeheartedly agree that Wells Fargo's behavior has been outrageous. Yet because the arbitration agreements here contain a delegation provision, any argument asserting fraud as a defense to arbitration would need to show how that fraud is "specific to the delegation provision." *Rent-A-Center W., Inc. v. Jackson*, 561 U.S. 63, 73 (2010). That would be a difficult showing to make. *See* Pls.' Mem. 8; Stipanowich Decl. ¶¶ 26–27. The *Mitchell* Objectors' response is to suggest that Wells Fargo's fraud makes the arbitration clauses invalid from the outset—"void *ab initio*"— and not merely voidable. *Mitchell* Obj. 7. The case law *does* commit to courts, and not to arbitrators, the question whether a contract is void *ab initio*. *E.g.*, *Three Valleys Mun. Water Dist. v. E.F. Hutton & Co.*, 925 F.2d 1136, 1140–41 (9th Cir. 1991). But no court appears to have embraced the *Mitchell* Objectors' theory that fraudulent inducement, if sufficiently serious and extensive, can void a contract *ab initio*. Indeed, the California Supreme Court has rejected the notion that a "'grand scheme' of fraud, or fraud 'permeating' the transaction," can void a contract *ab initio* and remove the fraud question from the arbitrator. *Rosenthal v. Great W. Fin. Sec. Corp.*, 926 P.2d 1061, 1076 (Cal. 1996).

The *Mitchell* Objectors' affiant, Paul Dubow, opines that even a broadly drafted arbitration agreement, like the ones here, should not be interpreted to cover matters that customers could not have reasonably anticipated when they signed the agreement. Dubow Aff. ¶¶ 9-18. Plaintiffs fully agree with this proposition, *see* Pls.' Opp'n to MTCA 5–8, but it does not solve the core problem here: Wells Fargo's argument that its agreements delegate interpretation of the clause to the arbitrator. Dubow does not explain

---

[11] Plaintiffs' Counsel have also reviewed the arbitration clauses in every Wells Fargo Customer Account Agreement from 2002 through 2016. They have concluded that every Class Member subject to one of those Agreements faces substantially the same arbitration-related risks.

how, despite this delegation, a court could decide the interpretive issue he raises; in the cases he cites, it was the court, not an arbitrator, that interpreted the scope of the arbitration clause.[12] So Dubow's analysis does not alter the risks here, because individual arbitration—even if only to arbitrate arbitrability—would create serious risks for class certification. *See* Pls.' Mem. 11–12; Stipanowich Decl. ¶¶ 30–34.

Finally, the *Jeffries* Objectors insist that Plaintiffs have "waived" any argument that the "arbitration provision is susceptible to rescission for fraud or fraudulent inducement." *Jeffries* Obj. 21–22. In fact, Plaintiffs did raise fraud in their arguments before this Court, noting that Wells Fargo had not disclosed its unlawful behavior when it entered into arbitration agreements. Pls.' Opp'n to MTCA 7 n.3. But Plaintiffs had good strategic reasons not to rely too heavily on arguments about fraud. Relying on fraud to void the delegation provision would supply Wells Fargo with a potentially strong argument against class certification. *See* Pls.' Mem. 10; *see also* Pls.' Mem. 8; Stipanowich Decl. ¶ 27.

## C.  No Intraclass Conflict Makes the Settlement Unfair.

The *Chernavsky* Objectors argue that Plaintiffs have neglected the interest of a so-called Privacy Subclass—class members for whom Wells Fargo opened unauthorized credit cards. *Chernavsky* Obj. 11. Such customers *are* represented here, however; proposed class representative Rodriguez had an unauthorized credit card opened in his name. Rodriguez Decl. ¶ 4.[13] Rodriguez and his counsel are not inadequate, or the settlement unfair, simply because they made a reasonable decision not to pursue extra-compensation for a claim that for good reason they have concluded is problematic. *See supra* pp. 7-9 (explaining why the claim is weak); Pls.' Mem. 13-14 (same). "A strategic decision to pursue those claims

---

[12] *See Rogers-Dabbs Chevrolet-Hummer, Inc. v. Blakeney*, 950 So. 2d 170 (Miss. 2007) (no mention of a delegation provision; the court interpreted the scope of the arbitration clause); *Clay v. N.M. Title Loans, Inc.*, 288 P.3d 888, 894 (N.M. Ct. App. 2012) (holding—under New Mexico precedent—that because the party resisting arbitration had "challenged" the delegation provision in the arbitration agreement, the court would decide the scope of the agreement); *Aiken v. World Fin. Corp. of S.C.*, 644 S.E.2d 705, 707–08 (S.C. 2007) (any argument about delegation had been forfeited on appeal, so the court would interpret the scope of the clause).

