W. LEWIS GARRISON, JR., *PHV admitted*
lewis@hgdlawfirm.com
CHRISTOPHER HOOD, *PHV admitted*
chood@hgdlawfirm.com
HENINGER GARRISON DAVIS, LLC
2224 First Avenue North
Birmingham, AL 35203
Tel: 205-326-3336
Fax: 205-326-3332

JAMES F. MCDONOUGH, III, *PHV admitted*
jmcdonough@hgdlawfirm.com
HENINGER GARRISON DAVIS, LLC
3621 Vinings Slope, Suite 4320
Atlanta, GA 30339
Tel: 404-996-0869
Fax: 205-326-3332

*Attorneys for Intervenors*

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| SHAHRIAR JABBARI and KAYLEE HEFFELFINGER, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>WELLS FARGO & COMPANY AND WELLS FARGO BANK, N.A.,<br><br>Defendants. | Case No. 15-cv-02159<br><br>**INTERVENORS' REPLY TO PLAINTIFFS' SUPPLEMENTAL BRIEFING IN RESPONSE TO COURT INQUIRIES (DKT. NO. 145) AND DEFENDANTS' SUPPLEMENTAL MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT (DKT. NO. 146)**<br><br>**Judge: Hon. Vince Chhabria**<br>**Ctrm: 4**<br>**Date: May 18, 2017**<br>**Time: 10:00 a.m.**<br><br>**Action Filed: May 13, 2015** |

The undersigned are counsel of record for intervenors Hodge, Jeffries, Lessa, and Stanton (the "Intervenors") in the "Related Actions." *See* Dkt. No. 100, par. 2.46. Intervenors hereby reply to Plaintiffs' Supplemental Briefing in Response to Court Inquiries (Dkt. No. 145, "Plaintiffs' Response") and Defendants' Supplemental Memorandum in Support of Plaintiffs' Motion for Preliminary Approval of Class Action Settlement (Dkt. No. 146, "Defendants' Response").

1. ***First***, in late November of 2016, Wells Fargo counsel told Intervenor's Counsel that there were **three million class members**. Given the ascertainability problem that overwhelms this settlement, as well as the admitted frailties in the PWC analysis, the Court needs to be advised of the following: On November 29, 2016, counsel for Intervenors was contacted by Wells Fargo's counsel. Wells Fargo's counsel sought an urgent national class settlement demand—to be delivered the next day—and advised the Intervenors' counsel that the size of the class was "three million people." The next day, the undersigned complied with the urgent request, which was met with silence from Wells Fargo. If the Court wishes to see a copy of the settlement demand, undersigned is happy to file same under seal. We bring this matter before the Court to refocus its attention on the fact that the size of the class is a moving target. Wells Fargo's request for a settlement demand on November 29, 2016, obviously also calls into question the authenticity of the alleged "settlement in principle" that was announced in September of 2016. Before a settlement can be approved, these discrepancies must be scrutinized.

Defendants' Response portrays the "approximately 2 million accounts" as an "intentionally over-inclusive population of potentially unauthorized accounts identified by PricewaterhouseCoopers ("PWC")" and "the 3.5 million figure" as "Plaintiffs' own estimate covering a broader timeframe." Defendants Response, p. 1. They also proceed to walk-back that "intentionally over-inclusive" number of two million accounts to "'hundreds of thousands of unauthorized deposit accounts'" and only "'tens of thousands of credit cards,'" providing self-serving internal surveys to substantiate that walk-back. *Id.*, at pp. 1-9, and fn. 2. Plaintiffs' Response describes their competing disclosures of 2 million accounts, on the one hand, and 3.5 million accounts, on the other hand, as an oversight, indicating they "realized that the additional information

would assist the Court in evaluating the fairness of the Settlement." Plaintiffs' Response, at p. 2.

These rival characterizations are at odds with what Intervenors were told by Wells Fargo on November 29, 2016, which is that there were 3 million class members. That is people, not accounts. And that number conflicts with Defendants' statement that "[t]he PWC analysis identified approximately 2.2 million accounts (the number of customers is somewhat lower) for the period May 2011 to mid-2015," and their claim that "[t]he analysis period is being refined and expanded," so "[t]he number will therefore likely increase." Defendants' Response, at p. 9. On November 29, 2016, Wells Fargo already knew the number was higher.

