Derek W. Loeser, *admitted pro hac vice*
Gretchen Freeman Cappio, *admitted pro hac vice*
KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
(206) 623-1900; Fax: (206) 623-3384
dloeser@kellerrohrback.com
gcappio@kellerrohrback.com

Jeffrey Lewis (Bar No. 66587)
KELLER ROHRBACK L.L.P.
300 Lakeside Drive, Suite 1000
Oakland, CA 94612
(510) 463-3900; Fax: (510) 463-3901
jlewis@kellerrohrback.com

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| SHAHRIAR JABBARI and KAYLEE HEFFELFINGER, on behalf of themselves and all others similarly situated,<br><br>         Plaintiffs,<br><br>  v.<br><br>WELLS FARGO & COMPANY AND WELLS FARGO BANK, N.A.,<br><br>         Defendants. | No. 15-cv-02159-VC<br><br>**PLAINTIFFS' NOTICE OF MOTION, MOTION, AND MEMORANDUM IN SUPPORT OF MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT**<br><br>Date:    March 22, 2018<br>Time:    10:00 a.m.<br>Courtroom:  4, 17th Floor<br><br>Judge: Hon. Vince Chhabria |

# TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................. 1

II.     BACKGROUND .................................................................................................. 2

        A.      A Short History of This Case ................................................................. 2

        B.      The Terms of the Settlement .................................................................. 3

                1.      Class definition and notice.................................................... 3

                2.      Settlement benefits ............................................................... 4

                3.      The Claims process................................................................ 7

                4.      Fees, costs, and service awards ............................................. 8

                5.      Released Claims .................................................................... 8

III.    THE SETTLEMENT CLASS SHOULD BE CERTIFIED............................................ 9

        A.      The Class Satisfies the Rule 23(a) Prerequisites ................................. 9

        B.      The Class Satisfies the Rule 23(b)(3) Requirements ....................... 10

IV.     THE SETTLEMENT MERITS FINAL APPROVAL .................................................. 11

        A.      The Claims that Plaintiffs Can Assert are Strong on their Merits, if
                Limited in their Number...................................................................... 11

        B.      Further Litigation or Arbitration Would be Uncertain....................... 13

                1.      Further litigation on the delegation issue would be risky ...................... 13

                2.      Individual arbitrations of arbitrability would be risky and would, in
                        any event, delay recovery ................................................... 14

        C.      Even if Plaintiffs Ultimately Defeated Wells Fargo's Motion to Compel
                Arbitration, Gaining Class Certification Would be Uncertain—and if
                Plaintiffs Were Sent to Arbitration, a Proposed Class Might Face Further
                Challenges ........................................................................................... 15

                1.      Even if Plaintiffs were not sent to arbitration, trying to certify a
                        nationwide class would be risky........................................... 15

                2.      If Plaintiffs were sent to arbitration, certifying a nationwide class
                        might be difficult ................................................................ 15

        D.      The Amount Offered in Settlement is More than Adequate............................. 16

E.     The Parties Have Reached their Settlement at an Appropriate Stage in the Proceedings...................................................................................................... 18

F.     Experienced and Skilled Class Counsel Favor the Settlement .......................... 19

G.     This Settlement Builds on Separate Settlements Between Government Entities and Wells Fargo ................................................................................. 20

H.     The Reactions of Class Members Have Been Positive ..................................... 20

V.     NOTICE TO THE CLASS HAS SATISFIED THE REQUIREMENTS OF RULE 23 ...................................................................................................................... 23

VI.     CONCLUSION ......................................................................................................... 23

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                        **Page(s)**

*In re Bridgestone/Firestone, Inc.*,
   288 F.3d 1012 (7th Cir. 2002) ............................................................................. 12

*Butler v. Sears, Roebuck & Co.*,
   727 F.3d 796 (7th Cir. 2013) ............................................................................... 11

*Carnegie v. Household Int'l, Inc.*,
   376 F.3d 656 (7th Cir. 2004) ..........................................................................10, 11

*City of Detroit v. Grinnell Corp.*,
   495 F.2d 448 (2d Cir. 1974), *abrogated on other grounds by Goldberger v. Integrated
   Res., Inc.*, 209 F.3d 43 (2d Cir. 2000) ................................................................ 17

*Cotter v. Lyft, Inc.*,
   176 F. Supp. 3d 930 (N.D. Cal. 2016) ................................................................ 17

*Cotter v. Lyft, Inc.*,
   193 F. Supp. 3d 1030 (N.D. Cal. 2016) .............................................................. 11

*Deposit Guar. Nat'l Bank v. Roper*,
   445 U.S. 326 (1980) ............................................................................................ 22

*Dudum v. Carter's Retail, Inc.*,
   2016 WL 7033750 (N.D. Cal. Dec. 2, 2016) ..................................................... 18

*First Options of Chicago, Inc. v. Kaplan*,
   514 U.S. 938 (1995) ........................................................................................13, 17

*Hanlon v. Chrysler Corp.*,
   150 F.3d 1011 (9th Cir. 1998) ............................................................................ 10

*Hart v. Colvin*,
   2016 WL 6611002 (N.D. Cal. Nov. 9, 2016) ..................................................... 19

*Hawthorne v. Umpqua Bank*,
   2015 WL 1927342 (N.D. Cal. Apr. 28, 2015) .................................................... 22

*Jeffries v. Wells Fargo & Co.*,
   2017 WL 3149513 (N.D. Ala. July 25, 2017) .................................................... 14

*Mangone v. First USA Bank*,
   206 F.R.D. 222 (S.D. Ill. 2001) .......................................................................... 17

*In re Mego Fin. Corp. Sec. Litig.*,
   213 F.3d 454 (9th Cir. 2000) ............................................................................18, 19

*Mitchell v. Wells Fargo Bank*,
   2017 WL 5905535 (D. Utah Nov. 29, 2017) ..................................................... 14

*Murray v. GMAC Mortg. Corp.*,
  434 F.3d 948 (7th Cir. 2006) ................................................................... 10

*In re Netflix Privacy Litig.*,
  2013 WL 1120801 (N.D. Cal. Mar. 18, 2013) ............................................ 19

*In re Online DVD-Rental Antitrust Litig.*,
  779 F.3d 934 (9th Cir. 2015) ..................................................................... 8

*Parsons v. Ryan*,
  754 F.3d 657 (9th Cir. 2014) ..................................................................... 9

*Rent-A-Center W., Inc. v. Jackson*,
  561 U.S. 63 (2010) ..................................................................................... 14

*Satchell v. Fed. Express Corp.*,
  2007 WL 1114010 (N.D. Cal. Apr. 13, 2007) ............................................ 20

*Slaven v. BP Am., Inc.*,
  190 F.R.D. 649 (C.D. Cal. 2000) ............................................................... 9

*Staton v. Boeing*,
  327 F.3d 938 (9th Cir. 2003) ..................................................................... 10

*Stiener v. Apple Computer, Inc.*,
  2007 WL 4219388 (N.D. Cal. Nov. 29, 2007) ........................................... 19

*Stillmock v. Weis Markets, Inc.*,
  385 F. App'x 267 (4th Cir. 2010) ............................................................... 11

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*,
  2017 WL 2212783 (N.D. Cal. May 17, 2017) ........................................... 16

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*,
  2017 WL 672727 (N.D. Cal. Feb. 16, 2017) ......................................... 9, 23

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*,
  229 F. Supp. 3d 1052 (N.D. Cal. 2017) ..................................................... 20