[13] Counsel for the *Chernavsky* Objectors acknowledges that his purported subclass is subsumed within the *Jabbari* case's class. Hearing Tr. 8:13-9:14, ECF 117-1, Exhibit 1-K.

13                  PLAINTIFFS' REPLY FOR
                                                                                  PRELIMINARY APPROVAL OF
                                                                                  SETTLEMENT

a plaintiff believes to be most viable does not render her inadequate as a class representative." *Todd v. Tempur-Sealy Int'l, Inc.*, No. 13-CV-04984-JST, 2016 WL 5746364, at *5 (N.D. Cal. Sept. 30, 2016) (citing cases). Any other rule would allow class-action defendants and objectors to stymie every class action just by thinking up dubious claims that the class representatives reasonably chose not to pursue.

The *Chernavsky* Objectors also suggest that the two Net Settlement Pools may create an intraclass conflict of interest. *Chernavsky* Obj. 10–11, 12. In truth, the two Net Settlement Pools *prevent* a conflict of interest. Wells Fargo and Plaintiffs first reached a $110 million settlement to cover unauthorized accounts created from 2009 to 2017. When Plaintiffs' counsel had sufficient information to assert that Wells Fargo's misconduct reached back to 2002, the parties reached an additional agreement under which the Settlement would extend to 2002, with an additional $32 million reserved to cover unauthorized accounts created from 2002 to 2008. Loeser Decl. ¶¶ 17–18. In negotiating for this additional amount for the Class, Plaintiffs' counsel's guiding objective was to ensure that no further agreement would harm the interests of those whom counsel was already representing: Class Members with unauthorized accounts created from 2009 to 2017. To do this, Plaintiffs' counsel reserved the $110 million already agreed upon as a Pool just for the 2009-2017 period, and negotiated a separate Pool for the 2002-2008 period.

If the *Chernavsky* Objectors are suggesting that the $32 million Net Settlement Pool ("Net Settlement Pool 2") will treat the *earlier* group inequitably, that suggestion is simply wrong. The Settlement ensures that the earlier group will be compensated based on the same methodology as the later group. Pls.' Mem. 15–16. And, while there is a theoretical risk that these actual damages will deplete the $32 million in Net Settlement Pool 2, the number of unauthorized accounts in this earlier period likely falls far short of the number in the later period (both because Wells Fargo was much smaller before the 2008 Wachovia merger, and because the scandalous behavior increased over time). *See, e.g.*, Report at 5, 33. Moreover, under the Settlement, after the 2002-2008 Class Members are given the same relief as the 2009-2017 Class Members, any money that remains in Net Settlement Pool 2 will be shared equally across

*both* groups. SA ¶ 9.7.2.1. In sum, not only is there no conflict between the two groups, but the structure of the settlement also ensures that *both* groups are better off than they would have been had they negotiated separate settlements.

Next, the *Jeffries* Objectors assert that the proposed Settlement is inadequate because Plaintiffs, not being former Wachovia customers, have failed to assert claims on behalf of former Wachovia customers with a Wachovia agreement. *Jeffries* Obj. 14. But Class Members who used to have Wachovia agreements face essentially the same arbitration-related barriers as Plaintiffs.

Finally, the *Mitchell* Objectors maintain that there is an intraclass conflict because the work of ascertaining Class Members is, they say, assigned "to a consultant that was used for a more limited purpose, in a totally different case." *Mitchell* Obj. 5. This objection simply misunderstands the Settlement. The Settlement includes those whom Wells Fargo's consultant, PricewaterhouseCoopers ("PwC"), has identified. Pls.' Mem. 4. But it also includes many others—not only persons identified through their complaints to federal agencies or to Wells Fargo itself, SA ¶ 2.15, but also anyone who submits a proper claim form, Pls.' Mem. 4.

**D.  Plaintiffs Had Access to Sufficient Information to Settle.**

"[F]ormal discovery is not a necessary ticket to the bargaining table[,] where the parties have sufficient information to make an informed decision about settlement." *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 459 (9th Cir. 2000) (quotation marks and citation omitted). This proposition is nowhere truer than where a motion to compel arbitration has been filed. Courts typically stay merits discovery when a motion to compel arbitration is pending.[14] And where a motion to compel arbitration has been granted and the case dismissed, plaintiffs have no mechanism to obtain formal discovery. If formal

---

[14] *See, e.g.*, *Stiener v. Apple Computer, Inc.*, No. 07-CV-4486-SBA, 2007 WL 4219388, at *1 (N.D. Cal. Nov. 29, 2007) (staying discovery because if the "pending motion to compel arbitration is granted, litigation will proceed in an arbitral forum, not in this Court.")