Simply put, the Court does not know the size of this class. The 3.5 million accounts represented to the Court is (apparently) the *Jabbari* Plaintiffs' counsel's best estimate of the number of accounts. But the *Jabbari* Plaintiffs should not have to rely on their own analysis. The information needed to settle this case is in the sole control of Wells Fargo and is known (or should be known). In its answer to the Court's questions, Wells Fargo claims that the PWC analysis has shortcomings, but it believes these shortcomings relate to the class being "over-inclusive." Defendants' Response, at p. 1. This is unlikely given their disclosure to Intervenors' counsel in late November. Given their own alleged issues with this number, perhaps the PWC analysis is not the best methodology to ascertain the identities of the class members. After all, Wells Fargo admitted to firing a staggering 5,300 people due to this scandal, so presumably there are other options to identify class members that is based on the accounts handled by these former employees. In the end, the Responses raise even more questions concerning ascertainabilty of the class, and these questions preclude settlement at the preliminary approval stage. These questions include:

- *Where did this "3 Million Class Member" number come from?*
- *Why was this number kept from counsel for the Jabbari Plaintiffs?*
- *If there was an agreement "in principle" between the parties, why was Wells Fargo urgently seeking a national class settlement demand from Intervenors' counsel on November 29, 2016?*
- *If the PWC survey was so defective, why was it used as a basis for settling the class?*
- *What methodology was used to terminate the 5300 employees?*

To answer these questions, and to properly ascertain the class, ***Intervenors suggest appointment of a special master*** to address issues of ascertainability and to explore and work with ***all plaintiffs*** before this Court to identify an approvable settlement that can withstand further review.  As it stands, it appears that the only information used to support the settlement has been provided by Wells Fargo, and even they claim that this information is defective.

2. *Second*, state identity-theft claims are not coextensive with recovery under the FCRA.  This is pertinent to the Court's understanding and announcement at the hearing that the damages here are minimal, which Intervenors believe is incorrect due to the fact that it is based on information conveyed to it solely by Wells Fargo.  At the outset, there is no preemption of the identify theft claims by the FCRA.  The FCRA does not preempt identity theft claims to the extent there is a state law providing a remedy for identity theft that is separate and apart from remedies provided by the FCRA for wrongful or erroneous actions by a defendant in providing credit reporting information to consumer reporting agencies.  For instance, the Second Circuit recently held that the FCRA does not preempt the New York identity theft statute.  *See Galper v. JP Morgan Chase Bank, N.A.*, 802 F.3d 437, 441 (2d Cir. 2015).  Notably, that opinion pointed to the similarities between the NY law and the identity theft laws of other states, citing to the Alabama, Georgia, and NC statutes under which Intervenors Jeffries, Hodge, and Lessa brought their claims.  *See Galper v. JP Morgan Chase Bank, N.A.*, 802 F.3d 437, 441, fn. 1 (2d Cir. 2015).[1]  Moreover, actual damages for FCRA do not reach unauthorized products or services other than lines of credit.  The FCRA only applies to accounts involving the misreporting or misuse of credit information by Defendants.  In other words, FCRA claims do not cover those situations where checking or savings accounts were open because those do not require a credit inquiry or reporting to credit agencies, so there is no duplication of recovery there.

---

[1] "For examples of other state laws allowing victims of identity theft to sue an identity thief for damages, *see **Ala.Code § 13A–8–199 (2015)***; Conn. Gen.Stat. § 52–571h (2015); ***Ga.Code Ann. § 16–9–130 (West 2015)***; Iowa Code § 714.16B (2015); Mo.Rev.Stat. § 570.223 (2015); ***N.C. Gen.Stat. § 1–539.2C (West 2015)***; 42 Pa. Cons.Stat. § 8315 (2015); Tenn.Code Ann. § 47–18–2104 (West 2015); Wash. Rev.Code § 9.35.020(7) (2015)." *Id.*