*White v. E-Loan, Inc.*,
  No. 05-CV-0208-SI, 2006 WL 2411420 (N.D. Cal. Aug. 18, 2006) ............ 22

**Statutes**

15 U.S.C. § 1681 ................................................................................ *passim*

18 U.S.C. § 96 ............................................................................................ 13

18 U.S.C. §121 ........................................................................................... 13

Racketeer Influenced and Corrupt Organizations Act (RICO) ................... 13

Stored Communications Act ............................................................................................. 13

**Other Authorities**

Fed. R. Civ. P. 23(a) .............................................................................................. 9, 16, 23

Fed. R. Civ. P. 23(b) ............................................................................................. 9, 10, 11

Fed. R. Civ. P. 23(c) .................................................................................................. 11, 23

Fed. R. Civ. P. 23(e) ...................................................................................................... 11

Federal Rule of Evidence 408 ........................................................................................ 19

**SHORT CITATION FORMS FOR FILINGS**

| FULL TITLE OF THE FILING | CITATION OF FILING |
|---|---|
| Amended Stipulation and Agreement of Class Action Settlement and Release, June 14, 2017, ECF 162 | Settlement, Settlement Agreement, or SA |
| Complaint, May 13, 2015 | ECF 1 |
| Consolidated Amended Complaint, July 30, 2015 | ECF 37 |
| Order Granting Defendants' Motions to Compel Arbitration, September 23, 2015 | ECF 69 |
| Declaration of Derek W. Loeser in Support of Plaintiffs' Motion for Final Approval of Class Action Settlement, Certification of a Settlement Class, Service Awards, and Fee/Cost Award | Loeser Decl. |
| Order Re Motion for Final Approval, May 24, 2017 | ECF 155 |
| Order Granting Motion for Preliminary Approval, Denying Motions to Intervene, July 8, 2017 | ECF 165 |
| Declaration of Shannon R. Wheatman, Ph.D., on the Implementation and Adequacy of the Class Notice Program | Wheatman Decl. |
| Declaration of Lynn A. Baker in Support of Plaintiffs' Notice of Motion, Motion, and Memorandum in Support of Motion for Final Approval of Class Action Settlement | Baker Decl. |
| Declaration of Edward M. Stockton in Support of Plaintiffs' Motion for Final Approval of Class Action Settlement | Stockton Decl. |
| Rebuttal Declaration of Edward M. Stockton in Support of Motion for Preliminary Approval of Class Action Settlement and for Certification of a Settlement Class, May 11, 2017, ECF 134 | Stockton Rebuttal Decl. |
| Plaintiffs' Brief in Support of Amended Settlement Agreement and in Response to Order on Motion for Preliminary Approval, June 13, 2017 | ECF 160 |

| | |
|---|---|
| Plaintiffs' Notice of Motion, Motion, and Memorandum in Support of Motion for Preliminary Approval of Class Action Settlement and for Certification of a Settlement Class, April 20, 2017, ECF 101 | Mot. |
| Plaintiffs' Supplemental Briefing in Response to Court Inquiries, May 17, 2017 | ECF 145 |
| Plaintiffs' Reply Memorandum in Support of Motion for Preliminary Approval of Class Action Settlement and for Certification of a Settlement Class, May 11, 2017, ECF 133 | Reply |
| Declaration of Plaintiff Kaylee Heffelfinger in Support of Plaintiffs' Motion for Preliminary Approval of Class Action Settlement and for Certification of a Settlement Class, April 20, 2017, ECF 104 | Heffelfinger Decl. |
| Declaration of Plaintiff Shahriar Jabbari in Support of Plaintiffs' Motion for Preliminary Approval of Class Action Settlement and for Certification of a Settlement Class, April 20, 2017, ECF 103 | Jabbari Decl. |
| Declaration of Proposed Settlement Class Representative Jose Rodriguez in Support of Plaintiffs' Motion for Preliminary Approval of Class Action Settlement and for Certification of a Settlement Class, April 20, 2017, ECF 105 | Rodriguez Decl. |
| Declaration of Proposed Settlement Class Representative Antonette Brooks in Support of Plaintiffs' Motion for Preliminary Approval of Class Action Settlement and for Certification of a Settlement Class, April 21, 2017, ECF 112 | Brooks Decl. |
| Declaration of Thomas J. Stipanowich in Support of Plaintiffs' Motion for Preliminary Approval of Class Action Settlement and for Certification of a Settlement Class, April 20, 2017, ECF 108 | Stipanowich Decl. |
| Stipulation and Administrative Motion Re Settlement Reserve and Schedule | ECF 176 |
| Declaration of Joel K. Botzet Re: Claims Administration Process | Botzet Decl. |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## NOTICE OF MOTION AND MOTION

**TO ALL PARTIES AND COUNSEL OF RECORD:**

PLEASE TAKE NOTICE that on March 22, 2018 at 10:00 a.m., or at such other date as may be agreed upon, in Courtroom 4 of the United States District Court for the Northern District of California, located at 450 Golden Gate Avenue, San Francisco, California, Plaintiffs, on behalf of a proposed Settlement Class[1] (or "Class"), will and hereby do move for an order granting final approval of the Settlement, and for other relief explained in the accompanying Memorandum.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    INTRODUCTION

This Class Settlement arises from Wells Fargo's creation of millions of unauthorized deposit and credit accounts. It addresses that scheme by providing the Class with relief that is simultaneously comprehensive and customized.

Quantitatively, the Settlement guarantees complete relief, and more, to the Class. It guarantees that full Compensatory Damages will be paid to Class members for identifiable unreimbursed fees and damage to their credit, with at least $25 million left over for Non-Compensatory Damages. If the $142 million Settlement Fund should fall short, Wells Fargo must make up the difference.

Qualitatively, the Settlement provides relief that is tailored to the particular circumstances of each Class member. Where Wells Fargo's scheme lowered an eligible Class member's credit score, the Settlement accounts for how much that specific score fell. It also accounts for how that score increased the probable cost of borrowing for each eligible Class member, given the particular kind and amount of credit that each took out. This expert-designed, customized method of calculating Credit Impact Damages is, to Class Counsel's knowledge, unprecedented. Further details on Credit Impact Damages can be found in the interim report that Plaintiffs are filing along with this Motion in accordance with the

---

[1] The capitalized terms in this Motion have the meanings ascribed to them in the Amended Stipulation and Agreement of Class Action Settlement and Release, unless otherwise indicated.

1    Court's orders. *See* Stockton Decl.

2         The risks of continued litigation also favor this proposed Settlement. If litigation had continued,

3    Plaintiffs would have faced formidable legal challenges. Some would have arisen from the federal law

4    of arbitration. Others would have arisen from the need to present classwide proof of whether accounts

5    were unauthorized—not an easy proposition, and yet required to certify a class. Particularly in light of

6    these challenges, the relief that the proposed Settlement provides is exceptional.

7

8         For these reasons, as well as the others given below, Plaintiffs respectfully request that the Court

9    certify the Settlement Class and give final approval to the Settlement.

10                                     **II.      BACKGROUND**

11   **A.      A Short History of This Case**

12        Plaintiffs Shahriar Jabbari and Kaylee Heffelfinger filed this proposed nationwide class action

13   against Wells Fargo[2] in mid-2015, alleging that Wells opened checking, savings, and credit card

14   accounts without customer consent. ECF 1, 37. Shortly thereafter, Wells moved to compel arbitration,

15   invoking an arbitration clause in an agreement that Plaintiffs signed when they opened legitimate

16   accounts at Wells Fargo. The Court granted the motion and dismissed the case in September 2015. ECF

17   69.