PLAINTIFFS' REPLY FOR
PRELIMINARY APPROVAL OF
SETTLEMENT

discovery were a prerequisite to settling class actions where a party has moved successfully to compel arbitration, such actions could not be settled at all.

Plaintiffs have obtained sufficient information through methods other than formal discovery. Their counsel engaged in substantial informal discovery while investigating claims and negotiating the Settlement, and the parties also exchanged confirmatory discovery.[15] *See* Pls.' Mem. 17; Loeser Decl. ¶¶ 4–7, 17–18. Extensive arms'-length negotiations combined with diligent investigation and informal discovery is enough to give parties the information needed to make an informed decision on settlement.[16]

**E.  The Proposed Class Notice, Claims Process, and Opt-Out Deadline Are All Fair.**

The *Chernavsky* Objectors fire a volley of objections against the Settlement's proposed claims process, class notice, and opt-out process. None of these objections hits its target.

*1.  The Settlement keeps the claims forms as simple as possible, given the limitations of Wells Fargo's data.*

The *Chernavsky* Objectors maintain that the claims process will burden Class Members. Plaintiffs' counsel is keenly aware that a class-action claims process must be kept as simple as possible, and have consistently pushed, with expert assistance, for maximum simplicity. They have also consistently come up against a practical problem: The information that Wells Fargo collected from PwC, and which the CFPB, OCC, and City of Los Angeles used for its settlements, is not enough to guarantee the identification of all Class Members with unauthorized accounts. The Settlement's proposed claim forms are thus designed to gather the least information necessary from Class Members to process their claims. The *Chernavsky* Objectors wrongly assume that Wells Fargo "possesses most if not all information necessary

---

[15] Plaintiffs' Counsel acknowledge and take responsibility for the fact that they missed previous deadlines to file a motion for preliminary approval. One reason they missed those deadlines, however, was their effort to obtain sufficient information to ensure that the Settlement was in the Class's best interest.

[16] *E.g.*, *Munday v. Navy Fed. Credit Union*, No. 15-CV-1629-JLS, 2016 WL 7655807, at *9 (C.D. Cal. Sept. 15, 2016); *Williams v. Costco Wholesale Corp.*, No. 02-CV-2003-IEG, 2010 WL 761122, at *5 (S.D. Cal. Mar. 4, 2010); *Glass v. UBS Fin. Servs., Inc.*, No. 06-CV-4068-MMC, 2007 WL 221862, at *4 (N.D. Cal. Jan. 26, 2007).

to identify all members of the Settlement Class who may have valid claims." *Chernavsky* Obj. 6. Rather, Wells Fargo has represented publicly that it *lacks* adequate data to identify unauthorized accounts back to 2002.[17]

A claim form is also necessary for those Class Members whom Wells Fargo has already identified. That is so for several different reasons. Wells Fargo has insisted that the analysis PwC used to identify persons with potentially unauthorized accounts—i.e., the method by which Consultant-Identified Persons were identified, *see* SA ¶¶ 2.11, 2.12—was over-inclusive. That is why Consultant-Identified Persons are asked to check off which accounts they believe to be unauthorized; some of those accounts may have been authorized. Automatically-Enrolled Claimants who wish to be eligible for their full damages, *see id.* ¶¶ 2.3, 9.7.1, must also submit claim forms. For while Wells Fargo can identify Class Members through the Customer Complaint Review Process, *id.* ¶ 2.15, it cannot identify what accounts those Class Members complained about, because records identifying those accounts are incomplete. Finally, a claim form is necessary for all those who seek Credit-Impact Damages, because calculating those damages requires Class Members' permission to access their credit reports.

The claim forms, however, are kept extremely simple. That is certainly true for Consultant-Identified Persons, whose claim forms come pre-populated with helpful information. SA Ex. A1 at 5. It is also true for other Class Members, who are simply required to check a few boxes, and to give some very general—and quickly provided—information about their claim. *Id.* at 3. This means that Class Members

---

[17] Testimony of John Stumpf, Chairman and Chief Executive Officer of Wells Fargo & Co., Before the U.S. Sen. Comm. on Banking, Housing and Urban Affairs (Sep. 20, 2016) (testifying that PwC methodology identifies accounts that "could have been unauthorized"), *available at* https://www.banking.senate.gov/public/_cache/files/18312ce0-5590-4677-b1ab-981b03d1cbbb/3B18AA6E3A96E50C446E2F601B854CF1.092016-stumpf-testimony.pdf; Tim Sloan, Interview, *Wells Fargo CEO: We Should Have Addressed Concerns in 2004*, CNN (Apr. 20, 2017) http://money.cnn.com/2017/04/20/investing/wells-fargo-ceo-fake-accounts-2002/index.html?iid=EL at 0:37 ("The challenge we have is just the quality of the data that goes back 5, 10, 15 [years] . . . .") .

who have only an imperfect recollection will be able to "recover what is rightfully theirs." *Chernavsky* Obj. 6 (arguing that Class Members are expected to recall too much information).