3.     ***Third***, the current settlement provides for no deterrence of future wrongdoing by Defendants. *Compare Villaman v. Schee*, Nos. 92-15490, 92-15562, 1994 WL 6661, at *4 (9th Cir. Jan. 10, 1994) (stating that "tort law is designed in part to deter negligent conduct within its borders"). Instead, Defendants simply have to return the money they took from class members, and even then, class members have to make a claim—a claim they may not even know they have due to the methods employed by Defendants. An accounting of identity theft claims in the settlement, and the statutory damages assessed thereunder, will provide for the deterrence necessary in this situation—where Wells Fargo' business was built on this fraudulent practice, and even paying actual damages back to class members ends up in a windfall and award to Wells Fargo for their conduct. *L.A. News Serv. v. Reuters Television Int'l., Ltd.*, 149 F.3d 987, 996 (9th Cir.1998) (noting that awards of statutory damages can serve compensatory, punitive and/or deterrent purposes).

As noted before, counsel for *Jabbari* Plaintiffs are well aware of the value of identity theft claims, and they have used their strength and statutory damages provisions—and specifically those of the Colorado statute—to measure damages and provide the only compensation to class members in the *Sony* class action, which is the case they cited to highlight their experience with these statutes. *See* Dkt. No. 138, at pp. 3-4. On the other hand, discounting identity theft statutes will cause the release of valuable, non-duplicative claims without compensation. And in light of the fact that Defendants say "it is not possible to guarantee that no claimant will recover less than his or her actual harm," Defendants' Response, at p. 13, the settlement does not deter but instead creates an incentive for bad conduct in the future because the bad acts were actually profitable for Defendants.

4.     ***Fourth***, and finally, the settlement fails to provide for the future impact of credit damage from Defendants' fraudulent conduct, and accordingly, the settlement does not fully compensate for actual damages.[2] The compensation for past injury related to credit damage that is included in the settlement does not compensate for those that will inevitably incur future harm from the credit damage, and this must be considered in the settlement. *See, e.g. In re Target Corp.*

---

[2] Even absent this issue regarding future damages, even Wells Fargo acknowledges that "it is not possible to guarantee that no claimant will recover less than his or her actual harm." Defendants' Response, at p. 13.

Case No. 3:15-cv-02159-VC               4                    INTERVENORS' REPLY TO
                                                             DKT. NOS. 145 AND 146

*Customer Data Sec. Breach Litig.*, 847 F.3d 608, 611 (8th Cir. 2017), *amended*, No. 15-3909, 2017 WL 1573829 (8th Cir. May 2, 2017) (remanding to conduct rigorous Rule 23(a) analysis because objector's future injury released without compensation).  Fixing credit reports and removing negative credit information is the only thing that will address this issue, and leveraging identity theft claims can provide a basis for requiring Wells Fargo to do that.  *See* Dkt. No. 117, pp. 20-21.  Without this, the opt-out period will expire before many people can make a claim for actual damages because class members may not have taken a new loan or credit line by then.  These class members are thereby excluded from compensation under the settlement agreement while releasing their claims.

DATED:  May 23, 2017.

Respectfully submitted,

**HENINGER GARRISON DAVIS, LLC**

By: */s/ W. Lewis Garrison, Jr.*
W. LEWIS GARRISON, JR., *PHV admitted*
lewis@hgdlawfirm.com
CHRISTOPHER HOOD, *PHV admitted*
chood@hgdlawfirm.com
HENINGER GARRISON DAVIS, LLC
2224 First Avenue North
Birmingham, AL 35203
Tel: 205-326-3336
Fax: 205-326-3332

JAMES F. MCDONOUGH, III, *PHV admitted*
jmcdonough@hgdlawfirm.com
HENINGER GARRISON DAVIS, LLC
3621 Vinings Slope, Suite 4320
Atlanta, GA 30339
Tel: 404-996-0869
Fax: 205-326-3332

*Attorneys for Intervenors*

## CERTIFICATE OF SERVICE

This is to certify that I have this day electronically filed the foregoing using the CM/ECF system.

Dated: May 23, 2017

*/s/W. Lewis Garrison, Jr.*
W. Lewis Garrison
HENINGER GARRISON DAVIS, LLC