18

19        After Plaintiffs filed an appeal, the parties, assisted by Ninth Circuit Mediator Ann Julius, began

20   to exchange information and discuss a possible settlement. Loeser Decl. ¶ 29. They later engaged retired

21   U.S. District Court Judge Layn Phillips to assist with further settlement discussions, which lasted far

22   beyond the parties' September 2016 announcement of a settlement in principle. *See id.* ¶¶ 30–36, 40–43.

23   After the negotiations hit an impasse on the settlement amount in March 2017, Judge Phillips made a

24   mediator recommendation of $110 million that both sides accepted. *Id.* ¶ 40. Under this agreement in

25   principle, the Class Period was to run from 2009 to 2017. *Id.*

26

27

28   ---
     [2] The Defendants—the holding company Wells Fargo & Co. and its banking subsidiary Wells Fargo,
     N.A.—are referred to collectively as "Wells" or "Wells Fargo."

Even after this initial agreement, Class Counsel—based on new information and confirmatory discovery—continued pushing Wells to expand the Class Period and to provide additional compensation. *Id.* ¶¶ 42-43. With more assistance from Judge Phillips and co-mediator Michelle Yoshida, the parties extended the Class Period back to May 2002 and increased the settlement to a total of $142 million. *Id.* ¶ 43.

The parties sought preliminary approval of their settlement in April 2017. After written questions from the Court, supplemental briefing, and a hearing that included the parties and several objectors,[3] the Court issued an order stating that it was "inclined to grant the motion for preliminary approval" if the parties modified the settlement agreement to address issues discussed at the Preliminary Approval Hearing. ECF 155 at 1. The parties submitted an amended settlement agreement to which the Court gave preliminary approval in July 2017. ECF 165.

## B.      The Terms of the Settlement

### 1.      Class definition and notice

The Settlement Class is defined as all persons for whom Wells Fargo or its subsidiaries, affiliates or agents "opened an Unauthorized Account or submitted an Unauthorized Application" from May 1, 2002 through April 20, 2017, as well as all persons "who obtained Identity Theft Protection Services from Wells Fargo" during that period.[4] SA ¶ 2.53. To notify the Class, the Settlement called for, and Kinsella Media has directed, a comprehensive multimedia notice campaign, including email notice to current and former Wells Fargo customers who are potential Class members.  *See generally* Wheatman Decl.

---

[3] *See* Order Requesting Further Briefing, ECF 141; Pls.' Suppl. Br. in Resp. to Court Inquiries, ECF 145; Defs.' Suppl. Mem. in Supp. of Pls.' Mot. for Prelim. Approval, ECF 146; Minute Entry, ECF 152.

[4] The usual persons are excluded: Defendants' officers, directors, and employees; judges and court staff assigned to this case, along with their immediate family members; and all opt-outs. SA ¶ 2.53.

### 2.      Settlement benefits

The Settlement Fund.  The Settlement creates a nonreversionary $142 million Settlement Fund to pay benefits, fees, and costs. Under certain conditions, described in more detail below, Wells Fargo must add to the Settlement Fund.

The two pools within the Settlement Fund.  After fees, costs, and expenses are deducted from the Settlement Fund, the resulting Net Settlement Fund is divided into two pools. Net Settlement Pool 1, which will be 77.46% of the Net Settlement Fund, will go to pay damages related to the period running from January 1, 2009 through April 20, 2017 (the "2009-2017 period"). SA ¶ 2.38. Net Settlement Pool 2, representing the rest of the Net Settlement Fund, will go to pay damages related to the period running from May 1, 2002 through December 31, 2008 (the "2002-2008 period"). SA ¶ 2.39. Drawing on a legal ethics expert's advice, Plaintiffs negotiated the creation of these two pools to prevent any potential intraclass conflict. Baker Decl. ¶¶ 20-22. That potential conflict arose from the history of the parties' negotiations. Wells Fargo and Plaintiffs first reached a $110 million settlement to cover the 2009-2017 period. Then, when Class Counsel had sufficient information to assert that Wells Fargo's misconduct reached back to 2002, the parties agreed to extend the Settlement to 2002, with an additional $32 million reserved to cover the 2002-2008 period. Loeser Decl. ¶¶ 42–43. In negotiating for this additional amount, Class Counsel's guiding objective was to ensure that an expanded settlement would not harm the group that Class Counsel was already representing: Class members with claims from the 2009-2017 period. Class Counsel therefore reserved the already negotiated $110 million (minus proportional fees, costs, and expenses) as a pool just to cover the 2009-2017 period, and negotiated a separate pool for the 2002-2008 period. *See generally* Baker Decl.

Fee Damages.  Because Wells Fargo has records showing the fees for Unauthorized Accounts opened during the 2009-2017 period, the Settlement will refund all unreimbursed fees arising from unused accounts during that period. SA ¶ 9.7.2. By contrast, Wells Fargo lacks records indicating the fees for Unauthorized Accounts opened during the 2002-2008 period, so it is impossible to precisely

quantify those fees. Thus, for this period, Fee Damages for each affected Unauthorized Account will equal the average Fee Damages payment for the 2009-2017 period. *Id*. That average payment will be calculated by dividing the total 2009-2017 Fee Damages by the number of claimants claiming unreimbursed fees for that period.

Credit Impact Damages.  The Settlement also compensates the Class for damage to its credit, using an expert-designed and -directed method. *See generally* Stockton Decl. The method accounts for how Class members' credit scores fell due to unauthorized credit cards, lines of credit, and small business deposit accounts, or unauthorized applications for credit cards, lines of credit, and small business deposit accounts.[5] Stockton Decl. ¶ 37. Incorporating data from the Consumer Reporting Agencies, it measures how credit scores fell due to Delinquency or Derogatory Reports (DDRs), which are derogatory credit reports caused by Unauthorized Accounts. *Id.* ¶ 40. Using this measurement, the method then determines the probable increase in borrowing costs that the Class member suffered if he or she thereafter took out credit (e.g., an auto loan). *Id.* ¶ 42. For Class members to recover Credit Impact Damages, they must have taken out credit either within a year after an Unauthorized Account's opening or an Unauthorized Application's submission, or within seven years after a Consumer Reporting Agency has received a DDR. SA ¶ 9.7.1.2. The Credit Impact Damages expert has established these time limits because an Unauthorized Account or Unauthorized Application is unlikely to significantly affect credit scores beyond a year, *see* Stockton Rebuttal Decl. ¶¶ 5-6, and a DDR remains on credit reports for up to seven years, *see* ECF 160 at 2. The Court-ordered interim report on Credit Impact Damages takes the form of a Declaration, filed contemporaneously with this Motion, from Edward M. Stockton, the Credit Impact Damages Expert.

Non-Compensatory Damages.  After allocating Fee Damages and Credit Impact Damages—which together comprise the Settlement's Compensatory Damages—the Settlement pays Non-

---

[5] Credit Impact Damages focus on these accounts and applications because they were the only Unauthorized Accounts or Unauthorized Applications for which a hard credit pull was made. The compensation process described here applies to credit products that were unused and unactivated.