Finally, the *Chernavsky* Objectors believe that a court seal on the claim form may scare claimants. *Chernavsky* Obj. 7. While there is nothing unusual about a court seal on a court approved claim form, Plaintiffs are happy to remove or retain the seal as directed by the Court.

### 2. *The claims process is fair.*

The *Chernavsky* Objectors say that the deadline to submit a claim comes too early. *Chernavsky* Obj. 7. In light of this objection, Plaintiffs propose that the deadline to submit claim forms fall 210 days after a preliminary approval order and 30 days after final approval. The *Chernavsky* Objectors also complain that the Settlement Administrator's decisions are final and not appealable. *Chernavsky* Obj. 6–7. But this is typical in class-action settlements.[18] It does not mean Class Members have no advocate in the claims process. Class Counsel, as fiduciaries to the Class, would have that role, as they currently do in the *Volkswagen* settlement.

### 3. *The proposed notice to Class Members is unobjectionable.*

The *Chernavsky* Objectors say that the Settlement website should provide information on objections, and that the proposed class notice should, but does not, disclose Class Members' waiver under California Civil Code section 1542. *Chernavsky* Obj. 7, 8. Plaintiffs' counsel are not familiar with any Settlement that has been subject to judicial criticism for failing to do either of these things.[19] In fact, the settlement website for the *Volkswagen* diesel emissions litigation in this district has not provided

---

[18] *See, e.g.*, 3.0-Liter Consumer Class Action Settlement Agreement and Release (Amended) § 8.4, *In re Volkswagen "Clean Diesel" Marketing, Sales Practices & Prods. Liab. Litig.*, MDL 2672 CRB (JSC) (N.D. Cal. filed Feb. 10, 2017) (hereinafter "*Volkswagen* 3.0-Liter Settlement"), *available at* http://www.cand.uscourts.gov/filelibrary/2954/2894-Amended-3.0-Liter-Class-Action-Settlement.pdf; Consumer Class Action Settlement Agreement and Release § 5.3, *In re Volkswagen*, MDL 2672 CRB (JSC) (N.D. Cal. filed June 28, 2016) (hereinafter "*Volkswagen* 2.0-Liter Settlement"), *available at* http://www.cand.uscourts.gov/filelibrary/1782/Consumer_Settlement_Agreement.pdf.

[19] In any case, the Settlement website, www.WFSettlement.com, is not yet online, but once it is it will include the proposed Long Form Notice and other information.

information on objections, *see* Volkswagen/Audi/Porsche Diesel Emissions Settlement Program, https://www.vwcourtsettlement.com/en/ (last visited May 11, 2017), and the notices to class members for both the two-liter and three-liter settlements did not discuss California Civil Code section 1542, even though the settlements waived class members' rights under that provision.[20] Despite this, Judge Breyer granted final approval to both.

### 4. The opt-out process is fair.

The *Chernavsky* Objectors say it is unfair for Class Members not to be told whether they are Consultant-Identified Persons before they are given an opportunity to opt out of the Settlement, because otherwise they will not know "if they have a viable claim" before the opt-out date. *Chernavsky* Obj. 6–7. The Objectors appear to be assuming that only Consultant-Identified Persons have "viable claim[s]," *id.* at 6, but the Settlement is built on the assumption that many others also have viable claims. That is why the Settlement allows others besides Consultant-Identified Persons to submit claim forms and receive compensation. Also, Class Members *will* know whether they are Consultant-Identified Persons well in advance of the opt-out date. After all, Consultant-Identified Persons will receive a special claim form, while other Class Members will not. *See* SA Ex. A1.

The *Chernavsky* Objectors also contend that the deadline to opt out is too early. *Chernavsky* Obj. 7. Under the Plaintiffs' proposed schedule, the deadline for opting out will fall 45 days after the last notices to Class Members are issued. This timetable is normal. *See Manual for Complex Litigation (Fourth)* § 21.321 (usual period is "thirty to sixty days (or longer if appropriate)").