Compensatory Damages out of the remaining money. The remainder of Net Settlement Pool 1 is paid *pro rata* as Non-Compensatory Damages, according to each Class member's share in the number of 2009-2017 Unauthorized Accounts and Unauthorized Applications. SA ¶ 9.8.1. Then, the same per-Account or per-Application amount as was allocated for the 2009-2017 period is allocated out of Net Settlement Pool 2 for each 2002-2008 Unauthorized Account and Unauthorized Application. SA ¶ 9.8.2. For example, if each Unauthorized Account or Application from the 2009-2017 period was allocated $10, each Unauthorized Account or Application from the 2002-2008 period will also be allocated $10. If, after that allocation, Net Settlement Pool 2 still has funds left, the balance is allocated *pro rata* as further Non-Compensatory Damages to the entire Class, according to the total classwide number of Unauthorized Accounts and Unauthorized Applications. *Id*. If, on the other hand, Net Settlement Pool 2 *lacks* the funds to pay the same per-Account or per-Application amount as was allocated for the 2009-2017 period, its remaining funds are instead allocated *pro rata* according to the number of 2002-2008 Unauthorized Accounts and Unauthorized Applications. SA ¶ 9.8.3. Non-Compensatory Damages for the 2002-2008 period are allocated in this way to ensure that the expansion of the Settlement back to 2002 only benefits, and does not harm, Class members already covered by the initial 2009-2017 settlement period. *See generally* Baker Decl. For the purpose of calculating Non-Compensatory Damages, authorized enrollment in Identity Theft Protection Services is counted as one Unauthorized Account.

Guarantee of more than full compensation. The Settlement guarantees that Net Settlement Pool 1 will pay Fee Damages and Credit Impact Damages for the 2009-2017 period and still leave at least $19,366,000 for Non-Compensatory Damages, and that Net Settlement Pool 2 will pay Fee Damages and Credit Impact Damages for the 2002-2008 period and still leave at least $5,634,000 for Non-Compensatory Damages. If either Net Settlement Pool turns out to lack sufficient funds, Wells Fargo is obligated to make up the difference. SA ¶ 9.9.

<u>If there are more Unauthorized Accounts than assumed.</u>  In the negotiations leading up to the Settlement to which the Court gave preliminary approval, Plaintiffs operated under the assumption that Class members would submit claims for a maximum of 3.5 million Unauthorized Accounts. Since preliminary approval, however, the parties modified the Settlement in case that number turns out to be higher. If the number is higher, the guaranteed "cushions" for Non-Compensatory Damages—$19,366,000 for Net Settlement Pool 1 and $5,634,000 for Net Settlement Pool 2—will be increased proportionately, according to how much higher than 3.5 million the number turns out to be. *See* ECF 176 at 3; Proposed Order Granting Final Approval of Settlement ¶¶ 15-16.

<u>Credit reporting corrections.</u>  The Settlement also requires Wells Fargo to ask Consumer Reporting Agencies to suppress credit inquiries or Delinquency or Derogatory Reports related to certain Unauthorized Accounts and Unauthorized Applications. SA ¶ 9.10.

<u>Early Warning Services corrections.</u>  Negative reports from Early Warning Services (EWS), a consumer reporting agency that functions as a credit bureau for deposit accounts, may lead banks to deny customers a deposit account. Under the Settlement, Wells will contact EWS and ask that negative information related to an unauthorized consumer deposit account be removed. SA ¶ 9.11.

### 3.      The Claims process

The Settlement has made every effort to simplify the Claims process. When Wells Fargo has a record of Class members who previously complained to Wells Fargo or federal agencies about Unauthorized Accounts, these Class members have been automatically enrolled in the Settlement (and hence are called "Automatically-Enrolled Claimants"). The claim forms for all Class members have also been kept as simple as possible. *See, e.g.*, ECF 162-9. Indeed, where persons with potential Unauthorized Accounts have already been identified by Wells Fargo's consultant ("Consultant-Identified Persons"), claim forms for these Class members have been prepopulated with the accounts that PwC identified. *See* ECF 162-6. Claim forms can be submitted through the mail or on the Settlement Website. SA ¶ 9.15.

As of January 17, 2018, the Settlement Administrator has received a total of 165,774 claims through the Settlement Website or the mail. This includes 9,709 claims from Automatically-Enrolled Claimants, 106,352 claims from Consultant-Identified Persons, and 49,701 claims from other persons. Botzet Decl. ¶ 16.

### 4.      Fees, costs, and service awards

The Settlement provides for a limited category of expenses—roughly speaking, those related to Notice and the Settlement Administrator—to be paid out of the Settlement Fund. SA ¶¶ 2.37, 2.42. Separate and apart from the Settlement Fund, Wells Fargo has agreed to cover certain costs of notice, settlement administration, and credit impact damages assessment. It has agreed to pay the cost of engaging the Consumer Reporting Agencies to conduct their respective tasks in connection with the analysis of Credit Impact Damages; up to $1 million of the cost of conducting the expert analysis necessary to calculate Credit Impact Damages; $1 million toward the increased cost of mailing notice by envelope to Consultant-Identified Persons; and certain call center costs related to management, training, and live support. *See* Loeser Decl. ¶ 87; SA ¶ 2.16.

Although the Settlement authorizes an award of fees equal to 25% of the Settlement Fund, SA ¶ 6.2, Class Counsel is petitioning this Court for a 15% award, well below the Ninth Circuit's 25% "benchmark" for class settlements. *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 949 (9th Cir. 2015). The Settlement also authorizes—and Class Counsel requests—an award of $5,000 as a service award to each Named Plaintiff. SA ¶ 6.2. The service awards are amply justified for their contributions to the successful result of this litigation, as described in their declarations. *See* ECF 103 104, 105, and 112.

### 5.      Released Claims

The Settlement provides that Class members are releasing only those claims that are based on the identical factual predicate as the claims asserted in this action. SA ¶ 2.50.

## III.    THE SETTLEMENT CLASS SHOULD BE CERTIFIED

When it granted preliminary approval to the proposed Settlement, the Court concluded that the Settlement Class satisfied the four prerequisites of Rule 23(a), and that it also met the requirements for certification under Rule 23(b)(3). ECF 165 at 9-10. Since then, the Class definition has not changed, and final certification should be granted. Plaintiffs' arguments on certification will be brief, to prevent the needless repetition of arguments previously made. *See* Mot. 19-23.

### A.    The Class Satisfies the Rule 23(a) Prerequisites

Rule 23(a) establishes four prerequisites for class certification: numerosity, commonality, typicality, and adequacy. *See* Fed. R. Civ. P. 23(a). Each is satisfied here.

Numerosity is satisfied because the Class contains far more than forty members. *See, e.g.*, *Slaven v. BP Am., Inc.*, 190 F.R.D. 649, 654 (C.D. Cal. 2000). Plaintiffs have estimated that the Class contains approximately 2.73 million people. ECF 145 at 3.

Commonality is satisfied. The Class members share common questions of law and fact that derive from Wells Fargo's common course of conduct, i.e., its systematic drive to increase the number of accounts per customer. *See, e.g.*, *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*, MDL No. 2672 CRB, 2017 WL 672727, at *13 (N.D. Cal. Feb. 16, 2017) ("The Settlement Class Representatives satisfy the commonality requirement, as their claims arise from Volkswagen's common course of conduct.").

Typicality is satisfied. Just as for other Class members, Wells Fargo opened accounts for the Named Plaintiffs without their consent. They thus suffered a similar injury as other Class members, and were injured by the same kind of conduct. *See Parsons v. Ryan*, 754 F.3d 657, 685 (9th Cir. 2014) (determining typicality was satisfied because the named plaintiffs alleged "the same or [a] similar injury" as the rest of the class, an injury that was "a result of a course of conduct that is not unique to any of them" (quotation marks omitted)).