---

[20] *See* Volkswagen and Audi 2.0-Liter TDI Diesel Emissions Settlement Long-Form Notice, *In re Volkswagen*, MDL 2672 CRB (JSC) (N.D. Cal. filed June 28, 2016) *available at* http://www.cand.uscourts.gov/filelibrary/1782/Consumer_Settlement_Agreement.pdf; Volkswagen 3.0-Liter Diesel Emissions Class Action Settlement Class Notice, *In re Volkswagen*, MDL 2672 CRB (JSC) (N.D. Cal. filed Feb. 14, 2017) *available at* http://www.cand.uscourts.gov/filelibrary/2959/2915-Amended-Long-Form-Notice-3L-Settlement.pdf.

**F.  The Scope of the Settlement Is Appropriate.**

The *Chernavsky* Objectors maintain that the Settlement's release of claims is overbroad because it extinguishes not only claims that were brought in this action, but claims that could have been brought and unknown claims. *Chernavsky* Obj. 8. These are normal release provisions. *See Cotter v. Lyft, Inc.*, 193 F. Supp. 3d at 1038 ("Nor is there anything necessarily unseemly (or unusual) about a class action settlement agreement that releases claims the plaintiff did not originally bring.").[21]

The *Chernavsky* Objectors also believe that the Settlement should have explicitly enumerated the "accounts," "products," and "services" that it covers, so that Class Members know the breadth of the Settlement's relief and of its release. *Chernavsky* Obj.10. This Settlement encompasses and releases claims with respect to only Wells Fargo consumer or small business checking or savings accounts, or unsecured credit cards or unsecured lines of credit. The Settlement also provides certain relief to persons who purchased Wells Fargo Identity Theft Services, even though the services were not unauthorized.

**G.  The Proposed Method of Calculating Credit-Impact Damages Is Fair and Practicable.**

As explained in Ted Stockton's Rebuttal Declaration, Plaintiffs' proposed method of calculating Credit-Impact Damages is fair. It calculates damages reasonably, and it is feasible, affordable, and not excessively time-consuming. It is all the fairer in light of the strong resistance Wells Fargo would have put up against any attempt to certify Credit-Impact Damages for class treatment at trial.

## II.    CONCLUSION

For the reasons given here as well as in their initial motion, Plaintiffs respectfully request that the proposed Settlement should be preliminarily approved.

//

//

---

[21] *See also Volkswagen* 3.0-Liter Settlement §§ 12.3–12.6; *Volkswagen* 2.0-Liter Settlement §§ 9.3–9.6.

1    Respectfully submitted,

2    DATED this 11th day of May, 2017.

3                                         KELLER ROHRBACK L.L.P.

4

5                                         By   */s/ Derek W. Loeser*
                                          Derek W. Loeser, *admitted pro hac vice*
6                                         Gretchen Freeman Cappio, *admitted pro hac vice*
                                          Daniel P. Mensher, *admitted pro hac vice*
7                                         KELLER ROHRBACK L.L.P.
                                          1201 Third Avenue, Suite 3200
8                                         Seattle, WA 98101-3052
                                          (206) 623-1900; Fax: (206) 623-3384
9                                         dloeser@kellerrohrback.com
                                          gcappio@kellerrohrback.com
10                                        dmensher@kellerrohrback.com

11
                                          Jeffrey Lewis (Bar No. 66587)
12                                        KELLER ROHRBACK L.L.P.
                                          300 Lakeside Drive, Suite 1000
13                                        Oakland, CA 94612
                                          (510) 463-3900; Fax: (510) 463-3901
14                                        jlewis@kellerrohrback.com

15
                                          Matthew J. Preusch (Bar No. 298144)
16                                        KELLER ROHRBACK L.L.P.
                                          801 Garden Street, Suite 301
17                                        Santa Barbara, CA 93101
                                          (805) 456-1496; Fax: (805) 456-1497
18                                        mpreusch@kellerrohrback.com

19                                        **Attorneys for Plaintiffs**

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

I, Derek W. Loeser, hereby certify that on this 11th day of May, 2017, I electronically filed Plaintiffs' Reply Memorandum in Support of Motion for Preliminary Approval of Class Action Settlement and for Certification of a Settlement Class with the Clerk of the United States District Court for the Northern District of California using the CM/ECF system, which shall send electronic notification to all counsel of record.

*/s/ Derek W. Loeser*
Derek W. Loeser

PLAINTIFFS' REPLY FOR
PRELIMINARY APPROVAL OF
SETTLEMENT