Adequacy is satisfied for two reasons. First, the Named Plaintiffs do not "have any conflicts of interest with other class members." *Staton v. Boeing*, 327 F.3d 938, 957 (9th Cir. 2003). Their interests align with that of the Class as a whole: showing that Wells Fargo opened Unauthorized Accounts in their names and ensuring that they receive damages (actual and statutory) for that misconduct. *See also* Reply at 10-12, 13-15 (explaining why there is no intraclass conflict). Second, the Named Plaintiffs and Class Counsel have prosecuted—and will prosecute—this action "vigorously on behalf of the Class." *Staton*, 327 F.3d at 957. The Named Plaintiffs understand the nature of this case, their duties as Class representatives, and have actively participated in the litigation and the Settlement. Heffelfinger Decl. ¶¶ 4–5; Jabbari Decl. ¶ 5; Rodriguez Decl. ¶ 7; Brooks Decl. ¶ 6. Class Counsel, experienced attorneys with a track record of success, have demonstrated their commitment to the Class by continually pushing to obtain the best results possible for the Class. *See supra* pp. 2–3.

## B.      The Class Satisfies the Rule 23(b)(3) Requirements

Final certification under Rule 23(b)(3) is proper because (1) common questions of law and fact predominate over individual ones and (2) a class action is superior to other available methods for fairly and efficiently adjudicating this controversy.

Common factual and legal questions predominate over individual ones. Common factual questions predominate because Plaintiffs' claims arise from Wells Fargo's common course of conduct. *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1022-23 (9th Cir. 1998). Common legal questions predominate because Plaintiffs rely primarily on a claim arising under a federal statute—the Fair Credit Reporting Act (FCRA), 15 U.S.C. §§ 1681–1681x—rather than many different state-law claims. *See, e.g.*, *Murray v. GMAC Mortg. Corp.*, 434 F.3d 948, 953 (7th Cir. 2006).

A class action is superior to other modes of adjudication. The amount of "actual financial harm suffered by the class members" is "low," ECF 165 at 3; *see also* ECF 145 at 8-9, which means the "realistic alternative" to a class action is "zero individual suits" or arbitrations, *Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 661 (7th Cir. 2004). The availability of punitive damages does not change this

fact. As courts have observed, it is typically the size of actual damages that motivate a layperson to litigate or arbitrate. *See id.*; *Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 801 (7th Cir. 2013). Thus, "there is no reasoned basis to conclude that the fact that an individual plaintiff can recover attorney's fees in addition to statutory damages of up to $1,000 will result in enforcement of FCRA by individual actions." *Stillmock v. Weis Markets, Inc.*, 385 F. App'x 267, 274 (4th Cir. 2010).

## IV.   THE SETTLEMENT MERITS FINAL APPROVAL

A class action settlement cannot become binding unless the presiding court determines that it is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(3). In coming to that determination, courts balance a number of factors:

> [1] the strength of the plaintiffs' case; [2] the risk, expense, complexity, and likely duration of further litigation; [3] the risk of maintaining class action status throughout the trial; [4] the amount offered in settlement; [5] the extent of discovery completed and the stage of the proceedings; [6] the experience and views of counsel; [7] the presence of a governmental participant; and [8] the reaction of the class members to the proposed settlement.

*Cotter v. Lyft, Inc.*, 193 F. Supp. 3d 1030, 1035 (N.D. Cal. 2016) (quoting *Hanlon*, 150 F.3d at 1026). In addition, when, as here, a proposed settlement class is certified under Rule 23(b)(3), the class must be given "the best notice that is practicable under the circumstances," and the substance of that notice must comply with Rule 23(c)(2)(B).

The Settlement in this Action satisfies all of these requirements.

## A.   The Claims that Plaintiffs Can Assert are Strong on their Merits, if Limited in their Number

Plaintiffs' case has a strong factual foundation: Wells Fargo has publicly admitted that its employees opened accounts without its customers' authorization, and its consultant has identified 3.5 million potentially unauthorized accounts. These facts give rise to strong claims.

Plaintiffs continue to believe that Wells would face substantial liability under FCRA if they could pursue their claims through a class action. As Plaintiffs have noted, a jury could award a maximum of $600 million in statutory FCRA damages for all misuses of credit reports within the five

years before this action. *See* Mot. at 15; *see also* 15 U.S.C. § 1681p (five-year statute of repose). Note, however, that this figure assumes that statutory damages of $1,000 are awarded per account. The statutory language, however, *see* 15 U.S.C. § 1681n(a)(1)(B), could allow Wells Fargo to argue that damages are calculated per affected Class member, in which statutory damages would be less than $600 million. *See also* Mot. at 15. Punitive damages would also be available, to be awarded in the discretion of the factfinder.

Plaintiffs could also assert strong claims for breach of contract, or, in the alternative, for unjust enrichment. Under these claims, actual damages would be available, but probably could not be stacked on top of the damages available under FCRA or state consumer protection laws. *See* Reply at 5-6. Punitive damages are not available for breach of contract or unjust enrichment. ECF 145 at 10.

In addition, Plaintiffs likely have strong claims under at least some state consumer protection laws. Assuming generously that each Class member who has been charged unauthorized fees could recover under one of these laws, and that treble damages are available for each, the Class's maximum recovery would be $12.6 million. Reply at 10. Consumer protection law claims, however, do have one drawback that FCRA or common law claims do not: variations among state laws could impede certification of a nationwide class. *See In re Bridgestone/Firestone, Inc.*, 288 F.3d 1012, 1017-18 (7th Cir. 2002).

Class Counsel have also considered the viability of other claims. In our view, however, any possible recovery under those claims must be greatly reduced to account for their substantial weaknesses. Before preliminary approval, the Court heard arguments about the viability and value of claims under state identity-theft statutes. As Plaintiffs observed then, only twenty states allow private civil actions for identity theft. Reply at 4. Of those, ten authorize recovery only of actual damages, which would probably overlap with the damages already recoverable under FCRA or common-law claims. Reply at 4. Identity-theft statutes from the remaining ten states allow statutory damages, but they all require proof of purpose or intent—proof that might be harder to come by and that could also stymie

class certification. *Id.* at 4-5. It is unclear, moreover, whether statutory damages under these state laws could be stacked on top of FCRA statutory damages. *Id.* at 5-6.

This Court has also heard arguments about possible claims under the Stored Communications Act (SCA), or the Racketeer Influenced and Corrupt Organizations Act (RICO).  As Plaintiffs explained before preliminary approval, it is improbable that the Class could assert viable claims under the SCA or RICO. Reply at 7-8, 9; *see also* ECF 165 at 3 (describing such claims as "dubious").

**B.      Further Litigation or Arbitration Would be Uncertain**

**1.      Further litigation on the delegation issue would be risky**

If this Action were not to settle, much of its future would turn on the broad arbitration clause in Wells Fargo's Customer Account Agreement. According to Wells Fargo, that clause does not just foreclose class actions and require the merits of Plaintiffs' claims to be arbitrated individually. Wells also argues that the arbitration clause's delegation provision invests an arbitrator rather than a court with the foundational power to decide arbitrability—i.e., whether a valid arbitration clause exists at all, or whether it covers Plaintiffs' claims.

For arbitrability decisions to be delegated to an arbitrator rather than a court, the delegation must be "clear and unmistakable." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995) (quotation marks, citation, and alteration omitted). Precedent might make it difficult for Plaintiffs to argue, on purely textual grounds, that the delegation provision here is not clear and unmistakable. *See* Stipanowich Decl. ¶¶ 24–25.

Thus, Plaintiffs would have to argue that the delegation provision is invalid or unconscionable. To be considered, however, any argument must challenge the delegation provision specifically. *Rent-A-Center W., Inc. v. Jackson*, 561 U.S. 63, 70–72 (2010). Here, Plaintiffs would likely argue that the agreement to delegate arbitrability to the arbitrator was invalidated both by Plaintiffs' ignorance and Wells Fargo's concealment of its practice of opening Unauthorized Accounts—i.e., by Plaintiffs' unilateral mistake and Wells Fargo's fraudulent inducement, which in this case are two sides of the same

coin. *See* Mot. at 8. On unconscionability, Plaintiffs would need to argue that the delegation provision is procedurally unconscionable due to Wells' secret creation of Unauthorized Accounts, and substantively unconscionable because it "insulat[es] Wells Fargo's widespread fraudulent and illegal activities from class action or judicial review." *Mitchell v. Wells Fargo Bank*, No. 2:16-CV-00966-CW, 2017 WL 5905535, at *21 (D. Utah Nov. 29, 2017); *see also* Mot. at 9.

Plaintiffs would face the risk, however, that courts would hold that these arguments for invalidity or unconscionability attack the arbitration agreement as a whole, rather than just the delegation provision, and thus cannot be considered. *See* Stipanowich Decl. ¶¶ 27, 28. There is considerable uncertainty in the courts about just what it means to attack a delegation provision specifically. One district court, considering arguments against Wells Fargo's delegation provision like the ones canvassed above, ruled that they were not "sufficiently specific" to the delegation provision. *Jeffries v. Wells Fargo & Co.*, No. 2:16-CV-01987-LSC, 2017 WL 3149513, at *4 (N.D. Ala. July 25, 2017). Another district court recently ruled differently. *Mitchell*, 2017 WL 5905535, at *21.[6] This disagreement illustrates the uncertainties that would confront further litigation.

2. **Individual arbitrations of arbitrability would be risky and would, in any event, delay recovery**

If Plaintiffs were to fail in their challenge to the delegation provision, they would be required to engage in individual arbitration to determine arbitrability. The language of the arbitration clause may be broad enough to encompass the disputes here. *See* ECF 69 at 2 (observing that "the arbitration provisions in the plaintiffs' customer agreements with Wells Fargo are broad"). Plaintiffs would thus need to advance arguments against the arbitration clause's validity and conscionability—arguments similar to the ones discussed above. Although Plaintiffs believe these arguments to be compelling, their

---

[6] It appears that the ruling in *Mitchell* was affected by the individual plaintiffs' unique facts involving contract formation. *Mitchell*, 2017 WL 5905535, at *12-16; *see id.* at *20 ("The court concludes that factual questions exist regarding the formation of delegation agreements with the consumer account Plaintiffs."). In any event, the court in *Mitchell* reserved ruling on Wells Fargo's motion to compel arbitration, pending a summary trial. Since then, Wells Fargo has withdrawn its motion to compel arbitration, and the court has set a briefing schedule on Wells Fargo's motion to dismiss.

success is not guaranteed, *see* Mot. at 10, and, in any event, recovery would be delayed, even by arbitration that decided against arbitrability.

**C.     Even if Plaintiffs Ultimately Defeated Wells Fargo's Motion to Compel Arbitration, Gaining Class Certification Would be Uncertain—and if Plaintiffs Were Sent to Arbitration, a Proposed Class Might Face Further Challenges**

As the Court noted in its Order Granting Motion for Preliminary Approval (ECF 165), while the enforceability of the arbitration clause may be doubtful, plaintiffs would face "significant risk" at class certification. *Id.* at 2.

**1.     Even if Plaintiffs were not sent to arbitration, trying to certify a nationwide class would be risky**

If Plaintiffs defeated Wells Fargo's attempt to compel arbitration, the next step would be class certification. Plaintiffs strongly believe that Wells Fargo's common course of misconduct would favor class certification, even absent a settlement. Nevertheless, the kind of misconduct in which Wells Fargo engaged might, perversely, allow Wells Fargo to argue against class treatment. Wells Fargo could argue that adjudicating whether a particular account was unauthorized raises inherently individualized factual issues.

Moreover, victory against Wells Fargo's attempt to compel arbitration would itself spawn possible barriers to class certification, since a finding of unconscionability, fraudulent inducement, or mistake might supply Wells Fargo with ammunition to use against class certification. *See* Mot. at 10-11.

**2.     If Plaintiffs were sent to arbitration, certifying a nationwide class might be difficult**

If Plaintiffs were sent to individual arbitrations pursuant to the delegation provision, the first question for the arbitrators would be arbitrability. Again, a finding of unconscionability, fraud or mistake could allow Wells Fargo, once back in court, to argue against class certification. More fundamentally, if the arbitrators determined—for *any* reason—that the named Plaintiffs' disputes are not arbitrable, Wells Fargo could argue that a class could not be certified because the absent class members had not yet gone to arbitration pursuant to the delegation provision. There is some risk that Wells Fargo

would be allowed to assert this defense against absent class members. *See* Stipanowich Decl. ¶¶ 30–34. If it could, that defense would make it difficult for Plaintiffs to show that they were adequate class representatives with typical claims, Fed. R. Civ. P. 23(a)(3), (4), or that common issues predominated, *id.* 23(b)(3).

Nor would class certification become any easier if arbitrators determined that the Named Plaintiffs' disputes *are* arbitrable. Even if they prevailed on the merits in their individual arbitrations and came back to this Court to confirm their awards, Wells Fargo could argue that it had a defense against all absent Class members who had not yet arbitrated their claims in accordance with the arbitration agreement. Such a defense, if allowed, would again make certification difficult.

**D.     The Amount Offered in Settlement is More than Adequate**

If Plaintiffs could avoid arbitration and maintain a nationwide class through the end of trial, they estimate that they could receive as much as $600 million in compensatory and statutory damages. *See supra* p. 12. Punitive damages would also be available, although it is inherently difficult to predict how large they would be. For that reason, among others, courts generally do not account for punitive damages when measuring the fairness of a proposed class action settlement. *See In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*, MDL No. 2672 CRB, 2017 WL 2212783, at *24 (N.D. Cal. May 17, 2017) ("[G]iven that any award of punitive damages is inherently speculative and discretionary, courts regularly approve settlements that offer no or little compensation representing the risk of a punitive damages award." (quoting *In re Oil Spill by Oil Rig Deepwater Horizon*, 295 F.R.D. 112, 155 (E.D. La. 2013))); *accord, e.g.*, *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 458-59 (2d Cir. 1974) (declining to consider the availability of treble damages in determining whether an antitrust class action was fair), *abrogated on other grounds by Goldberger v. Integrated Res., Inc.*, 209 F.3d 43 (2d Cir. 2000); *Mangone v. First USA Bank*, 206 F.R.D. 222, 229 (S.D. Ill. 2001) (stating that "[p]unitive damages are generally not appropriate in measuring the fairness of a proposed class action settlement," and citing cases).

The question, therefore, is whether the Settlement provides the Class with a favorable amount of compensation, once the maximum recovery of approximately $600 million is discounted by the considerable risks that Plaintiffs would face in continued litigation. *See Cotter v. Lyft, Inc.*, 176 F. Supp. 3d 930, 935 (N.D. Cal. 2016) ("In determining whether the proposed settlement falls within the range of reasonableness, perhaps the most important factor to consider is plaintiffs' expected recovery balanced against the value of the settlement offer." (citation and quotation marks omitted)). Three considerations suggest that the Settlement amount is highly favorable.

*First*, while the Settlement Fund currently stands at $142 million, this amount is a floor rather than a ceiling.[7] If the current size of Net Settlement Pool 1 is insufficient to pay all 2009-2017 Compensatory Damages and still leave $19,366,000 for Non-Compensatory Damages, Wells Fargo must make up the difference. SA ¶ 9.9. Similarly, if the current size of Net Settlement Pool 2 is insufficient to pay all 2002-2008 Compensatory Damages and still leave $5,634,000 for Non-Compensatory Damages, Wells Fargo must make up the difference. *Id.* And even *these* amounts are subject to upward adjustment if there turn out to be more than 3.5 million Unauthorized Accounts compensated through the claims process, which was the estimate the parties gave the Court at the preliminary-approval stage. If there are more than 3.5 million Unauthorized Accounts, the guaranteed amount of Non-Compensatory Damages—$19,366,000 for Net Settlement Pool 1 and $5,634,000 for Net Settlement Pool 2—will increase in proportion to the amount by which the Unauthorized Accounts exceed 3.5 million. ECF 176 at 3; Proposed Order Granting Final Approval of Settlement ¶¶ 15-16.

*Second*, these provisions mean that claimants are guaranteed to receive all—indeed, *more* than— the Compensatory Damages they sustained as a result of Wells Fargo's actions. While there have been some class action settlements that, as a practical matter, provide the class with more than its actual damages, *see Dudum v. Carter's Retail, Inc.*, No. 14-CV-00988-HSG, 2016 WL 7033750, at *4 (N.D.

---

[7] To be clear, Class Counsel believes it unlikely that Compensatory Damages will be high enough to trigger the Settlement's "guarantee" provisions. Nonetheless, the Settlement's guarantees make the Settlement worth *at least* $142 million.

Cal. Dec. 2, 2016), Class Counsel have not encountered a settlement that provides a *formal guarantee* that the class will be made more than whole. In that way, this Settlement may be unprecedented in the relief it provides.

*Third*, even without the guarantee, a Settlement Fund of $142 million represents a sensible discount of the maximum $600 million. Continued litigation would present two distinct kinds of risk. First, there is a not insubstantial risk that Plaintiffs would be sent to individual arbitration. *See supra* pp. 13–14. Second, quite apart from—and probably more formidable than—that risk are the challenges that Plaintiffs would face in gaining, and then maintaining, nationwide class certification. *See supra* pp. 15–16. In light of these risks, $142 million is well within the range of reasonableness for a class action settlement in these circumstances.

**E.     The Parties Have Reached their Settlement at an Appropriate Stage in the Proceedings**

This case did not reach the discovery stage, but "formal discovery is not a necessary ticket to the bargaining table" if "the parties have sufficient information to make an informed decision about settlement." *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 459 (9th Cir. 2000) (quotation marks and citation omitted). Here, Class Counsel had sufficient information to make an informed decision. Before and during litigation and continuing throughout settlement negotiations up until the present, Class Counsel scoured public documents for factual information and persuaded Wells Fargo to supply still more details under the protection of Federal Rule of Evidence 408. *See* Loeser Decl. ¶¶ 5–7; *see also In re Mego*, 213 F.3d at 459 (holding "significant investigation, discovery and research" supported "district court's conclusion that the Plaintiffs had sufficient information to make an informed decision"). After the Settlement was reached, Wells provided confirmatory discovery that has strengthened Class Counsel's conclusion that the Settlement is fair. *See* Loeser Decl. ¶¶ 7, 42, 50; *see also Hart v. Colvin*, No. 15-CV-00623-JST, 2016 WL 6611002, at *8 (N.D. Cal. Nov. 9, 2016) ("While no formal discovery has taken place, the parties exchanged some documents and information that allowed the parties to draft

and refine the terms of the Settlement Agreement, and Plaintiffs' own investigation resulted in useful documents[.]") (internal quotation omitted).

This kind of informal discovery was particularly appropriate given the Court's grant of Wells Fargo's motion to compel arbitration. Indeed, if formal discovery were a prerequisite to settlement, then no action could be settled on a classwide basis once a court granted a motion to compel arbitration. Courts typically stay merits discovery when a motion to compel arbitration is pending. *See, e.g.*, *Stiener v. Apple Computer, Inc.*, No. 07-CV-4486-SBA, 2007 WL 4219388, at *1 (N.D. Cal. Nov. 29, 2007) (staying discovery because if the "pending motion to compel arbitration is granted, litigation will proceed in an arbitral forum, not in this Court."). And once a motion to compel arbitration is granted, there is no judicial mechanism to facilitate discovery. Here, extensive arm's-length negotiations, combined with diligent investigation and informal discovery, was enough to give Class Counsel the information needed to make an informed decision about the Settlement.

## F.    Experienced and Skilled Class Counsel Favor the Settlement

Class Counsel are experienced class action lawyers who have litigated some of the country's largest consumer class actions. *See* Loeser Decl. ¶ 3 & Ex. A. Class Counsel engaged in arm's-length settlement discussions with Wells Fargo's skilled counsel at Munger, Tolles & Olson. *See In re Netflix Privacy Litig.*, No. 11-CV-00379-EJD, 2013 WL 1120801, at *4 (N.D. Cal. Mar. 18, 2013) (applying at preliminary approval a "presumption" of fairness to settlement that was "the product of non-collusive, arms' length negotiations conducted by capable and experienced counsel"). These discussions, moreover, were overseen by two professional mediators, Loeser Decl. ¶¶ 27, 30–36, 40, 51, whose assistance further "confirms that the settlement is non-collusive." *Satchell v. Fed. Express Corp.*, No. 03-CV-2659-SI, 2007 WL 1114010, at *4 (N.D. Cal. Apr. 13, 2007).

Class Counsel's opinion should certainly carry weight where, as here, Class Counsel have proved themselves to be committed advocates and fiduciaries for the Class. Even after the parties had reached a settlement in principle, Class Counsel continued to press for additional relief for the Class. As

more information became available due to congressional hearings and their own investigations, Class

Counsel first expanded the time frame of the Settlement to reach back to 2002. Then, prompted by the

Court's Order Regarding Preliminary Approval (ECF 155), and after extensive additional negotiations,

Class Counsel secured an uncapped guarantee of Compensatory Damages, as well as a $25 million

guarantee of Non-Compensatory Damages.  And even after the Court issued its Preliminary Approval

Order, Class Counsel secured a promise from Wells Fargo to add to the Settlement Fund should the

number of validated Unauthorized Accounts ultimately be greater than had been estimated. In light of

Class Counsel's proven commitment to the Class, their recommendation weighs strongly in favor of

final approval. *See, e.g.*, *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*,

229 F. Supp. 3d 1052, 1067 (N.D. Cal. 2017).

## G.   This Settlement Builds on Separate Settlements Between Government Entities and Wells Fargo

The Los Angeles City Attorney, the Office of the Comptroller of Currency (OCC), and the

Consumer Financial Protection Bureau (CFPB), pursued separate, parallel litigation, and investigation,

respectively. The work of the government resulted in substantial penalties, and $5 million of consumer

restitution. This Settlement does not affect Wells Fargo's obligations under those earlier settlements. SA

¶ 9.6. The Settlement also provides substantially more relief for consumers—both because it covers a

broader period and because it creates a much larger fund for consumers.

## H.   The Reactions of Class Members Have Been Positive

The objection deadline is February 19, 2018, and thus, full consideration of Class member

reaction must necessarily wait until after that date.  Nevertheless, to date, over 160,000 claims have been

filed in the Settlement, while only forty-five persons have opted out. Thus, out of the persons who have

responded to the Settlement thus far, about 0.03% have chosen to exclude themselves.

Likewise, to date, seven objections were submitted, but of these, three did not object to the Settlement and now appear to be resolved, two did not explain the grounds of their objection and were submitted along with opt-out requests, one lacks merit, and one does not appear to be an objection at all.

*Three objections that did not object to the Settlement and may now be resolved:* One of these three objections expressed a misunderstanding of the Settlement and simultaneously submitted an opt-out form. Loeser Decl. Ex. C1. (Subsequently, this Class member submitted two Claim Forms. *Id.*) Two other objections—one submitted by a Class member on her own behalf, and the other submitted by that same Class member on her mother's behalf—did not appear to be objecting to the substance of the Settlement. *See id.*, Exs. C2, C3. Because these three objections did not seem to be objecting to the Settlement, Class Counsel reached out to the putative objectors, stating that they did not wish to interfere with the Class members' right to object, but simply wanted to answer any questions the Class members might have. *Id.* ¶ 149. After conversations with Class Counsel, the Class members stated orally that they wished to withdraw their objections, although none of these objectors has officially withdrawn their objection in writing. *Id.* ¶ 148.

*Two objections that were submitted with opt-out letters and do not explain their objections:* Two other objections were submitted along with requests for exclusion. *Id.*, Exs. C4, C5. Under the Settlement Agreement, Class members who attempt to both object and opt out are deemed to be excluded, and thus they are precluded from objecting to the Settlement. SA ¶ 12.4. One of these persons, Roberto Rizzi, stated that he "object[ed]," but did not specify why.[8] Loeser Decl., Ex. C4. The other person, Janeice Moore, also stated that she objected, but, as far as Class Counsel can discern from her handwriting, she also did not specify why. *Id.*, Ex. C5.

*The two other objections:* The two other objections are from Class members Destiny Lynn Alcorn and Dan Leroy Wagner.

---

[8] Class Counsel have attempted to reach out to Mr. Rizzi, but have not yet been able to speak with him. Loeser Decl. ¶ 150.

1   Destiny Lynn Alcorn submitted four objection forms that are somewhat different from each

2   other, but as a whole criticize the Settlement in two ways. *Id.*, Ex. C6. First, she objects to paying any

3   attorney fees out of the Settlement Fund, on the ground that the "government has that responsibility of a

4   case." *Id.* But the government has already acted. The CFPB, OCC, and Los Angeles City Attorney have

5   already entered into settlements with Wells Fargo—and this Settlement provides consumers with far

6   more relief. Loeser Decl. ¶ 75 n.5. More generally, the American regulatory system relies heavily on

7   private enforcement,[9] which, in turn, requires that private counsel have a sufficient motive to represent

8   classes of consumers with small claims. This motive, as courts have recognized, is generally provided by

9   fees from a common fund. *See Deposit Guar. Nat'l Bank v. Roper*, 445 U.S. 326, 338–39 & n.9 (1980).

10   In Ms. Alcorn's second criticism, she objects to the payment of any administrative expenses and other

11   costs ("payment to non-lawyers"), seemingly on the ground that such expenses constitute "lawyer fees."

12   Loeser Decl., Ex. C6. But the expenses claimed here are not fees for legal work, and courts routinely

13   approve the payment of reasonable, sufficiently documented expenses out of a common fund because

14   they benefit the class as a whole. *See, e.g.*, *Hawthorne v. Umpqua Bank*, No. 11-cv-06700-JST, 2015

15   WL 1927342, at *6 (N.D. Cal. Apr. 28, 2015).

16   The objection from Dan Leroy Wagner reads: "Apparently I have an account that caused this

17   communication to come to me. I'd like to know where it is and why Wells Fargo has apparently used my

18   Social Security Number. I haven't had an account with Wells Fargo for quite some time, quite possibly

19   4 to 5 years." Loeser Decl., Ex. C7. This does not sound like an objection to the Settlement so much as a

20   request for more information. Class Counsel have attempted to contact Mr. Wagner, but have not yet

21   been able to reach him. *Id.* ¶ 154.

---

[9] *See, e.g.*, *White v. E-Loan, Inc.*, No. 05-CV-0208-SI, 2006 WL 2411420, at *9 (N.D. Cal. Aug. 18, 2006) ("While the FTC can bring a civil action against a company, . . . such an action does not provide the consumer whose rights were violated with any redress. Further, as evidenced by the FCRA's authorization of statutory damages and attorneys' fees awards, FTC enforcement is not designed to be the sole mechanism for protecting consumers' rights created by the FCRA.").

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

In short, to date, the number of opt-outs is exceedingly low, and the number of objections is even lower. To the extent other opt-outs and objections are received later, Class Counsel will address them in their Reply.

## V.   NOTICE TO THE CLASS HAS SATISFIED THE REQUIREMENTS OF RULE 23

Rule 23 requires that the best notice practicable be sent to all class members who will be bound by the proposed Settlement if they have not opted out. *See* Fed. R. Civ. P. 23(c)(2)(B), (e)(1). As detailed in the Declaration from Shannon Wheatman, the Notice Plan—which faithfully followed the program proposed to the Court at the preliminary approval stage—has satisfied this requirement. *See generally* Wheatman Decl.; Botzet Decl.

## VI.   CONCLUSION

For the reasons given above, Plaintiffs respectfully request that the Court enter an order granting final certification to the Class and final approval to the Settlement.

Respectfully Submitted,

DATED this 19th day of January, 2018.

KELLER ROHRBACK L.L.P.

By   */s/ Derek W. Loeser*
Derek Loeser, *admitted pro hac vice*
Gretchen Freeman Cappio, *admitted pro hac vice*
Daniel P. Mensher, *admitted pro hac vice*
KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
(206) 623-1900; Fax: (206) 623-3384
dloeser@kellerrohrback.com
gcappio@kellerrohrback.com
dmensher@kellerrohrback.com

Jeffrey Lewis (Bar No. 66587)
KELLER ROHRBACK L.L.P.
300 Lakeside Drive, Suite 1000
Oakland, CA 94612
(510) 463-3900; Fax: (510) 463-3901
jlewis@kellerrohrback.com

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Matthew J. Preusch (Bar No. 298144)
1129 State Street, Suite 8
Santa Barbara, CA 93101
(805) 456-1496; Fax: (805) 456-1497
mpreusch@kellerrohrback.com

*Attorneys for Plaintiffs*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CERTIFICATE OF SERVICE

I, Derek W. Loeser, hereby certify that on January 19, 2018, I electronically filed **PLAINTIFFS' NOTICE OF MOTION, MOTION, AND MEMORANDUM IN SUPPORT OF MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT** with the Clerk of the United States District Court for the Northern District of California using the CM/ECF system, which shall send electronic notification to all counsel of record.


*/s/ Derek W. Loeser*
Derek W. Loeser