Derek W. Loeser, *admitted pro hac vice*
Gretchen Freeman Cappio, *admitted pro hac vice*
KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
(206) 623-1900; Fax: (206) 623-3384
dloeser@kellerrohrback.com
gcappio@kellerrohrback.com

Jeffrey Lewis (Bar No. 66587)
KELLER ROHRBACK L.L.P.
300 Lakeside Drive, Suite 1000
Oakland, CA 94612
(510) 463-3900; Fax: (510) 463-3901
jlewis@kellerrohrback.com

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| SHAHRIAR JABBARI and KAYLEE HEFFELFINGER, on behalf of themselves and all others similarly situated,<br><br>          Plaintiffs,<br><br> v.<br><br>WELLS FARGO & COMPANY AND WELLS FARGO BANK, N.A.,<br><br>          Defendants. | No. 15-cv-02159-VC<br><br>**DECLARATION OF PROFESSOR ROBERT H. KLONOFF RELATING TO CLASS SETTLEMENT APPROVAL, ATTORNEYS' FEES, COSTS, AND INCENTIVE PAYMENTS**<br><br>Date:   March 22, 2018<br>Time:   10:00 a.m.<br>Courtroom: 4, 17th Floor<br><br>Judge:  Hon. Vince Chhabria |

# TABLE OF CONTENTS

I.   INTRODUCTION                                                                          1

II.  QUALIFICATIONS                                                                        1

III. MATERIALS RELIED UPON                                                                 7

IV.  BACKGROUND OF THIS LITIGATION AND SETTLEMENT                                          7

   A.  Allegations in the Complaints                                                      7

   B.  Settlement Negotiations                                                           8

   C.  Terms of the Initial Agreement in Principle                                        9

   D.  Amendments to Proposed Settlement Based on District Court's Concerns              10

   E.  Preliminary Approval and Notice                                                   12

   F.  Plaintiffs' Request for Class Certification, Settlement Approval, Attorneys' Fees,
      Costs, and Incentive Payments                                                  14

V.   SUMMARY OF OPINIONS                                                                  14

VI.  DETAILED DISCUSSION OF OPINIONS                                                      16

   A.  This Case Should Be Certified as a Class Action for Settlement Purposes           16

      1.  The Threshold Requirements for Class Certification Are Satisfied              17

      2.  The Explicit Rule 23(a) Requirements Are Satisfied                           18

      3.  The Rule 23(b)(3) Requirements Are Satisfied                                 19

   B.  The Proposed Class Settlement Is Fair, Reasonable, and Adequate                   20

      1.  The Ninth Circuit's *Churchill* Factors, Taken as a Whole, Support
         the Settlement                                                               20

         a.  Strength of the Plaintiffs' Case                                         20

         b.  Risk, Expense, Complexity, and Likely Duration of Further Litigation     21

         c.  Risk of Maintaining Class Action Status Throughout Trial                 23

         d.  Amount Offered in Settlement                                             23

         e.  Extent of Discovery and Stage of Proceedings                             25

         f.  Experience and Views of Counsel                                          25

         g.  Presence of Government Participants                                       25

         h.  Reaction of Class Members: Unpersuasiveness of Objections Raised to
            Date                                                                     26

            i.   Objections Based on Lack of Formal Discovery                         26

            ii.  Objections Based on Failure to Pursue Various Causes of Action       27

            iii. Objections Based on Failure to Designate Subclasses                 30

iv.  Miscellaneous Objections ..... 33

2.  The Ninth Circuit's *Bluetooth* Factors Support the Settlement ..... 34

   a.  Whether Class Counsel Are Receiving All or Most of the Settlement ..... 35

   b.  Whether There Is a "Clear Sailing" Agreement ..... 35

   c.  Whether Funds Revert to the Defendant ..... 35

3.  Additional Factors Identified in the Case Law Support the Settlement ..... 36

   a.  Involvement of a Mediator ..... 36

   b.  Active Role of the District Court at the Preliminary Approval Stage ..... 37

4.  Conclusion on Settlement Fairness ..... 38

C.  The Attorneys' Fees Requested By Class Counsel Are Reasonable ..... 38

1.  The Court Should Use the Percentage-of-the-Fund Method ..... 39

2.  The 15 Percent Fee Requested Here Is Reasonable ..... 40

   a.  The Percentage Requested Is Well Under the Ninth Circuit's 25 Percent Benchmark ..... 40

   b.  The Percentage Requested is at the Low End of Fees Awarded in Major Class Actions ..... 40

   c.  The 15 Percent Fee Requested Is Supported By the Ninth Circuit's Reasonableness Factors ..... 42

      i.  Results Achieved by Class Counsel ..... 43

      ii.  Length the Case Has Transpired ..... 43

      iii.  Complexity of the Case and Skill Required ..... 43

      iv.  Risks Involved ..... 43

      v.  Percentages Awarded in Other Class Actions ..... 44

      vi.  Non-Monetary Benefits ..... 44

      vii. Percentages in Standard Contingency-Fee Agreements in Similar Individual Cases ..... 44

      viii. Class Counsel's Lodestar ..... 45

3.  There Is No Need for a Lodestar Cross Check ..... 45

4.  In Any Event, a Lodestar Analysis Supports the Fees Requested ..... 47

   a.  The Hours and Billing Rates Proposed By Class Counsel Are Reasonable ..... 47

   b.  Additional Expected Hours Should Be Included ..... 51

   c.  The Multiplier Is Well Justified Under the *Kerr* Factors ..... 51

      i.  Time and Labor Required ..... 54

      ii.  Novelty and Difficulty of Questions Involved ..... 54

iii.  Skill Requisite to Perform the Legal Service Properly              54

iv.  Preclusion of Other Employment Due to Acceptance of the Case        55

v.   Customary Fee                                                       55

vi.  Time Limitations Imposed By the Client or the Circumstances         55

vii. Amount Involved and Results Obtained                                55

viii. Experience, Reputation, and Ability of the Attorneys               56

ix. The "Undesirability" of the Case                                     56

x.  Nature and Length of the Professional Relationship With the Client   57

xi. Awards in Similar Cases                                              57

5.   Conclusion on Attorneys' Fees                                       58

D.  The Out-of-Pocket Costs Sought By Class Counsel Are Reasonable       58

E.  The Proposed Incentive Payments for the Class Representatives Are Reasonable   59

VII.    CONCLUSION                                                       62


APPENDIX A:    Curriculum Vitae                                          63

APPENDIX B:    Materials Reviewed                                        77

ROBERT H. KLONOFF, under penalty of perjury, declares as follows:

## I. INTRODUCTION

1. I have been asked by class counsel to opine on the following issues: the suitability of the case for certification as a settlement class; the fairness of the proposed class action settlement; the reasonableness of the requested attorneys' fees; the reasonableness of the requested out-of-pocket costs; and the reasonableness of the proposed incentive payments to the class representatives. I am offering my opinions for the Court's consideration based on my background and experience. I recognize, of course, that my role is limited and that this Court will make the ultimate decision.

## II. QUALIFICATIONS

2. I have served as an expert in numerous class action cases, including several recent high-profile class settlements. I am currently the Jordan D. Schnitzer Professor of Law at Lewis & Clark Law School and have held that position since June 1, 2014. This is an endowed, tenured position at the rank of full professor. From July 1, 2007, to May 31, 2014, I served as the Dean of Lewis & Clark Law School, and I was also a full professor at Lewis & Clark during that time. Immediately prior to assuming the deanship at Lewis & Clark, I served for four years as the Douglas Stripp/Missouri Professor of Law at the University of Missouri-Kansas City School of Law (UMKC). That appointment was an endowed, tenured position at the rank of full professor. Prior to my academic post at UMKC, I served for more than a dozen years as an attorney with the international law firm of Jones Day, working in the firm's Washington, D.C. office. For most of that time, I was an equity partner at the firm. (I continued to work at Jones Day while I was employed at UMKC; my status with the firm during that time changed from partner to of counsel.) While working at Jones Day (before joining the UMKC faculty), I also served for many years as an adjunct professor of law at Georgetown University Law Center. Before joining Jones Day, I served as an Assistant United States Attorney and as an Assistant to the Solicitor General of the United States. Immediately after graduating from law school, I served as a law clerk for Chief Judge John R. Brown of the U.S. Court of Appeals for the Fifth Circuit. I received my law degree from Yale Law School.

3.    In my various academic positions, I have taught (among other subjects) complex litigation, class actions, civil procedure, federal courts, and federal appellate procedure.

4.    In September 2011, Chief Justice John G. Roberts, Jr., appointed me to serve a three-year term as the academic voting member of the Judicial Conference Advisory Committee on Rules of Civil Procedure ("Advisory Committee").   The Advisory Committee considers and recommends amendments to the Federal Rules of Civil Procedure.   Only one civil procedure professor in the United States is selected by the Chief Justice to serve in that role during any three-year term.   In May 2014, Chief Justice Roberts reappointed me to serve a second three-year term on the Advisory Committee.   I completed that service in May 2017.   (The maximum period of service on the Advisory Committee is six years.)   I also served on the Advisory Committee's Class Action Subcommittee, which took the lead for the full Advisory Committee on proposed amendments to the federal class action rule, Federal Rule of Civil Procedure 23.   Those proposed amendments are currently making their way through the rules adoption process and are on track to become effective on December 1, 2018.[1]

5.    I served for five years as an Associate Reporter for the American Law Institute's class action (and other multi-party litigation) project, *Principles of the Law of Aggregate Litigation*.   I was the principal author of Chapter 3, which addresses class action settlements and attorneys' fees.   The ALI project was unanimously approved by the membership of the American Law Institute at its annual meeting in May 2009, and was published by the American Law Institute in May 2010.   It has been frequently cited by courts and commentators.[2]

---

[1]   *See* Pending Rules and Forms Amendments, U.S. COURTS, http://www.uscourts.gov/rules-policies/pending-rules-and-forms-amendments (last visited Jan. 16, 2018).

[2]   *See, e.g.*, *Smith v. Bayer Corp.*, 131 S. Ct. 2368, 2381 n.11 (2011); *Baker v. Microsoft Corp.*, 797 F.3d 607, 615 n. 5 (9th Cir. 2015), *rev'd on other grounds*, 137 S. Ct. 1702 (2017); *Hill v. State Street Corp.*, 794 F.3d 227, 229, 231 (1st Cir. 2015); *In re BankAmerica Corp. Secs. Litig.*, 775 F.3d 1060, 1063–67 (8th Cir. 2015); *In re Nexium Antitrust Litig.*, 777 F.3d 9, 19–20 (1st Cir. 2015); *In re Trans Union Corp. Privacy Litig.*, 741 F.3d 811, 813 (7th Cir. 2014); *In re Baby Prods. Antitrust Litig.*, 708 F.3d 163, 171–72 (3d Cir. 2013); *Ira Holtzman, CPA v. Turza*, 728 F.3d 682, 689–90 (7th Cir. 2013); *In re Lupron Mktg. & Sales Practices Litig.*, 677 F.3d 21, 32–33 (1st Cir. 2012); *Klier v. Elf Atochem N.A., Inc.*, 658 F.3d 468, 474–75 nn.14–16 (5th Cir. 2011); *Nachshin v. AOL, LLC*, 663 F.3d 1034, 1039 n.2 (9th Cir. 2011); *Keepseagle v. Vilsack*, 118 F. Supp. 3d 98, 116 (D.D.C. 2015); *In re Checking Account Overdraft Litig.*, 830 F. Supp. 2d 1330, 1355–56 (S.D. Fla. 2011); Sergio J. Campos, *Mass Torts and Due Process*, 65 VAND. L. REV. 1059, 1063 (2012); Tanya J. Monestier, *Transnational Class Actions and the Illusory Search for Res Judicata*, 86 TUL. L. REV. 1, 66 (2011); Rhonda Wasserman, *Cy Pres in Class Action Settlements*, 88 S. CAL. L. REV. 97, 111 (2014); Ryan C. Williams, *Due Process, Class Action Opt Outs, and the Right to Sue*, 115 COLUM. L. REV. 599, 649–50 (2015).

6.  I have more than 30 years of experience as a practicing lawyer.  I have had eight oral arguments before the U.S. Supreme Court, and numerous oral arguments in other federal and state appellate courts throughout the country.  As an attorney at Jones Day, I personally handled more than 100 class action cases, mostly (but not entirely) on the defense side.

7.  I have lectured and taught on class actions and other litigation topics throughout the United States and abroad, including presentations at law schools in Cambodia, Canada, China, Colombia, Croatia, Ecuador, India, Israel, Italy, Japan, the Philippines, Russia, South Korea, Taiwan, and Turkey.  Over the years, I have frequently appeared as an invited speaker at class action symposia, conferences, and continuing legal education programs.[3]

8.  I co-authored the first casebook devoted specifically to class actions, and I am now the sole author of that book:  *Class Actions and Other Multi-Party Litigation: Cases and Materials* (West 4th ed. 2017).  I am also the sole author of the Nutshell on class actions: Robert H. Klonoff, *Class Actions and Other Multi-Party Litigation in a Nutshell* (West 5th ed. 2017). These texts are used at law schools throughout the United States and have been cited by many courts and commentators.[4]   In addition, I have authored or co-authored numerous scholarly articles on class actions and other topics.[5]   I also serve on the advisory board of Class Action Litigation Report, a Bloomberg/BNA publication.

---

[3]  Examples of those courses and speaking engagements are contained in my attached curriculum vitae (Appendix A).

[4]  *See, e.g., Kolbe v. BAC Home Loans Servicing, LP,* 738 F.3d 432, 468 (1st Cir. 2013) (citing *Nutshell*); *Culver v. City of Milwaukee,* 277 F.3d 908, 913 (7th Cir. 2002) (citing *Nutshell*); *Adams v. United Services Automobile Ass'n,* No. 2:14-CV-02013, 2016 WL 1465433, at *7 (W.D. Ark. Apr. 14, 2016) (citing *Nutshell*); Jaime Dodge, *Privatizing Mass Settlement,* 90 NOTRE DAME L. REV. 335, 337 n.12 (2014) (citing casebook); Vaughn R. Walker, *Class Actions Along the Path of Federal Rule Making,* 44 LOY. U. CHI. L.J. 445, 449 n. 17 (2012) (citing *Nutshell*); Richard A. Nagareda, *The Preexistence Principle and the Structure of the Class Action,* 103 COLUM. L. REV. 149, 151 n.5 (2003) (citing casebook); Kenneth S. Rivlin & Jamaica D. Potts, *Proposed Rule Changes to Federal Civil Procedure May Introduce New Challenges in Environmental Class Action Litigation,* 27 HARV. ENVTL. L. REV. 519, 521 n.10 (2003) (citing *Nutshell*).

[5]  For example, my 2013 article, *The Decline of Class Actions,* 90 WASH. U. L. REV. 729 (2013), has been widely cited. *See, e.g., In re National Football League Players' Concussion Injury Litig.,* 775 F.3d 570, 576 (3d Cir. 2014); *Eubank v. Pella Corp.,* 753 F.3d 718, 719 (7th Cir. 2014) (Posner, J.); *In re Johnson,* 760 F.3d 66, 75 (D.C. Cir. 2014); *Dickens v. GC Services Limited Partnership,* 220 F. Supp. 3d 1312, 1324 (M.D. Fla. 2016); *In re Kosmos Energy Ltd. Sec. Litig.,* No. 3:12-cv-373-B, 2014 WL 1095326, at *2 n.20 (N.D. Tex. Mar. 19, 2014); Joseph A. Seiner, *Tailoring Class Actions to the On-Demand Economy,* 78 OHIO ST. L.J. 21, 25 n.14, 32 n.54 (2017); Brian T. Fitzpatrick, *Justice Scalia and Class Actions: A Loving Critique,* 92 NOTRE DAME L. REV. 1977, 1979 (2017); Deborah R. Hensler, *From Sea to Shining Sea: How and Why Class Actions Are Spreading Globally,* 65 KAN. L. REV. 965, 965 n.2 (2017); Richard Marcus, *Bending in the Breeze: American Class Actions in the Twenty-First Century,* 65 DEPAUL L. REV. 497, 497 & n.2 (2016); Maureen Carroll, *Class Action Myopia,* 65 DUKE L.J. 843, 846

9.   In October 2014, I was elected to membership in the International Association of Procedural Law (IAPL), an organization of preeminent civil procedure scholars from around the world.  I was selected in a competitive process to present a scholarly article on class actions at the May 2015 Congress of the IAPL, an event held once every four years.

10.   I have testified as an expert in numerous class action cases and in other cases raising civil procedure issues.  Between 2011 and the present, I testified in the following cases:

- *Lynch v. Lynch*, No. F.D. 14-6239-006 (Pa. Ct. Comm. Pl., Allegheny Cnty.) (submitted expert declaration on the nature of class action law practice in the context of a divorce proceeding involving a class action attorney) (dated 9/05/17);

- *In re Chinese-Manufactured Drywall Litigation*, MDL No. 2047 (E.D. La.) (submitted expert declaration on attorneys' fees issues) (dated 5/04/17);

- *In re Volkswagen "Clean Diesel" Marketing, Sales Practices and Products Liability Litigation*, No. 3:15-md-02672-CRB (N.D. Cal.) (submitted expert declaration addressing objections by class members to proposed 3.0-liter and Bosch settlements) (dated 4/28/17);

- *State of Louisiana & Vermilion Parish School Board v. Louisiana Land and Exploration Co., et al.,* No. 82162 (15th Judicial Court, Parish of Vermilion) (submitted expert declaration on attorneys' fees issues) (dated 3/9/17);

- *Thacker v. Farmers Insurance Exchange*, Case No. 2006CV342 (Dist. Ct. Boulder County, Colo.) (submitted expert declaration on class certification issues) (dated 1/24/17);

n.8, 876–78 & nn.181, 183 & 190–93, 881 nn.211 & 213, 883 n.225 (2016); Claire E. Bourque, Note, *Liability Only, Please—Hold the Damages: The Supreme Court's New Order for Class Certification*, 22 GEO. MASON L. REV. 695, 698 n.29 (2015); Martin H. Redish & Julie M. Karaba, *One Size Doesn't Fit All: Multidistrict Litigation, Due Process, and the Dangers of Procedural Collectivism*, 95 B.U. L. REV. 109, 110 n.2 (2015); Robert G. Bone, *The Misguided Search For Class Unity*, 82 GEO. WASH. L. REV. 651, 654 n.6 (2014); David Freeman Engstrom, *Private Enforcement's Pathways: Lessons From Qui Tam Litigation*, 114 COLUM. L. REV. 1913, 1920 n.17 (2014); Howard M. Erichson, *The Problem of Settlement Class Actions*, 82 WASH. U. L. REV. 951, 956 n.20 (2014); Arthur R. Miller, Keynote Address, The Preservation and Rejuvenation of Aggregate Litigation: A Systemic Imperative, 64 EMORY L.J. 293, 294 n.7 (2014); Linda S. Mullenix, *Ending Class Actions As We Know Them: Rethinking the American Class Action*, 64 EMORY L.J. 399, 403 n.14 (2014); Stephen R. Subrin & Thomas O. Main, *The Fourth Era of American Civil Procedure*, 162 U. PA. L. REV. 1839, 1853 n.80 (2014); Erin L. Geller, *The Fail-Safe Class as an Independent Bar to Class Certification*, 81 FORDHAM L. REV. 2769, 2775 n. 38 (2013); Arthur R. Miller, *Simplified Pleading, Meaningful Days in Court, and Trials on the Merits: Reflections on the Deformation of Federal Procedure*, 88 N.Y.U. L. REV. 286, 314 n.105 (2013); D. Theodore Rave, *Governing the Anticommons in Aggregate Litigation*, 66 VAND. L. REV. 1183, 1186 n.5 (2013); Brandon L. Garrett, *Aggregation and Constitutional Rights*, 88 NOTRE DAME L. REV. 593, 610 n.82 (2012); Richard Marcus, *Still Confronting the Consolidation Conundrum*, 88 NOTRE DAME L. REV. 557, 560 n.17, 589 n.154 (2012); *Hearing on "The State of Class Actions Ten Years after the Class Action Fairness Act" Before the Committee on the Judiciary, Subcommittee on the Constitution and Civil Justice* (U.S. House of Representatives, Feb. 27, 2015) (statement of Prof. Patricia W. Moore), at 2 n.4.

- *In re Volkswagen "Clean Diesel" Marketing, Sales Practices and Products Liability Litigation*, No. 3:15-md-02672-CRB (N.D. Cal.) (submitted expert declaration addressing objections by class members to proposed 2.0-liter settlement) (dated 9/30/16);

- *In the Matter of Gosselin Group*, No. 15/3925/B (Antwerp Court of First Instance, Belgium) (submitted expert declaration discussing the role of U.S. federal appellate courts in the factfinding process) (dated 9/27/16);

- *In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico on April 20, 2010*, Nos. 12-970, 15-4143, 15-4146, and 15-4645 (E.D. La.) (submitted expert declaration on class certification, settlement fairness, and attorneys' fees relating to proposed Halliburton/Transocean class settlement) (filed 8/5/16);

- *Ben-Hamo v. Facebook, Inc. and Facebook Ireland Limited*, No. 46065-09-14 (Central District Court, Israel) (submitted expert declaration on Sept. 3, 2015, on behalf of Facebook, Inc. and Facebook Ireland Limited addressing various issues of U.S. civil procedure and class action law);

- *Skold v. Intel Corp.*, Case No. 1-05-CV-039231 (Super. Ct. of Cal., Santa Clara County) (submitted expert declaration on class settlement approval, attorneys' fees, and incentive payments to class representatives) (filed 12/30/14);

- *In re National Football League Players' Concussion Injury Litigation*, No. 2:12-md-02323-AB (E.D. Pa.) (submitted expert declaration on class certification, class notice, and settlement fairness) (Doc. No. 6423-9) (filed 11/12/14);

- *MBA Surety Agency, Inc. v. AT&T Mobility, LLC*, Case No. 1222-CC09746 (Mo. 22d Dist.) (submitted expert declaration on class certification and settlement fairness on Feb. 13, 2013; submitted supplemental expert declaration on Feb. 19, 2013; and testified in court on Feb. 20, 2013);

- *In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico on April 20, 2010*, No. 2:10-md-02179-CJB-SS (E.D. La.) ("Deepwater Horizon") (submitted expert declarations on class settlement for economic and property damages and attorneys' fees (Doc. No. 7104-3) and class settlement for personal injuries (Doc. No. 7111-4) (both filed 08/13/12), and submitted supplemental expert declarations for both class settlements (Doc. No. 7727-4) (economic), (Doc. No. 7728-2) (medical) (both filed 10/22/12));

- *Robichaux v. State of Louisiana, et. al.* (No. 55,127) (18th Judicial Dist. Ct., Iberville Parish, La.) (submitted written report on attorneys' fees on February 20, 2012, gave deposition testimony on March 7, 2012, and testified in court on April 11, 2012); and

- *In re AT&T Mobility Wireless Data Services Sales Tax Litig.*, MDL No. 2147, Case No. 1:10-cv-02278 (N.D. Ill.) (submitted expert declarations on the fairness of a proposed class action settlement (Doc. No. 163-3) and on

attorneys' fees and incentive payments (Doc. 164-1) (both filed 03/08/11), and testified in court on March 10, 2011).

11.   Courts reviewing class settlements and attorneys' fees issues have relied extensively on my testimony.   For example, in the *Volkswagen Clean Diesel* litigation, Judge Charles Breyer repeatedly cited and quoted my two Declarations in his three opinions—relating to the 2.0-liter VW class settlement, the 3.0-liter VW class settlement, and the class settlement with VW's co-defendant, Bosch.[6]   In the *Deepwater Horizon* case, Judge Carl Barbier cited and quoted my Declarations (relating to a proposed settlement with British Petroleum) more than 60 times in his analysis of class certification and fairness.[7]   In a later order in that MDL, Judge Barbier repeatedly cited my Declaration (which I filed in connection with a class settlement involving Transocean and Halliburton).[8]   In the *AT&T Mobility* litigation, Judge Amy St. Eve cited and quoted my Declarations more than 20 times in upholding a class settlement and awarding attorneys' fees.[9]   And in *Skold v. Intel Corp.*, Judge Peter Kirwan cited my Declaration in approving a class settlement and awarding attorneys' fees.[10]

12.   Along with my expertise and experience in the areas of class certification and settlement fairness, I have done extensive work in the area of attorneys' fees.   In addition to my expert witness work, I have litigated attorneys' fees issues in private practice, have worked on such issues in my role as Associate Reporter for the ALI *Aggregate Litigation* project, and have

---

[6]   *See In re Volkswagen "Clean Diesel" Marketing, Sales Practices & Prods Liab. Litig.*, No. 3:15-md-02672-CRB, 2016 WL 6248426, at *18, *19, *20 (N.D. Cal. Oct. 25, 2016), *appeal filed*, No. 16-17185 (9th Cir. Nov. 29, 2016); Order Granting Final Approval of the Consumer and Reseller Dealership 3.0-Liter Class Action Settlement, Case No. 3:15-md-02672-CRB (Doc. 3229) (filed 05/17/17), at 34, 35, 38; Order Granting Final Approval of the Bosch Class Action Settlement, Case No. 3:15-md-02672-CRB (Doc. 3230) (filed 05/17/17), at 18.

[7]   *See In re Deepwater Horizon*, 910 F. Supp. 2d 891, 903, 914–16, 918–21, 923–24, 926, 929–33, 938, 941, 947, 953, 955, 960, 962 (E.D. La. 2012) (approving economic and property damages settlement), *aff'd*, 739 F.3d 790 (5th Cir. 2014); *In re Deepwater Horizon*, 295 F.R.D. 112, 133–34, 136, 138–41, 144–45, 147 (E.D. La. 2013) (approving medical benefits settlement).

[8]   *See* Order and Reasons, Case No. 2:10-md-02179-CJB-JCW (Doc. 22252) (E.D. La. 02/15/17); *available at* http://www.laed.uscourts.gov/sites/default/files/OilSpill/2152017OrderAndReasons%28HESI%26TOsettlement%29.pdf (last visited Aug. 26, 2017).

[9]   *See In re AT&T Mobility Wireless Data Svcs. Sales Tax Litig.*, 789 F. Supp. 2d 935, 956–59, 961, 963–65 (N.D. Ill. 2011) (approving class settlement); *In re AT&T Mobility Wireless Data Svcs. Sales Tax Litig.*, 792 F. Supp. 2d 1028, 1032 n.3, 1034–35, 1037, 1040, 1042 (N.D. Ill. 2011) (awarding attorneys' fees).

[10]   *See Skold v. Intel Corp.*, No. 1-05-CV-039231 (Cal. Super. Ct. Santa Clara County) (Jan. 29, 2015), at 7.

addressed attorneys' fees issues in my academic writings.[11]  In those various tasks, I have developed expertise in attorneys' fees concepts, such as percentage of the fund and the lodestar.

13.  I have extensive knowledge of typical hourly rates for attorneys and paralegals in class action litigation.  I have served as counsel and as an expert in class action cases throughout the United States, and have gained knowledge of hourly rates during that work. I have also gained familiarity with hourly rates of legal personnel through my work as a scholar.

14.  I am being compensated at the rate of $700 per hour.  My fee is not contingent on the substance of my opinions.

15.  Additional information regarding my qualifications and experience—including a list of my publications—can be found in my curriculum vitae, attached hereto as Appendix A.

## III. MATERIALS RELIED UPON

16.  In addition to reviewing cases and materials in other class actions, I reviewed numerous documents in the instant case.  *See* Appendix B (listing those documents).

## IV.  BACKGROUND OF THIS LITIGATION AND SETTLEMENT

17.  This Court is thoroughly familiar with the background of this litigation.  Thus, I focus only on those facts that bear on my opinions in this matter.

### A.  Allegations in the Complaints

18.  The original plaintiff, Shahriar Jabbari (Jabbari), filed a proposed nationwide class action in May 2015, alleging that Wells Fargo & Co. and its subsidiary, Wells Fargo, N.A. (collectively, Wells Fargo) opened a number of unauthorized accounts in his name.  Another plaintiff, Kaylee Heffelfinger (Heffelfinger), later joined with Jabbari, and the two filed a consolidated amended complaint.[12]  That complaint was based on California and Arizona state

---

[11]  *See, e.g.*, ROBERT H. KLONOFF, CLASS ACTIONS AND OTHER MULTI-PARTY LITIGATION: CASES AND MATERIALS 632–49 (West 4th ed. 2017) (overview of attorneys' fees issues); ROBERT H. KLONOFF, CLASS ACTIONS AND OTHER MULTI-PARTY LITIGATION IN A NUTSHELL 351–56 (West 5th ed. 2017) (similar); Robert H. Klonoff & Mark Herrmann, *The Class Action Fairness Act: An Ill-Conceived Approach to Class Settlements*, 80 TULANE L. REV. 1695 (2006) (discussing attorneys' fees issues in the settlement context); PRINCIPLES OF THE LAW OF AGGREGATE LITIGATION §§ 3.08, 3.13 (Am. Law Inst. 2010) (addressing attorneys' fees in class actions and other aggregate litigation).

[12]  In addition, Antonette Brooks and Jose Rodriguez were later added as class representatives.  (Jabbari, Heffelfinger, Brooks, and Rodriguez are hereinafter referred to jointly as "plaintiffs.")

statutory law;[13] the federal Fair Credit Reporting Act (FCRA)[14] and Electronic Funds Transfer Act (EFTA);[15] and conversion and unjust enrichment theories.   According to the complaint, Wells Fargo opened numerous checking, savings, and credit card accounts for existing customers without obtaining their approval.   Wells Fargo allegedly opened these unauthorized accounts to increase revenues from fees, interest, and other transactions.   Plaintiffs alleged that class members were charged unauthorized fees and, in many instances, suffered negative impacts on their credit reports.

19.   In response to the complaint, Wells Fargo moved to compel arbitration, relying on arbitration clauses that plaintiffs signed at the time they originally opened their authorized accounts.[16]   Wells Fargo argued that those clauses governed the allegations regarding unauthorized accounts as well.   Agreeing with Wells Fargo, this Court held that the arbitration clauses were dispositive, and on September 23, 2015, it dismissed the complaints.   Plaintiffs, in turn, appealed this Court's ruling to the Ninth Circuit.

20.   As discussed below, on September 6, 2016, the parties reached an agreement in principle on a putative class action settlement.   That agreement was later modified in several ways to the benefit of class members.   During that same time frame, regulators at the federal and local levels were investigating the same alleged conduct by Wells Fargo.   On September 8, 2016, the Consumer Financial Protection Bureau (CFPB), the Office of the Comptroller of the Currency (OCC), and the Los Angeles City Attorney announced settlements with Wells Fargo.   The company was fined $185 million, with the bulk of that money going to the CFPB and the OCC. Only $5 million was set aside for restitution to injured customers.[17]

**B. Settlement Negotiations**

21.   The negotiations leading to the September 6, 2016 classwide agreement in principle did not commence until after this Court had dismissed the action in light of the arbitration clauses.

---

[13] California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 *et seq*.; California Customer Records Act, Cal. Civ. Code §§ 1798.80 *et seq*.; Arizona Consumer Fraud Act, Ariz. Rev. Stat. § 44-1522(A).

[14] 15 U.S.C. §§ 1681 *et seq*.

[15] 15 U.S.C. §§ 1693 *et seq*.

[16] According to Wells Fargo, former Wachovia account holders signed new agreements when Wachovia was acquired by Wells Fargo.   *See* Def.'s Reply in Supp. of Pls.' Mot. for Prelim. Approval 2–6 (Dkt. No. 131).

[17] *See* Consent Order ¶ 49, 2016 CFPB-0015 (CFPB Sept. 8, 2016).

Those discussions began under the direction of Ninth Circuit Mediator Ann Julius.  The parties subsequently retained Layn Phillips, a retired federal judge, who helped the parties to reach the initial agreement in principle.  At the time of settlement, no class action had been filed other than the one involved here (by Keller Rohrback).  *See* Loeser Decl. ¶ 9 (Dkt. No. 102).

**C. Terms of the Initial Agreement in Principle**

22.  The September 6, 2016 agreement in principle provided for a settlement fund of $110 million, with a class period of January 1, 2009, to April 20, 2017.  Class counsel, however, subsequently pressed Wells Fargo to increase the settlement fund to $142 million based on information showing that the alleged misconduct began as early as May 1, 2002.  These terms were embodied in the agreement submitted to the Court in April 2017 (Dkt. No. 100) (hereinafter "Original Settlement").  That agreement provided recovery for all person for whom Wells Fargo opened an account in their name without their consent, enrolled them in a product or service without their consent, or submitted an application for a product or service in their name and without their consent between May 1, 2002, and April 20, 2017.[18]

23.  The $142 million proposed settlement was  structured as a non-reversionary fund.  Under no circumstances would any of the $142 million revert to Wells Fargo.  The fund was designed to reimburse class members for unauthorized fees, as well as to compensate class members who suffered damage to their credit rating as a result of Wells Fargo's alleged misconduct.  In determining damages for unauthorized fees, the actual fees paid by class members for unauthorized accounts would be awarded for the period January 1, 2009, to April 20, 2017.  For earlier years, Wells Fargo asserted that information on actual fees paid was more difficult to ascertain.  Thus, if the fees related to accounts from May 1, 2002 through December 31, 2008, class members would receive a flat rate fee reimbursement based on the average fees paid to class members for the January 1, 2009 to April 20, 2017 period.[19]  With respect to credit report injuries, the settlement proposed an expert methodology to calculate damages for credit injury.  Attorneys' fees and costs were to come out of the fund, and all of the remaining funds would be distributed pro-rata to class members based on their actual compensatory damages.

---

[18] The agreement also covered purchasers of Wells Fargo identity theft protection services.  The purchase of identity theft services counted as one unauthorized account.

[19] Class members who received compensation through the regulatory settlements would not receive double compensation from the private settlement.

24. The settlement agreement provided that class counsel could seek attorneys' fees of up to 25 percent of the settlement fund, although class counsel later informed the Court that they would not seek more than 15 percent of the settlement fund as fees.[20] Class counsel were also permitted to seek reimbursement from the fund for reasonable out-of-pocket costs in connection with their work in this matter.

25. In a declaration in support of the settlement (dated April 20, 2017) (Dkt. No. 107), the mediator, Judge Phillips, opined that the proposed settlement was fair, reasonable, and adequate. Phillips Decl. ¶ 22. Judge Phillips noted that the negotiations were "hard fought and challenging," and took place over a period of nine months. *Id.* at ¶ 16. He described the (ultimately successful) efforts of class counsel to expand the class period (to start in 2002) and to increase the settlement fund from $110 million to $142 million. *Id.* at ¶¶ 13–15. In urging the Court's approval of the settlement, Phillips noted that further litigation would have been "expensive, time-consuming, and uncertain . . . ." *Id.* at ¶ 22.

26. On April 20, 2017, plaintiffs filed a motion for preliminary approval of the settlement, accompanied by supporting declarations from Phillips (as noted above), class counsel, an expert on arbitration (Professor Thomas Stipanowich), a notice expert (Shannon Wheatman), an expert on claims administration (James Parks), and an expert on the precise methodology for calculating credit injury (Edward Stockton).

**D. Amendments to Proposed Settlement Based on District Court's Concerns**

27. On May 16 and 17, 2017, the Court specified numerous settlement-related issues that it wanted the parties to address, including issues that the Court viewed as potentially troublesome. *See* Order Requesting Further Briefing (Dkt. No. 141); Order Re: Prelim. Approval Hrg. (Dkt. No. 144). On May 18, 2017, the Court heard oral argument on the proposed settlement. In addition to hearing the parties' presentations (including responses to the Court's concerns), the Court heard from various objectors. Although the Court was generally enthusiastic about the settlement, it expressed concerns about several aspects of the settlement. The Court embodied those concerns in an order dated May 24, 2017. *See* Order Re: Mot. for Prelim. Approval (Dkt. No. 155). As a result of the Court's concerns, the parties made a number of changes to the

---

[20] Wells Fargo did not give up its right to challenge the amount of fees sought by class counsel.

10

settlement, and they incorporated those changes in an amended settlement agreement dated June 14, 2017 (Dkt. No. 162) (hereinafter "Amended Settlement").  All of those changes made the settlement more beneficial to class members.  In particular:

- The settlement will provide full compensation for unauthorized fees and credit impact damage, even if that means that Wells Fargo must increase the $142 million fund.  Put another way, while the designated settlement amount is still $142 million, the settlement is now uncapped in the event that actual damages (and non-compensatory damages described below) exceed $142 million.  *See* Amended Settlement ¶ 9.9.

- The Original Settlement provided for non-compensatory damages, but only if funds remained after payment of compensatory damages.  That left open the possibility that there would be no payments above compensatory damages.  To ensure that class members will in fact receive compensation on top of compensatory damages, the settlement guarantees a fund of at least $25 million for non-compensatory damages.  Amended Settlement ¶ 9.9.  As in the Original Settlement, non-compensatory damages are calculated pro rata based on compensatory damages awarded to class members.

- The claims period has been extended by 90 days to give class members more time to submit their claims.  *See* Amended Proposed Order Granting Prelim. Approval of Class Action Settlement § VII (Dkt. No. 162-4).  The period to object or opt out has been extended by five days.  *Id*.

- The claim form has been revised to allow class members who suffered unusual damages to so specify.  *See* Amended Settlement, Ex. B-4 (Dkt. No. 162-9).

- The parties have expanded the contours of credit impact damages in a number of ways, as detailed in Plaintiffs' Brief in Support of Amended Settlement at 1–2 (Dkt. No. 160).

- Under the Amended Settlement, the Court is given the opportunity, prior to the final fairness hearing, to review and assess the actual calculation of credit impact damages by plaintiffs' expert, thereby allowing the Court to assure itself that the calculations are fair to class members.  *See* Amended Settlement ¶ 9.7.1.7.  In addition, Wells Fargo has agreed to pay for a special master to evaluate the process for assessing credit impact damages and report to the Court (assuming that the Court deems such an assessment to be necessary).  Amended Settlement ¶ 9.7.1.6.

- The settlement has been amended to provide a mechanism for Wells Fargo to repair damaged credit scores.  Amended Settlement ¶¶ 9.10, 9.11, 11.2.7.  Also, the revised settlement provides that Wells Fargo will contact Early Warning Services, a consumer reporting agency, requesting that the agency remove from its reports any negative information regarding any unauthorized consumer deposit account.  Amended Settlement ¶ 9.11.

- The revised settlement provides that opt-out requests may be submitted through an online form, and objection forms may be downloaded (for completion and mailing to the Court). Amended Settlement ¶¶ 12.1, 12.6, Exs. B-6, B-7 (Dkt. Nos. 162-11, 162-12). Moreover, to validly lodge objections or opt-outs, only substantial compliance with the requirements for objecting or opting out will be required. Amended Settlement ¶¶ 12.1, 12.6.

- The parties have narrowed the scope of the release so that, instead of releasing any and all claims (known and unknown), *see* Original Settlement ¶ 2.47, it releases only claims based on the "identical factual predicate" of the claims asserted in the lawsuit. Amended Settlement ¶ 2.50. The revised release language also explicitly carves out claims asserted under the Telephone Consumer Protection Act, 47 U.S.C. § 227, and claims asserted in MDL No. 2036. *Id.*[21]

- The parties have improved the notice process by requiring Wells Fargo to send email notice to current and former Wells Fargo customers who are potential class members, and to provide the same notice with inserts in account statements sent by mail to current Wells Fargo customers who receive such statements. Amended Settlement ¶¶ 2.57, 8.4, Ex. B-5. Also, Wells Fargo has agreed to absorb separately up to $1 million in notice costs that previously were to be paid out of the $142 million settlement fund.

## E. Preliminary Approval and Notice

28. In an order entered on July 8, 2017, the Court granted preliminary approval of the Amended Settlement, ordered that notice be sent to the class, and set forth the schedule of various events—culminating in the briefing for final approval, the final approval hearing, and the deadline for submitting claim forms. *See* Order Granting Mot. for Prelim. Approval, Denying Mots. to Intervene (Dkt. No. 165) (hereinafter "Preliminary Approval Order").

29. In reviewing the settlement, the Court noted the many improvements that the parties had made (at the Court's behest) to the Original Settlement:

> In response to the Court's comments at the preliminary approval hearing, the parties negotiated a revised settlement that guarantees classwide compensation for actual damages, supplements compensation for noncompensatory damages, and provides a better process for claimant input and court oversight prior to final approval. The parties have expanded the anticipated scope of credit-impact damages, narrowed (or at least clarified) the scope of preclusion, and simplified the process for opting out. . . .

---

[21] Although the release language relating to purchasers of identity theft protection services is arguably still broad, *see* Amended Settlement ¶ 2.50 (second sentence), I have been advised by class counsel that both Wells Fargo and plaintiffs intend that that release will also apply only to claims based on the "identical factual predicate."

* * *

> . . . Notice has been significantly expanded—and the claims process lengthened—to account for the likelihood that there exist class members whose identities are not practical or possible to identify from Wells Fargo's existing records. Individualized damages can now be described in the claims-form narrative the parties have approved.

Preliminary Approval Order at 1, 4 (footnote omitted).

30.   In its Order, the Court analyzed and rejected all of the arguments made by the objectors.[22]   First, the Court rejected the objectors' concern that the settlement was reached without sufficient discovery.  It found that "if discovery . . . is itself a benefit of pursuing litigation rather than reaching an early settlement, it's a benefit that must be weighed against the costs of further proceedings and the risk of forfeiting a recovery of real value to the injured class members." *Id.* at 2.  Second, the Court rejected the objectors' argument that the settlement fund was deficient because plaintiffs purportedly failed to bring a number of strong claims.  The Court found that those allegedly strong claims (involving various federal statutes and various state identity-theft laws) were in fact problematic.  Specifically, the Court noted that "relatively few state statutes provide for identity-theft actions that precede criminal prosecution and offer recovery that's nonduplicative of FCRA damages." *Id.*  The Court similarly found that "the [federal Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961–86] and Stored Communications Act [(SCA), 18 U.S.C. §§ 2701–12] claims floated by certain proposed intervenors are dubious." Preliminary Approval Order at 3.  Ultimately, the Court found that "the current settlement adequately discounts from the upper limit of feasible recovery given the cost and risk associated with bringing FCRA and state-law actions, either individually or on a classwide basis." *Id.* at 2.

31.   After rejecting the objectors' arguments, the Court addressed the various preliminary approval considerations.  First, the Court preliminarily found that the proposed class met the requirements for class certification under Federal Rule of Civil Procedure 23(b)(3). *Id.* at 9–10. The Court also preliminarily found that the proposed revised settlement "appears to be within the range of reasonableness of a settlement which could ultimately be given final approval by this Court, and that the Settlement is fair and reasonable to the Settlement Class . . . ." *Id.* at 9.

---

[22] The Court denied motions to intervene by various objectors, finding that they could make their arguments as objectors without formally intervening.  Preliminary Approval Order at 3.

13

32.  In granting preliminary approval, the Court balanced the payments to be received under the settlement "against the probable outcome of further litigation, liability and damages issues, and potential appeals of rulings, in particular given the Parties' dispute over the mandatory arbitration and class action waiver provisions contained in [Wells Fargo's] Customer Account Agreements." *Id.* at 9.  In the Court's view, "the amount Wells Fargo is required to pay under the settlement agreement is significant, especially considering the apparently low degree of actual financial harm suffered by the class members as a result of the bank's actions." *Id.* at 2–3. The Court recognized, however, that "[f]urther scrutiny will still be required at final approval . . . ." *Id.* at 1.

### F. Plaintiffs' Request for Class Certification, Settlement Approval, Attorneys' Fees, Costs, and Incentive Payments

33.  In what is now the final approval phase, plaintiffs and class counsel seek:  (1) a final ruling on class certification; (2) final approval of the settlement as fair, reasonable, and adequate; (3) approval of attorneys' fees based on 15 percent of the $142 million settlement fund; (4) payment from the settlement fund of reasonable out-of-pocket costs; and (5) incentive payments to the four class representatives in the amount of $5,000 each.

## V.  SUMMARY OF OPINIONS

34.  **Overarching Comments.**  This case involves Wells Fargo's highly publicized conduct of opening millions of unauthorized accounts, causing its customers to pay improper fees and damaging their credit scores.  The damages suffered by individual customers were small, and thus there was little incentive for individuals to bring their own lawsuits.  Although a class action would normally be the logical procedural mechanism, most class action attorneys were deterred by the potential problems in the case, including arbitration agreements that arguably foreclosed class action relief either in court or in arbitration.  Although it is common in high-profile cases for numerous competing class actions to be filed almost immediately after news of wrongdoing hits the press, in this case only Keller Rohrback took the risk of pursuing class action litigation early on.  Other firms did not file class actions until *after* Wells Fargo had reached an agreement in principle with Keller Rohrback.  Importantly, prior to the announcement of the agreement, the caution on the part of non-Keller Rohrback attorneys seemed justified, since this Court dismissed

the litigation precisely because of the arbitration clauses, leaving Keller Rohrback to fight in the Ninth Circuit to resuscitate the lawsuit.

35.  Federal and Los Angeles regulators pursued Wells Fargo for the conduct in question, but only about $5 million out of the $185 million in civil penalties was designated to compensate injured victims.  Class counsel, however, was able to reach a substantial settlement worth at least $142 million.  And through the impressive hands-on scrutiny by this Court, the settlement was improved in numerous ways to make it even stronger for the class.  Notably, after attorneys' fees and costs are paid, the balance of the fund will go entirely to compensating class members for compensatory and non-compensatory damages.  Under no circumstances will any of the fund revert to Wells Fargo.

36.  As noted in ¶ 1, I have been asked to opine on (1) the suitability of the case as a settlement class; (2) the fairness of the class settlement; (3) the reasonableness of the requested attorneys' fees; (4) the reasonableness of the requested out-of-pocket costs; and (5) the reasonableness of the proposed incentive payments.  In my opinion, the settlement passes muster on all of those issues.

37.  **Class Certification.**  As I explain below, it is my opinion that this case meets all of the requirements for certification of a Rule 23(b)(3) settlement class.  It involves an overarching common issue regarding Wells Fargo's alleged misconduct, an issue that easily predominates over individualized issues (mainly damages).  A class action is clearly superior; indeed, given the small actual damages, it is the only economically viable way to litigate the claims.  The class definition is clear, there are potentially millions of class members, and the class representatives are typical and adequate (and class counsel are adequate as well).

38.  **Fairness.**  As I explain below, this is a remarkable settlement, especially given the very serious risk of no recovery. It was a strong settlement coming out of the mediation, and through this Court's active involvement, it ended up being even stronger.  Unlike the governmental settlements (where only a small amount was set aside for compensation of victims), this private settlement will provide compensation to all class members who choose to participate.  Moreover, under no circumstances will any of the fund revert to Wells Fargo.  A small number of objectors appeared at the preliminary approval stage, but as I detail below, their criticisms (mainly the

failure to bring various causes of action, the failure to conduct formal discovery, and the failure to designate subclasses) are meritless.

39. **Attorneys' Fees.** Class counsel request 15 percent of the fund as attorneys' fees. In my opinion, that request is very reasonable. It is well below the Ninth Circuit's benchmark of 25 percent, and it is at the low end of percentages in recent major class actions. Indeed, in many recent class settlements, attorneys' fees have been well over 25 percent of the settlement fund. Although the Court need not conduct a lodestar cross check, doing so confirms the reasonableness of class counsel's fee request.

40. **Out-of-Pocket Costs.** Class counsel request $442,974.75 for out-of-pocket costs, an amount I believe is very reasonable. This represents only about 0.31 percent of the settlement fund, which is on the low side when compared to many other major class actions. The costs are primarily for essential investigatory work (including experts and research) and for the mediation.

41. **Incentive Payments.** Class counsel request an incentive payment of $5,000 for each of the four class representatives. Those requests are also reasonable. Courts have approved requests for significantly higher amounts. Here, the class representatives invested substantial time on the case, even though they stood to recover only small amounts as actual damages. Without the diligence and dedication of these representatives, the settlement would not have been possible.

## VI. DETAILED DISCUSSION OF OPINIONS

42. In the remaining sections of this declaration, I offer my opinions on class certification, the fairness of the settlement, and the reasonableness of the proposed attorneys' fees, costs, and incentive payments.

## CLASS CERTIFICATION

### A. This Case Should Be Certified as a Class Action for Settlement Purposes

43. In this section, I offer my opinion on whether the case is suitable for certification as a settlement class.[23] The issues are straightforward, and thus I address them only briefly. The fact

---

[23] As noted in ¶ 11, numerous courts have relied upon my opinions regarding class certification for settlement purposes, as well as other topics discussed in this Declaration.

that the parties have reached a settlement does not relieve a trial court of its duty to assess whether the case should be certified as a class action.[24]   Indeed, the fact that the parties are simultaneously seeking class certification and settlement approval necessitates heightened scrutiny to protect the interests of absent parties.[25]

44.   To obtain class certification, plaintiffs must satisfy three threshold requirements (a proper class definition, and a representative who is both a member of the class and has a claim that is live, not moot); four explicit requirements under Rule 23(a) (numerosity, commonality, typicality, and adequacy of representation); and at least one subdivision of Rule 23(b)— (b)(1)(A), (b)(1)(B), (b)(2), or (b)(3).[26]   Because plaintiffs in this case seek certification under Rule 23(b)(3), they must show that common issues predominate over individual issues, and that a class action is superior to other methods of adjudicating the plaintiffs' claims.  *See* Fed. R. Civ. P. 23(b)(3).[27]

### 1. The Threshold Requirements for Class Certification Are Satisfied

45.   The three threshold requirements are easily satisfied.  First, the four class representatives are members of the class.  They all allege that Wells Fargo opened unauthorized accounts in their names and that they were injured as a result.  Because they are seeking damages for their injuries, their claims are live.  Finally, the definition of the settlement class is clear and objective. It includes all persons for whom Wells Fargo opened an unauthorized account or submitted an unauthorized application (or who obtained identity theft protection services from Wells Fargo) during the period May 1, 2002 to April 20, 2017.  Amended Settlement ¶ 2.53.  *See also id.* ¶¶ 2.31, 2.59, 2.60 (defining, respectively, the terms "identity theft protection service," "unauthorized account," and "unauthorized application" (initial capitalization omitted)).

---

[24] *See, e.g., Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997); *Staton v. Boeing Co.*, 327 F.3d 938, 952 (9th Cir. 2003).

[25] *See Amchem*, 521 U.S. at 620.  One caveat, however, is that in the settlement context "a district court need not inquire whether the case, if tried, would present intractable management problems, for the proposal is that there be no trial." *Id.* (citing FED. R. CIV. P. 23(b)(3)(D)).

[26] *See* ROBERT H. KLONOFF, CLASS ACTIONS AND OTHER MULTI-PARTY LITIGATION IN A NUTSHELL 37–152 (West 5th ed. 2017).

[27] *See id.* at 129–52.

## 2. The Explicit Rule 23(a) Requirements Are Satisfied

46. **Numerosity.** Rule 23(a)(1) requires that the putative class be "so numerous that joinder of all members is impracticable." That requirement is readily satisfied here, given the allegations that millions of unauthorized accounts were opened.[28]

47. **Commonality.** Rule 23(a)(2) requires "questions of law or fact common to the class." Even a single common question suffices.[29] In my opinion, commonality is easily satisfied here. The question whether Wells Fargo opened unauthorized accounts in violation of federal and state law is plainly common.

48. **Typicality.** Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Typicality is amply satisfied here. "[R]epresentative claims are 'typical' if they are reasonably coextensive with those of absent class members . . . ."[30] This is clearly the case here: as noted, all of the representatives allege that Wells Fargo opened unauthorized accounts in their names.

49. **Adequacy of Representation.** Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." Courts in the Ninth Circuit must address two questions: "(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?"[31]

50. With respect to potential intra-class conflicts, I see no conflicts that would warrant denial of class certification. As I explain below in addressing various objections, *see* ¶¶ 82–89, this case does not require the creation of subclasses (with separate class representatives and counsel).

51. With respect to the zealousness of the class representatives, it is clear that all of them have been actively involved in the case. *See* ¶ 170 (discussing class representatives' declarations). Moreover, it is my opinion that class counsel have zealously and effectively

---

[28] *See, e.g., Int'l Molders' & Allied Workers' Local 164 v. Nelson*, 102 F.R.D. 457, 461 (N.D. Cal. 1983) ("Where the number of class members exceeds forty, and particularly where class members number in excess of one hundred, the numerosity requirement will generally be found to be met.").

[29] *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 359 (2011).

[30] *Parsons v. Ryan*, 754 F.3d 657, 685 (9th Cir. 2014) (citation omitted).

[31] *Evon v. Law Offices of Sidney Mickell*, 688 F.3d 1015, 1030 (9th Cir. 2012) (citation omitted).

1  pursued the claims in this case.

2  ### 3. The Rule 23(b)(3) Requirements Are Satisfied

3  52.  Rule 23(b)(3) requires the Court to find that "the questions of law or fact common to
4  class members predominate over any questions affecting only individual members" and that "a
5  class action is superior to other available methods for fairly and efficiently adjudicating the
6  controversy."

7  53.  Predominance is satisfied "[w]hen common questions present a significant aspect of the
8  case and they can be resolved for all members of the class in a single adjudication."[32]  That test is
9  easily met here.   The question whether Wells Fargo opened unauthorized accounts is
10  overarching.   The fact that there will be individualized damages determinations does not defeat
11  class certification.[33]   Also, a class action is clearly the superior vehicle, since it allows the
12  overarching liability issues to be decided only once.[34]   Indeed, as a practical matter, a class
13  action is the only vehicle to adjudicate the claims, since the claims are too small to be brought
14  individually.  As Judge Richard Posner noted in a case involving claims of about $30 per class
15  member, "[t]he *realistic* alternative to a class action is not 17 million individual suits, but zero
16  individual suits, as only a lunatic or a fanatic sues for $30."[35]

16  54  In sum, it is my opinion that the proposed settlement satisfies all of the requirements for
17  certification of a Rule 23(b)(3) settlement class.

---

[32] *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1022 (9th Cir. 1998).

[33] *See, e.g.*, *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016) ("When one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, *such as damages* . . . ." (emphasis added; citation and internal quotation marks omitted)); *Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d 979, 987–88 (9th Cir. 2015) (holding that "[individualized] damages calculations alone cannot defeat class certification" (citation omitted)).

[34] *See, e.g.*, *Butler v. Sears, Roebuck & Co.*, 702 F.3d 359, 363 (7th Cir. 2012) (reasoning, in a product defect class action, that "[i]t is more efficient for the question whether the washing machines were defective—the question common to all class members—to be resolved in a single proceeding than for it to be litigated separately in hundreds of different trials"), *vacated*, 569 U.S. 1015, *reinstated*, 727 F.3d 796 (2013), *cert. denied*, 134 S. Ct. 1277 (2014).

[35] *Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 661 (7th Cir. 2004) (emphasis in original).

1

**SETTLEMENT FAIRNESS**

2

**B.  The Proposed Class Settlement Is Fair, Reasonable, and Adequate**

3

55.  In this section, I address the fairness of the proposed settlement under Rule 23(e).  That

4

subsection provides that a proposed settlement may only be approved "after a hearing and on

5

finding that it is fair, reasonable, and adequate."[36]   In the Ninth Circuit, the fairness of a

6

settlement is analyzed using a variety of factors discussed below.  I address those factors based

7

on the particular facts here.  In doing so, I also address the specific objections that were raised at

8

the preliminary approval stage.

9

**1. The Ninth Circuit's *Churchill* Factors, Taken as a Whole, Support the Settlement**

10

56.  In the Ninth Circuit, courts evaluate the reasonableness of a proposed class settlement

11

using the seven factors set forth in *Churchill Village, L.L.C. v. General Electric*.[37]  These are:

12

> (1) the strength of the plaintiff's case; (2) the risk, expense, complexity, and likely
> duration of further litigation; (3) the risk of maintaining class action status
> throughout the trial; (4) the amount offered in settlement; (5) the extent of
> discovery completed and the stage of the proceedings; (6) the experience and
> views of counsel; (7) the presence of a governmental participant; and (8) the
> reaction of the class members to the proposed settlement.[38]

13

14

15

16

57.  In my opinion, these factors—taken as a whole—strongly support the settlement.[39]

17

**a.  Strength of the Plaintiffs' Case**

18

58.  In terms of proving the alleged wrongdoing—*i.e.*, Wells Fargo's conduct in opening as

19

many as 3.5 million unauthorized accounts—this is a very strong case.  Wells Fargo has publicly

20

admitted wrongdoing.[40]   Standing alone, this factor would not support settlement.  As noted

21

below, however, plaintiffs faced substantial hurdles that made this a very challenging case.

22

[36] FED. R. CIV. P. 23(e).

23

[37] 361 F.3d 566 (9th Cir. 2004).

24

[38] *Id*. at 575.

25

[39] As noted in ¶ 94, after addressing the *Churchill* factors, the Court must also consider the various factors set forth in *In re Bluetooth Products Liability Litigation*, 654 F.3d 935, 946 (9th Cir. 2011).  I address those factors in ¶¶ 94–97.

26

[40] *See, e.g.*, Samantha Masunaga & James Rufus Koren, *Wells Fargo's Estimate for Unauthorized Accounts Jumps 67%, to 3.5 Million*, L.A. TIMES (Aug. 31, 2017), http://www.latimes.com/business/la-fi-wells-fargo-accounts-20170831-story.html.

27

28

These hurdles are discussed immediately below (in addressing the risks of litigation), but they could just as easily be categorized as points that severely undermine the strength of the case (because of the difficulty in litigating the claims). As a result, the fact that Wells Fargo admitted wrongdoing does not, in my view, cut against the settlement.

### b. Risk, Expense, Complexity, and Likely Duration of Further Litigation

59. This factor strongly supports the settlement. In my opinion, as detailed in the next several paragraphs, litigation would entail numerous serious risks.

60. Most importantly, plaintiffs faced a serious possibility that no class action would ever go forward, either in court or in the arbitration context. (And, as noted, the cases are too small to justify individual lawsuits, so the putative class members faced a grave risk of no recovery whatsoever.) It is my understanding that Wells Fargo maintains that all of the plaintiffs signed arbitration clauses when they opened their authorized accounts.[41] Wells Fargo successfully argued in this Court that those clauses also governed claims based on unauthorized accounts. The fact that Wells Fargo has admitted wrongdoing to the media and elsewhere is of little value without a viable forum to litigate the claims on an aggregate basis. As Vanderbilt Law Professor Brian Fitzpatrick has stated, regardless of the strength of plaintiffs' substantive claims, arbitration clauses with class action waivers "are tantamount to insulating businesses altogether from liability for the small-stakes injuries they cause."[42]

61. At the preliminary approval stage of this case, class counsel filed a declaration by Pepperdine Law Professor Thomas Stipanowich (Dkt. No. 108), a renowned expert on the enforceability and interpretation of arbitration clauses. Professor Stipanowich explained the risks that class counsel faced due to the arbitration clauses (including the likelihood that plaintiffs would have been unsuccessful in their Ninth Circuit appeal). He called those risks "serious" and "substantial," Stipanowich Decl. ¶¶ 28–29, noting the "compelling" arguments available to Wells Fargo. *Id*. at ¶ 27. As he explained, the arbitration provisions in the customer account agreements "are very broadly worded," and "also contain a broad delegation of authority to arbitrators to resolve issues relating to the arbitrability of disputes." *Id*. at ¶ 22. As Professor

---

[41] As explained in note 16, former Wachovia customers signed new agreements when Wells Fargo acquired Wachovia.

[42] Brian T. Fitzpatrick, *The End of Class Actions?*, 57 ARIZ. L. REV. 161, 190 (2015).

Stipanowich opined, plaintiffs faced a serious risk that the Ninth Circuit would have found the delegation provision clear and unmistakable. *Id*. at ¶¶ 23–25.  Moreover, Professor Stipanowich opined that, even if the arbitrator held that the disputes were not arbitrable, there would be a serious risk that a court would not apply the doctrine of offensive nonmutual collateral estoppel, meaning that the arbitrator's ruling would not be binding for other claimants.  As he indicated, under *Parklane Hosiery Co. v. Shore*,[43] a court has discretion whether to apply the doctrine, and in exercising that discretion it must consider whether it would be fair to do so.  As Professor Stipanowich noted by way of example, "a court might conclude that because little money was at stake in the individual arbitrations, it would be unfair to allow absent class members to use the result of those arbitrations against Wells Fargo in a case worth hundreds of millions of dollars in the aggregate."  Stipanowich Decl. ¶ 32.  Professor Stipanowich also argued that, assuming state law governs the issue preclusion question, U.S. Supreme Court case law under the Federal Arbitration Act (9 U.S.C. §§ 1–14) might "preempt any state law rule that would give nonmutual issue-preclusive effect to arbitration—or at least would preempt any state rule that would allow absent class members to use offensive nonmutual collateral estoppel against Wells Fargo here." *Id*. at ¶ 34.  While I am not as pessimistic as Professor Stipanowich with respect to these challenges, I certainly agree that the arbitration clauses posed serious risks on appeal.

62.  Importantly, one does not need to speculate—based on expert testimony—about how this Court *might* have ruled on the arbitration issues.  This Court *in fact* dismissed the claims because of the arbitration clauses, and plaintiffs were pursuing an appeal in the Ninth Circuit at the time the parties reached a settlement.  To be sure, in its Preliminary Approval Order, the Court noted its "doubts about Wells Fargo's continued ability to enforce its adhesive arbitration agreements and class waivers (notwithstanding the Court's prior ruling on that issue)." Preliminary Approval Order at 2.  Yet, the posture faced by class counsel in pursuing settlement was that the Court had in fact ruled against them.  The fact that class counsel were able to achieve what they did after this Court dismissed their claims is nothing short of remarkable.

63.  Even if class counsel felt optimistic that they could ultimately win in the Ninth Circuit, there was a risk that Wells Fargo could secure review and reversal by the U.S. Supreme Court. And, in all events, this contentious litigation would have dragged on for years, as Wells Fargo no

---

[43] 439 U.S. 322 (1979).

doubt would have pursued every conceivable ground for avoiding liability.  Here, the class will receive benefits right away—benefits that are designed to fully compensate them for unauthorized fees that they paid and for damage to their credit.

### c.  Risk of Maintaining Class Action Status Throughout Trial

64.  This factor likewise favors settlement.  As noted, if the arbitration clauses were enforced, neither a class action in court nor a class action in arbitration would be allowed.  Moreover, were plaintiffs to have argued that the delegation clause was procedurally or substantively unconscionable, they could have faced the argument in a contested class certification context that applying the laws of 50 states and the District of Columbia would render a litigation class unmanageable.  Furthermore, in the litigation context, Wells Fargo could argue that the determination of whether a particular account was unauthorized raises manageability issues.

### d.  Amount Offered in Settlement

65.  Again, this factor favors settlement.  In stark contrast with the relatively small amount ($5 million) secured by regulators for individual victims of Wells Fargo's conduct, the instant settlement provides $142 million (up from the initial agreed upon amount of $110 million) for the class (less fees and costs).  Indeed, as explained in ¶ 27 (first bullet point), the settlement is now uncapped, so if compensatory damages exceed $142 million, Wells Fargo will be responsible for any additional compensatory damages, plus $25 million for non-compensatory damages.  In many cases, courts approve class settlements even where the recoveries amount to only pennies on the dollar.[44]  Here, however, the settlement is designed to ensure that class members are fully compensated for any unauthorized fees that they were charged, along with compensation for the actual damage to their credit and additional noncompensatory damages.

---

[44] *See, e.g.*, *Officers for Justice v. Civil Serv. Comm'n of City & Cnty. of S.F.*, 688 F.2d 615, 628 (9th Cir. 1982) ("It is well-settled law that a cash settlement amounting to only a fraction of the potential recovery will not per se render the settlement inadequate or unfair."), *cert. denied*, 459 U.S. 1217 (1983); *TBK Partners Ltd. v. Western Union Corp.*, 675 F.2d 456, 463–64 (2d Cir. 1982) ("As to the adequacy of [the monetary recovery] under the settlement, we note that '[t]he fact that a proposed settlement may only amount to a fraction of the potential recovery does not, in and of itself, mean that the proposed settlement' is inadequate; there is no reason 'why a satisfactory settlement could not amount to a hundredth or even a thousandth part of a single percent of the potential recovery.' " (citation omitted; brackets in original)); *Saccoccio v. JP Morgan Chase Bank, N.A.*, No. 13-21107-CIV, 2014 WL 808653, at *8 (S.D. Fla. Feb. 28, 2014) ("Even assuming that the monetary figure represents only 12.5% of Plaintiff's damages, which the Court is satisfied they do not, this recovery would still be adequate."); *In re Checking Account Overdraft Litig.*, 830 F. Supp. 2d 1330, 1346 (S.D. Fla. 2011) (recovery between 9% and 45% of plaintiffs' damages deemed an "exemplary result"); *In re Omnivision Technologies, Inc.*, 559 F. Supp. 2d 1036, 1042 (N.D. Cal. 2008) (approving settlement awarding 6 to 9 percent of investor losses in securities class action).

66.   Calculating unauthorized fees is straightforward.   On the other hand, the determination of actual credit impact damages is complicated.   Class counsel, however, have retained Edward Stockton (and his colleague, Dr. H. Sanford Weisberg) to determine a fair and accurate methodology for calculating such damages.   In a near-final January 17, 2018 Declaration, which I have reviewed, Stockton explains that methodology in detail.   The basic methodology is the same as he described in his Declaration at the preliminary approval stage, but he has now "conducted extensive market research, performed calculations related to consumer financial behavior, and reviewed industry literature" to ensure that the model is reliable.   Stockton 1/17/18 Decl. ¶ 20.   He conducted rigorous testing using a sample file, provided by Wells Fargo, with data for approximately 50,000 consumers.   *Id.* ¶ 21.   The Declaration is supported by detailed exhibits relating to the sample file.   Based on his extensive work, Stockton concludes that the model he proposes is "a feasible, reasonable, and objective method for estimating the amount of credit cost injury suffered by the class."   *Id.* ¶ 42.   I do not have expertise in calculating credit impact damages, and thus offer no opinion on Stockton's approach, but I would note that I see nothing that raises any obvious red flags concerning his credentials or his methodology.

67.   Moreover, although Wells Fargo had arguments—in a litigation context—that FCRA violations are subject to a five-year statute of limitations, class members with unauthorized accounts dating back as far as 2002 will be allowed to recover under the settlement. Furthermore, as a result of the related government enforcement action, Wells Fargo was fined $185 million.[45]   In addition, Wells Fargo's CEO was forced to resign,[46] and about 5,300 Wells Fargo employees who were involved in creating the unauthorized accounts were terminated.[47] When viewed, then, in conjunction with the regulatory proceedings, it is reasonable to conclude that justice was done in connection with Wells Fargo's condemnable conduct.

---

[45] *See* Michael Corkery, *Wells Fargo Fined $185 Million for Fraudulently Opening Accounts*, N.Y. TIMES (Sept. 8, 2016), https://www.nytimes.com/2016/09/09/business/dealbook/wells-fargo-fined-for-years-of-harm-to-customers.html.

[46] *See* James Rufus Koren, *Wells Fargo CEO Retires Amid Accounts Scandal and Is Replaced by a Longtime Company Insider*, L.A. TIMES (Oct. 12, 2016), http://www.latimes.com/business/la-fi-wells-fargo-stumpf-resigns-20161012-snap-story.html.

[47] *See id.*

### e.  Extent of Discovery and Stage of Proceedings

68.  Because the case was dismissed pursuant to the arbitration clauses early in the litigation, there was no formal discovery.  But as the Ninth Circuit has stated, "In the context of class action settlements, formal discovery is not a necessary ticket to the bargaining table where the parties have sufficient information to make an informed decision about settlement."[48]

69.  Here, formal discovery was not possible in light of the Court's early dismissal of the case.  Nonetheless, class counsel engaged in extensive and rigorous factfinding.  That effort included witness interviews, review of documents, and review of the regulatory record, along with direct questioning of Wells Fargo officials during settlement negotiations.  *See* Loeser Decl. ¶ 14.  Indeed, it was during that process that class counsel learned that Wells Fargo created unauthorized accounts as far back as 2002, several years longer than had been originally understood.  Thus, class counsel had voluminous information at the time they entered into the settlement, notwithstanding the absence of formal discovery.

### f.  Experience and Views of Counsel

70.  Counsel for both the class and Wells Fargo enthusiastically support the settlement.  Wells Fargo is represented by prominent national counsel (Munger, Tolles & Olson), and plaintiffs are represented by experienced and savvy class action attorneys from Keller Rohrback, one of the country's premier plaintiffs' class action law firms.

### g.  Presence of Government Participants

71.  This factor strongly favors settlement.  The alleged wrongdoing at issue is subject not only to this private settlement but also to resolutions with federal regulators and regulators for the City of Los Angeles.  Those regulators did substantial investigation, and that work assisted class counsel as they did their own research, investigation, and due diligence.  The regulators secured fines totaling $185 million, including $100 million by the CFPB, the agency's largest fine to date.[49]

---

[48] *In re Mego Fin. Corp.*, 213 F.3d 454, 459 (9th Cir. 2000).  *Accord, e.g.*, *In re Nat'l Football League Players Concussion Injury Litig.*, 821 F.3d 410, 436–37 (3d Cir. 2016) ("To the extent objectors ask us to require formal discovery . . . we decline the invitation.  In some cases, informal discovery will be enough for class counsel to assess the value of the class' claims and negotiate a settlement that provides fair compensation.").

[49] *See* Corkery, *supra* note 45.

### h. Reaction of Class Members:  Unpersuasiveness of Objections Raised to Date

72.  The deadline for objections and opt outs is February 19, 2018.  I understand from class counsel that, as of January 19, 2018, only 5 class members have objected[50] and only 51 class members have opted out of the class.[51]  These numbers are trivial for a class that is estimated in the millions.  Yet, it is not uncommon for class members to wait until close to the Court's deadline before objecting or opting out.  That deadline is still a month away.  Thus, it is premature to give any serious weight to the current paucity of opt outs and objections.

73.  A small number of objectors came forward during the preliminary approval phase to object to the proposed settlement and to seek intervention under Federal Rule of Civil Procedure 24.  Those objectors would like to scuttle a settlement, worth a minimum of $142 million, that will benefit potentially millions of people.  As noted, the Court held that the various concerns raised by the objectors did not warrant the denial of preliminary approval.  In my opinion, these objections likewise do not warrant the denial of *final* approval.  The objections are voluminous and raise a host of issues, some of which are trivial and do not warrant serious attention.[52]  I focus here only on the more plausible (but ultimately meritless) arguments.[53]

### i. Objections Based on Lack of Formal Discovery

74.  Several of the objections complain about the lack of formal discovery.  *See* Mot. to Intervene 4–5 (Dkt. No. 114) (objections of William Cason, Sheila Cason, Darlene Martinez, Doris Lopez, and Caitlin Turner).  Surely, if class counsel negotiated a settlement that applied to millions of class members without an adequate understanding of the crucial facts, that would be ground to scuttle the proposed settlement.  But that is simply not the case here.  In relying on the

---

[50] Seven class members originally objected to the settlement, but two of those class members later filed opt outs, thus eliminating their right to object.

[51] I understand that class counsel will provide a list of opt outs to the Court.

[52] To illustrate, certain objectors complain about the fact that "there is a Court seal on the [proposed] claim form, which may have the effect of scaring off potential claimants who are unfamiliar with legal documents."  Dkt. No. 116 at 7.  Objectors cite nothing to support their speculative concern; in any event, class counsel have offered to remove the seal.  *See* Pls.' Corrected Reply Mem. in Supp. of Mot. for Prelim. Approval 18 (Dkt. No. 135-1) (hereinafter "Pls.' Reply Mem.") ("Plaintiffs are happy to remove or retain the seal as directed by the Court.").  Likewise, some objectors claim that class counsel have "overstated" the concerns regarding the arbitration clauses.  Dkt. No. 138 at 5.  That argument is inexplicable given that this Court *dismissed the lawsuit* in light of those arbitration clauses.

[53] As noted in ¶ 72, two other objections have been filed as of January 11, 2018.  Neither of those objections, however, raises any substantive arguments for this Court to reject the settlement.

absence of *formal* discovery, objectors put form over substance.  As noted in ¶ 69, class counsel obtained vast amounts of relevant information before agreeing to settle.

### ii.  Objections Based on Failure to Pursue Various Causes of Action

75.  Certain objectors complain that plaintiffs have failed to pursue all potentially lucrative causes of action, and that some of those causes of action could have yielded potentially larger recoveries than the settlement amount.  The Court, however, properly rejected that argument. *See* ¶ 30.

76.  As an initial matter, class counsel are not obligated to pursue every conceivable cause of action.  Rather, they are expected to scrutinize potential claims and to pursue only those that are the most viable and provable.[54]  Failure to exercise discretion in selecting what claims to pursue can be counterproductive.[55]  In the instant case, there are a host of reasons not to pursue claims that are theoretically possible.  For instance, some claims may have more difficult standards of proof; others (such as fraud claims) may raise individualized issues that could foreclose class certification; and still others may raise legal impediments, such as a statute of limitations bar.  Moreover, courts generally will not allow multiple recoveries for the same injuries, and some of the potential claims on objectors' wish list are arguably redundant.  It should also be noted that, if there are particular causes of action that uniquely benefit certain segments of the class members, those class members always have the right to opt out and bring their own claims.[56]

---

[54] *See, e.g.*, *Todd v. Tempur-Sealy Int'l, Inc.*, No. 13-CV-04984-JST, 2016 WL 5746364, at *5 (N.D. Cal. Sept. 30, 2016) ("A strategic decision to pursue those claims a plaintiff believes to be most viable does not render her inadequate as a class representative."); *In re Conseco Life Ins. Co. Life-Trend Ins. Sales & Mktg. Litig.*, 270 F.R.D. 521, 532 (N.D. Cal. 2010) ("Plaintiffs are permitted to press a theory of . . . liability that affords them the best chance of certification and of success on behalf of the class.").

[55] As two experienced attorneys have noted, "the more claims that are brought, the greater the likelihood that some of them will be dismissed, which impairs the plaintiff's overall credibility, and weakens the main claim." WAYNE N. OUTTEN & JACK A. RAISNER, PLAINTIFF'S PLEADINGS: PITFALLS TO AVOID WHEN DRAFTING THE COMPLAINT 8–9 (2013), *available at* https://www.americanbar.org/content/dam/aba/events/labor_law/basics_papers/elst/outten_raisner.authcheckdam.pdf.

[56] *See, e.g.*, *In re Nat'l Football League Players' Concussion Injury Litig.*, 821 F.3d 410, 441 (3d Cir. 2016) (class members' "opportunity to opt out" weighed in favor of finding settlement fair and reasonable); *Eisen v. Porsche Cars N. Am., Inc.*, No. 2:11-cv-09405-CAS-FFMx, 2014 WL 439006, at *7 (C.D. Cal. Jan. 30, 2014) ("Federal courts routinely hold that the opt-out remedy is sufficient to protect class members who are unhappy with the negotiated class action settlement terms."); *In re Oil Spill By the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*, 295 F.R.D. 112, 156 (E.D. La. 2013) ("Those objectors who are unhappy with their anticipated settlement compensation could have opted out and pursued additional remedies through individual litigation."); *Milligan v. Toyota Motor Sales, U.S.A., Inc.*, No. C 09-05418 RS, 2012 WL 10277179, at *7 (N.D. Cal. Jan. 6, 2012) (overruling objections to class settlement in part on the basis that "[o]bjectors who raised these

77.   Based on my experience in myriad class actions, it is fair to say that in virtually every case it is possible to envision additional causes of action that could have been brought but were not.   But in the end, the question comes down to whether class counsel and the class representatives made reasonable choices.[57]   Indeed, the notion that class counsel would deliberately avoid bringing strong and potentially lucrative claims makes no sense.   The attorneys here are highly experienced class counsel, and they are well aware that by pressing the most lucrative and compelling claims, they will enhance their own attorneys' fees.   The incentives that result from the percentage method of calculating attorneys' fees (*see* ¶ 107) are designed precisely to encourage class counsel to pursue the best claims.

78.   Moreover, the claim-selection criticisms leveled by objectors ring particularly hollow given that neither these objectors (and their counsel) nor anyone else—other than class counsel here—brought *any* class action claims until *after* plaintiffs' counsel here reached an agreement in principle with Wells Fargo.   If the omitted claims were so strong, why didn't counsel for the objectors bring them early on?   In my view, the fact that the objectors did not bring these purportedly strong claims when news of Wells Fargo's misconduct first became public speaks volumes.

79.   Certain objectors complain that class counsel failed to bring state law identity theft claims.   *See* Dkt. No. 138 (setting forth objections of Aaron Hodge, Douglas and Joann Jeffries, Ashley Lessa, and Nadine Stanton).   Class counsel have represented to this Court that they considered filing such claims but found them problematic on several grounds.   *See* Pls.' Reply Mem. at 2–6.   For example, class counsel noted that most states do not have such statutes.   *Id*. at 4.   Moreover, several states that do have such statutes require a high standard of proof (a purpose or intent to defraud or commit a crime)—much higher than for the claims that plaintiffs chose to bring.   *Id*. at 4–5.   Proving a corporate intent to defraud or commit a crime could be difficult; indeed, Wells Fargo maintains that what was involved here was lower level misconduct

concerns could have simply opted out of the settlement");

[57] *See, e.g., Todd*, 2016 WL 5746364, at *5 (plaintiffs acted reasonably in "declining to pursue claims for personal injuries"); *In re Univ. Serv. Fund Tel. Billing Practices Litig.*, 219 F.R.D. 661, 669–70 (D. Kan. 2004) (holding that plaintiffs reasonably "decided to pursue certain claims while abandoning a fraud claim that probably was not certifiable").

motivated by corporate pressure to meet sales targets.[58]  And assuming that plaintiffs could seek to hold Wells Fargo vicariously liable for the fraud of individual low-level employees (as opposed to the company's own fraud), such a theory for litigating the claims could raise class certification issues, given the need to prove individualized fraud with respect to each employee's conduct regarding each class member.  And while objectors point to Colorado statutes that they claim are especially strong (Dkt. No. 138 at 3–4), it is notable, as class counsel point out (Pls.' Reply Mem. at 6), that apparently no class action has ever been certified under those Colorado laws.  Also, as class counsel note (*id*.), the Colorado statutes arguably require a criminal conviction (or at least proof of all the elements of a crime) before civil liability is possible.  In short, I believe that class counsel have offered strong justifications for not pursuing state law identity theft claims.

80.  Certain other objectors criticize class counsel for not raising claims under the Stored Communications Act (SCA).  *See* Dkt. No. 116 at 12 (objections of Alex Chernavsky and William Castro).  But as class counsel explained, the SCA applies only to an electronic communication service or remote computing service, and those concepts have been narrowly construed to exclude banks such as Wells Fargo.  Pls.' Reply Mem. at 7.  In any event, even if Wells Fargo fit within those categories, plaintiffs would have to show that the information that Wells Fargo disclosed was received electronically—a showing that presumably could not be made with respect to customers who shared their identifying information only in paper form.  *See id*. at 7–8.  Moreover, the SCA prohibits only the *contents* of an electronic communication,[59] thus raising a serious issue whether the statute applies to basic identifying information.  *See* Pls.' Reply Mem. at 8.  I believe that class counsel have offered convincing grounds for not bringing SCA claims.

81.  Certain other objectors criticize class counsel's decision not to bring a claim under the Racketeer Influenced and Corrupt Organizations Act (RICO).  *See* Dkt. No. 118 (objections of Mitchell plaintiffs).  But as class counsel note (Pls.' Reply Mem. at 9), RICO is problematic because of (1) the high pleading standard, and (2) the difficulty identifying a RICO enterprise that is separate and distinct from Wells Fargo.  Indeed, it is widely known that civil RICO claims

---

[58] *See, e.g.*, Monique Judge, *Wells Fargo Blames Low-Level Employees for Bank's Recent Troubles*, THE ROOT (Sept. 15, 2016), https://www.theroot.com/wells-fargo-ceo-blames-low-level-employees-for-bank-s-r-1790856753.

[59] *See* 18 U.S.C. § 2702(a)(1)–(2).

are hard to prove.[60]  Thus, I believe that class counsel have offered convincing grounds for not bringing RICO claims.

### iii. Objections Based on Failure to Designate Subclassses

82.  Certain objectors complain that the settlement is deficient because separate subclasses (with separate class representatives and counsel) were not created for (1) class members who allege that Wells Fargo opened unauthorized credit cards, and (2) each of the two settlement pools—the 2002–2008 account holders and the 2009–2017 account holders.  *See* Dkt. No. 116 at 11–12; Dkt. No. 118 at 2–6 (setting forth objections).  These objectors assert, in conclusory fashion, that the failure to create such subclasses has resulted in fatal conflicts of interest in violation of Rule 23(a)(4)'s requirement of adequate representation.  I disagree.

83.  In *Amchem Products, Inc. v. Windsor*,[61] the Supreme Court found adequacy concerns because the massive asbestos settlement included, within a single class, class members who had been injured *and* those who had not yet suffered injuries.  The interests of the two groups conflicted because class members who were currently injured had an interest in securing "generous immediate payments," while those who were not yet injured had an interest in "ensuring an ample, inflation-protected fund for the future."[62]  In *Ortiz v. Fibreboard Corp.*,[63] the Supreme Court reiterated that "it is obvious after *Amchem* that a class divided between holders of present and future claims . . . requires division into homogeneous subclasses under Rule 23(c)(4)(B), with separate representation to eliminate conflicting interests of counsel."[64]  In my opinion, this case does not present conflict-of-interest problems analogous to those in *Amchem* and *Ortiz*.

---

[60] *See, e.g.*, Darrel C. Menthe, *Avoiding the Pitfalls of Pleading Civil RICO*, THE PRACTICAL LITIGATOR, May 2007, at 55, *available at* http://files.ali-aba.org/thumbs/datastorage/lacidoirep/articles/PLIT_PLIT0705-Menthe_thumb.pdf ("Civil RICO is a dangerous weapon.  It can misfire.  Or even explode in your hands."); Cara Spoto, *RICO: Powerful, But Hard to Prove*, THE JOURNAL TIMES (Mar. 15, 2014), http://journaltimes.com/news/local/rico-powerful-but-hard-to-prove/article_f728e4e0-acba-11e3-a51d-0019bb2963f4.html (to the same effect).

[61] 521 U.S. 591 (1997).

[62] *Id.* at 626–27.

[63] 527 U.S. 815 (1999).

[64] *Id.* at 856.

84.   To begin with, it is undisputed that one of the proposed class representatives, Jose Rodriguez, was allegedly the victim of unauthorized credit cards.   Thus, class members who were victims of unauthorized credit cards have a similarly situated class representative.   The fact that Rodriguez and class counsel did not pursue extra compensation for such claims (apart from what is embodied in the overall settlement) does not render either Rodriguez or counsel inadequate.   As explained above, class counsel and class representatives must be given substantial latitude in weighing the pros and cons of pursuing various claims, and their decision not to pursue additional claims relating to unauthorized credit cards was reasonable.   I do not believe that subclassing was required here.

85.   Objectors' argument with respect to the need for separate subclasses for the two net settlement pools is likewise ill-conceived.   Importantly, the interests of the 2002–2008 group *were negotiated separately*.   The original $110 million settlement amount was negotiated for the 2009–2017 group.   After becoming aware that unauthorized accounts had been opened as early as 2002, class counsel negotiated an additional $32 million for the 2002–2008 group (leading to the $142 million total).   Class members from both settlement pools are entitled to share the remaining funds as non-compensatory damages.   In this context, it makes no sense to argue that, upon learning of accounts from 2002–2008, class counsel needed to restructure the negotiations to add separate counsel and additional class representatives.   More fundamentally, objectors' argument is now especially weak given that the settlement has been revised to make it uncapped. *See* ¶ 27 (first bullet point).   Wells Fargo will compensate all eligible class members in each category, even if the payments will exceed the amount allocated to the particular net settlement pool.   Thus, there is no conflict, given that the pool of money is not limited.

86.   Not surprisingly, courts have been reluctant to order subclasses unless the purported conflicts are on par with those in *Amchem* and *Ortiz*.   It is possible to devise theoretical conflicts in almost every class action.   But once a court goes down the road of subclassing, drawing rational lines becomes difficult if not impossible.   And excessive subclassing poses a risk that the myriad factions will prevent any sort of reasonable settlement.

87.   A number of courts have made these points.   For example, in *In re Mego Financial Corp.*, the Ninth Circuit noted that subclasses were unlikely to address divides within the class "without creating further problems for the fair adjudication of the claims against [the

defendant]."[65]   In *In re Insurance Brokerage Antitrust Litigation*, the Third Circuit noted that, "[w]hile subclasses can be useful in preventing conflicts of interest, they have their drawbacks," including the potential to "create a 'Balkanization' of the class action"; indeed, such subclassing "present[s] a huge obstacle to settlement if each subclass has an incentive to hold out for more money."[66]   The Sixth Circuit has similarly stated that "[s]ubclassing . . . is appropriate only when the court believes it will materially improve the litigation."[67]   The Eighth Circuit has likewise characterized as "untenable" the argument that "a conflict of interest requiring subdivision is created when some class members receive more than other class members in a settlement," noting that "almost every settlement will involve different awards for various class members."[68] The Eleventh Circuit, as well, has observed that *Amchem* and *Ortiz* "appear to hold that Rule 23(a)(4) calls for *some type* of adequate structural protection, which would include, but may not necessarily require, formally designated subclasses."[69]

88.   Arguments for multiple subclasses were advanced by various objectors in the massive *Deepwater Horizon* oil spill class settlement.   There, two class settlements were negotiated: one for economic injuries and one for personal injuries.   The economic injuries included monetary losses for businesses and individuals, real property damage, loss of opportunity for charter boat income, physical damage to vessels, loss of subsistence fishing, and loss of income from commercial fishing.[70]   The personal injuries included a variety of ocular, respiratory, dermal, neurological, and other conditions, both acute and chronic.[71]   In neither class were any subclasses created, even though each class encompassed multiple kinds of injuries.   Judge Carl Barbier rejected objectors' arguments that subclasses should have been created based on the various types of injuries that class members suffered.   He stated, in language directly applicable here, that "[i]f subclasses were entertained, there would be no principled basis for limiting the

---

[65] 213 F.3d 454, 663 (9th Cir. 2000).

[66] 579 F.3d 241, 271 (3d Cir. 2009) (citation omitted).

[67] *Clark Equip. Co. v. Int'l Union, Allied Indus. Workers of Am.*, 803 F.2d 878, 880 (6th Cir. 1986).

[68] *Petrovic v. Amoco Oil Co.*, 200 F.3d 1140, 1146 (8th Cir. 1999).   *Accord, e.g., Walsh v. Great Atl. & Pac. Tea Co.*, 726 F.2d 956, 964 (3d Cir. 1983) ("[D]isagreements over the proposed division of a settlement fund do not necessarily create conflicts of interest requiring separate representation. . . . Such a rule would place substantial burden on the settlement process.") (citation omitted).

[69] *Juris v. Inamed Corp.*, 685 F.3d 1294, 1323 (11th Cir. 2012) (emphasis in original; citations omitted).

[70] 910 F. Supp. 2d at 903.

[71] 295 F.R.D. at 121–22.

number of subclasses," and he concluded that creating subclasses for each type of injury, "each with separate class representatives and counsel . . . would have greatly complicated both the settlement negotiations and the overall administration of the litigation."[72]   Just as the mediator here (Judge Phillips) ensured structural integrity, Judge Barbier found that the active involvement of the magistrate judge in the *Deepwater Horizon* negotiations "ensured structural integrity during the negotiations" without the need for subclasses.[73]

89.   At bottom, as the above authorities confirm, this Court should be very cautious about upending a massive settlement because of a purported need to create subclasses.   In my view, the subclasses proposed by objectors here would serve no useful purpose.   To the contrary, such subclasses would have only complicated the negotiations, perhaps even leading to an impasse.

### iv.  Miscellaneous Objections

90.   Various objectors complain about specific aspects of the settlement process, including concerns about the class notice, the claims process, and the opt-out deadline.   In my opinion, those objections lack merit.   As explained above, at the behest of the Court, the parties made a number of improvements in the settlement (to the benefit of class members), including (among many others) provisions relating to class notice, the claims process, and the opt-out deadline.   In my opinion, no additional changes are necessary.[74]

91.   Likewise, objectors' concern about the purportedly "overbroad" scope of the release is moot.   At the Court's behest, the release governing the unauthorized account and credit damage claims has been narrowed so that it applies only to claims "that were asserted, or that arise out of the identical factual predicate as the claims that were asserted" in the lawsuit.   Amended Settlement ¶¶ 2.50, 5.2.[75]

---

[72] 910 F. Supp. 2d at 920 (citations omitted).

[73] *Id.* at 918.

[74] I should also note that the forms for submitting objections and opt-outs are very simple, and the claim forms are likewise simple.   It is not possible to do away with claim forms altogether, because Wells Fargo does not know everyone who is claiming that a particular account is unauthorized.

[75] As noted in ¶ 27 note 21, although the release language governing purchasers of identity theft services is arguably still broad, *see* ¶ 2.50 (second sentence), I have been advised that both Wells Fargo and plaintiffs intend that that release language will also apply only to claims based on the "identical factual predicate."   A broad release, not so limited, would have concerned me, but the representations of both sides concerning the parties' actual intent alleviates my concern.   I am certain that the parties will offer this Court the same assurance, should the Court deem it useful to so inquire on the record.

92.   Finally, I fully agree with the Court's decision to deny objectors' requests to intervene. The settlement objection process gives those objectors an adequate platform to raise their concerns—both with this Court and on appeal (if any).   Permitting them to intervene—and potentially seek broad settlement-related discovery as parties—would only delay (and perhaps scuttle) the implementation of a very impressive settlement.[76]

\* \* \*

93.   In sum, while not every *Churchill* factor favors the settlement, the overwhelming number of them strongly support the settlement, and those that do not raise no red flags.[77]

### 2. The Ninth Circuit's *Bluetooth* Factors Support the Settlement

94.   In addition to the *Churchill* factors, courts in the Ninth Circuit hold pre-certification class settlements (such as the one here) to "an even higher level of scrutiny for evidence of collusion or other conflicts of interest than is ordinarily required under Rule 23(e)."[78]   As the Ninth Circuit has explained, in cases involving pre-certification settlements, courts "must be particularly vigilant not only for explicit collusion, but also for more subtle signs that class counsel have allowed pursuit of their own self-interests and that of certain class members to infect the negotiations."[79]   As set forth in *Bluetooth*, "warning signs" of subtle collusion include situations where:

> (1) class counsel "receive a disproportionate distribution of the settlement, or . . . the class receives no monetary distribution"; (2) the parties "negotiate a 'clear

---

[76] Objectors also claim that that "the proposed intervenors are inadequately represented" (and thus must be allowed to intervene) because they seek to pursue causes of action not being pursued by class counsel. Dkt. No. 117 at 21 (initial capitalization omitted).   Under this theory, unnamed class members would be entitled to intervene in every class settlement merely by complaining that class counsel failed to bring a particular cause of action.   No authority supports such an argument; indeed, if that argument were accepted, it would disrupt the entire structure of Rule 23(e) by giving every objector party status and the ability to hold up settlements through unnecessary settlement-related discovery and unreasonable demands.

[77] *See, e.g.*, *In re Volkswagen Clean Diesel Mktg. Sales Practices & Prods. Liab. Litig.*, 229 F. Supp. 3d 1052, 1065, 1071 (N.D. Cal. 2016) (holding that "the Churchill factors favor settlement" despite plaintiffs' strong case and Volkswagen's public admission of wrongdoing, because "[p]laintiffs' strong claims are balanced by the risk, expense, and complexity of their case, as well as the likely duration of further litigation"); *Larsen v. Trader Joe's Co.*, No. 11-cv-05188-WHO, slip op at 4 (N.D. Cal. July 11, 2014) ("Not all of [the *Churchill* factors] will apply to every class action settlement, and in certain circumstances, one factor alone may prove determinative in finding sufficient grounds for court approval." (citing *Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370, 1376 (9th Cir. 2003))).

[78] *In re Bluetooth Prods. Liab. Litig.*, 654 F.3d 935, 946 (9th Cir. 2011) (citation omitted).

[79] *Id.* at 947.

sailing' agreement providing for the payment of attorneys' fees separate and apart from class funds"; and (3) "the parties arrange for fees not awarded to revert to defendants rather than to be added to the class fund."[80]

None of these warning signs is present here. I discuss each one separately below.

### a. Whether Class Counsel Are Receiving All or Most of the Settlement

95. This factor strongly supports the settlement and negates any argument of collusion. Here, class counsel are requesting as fees only 15 percent of the $142 million settlement fund (along with well below one percent of the fund for actual out-of-pocket costs). As discussed below, the fee percentage is well under the norm in class actions, and well under the Ninth Circuit's benchmark of 25 percent. Likewise, the percentage requested for costs is comparatively low for a class action like this. Here, the entire settlement (apart from counsel's fees and their actual and necessary out-of-pocket costs) goes to the class; none of it will revert to Wells Fargo under any circumstances. *See* ¶ 23.

### b. Whether There Is a "Clear Sailing" Agreement

96. A clear sailing agreement is one where "the defendant agrees not to oppose a fee award up to a certain amount."[81] There is no clear sailing agreement here, a fact that also supports the settlement and negates any argument of collusion. Although class counsel are asking for only 15 percent of the fund as fees, they have no commitment from Wells Fargo that it will consent to even that percentage as attorneys' fees.

### c. Whether Funds Revert to the Defendant

97. A provision that sometimes accompanies a clear sailing agreement is a "kicker clause," which provides that any portion of attorneys' fees that are agreed to by defendant but not awarded by the court will revert to the defendant, as opposed to increasing the pot for the class.[82] Again, this factor favors settlement and negates any argument of collusion. As noted, this is a non-reversionary settlement. After payment of attorneys' fees and costs, 100 percent of the remainder will go to the class, either as compensatory damages or non-compensatory damages.

---

[80] *Id*. at 946–47 (citations omitted).

[81] *In re Sw. Airlines Voucher Litig*., 799 F.3d 701, 705 (7th Cir. 2015).

[82] *See id*. ("A 'kicker' clause provides that if a court reduces the attorney fee sought in a class action, the reduction benefits the defendant rather than the class.").

Should the Court decide to award class counsel less than 15 percent of the fund as fees, the difference (between 15 percent and the lower amount awarded) will increase the funds available to the class; no amount will revert to Wells Fargo.

### 3. Additional Factors Identified in the Case Law Support the Settlement

98.  In addition to satisfying the *Churchill* and *Bluetooth* factors, this settlement satisfies two other criteria that have been recognized as important in the case law:  involvement of a mediator and active judicial oversight.

### a. Involvement of a Mediator

99.  Courts place special importance on the fact that parties have utilized prominent and respected mediators to facilitate and guide settlement talks.  For example, the *Bluetooth* court itself noted that the presence of a neutral mediator is "a factor weighing in favor of a finding of non-collusiveness."[83]  Similarly, the Second Circuit has stated that "a court-appointed mediator's involvement in pre-certification settlement negotiations helps to ensure that the proceedings were free of collusion and undue pressure."[84]  And in the *NFL Concussion* litigation—another high-profile case where Judge Phillips served as mediator—the district court pointed to Judge Phillips's involvement as an important structural protection that "helped guarantee that the parties did not compromise some class members' claims in order to benefit other class members."[85]  A number of judges in this District have likewise cited the participation of "an experienced and neutral mediator" as a factor strongly suggesting that the settlement was a product of arm's length negotiations.[86]

100.  Here, Judge Phillips and his colleague, Michelle Yoshida, were heavily involved in the settlement discussions.  Indeed, it was Judge Phillips's initial proposal for $110 million that ultimately convinced the parties to reach an agreement in principle, even though they had been

---

[83] 654 F.3d at 948.

[84] *D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (2d Cir. 2001).

[85] *In re Nat'l Football League Players Concussion Injury Litig.*, 307 F.R.D. 351, 377 (E.D. Pa. 2015) (capitalization omitted), *aff'd*, 821 F.3d 410 (3d Cir. 2016) (hereinafter "*NFL*").

[86] *Vincent v. Reser*, No. C11-03572 CRB, 2013 WL 621865, at *4 (N.D. Cal. Feb. 19, 2013).  *Accord, e.g.*, *Pierce v. Rosetta Stone, Ltd.*, No. C 11-01283 SBA, 2013 WL 5402120, at *5 (N.D. Cal. Sept. 26, 2013)("[P]articipation of a mediator . . . is 'a factor weighing in favor of a finding of non-collusiveness.'" (quoting *Bluetooth*, 654 F.3d at 948)).  *See also* ¶ 88 (discussing *Deepwater Horizon* case).

far apart.  Phillips Decl. ¶ 10.  And Judge Phillips has explicitly voiced his support for the settlement.  *See* ¶ 25.[87]

### b.  Active Role of the District Court at the Preliminary Approval Stage

101.  Appellate courts derive added assurance of a settlement's fairness from the fact that district courts have played an active role in improving the settlement.  In the *NFL Concussion* litigation, for example, the district court was very active in facilitating important improvements to the settlement.  In upholding the settlement, the Third Circuit emphasized the district court's active role in "propos[ing] several changes to benefit class members" at the preliminary approval stage and in analyzing the fairness of the settlement in "great detail."[88]

102.  Here, this Court played an extremely active role.  As noted in ¶ 27, in orders dated May 16 and 17, 2017, the Court identified issues that it wanted the parties to address in further briefing and at the pending (May 18, 2017) preliminary approval hearing.  At that hearing, the Court focused on those and other concerns at length, identifying numerous specific concerns that it had with the April 20, 2017 settlement agreement.  *See* ¶ 27.  Then, subsequent to the hearing, the Court set forth its concerns in a detailed order, dated May 24, 2017.  The parties responded by addressing *every issue* raised by the Court, improving the settlement (in favor of the class) to

---

[87] Courts often afford significant weight to the opinions of a neutral and experienced mediator.  *See, e.g., In re NVIDIA GPU Litig.*, 539 F. App'x 822, 826 (9th Cir. 2013) (district court permissibly took into account "mediator's opinion that the [settlement] amount was fair and reasonable"); *Rodriguez v. West Publ'g Corp.*, 563 F.3d 948, 957 (9th Cir. 2009) (quoting mediator's declaration that class settlement was fair, reasonable, and adequate, and was reached through arm's length negotiations); *Browning v. Yahoo! Inc.*, No. C04-01463 HRL, 2007 WL 4105971, at *12 (N.D. Cal. Nov. 16, 2007) (citing positive recommendation of class settlement by a "qualified and experienced" mediator); *Stratton v. Glacier Ins. Adm'rs, Inc.*, No. 1:02-CV-06213 OWW DLB, 2007 WL 274423, at *14 (E.D. Cal. Jan. 29, 2007) (to the same effect).

[88] *NFL*, 821 F.3d at 423, 437; *cf. Redman v. Radioshack Corp.*, 768 F.3d 622, 629 (7th Cir. 2014) (in reviewing class settlements, the district court "is not to assume the passive role that is appropriate when there is genuine adverseness between the parties"); *Eubank v. Pella Corp.*, 753 F.3d 718, 721 (7th Cir. 2014) (admonishing district court for failure to actively scrutinize settlement, and emphasizing need for "intense judicial scrutiny of proposed class action settlements"); *see also* Hon. Elaine Bucklo & Thomas R. Meites, *What Every Judge Should Know About a Rule 23 Settlement (But Probably Isn't Told)*, 41 LITIG. 18 (2015) (explaining that district courts need to play an active role and obtain detailed information prior to approving class settlements, and noting that often "the burden of ferreting out problems [with a settlement] falls wholly on the [district] court"); Bruce D. Greenberg, *Keeping the Flies Out of the Ointment: Restricting Objectors to Class Action Settlements*, 84 ST. JOHN'S L. REV. 949, 956 (2010) ("Many cases hold that judges are not simply to rubber-stamp settlements but are instead to review them scrupulously.").  It is precisely to encourage this sort of proactive engagement that the Rules Committee drafted proposed amendments to Rule 23(e)(1) to ensure that the parties have disclosed crucial information about the settlement to the court at the preliminary approval stage.  *See* Memorandum from John D. Bates, Chair, Advisory Comm. on Civil Rules, to Hon. David G. Campbell, Chair, Comm. on Rules of Practice & Procedure 17–23 (May 18, 2017), *available at* http://www.uscourts.gov/sites/default/files/2017-06-cv_rules_committee_report_0.pdf.

address each concern. *See id.* (describing the myriad changes responsive to the Court's concerns). Thus, far from merely rubber-stamping the parties' agreement in principle, this Court played an active role in ensuring that the settlement would be as strong as possible, and it urged several important changes before granting preliminary approval.

103. I have reviewed myriad class settlements as a practitioner, scholar, and expert. I can say with assurance that I have seen few cases in which a court has worked as hard as this Court has to identify troublesome issues up front (before any notice has gone to the class) and to ensure that the parties address those concerns. Some scholars have criticized courts for engaging in only superficial review of class action settlements.[89] Here, however, the Court adopted a hands-on approach, using the preliminary review process to turn a strong settlement into an even stronger one. Without question, this Court took seriously its role as a fiduciary to the class.[90]

### 4. Conclusion on Settlement Fairness

104. In sum, it is my opinion that this settlement is not only fair, reasonable, and adequate; it is exceptional, especially given the challenges facing class counsel.

### ATTORNEYS' FEES

## C. The Attorneys' Fees Requested By Class Counsel Are Reasonable

105. In this section, I address the attorneys' fees sought by class counsel. The Ninth Circuit "requir[es] only that fee awards in common fund cases be reasonable."[91] In assessing the reasonableness of proposed attorneys' fees, courts must "consider all the circumstances of the case."[92]

106. Here, class counsel request fees of $21.3 million, which amounts to 15 percent of the common settlement fund. In my opinion, this figure is eminently reasonable. I explain below the grounds for my conclusion.

---

[89] *See, e.g.*, Linda S. Mullenix, *Ending Class Actions as We Know Them: Rethinking the American Class Action*, 64 EMORY L.J. 399, 430 (2014) (arguing that some courts conduct only "pro forma, rubber-stamping reviews" under Rule 23(e)); Deborah R. Hensler, *Goldilocks and the Class Action*, 126 HARV. L. REV. F. 56, 59–60 (2012) ("One of the critiques of private class actions is that judges too readily 'rubber stamp' settlements . . . .").

[90] *See, e.g., In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 534 (3d Cir. 2004) (noting that the district court serves "as a fiduciary who . . . serve[s] as a guardian of the rights of absent class members" (citation omitted)).

[91] *McKenna v. Sears, Roebuck & Co.*, 116 F.3d 1486, 1486 (9th Cir. 1997) (citation omitted).

[92] *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1048 (9th Cir. 2002).

### 1. This Court Should Use the Percentage-of-the-Fund Method

107. As an initial matter, this Court must decide whether to use the percentage-of-the-fund approach (the percentage approach) or the lodestar approach. Courts in the Ninth Circuit have "discretion in common fund cases to choose either the percentage-of-the-fund or the lodestar method."[93] Both within the Ninth Circuit and nationwide, however, courts have a strong preference for the percentage-of-the-fund method.[94] Indeed, although district courts in the Ninth Circuit have the discretion to apply the lodestar method where "special circumstances indicate that the percentage recovery would be either too small or too large,"[95] "the primary basis of the fee award remains the percentage method."[96] This preference for the percentage method—which I wholeheartedly share—stems primarily from the fact that the percentage method "aligns the interests of counsel and the class by allowing class counsel to directly benefit from increasing the size of the class fund."[97] By contrast, the lodestar method gives class counsel an incentive to work more hours than are necessary and to avoid early settlement.[98]

---

[93] *Id.* at 1047 (citation omitted).

[94] *See, e.g., id.* at 1050; Theodore Eisenberg, Geoffrey Miller & Roy Germano, *Attorneys' Fees in Class Actions: 2009–2013*, 92 N.Y.U. L. REV. 937, 963 (2017) (noting that the "rarely used" lodestar method "was used in only 6.29 [percent] of cases during the 2009–2013 period"); Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 J. EMPIRICAL LEGAL STUD. 811, 832–33 (2010) (noting that district courts "employed the lodestar method in only 12 percent of settlements" from 2006–2007); Theodore Eisenberg & Geoffrey Miller, *Attorneys' Fees and Expenses in Class Action Settlements: 1993–2008*, 7 J. EMPIRICAL LEGAL STUD. 248, 267 (2010) (lodestar method was used in only 9.6 percent of settlements from 2003–2008).

[95] *Six Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301, 1311 (9th Cir. 1990).

[96] *Vizcaino*, 290 F.3d at 1050. *Accord, e.g.*, AM. LAW INST., PRINCIPLES OF THE LAW OF AGGREGATE LITIGATION § 3.13(b) (2010) (noting that the "percentage-of-the-fund approach is the method [that should be] utilized in most common fund cases"); *Report of the Third Circuit Task Force on Court Awarded Attorney Fees*, 108 F.R.D. 237, 246–49 (1985) (concluding that courts should generally use the percentage method in common fund cases).

[97] *Craft v. Cnty. of San Bernardino*, 624 F. Supp. 2d 1113, 1123 (C.D. Cal. 2008). *See also* NAT'L ASS'N OF CONSUMER ADVOCATES, STANDARDS AND GUIDELINES FOR LITIGATING AND SETTLING CONSUMER CLASS ACTIONS 27 (3d ed. 2014) (noting that the percentage method is preferable from consumers' perspective because it "keeps class counsel's financial interest closely aligned with that of the class itself" and "approximates the 'free market' negotiated fees obtained in traditional contingency litigation").

[98] *See, e.g., McDaniel v. Cnty. of Schenectady*, 595 F.3d 411, 418 (2d Cir. 2010) ("The lodestar method . . . creates an incentive for attorneys to bill as many hours as possible, to do unnecessary work, and for these reasons also can create a disincentive to early settlement. Under certain conditions, moreover, lodestar awards can create the near opposite incentive, encouraging attorneys to settle before trial even when it is not in their clients' best interest."); *Vizcaino*, 290 F.3d at 1050 n.5 ("[I]t is widely recognized that the lodestar method creates incentives for counsel to expend more hours than may be necessary . . . , [and] the lodestar method does not reward early settlement."); *In re Synthroid Mktg. Litig.*, 264 F.3d 712, 721 (7th Cir. 2001) ("[T]he lodestar approach creates [an] incentive to run up the billable hours."); *In re Netflix Privacy Litig.*, No. 5:11-CV-00379 EJD, slip op. at 18 (N.D. Cal. Mar. 18, 2013) ("[T]he lodestar method's limitations lie in its creating a possible incentive for counsel to expend more hours than is necessary on a litigation or to delay settlement.").

108.   Here, the policies underlying the percentage method are well demonstrated.   Class counsel took on a difficult case that could have led to years of litigation.   Yet, they reached an early settlement that provides impressive and timely relief to class members.

### 2. The 15 Percent Requested Here Is Reasonable

109.   As noted, class counsel seek attorneys' fees of 15 percent of the $142 million settlement fund.   As I discuss below, that percentage is extremely reasonable:   it is well under the Ninth Circuit's 25 percent benchmark and well under the percentages typically awarded in major class actions.

### a. The Percentage Requested Is Well Under the Ninth Circuit's 25 Percent Benchmark

110.   In the Ninth Circuit, "[i]t is well established that 25 [percent] of a common fund is a presumptively reasonable amount of attorneys' fees."[99]   "[C]ourts typically calculate 25 [percent] of the fund as the 'benchmark' for a reasonable fee award . . . ."[100]   The percentage requested here (15 percent) is substantially below the 25 percent figure.

### b. The Percentage Requested Is at the Low End of Fees Awarded in Major Class Actions

111.   A fee of 15 percent is well below the mean and median for fees in major common fund cases in the Ninth Circuit and elsewhere.[101]   Professors Eisenberg, Miller, and Germano, for example, found that, "[o]n average, fees were 27 [percent] of gross recovery during the 2009–2013 period" nationwide.[102]   In the Ninth Circuit, they found that the mean attorneys' fees award was 26 percent, and the median was 25 percent.[103]   And in the Northern District of California, specifically, the mean and median were likewise 26 percent and 25 percent, respectively.[104]

---

[99] *In re High-Tech Employee Antitrust Litig.*, No. 11-CV-02509-LHK, 2015 WL 5158730, at *6 (N.D. Cal. Sept. 2, 2015) (citations omitted).

[100] *Bluetooth* 654 F.3d at 942.

[101] *See generally* NAT'L ASS'N OF CONSUMER ADVOCATES, *supra* note 97, at 27 (noting that "there is authority for presuming an [attorneys' fees] award in the 20 [percent] to 30 [percent] range to be reasonable and appropriate" in consumer class actions, because it "keeps class counsel's financial interest closely aligned with that of the class itself" and "approximates the 'free market' negotiated fees obtained in traditional contingency litigation (in which contingent fees of 30 to 40 percent are common)").

[102] Eisenberg, Miller & Germano, *supra* note 94, at 947.

[103] *Id.* at 950.

[104] *Id.* at 951.

Professor Fitzpatrick similarly found that mean and median attorneys' fees awards in federal class actions from 2006–2007 were "around 25 percent."[105]

112.   Scholars have found that fee awards (as a percentage) tend to decline as the amount of the settlement increases, with the lowest awards being made in so-called mega-settlements (those over $1 billion).[106]  In class actions involving dollar figures in the same range as the $142 million settlement here, mean and median attorneys' fees awards are still well over 15 percent. Specifically, in cases involving settlements between $100 million and $250 million during the 2006–2007 time period, Professor Fitzpatrick found that the mean and median attorneys' fees awards were 17.9 percent and 16.9 percent, respectively.[107]  Similarly, in their 2009–2013 study, Professors Eisenberg, Miller, and Germano found that mean and median attorneys' fees in settlements over $100 million "varied from a low of 16.6 [percent] in 2009 to a high of 25.5 [percent] in 2011 . . . ."[108]

113.   Courts within the Ninth Circuit have approved awards of *substantially* more than 15 percent of the fund.[109]  And the Ninth Circuit has upheld fee awards as high as 33.3 percent against challenges by objectors.[110]  Beyond the Ninth Circuit, fees well above 15 percent have likewise been approved in many major class actions.  The Eighth Circuit, for example, upheld a 36 percent fee award in *In re U.S. Bancorp Litigation*,[111] and it recently upheld a 38 percent fee award in *Huyer v. Buckley*.[112]

---

[105] Fitzpatrick, *supra* note 94, at 811.

[106] *See, e.g.*, *id.* (noting that fee percentages are "inversely associated with the size of the settlement"); Eisenberg, Miller & Germano, *supra* note 94, at 947–48 (describing "scaling effect" where, "as [the] recovery amount increases, the ratio of the size of the attorneys' fee relative to the size of the recovery (*i.e.*, the fee percentage) tends to decrease").

[107] *Id.* at 839.

[108] Eisenberg, Miller & Germano, *supra* note 94, at 947.

[109] *See, e.g.*, *Lusby v. GameStop, Inc.*, No. C12-03783, 2015 WL 1501095, at *9 (N.D. Cal. Mar. 31, 2015) (33.3 percent fee award); *Miller v. Ghirardelli Chocolate Co.*, No. 12-cv-04936, 2015 WL 758094, at *5 (N.D. Cal. Feb. 20, 2015) (30 percent fee award); *Boyd v. Bank of Am. Corp.*, No. 1300561-DOC, 2014 WL 6473804, at *12 (C.D. Cal. Nov. 18, 2014) (33.3 percent fee award); *In re Heritage Bond Litig.*, No. 02-ML-1475, 2005 WL 1594389, at *9 (C.D. Cal. June 10, 2005) (33.3 percent fee award).

[110] *See, e.g.*, *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 457, 463 (9th Cir. 2000) (affirming 33.3 percent fee award); *see also In re Pac. Enters. Sec. Litig.*, 47 F.3d 373, 379 (9th Cir. 1995) (affirming 33 percent fee award).

[111] 291 F.3d 1035 (8th Cir. 2002).

[112] 849 F.3d 395, 399 (8th Cir. 2017).

114.   Moreover, high fee awards (well above 15 percent) are especially common in cases, such as this one, involving a high degree of risk for class counsel.  For example, one study of class settlements between 1993 and 2008 (by Professors Eisenberg and Miller) found that the mean fee award in "high risk" consumer class actions during that time period was 31.3 percent.[113]  And in their 2009–2013 study, Professors Eisenberg, Miller, and Germano found that the mean fee award in high-risk cases was 27.6 percent.[114]

115.   Here, as noted, the arbitration clauses made this a very high risk case, one that deterred all prospective class action lawyers except Keller Rohrback from getting involved until after a settlement was in hand.  The difficulties posed by the case, in my view, would have justified fees well above 15 percent.  Indeed, a request at the Ninth Circuit's 25 percent benchmark would have been credible given the risks here.  Class counsel are to be commended for voluntarily requesting an amount that is well below what they reasonably could have sought.

### c.   The 15 Percent Fee Requested Is Supported By the Ninth Circuit's Reasonableness Factors

116.   In assessing whether a percentage award should be adjusted upward or downward from the 25 percent benchmark, courts in the Ninth Circuit consider a number of factors set forth by the Ninth Circuit in *Vizcaino* and *Six Mexican Workers*.  These factors include:  (1) the results achieved by class counsel; (2) the length the case has transpired; (3) the complexity of the case and the skill required of class counsel; (4) the risks involved in pursuing the case; (5) the percentages awarded in other class actions; (6) any non-monetary benefits obtained for class members; (7) the percentages used in standard contingency-fee agreements in similar cases; and (8) class counsel's lodestar.[115]

117.   In my opinion, these factors, taken as a whole, strongly support the reasonableness of the 15 percent fee award requested in this case.

---

[113] Eisenberg & Miller, *supra* note 94, at 265.

[114] Eisenberg, Miller & Germano, *supra* note 94, at 958–59.

[115] *See Vizcaino*, 290 F.3d at 1048–51 (results achieved, length of case, risks involved, percentages in other class actions, non-monetary benefits, percentages in standard contingency-fee agreements, and class counsel's lodestar); *Six Mexican Workers*, 904 F.2d at 1311 (results achieved, length of case, complexity of the case and skill required); *see also In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*, No. 3:15-md-02672, 2017 WL 2178787, at *1–3 (N.D. Cal. May 17, 2017) (discussing and applying those factors).

### i.  Results Achieved by Class Counsel

118.   As explained, this is an excellent result for the class.  The settlement is designed to provide full compensation for fees paid on unauthorized accounts and for credit report injury.  It is especially notable that the settlement provides a payment to the class of $142 million (less fees and costs), in contrast to the mere $5 million for injured victims under the regulatory settlements.

### ii.  Length the Case Has Transpired

119.   This case was originally brought in May 2015.  According to Professor Fitzpatrick, both the average and median time between commencement of class actions and settlement is approximately three years.[116]   Here, an agreement in principle was reached in September 2016, although the parties continued to modify the settlement to the benefit of class members.  The Court granted preliminary approval in May 2017.  But even using the time period of September 2016 to May 2017, the length here is shorter than is typical.  But that relatively short time span (less than three years) is presumably a major reason why the fees sought (15 percent) are already substantially lower than the Ninth Circuit's benchmark of 25 percent.  That short time span should not, in my view, be a reason to reduce the percentage even more below the benchmark than it already is.  Indeed, in my opinion, the short time span is a positive feature of the settlement for class members, who will recover compensation for their injuries without protracted litigation.  In my view, it would be illogical and unfair to penalize class counsel for accomplishing so much so quickly.

### iii.  Complexity of the Case and Skill Required

120.   This case certainly has complexities, especially with respect to determining how to calculate compensatory damages for (1) fees incurred to open the unauthorized accounts, and (2) damages caused by harm to credit.  Moreover, the arbitration issues were complicated.  The basic theory of the case, however, is not complicated, and proof of Wells Fargo's wrongdoing is aided by its public admissions.  On balance, I would consider this factor to be neutral.

### iv.  Risks Involved

121.   As discussed in ¶¶ 59–64, this case entailed substantial risks, especially in light of the arbitration clauses.   One would normally expect a revelation of major wrongdoing by a

---

[116] Fitzpatrick, *supra* note 94, at 820.

43

powerhouse such as Wells Fargo to have generated many class action lawsuits virtually overnight.[117]  Here, however, as discussed above, Keller Rohrback was the only firm to file class actions in 2015 regarding the unauthorized accounts.  Other class actions were not filed until *after* plaintiffs (represented exclusively by Keller Rohrback) announced that they had reached a classwide agreement in principle with Wells Fargo.  *See* Loeser Decl. ¶ 9.

### v.  Percentages Awarded in Other Class Actions

122.  As discussed in ¶ 110, the percentage sought here is substantially below the Ninth Circuit's benchmark of 25 percent, and is below the median and mean for percentage awards in both the Ninth Circuit and nationally.

### vi.  Non-Monetary Benefits

123.  The instant settlement provides important non-monetary benefits to class members who suffered credit impact damages.  I highlight two here.  First, by submitting a claim for credit impact damages, class members are entitled to a review of their credit history for unauthorized accounts or credit inquiries.  In essence, these class members will receive a credit monitoring service at no cost.  Second, all participating class members will have their unauthorized credit accounts immediately removed from their consumer reports.  *See* Amended Settlement ¶¶ 9.10–9.11.[118]  Thus, in addition to the impressive monetary benefits, this settlement contains significant non-monetary benefits.  While the primary relief here is monetary, I view this factor as mildly supportive of the settlement.

### vii. Percentages in Standard Contingency-Fee Agreements in Similar Individual Cases

124.  In individual contingency-fee contracts, the attorneys' fees percentage is virtually always at least 33 percent, and is often higher.[119]  The rate requested here (15 percent) is far

---

[117] *See* ¶ 155.

[118] Without this remedy, class members would have to submit a dispute regarding each unauthorized account to Wells Fargo and, possibly, each consumer reporting agency.  Thus, class members avoid what would otherwise be an unreliable and protracted process.

[119] *See, e.g.*, F. Patrick Hubbard, *Substantive Due Process Limits on Punitive Damages Awards: "Morals Without Technique"?*, 60 FLA. L. REV. 349, 383 (2008) ("usual" contingent fee is "33–40 percent"); Herbert M. Kritzer, *The Wages of Risk: The Returns of Contingency Fee Legal Practice*, 47 DEPAUL L. REV. 267, 286 (1998) (survey of Wisconsin attorneys revealed that "a contingency fee of 33% was by far the most common"); Lester Brickman, *ABA Regulation of Contingency Fees: Money Talks, Ethics Walks*, 65 FORDHAM L. REV. 247, 248 (1996) (noting that

44

below what would normally be set under an individual contingency-fee arrangement.

### viii.  Class Counsel's Lodestar

125.  As discussed below, I do not believe that it is necessary to calculate class counsel's lodestar in this case.  Nevertheless, as detailed in ¶¶ 130–159, class counsel's lodestar supports the requested 15 percent fee.

\* \* \*

126.  As the above discussion reflects, most of the *Vizcaino*/*Six Mexican Workers* criteria favor a high percentage award here, and the others are neutral.

### 3.  There Is No Need for a Lodestar Cross Check

127.  Courts in the Ninth Circuit and elsewhere often decline to conduct a lodestar cross check where a percentage award falls significantly below the 25% benchmark.  As the Ninth Circuit has stated, in upholding a percentage award "far below the 'benchmark of 25 [percent] of the common fund'":

> We reject the contention of the objectors that the district court was required to consider the alternatives of a lodestar and a percentage-of-fund award and explain its reasons for choosing the latter. . . . In *Florida v. Dunne*, [915 F.2d at 545,] we recognized a "recent ground swell of support for *mandating* a percentage-of-the-fund approach in common fund cases," but we declined to adopt a mandatory rule, requiring "only that fee awards in common fund cases be reasonable." . . . But in neither *Dunne* nor [in subsequent cases] did we require the district court expressly to balance the lodestar method against the percentage method . . . . [A] majority of our panel was of the view that the award should be judged in relation to the common fund; the district court certainly did not abuse its discretion in using a percentage method . . . .[120]

Consistent with that approach, courts have frequently refrained from conducting a lodestar cross check in the course of applying the percentage method.  For example, in *Ebarle v. Lifelock, Inc.*, the court "decline[d] to conduct a lodestar cross-check . . . , given that under the percentage-of-the-fund method the fee request was significantly below the 25 [percent] benchmark."[121]  The

---

"standard" contingency fees are "usually thirty-three percent to forty percent of gross recoveries" (emphasis omitted)).

[120] *McKenna*, 116 F.3d at 1486 (footnotes and citations omitted; emphasis in original).

[121] No. 15-CV-00258-HSG, 2016 WL 5076203, at \*11 (N.D. Cal. Sept. 20, 2016).  *Accord, e.g.*, *Glass v. UBS Fin. Svcs., Inc.*, No. C-06-4068 MMC, 2007 WL 221862, at \*16 (N.D. Cal. 2007) ("Under the circumstances

California Supreme Court has similarly held that courts "retain the discretion to forgo a lodestar cross-check and use other means to evaluate the reasonableness of a requested percentage fee."[122]

128.  Here, because the 15 percent fee falls well below the 25 percent benchmark, a lodestar cross check is unnecessary.  Indeed, if a lodestar cross check were required here, it would be difficult to imagine a case where such a cross check could be avoided.  That would mean that the lodestar analysis would become an essential part of every percentage-of-the-fund case, thus defeating the whole purpose of selecting the percentage method as an *alternative* to the lodestar method.  Knowing that a cross check was inevitable, counsel would conduct themselves with the very inefficiencies that the percentage method was designed to avoid—putting in unnecessary hours rather than focusing solely on achieving the biggest pot of money for the class, as early as possible.

129.  Moreover, a lodestar cross check is especially inappropriate here because not all hours are accounted for; class counsel still has considerable work to do that is not captured within its hours recorded to date.  As detailed in ¶ 140, class counsel have advised me that they estimate that at least 2,500 hours will be required before this settlement (including administration of the payments) is completed.  As the court noted in the *AT&T Sales Tax* litigation, in concluding that "a lodestar cross-check is unnecessary in the present case":

> [T]he Settlement calls for considerable ongoing efforts.  Class Counsel's endeavors in this matter will not come to an end simultaneously with this Court's approval of the [settlement].  Instead, . . . slightly more than 50 [percent] of the work involved in fully implementing the Settlement Agreement remains to be done. . . . This suggests that a lodestar approach may be both difficult and misleading.[123]

---

presented here, where the early settlement resulted in a significant benefit to the class, the Court finds no need to conduct a lodestar cross-check.  Class counsel's prompt action in negotiating a settlement . . . should be fully rewarded.").

[122] *Laffitte v. Robert Half Int'l Inc.*, 376 P.3d 672, 688 (Cal. 2016).  *Accord, e.g., Swedish Hosp. v. Shalala*, 1 F.3d 1261, 1266–70 (D.C. Cir. 1993) (lodestar analysis not required); *Bacchi v. Mass. Mut. Life Ins. Co.*, No. 12-11280-DJC, slip op at 7 (D. Mass. Nov. 8, 2017) (noting that lodestar cross check is discretionary in the First Circuit); *Smith v. Krispy Kreme Doughnut Corp.*, No. 1:05CV00187, 2007 WL 119157, at *3 (M.D.N.C. Jan. 10, 2007) (noting that "[i]t is not necessary for the Court to conduct a lodestar analysis" in the Fourth Circuit).

[123] *In re AT&T Mobility Wireless Data Services Sales Tax Litig.*, 792 F. Supp. 2d 1028, 1038–40 (N.D. Ill. 2011).

### 4.  In Any Event, a Lodestar Analysis Supports the Fees Requested

130.  Even if the Court were to conduct a lodestar cross check, it is my opinion that such an analysis would not undermine the reasonableness of the fees requested by class counsel.

131.  Under the lodestar method, a "lodestar figure is calculated by multiplying the number of hours the prevailing party reasonably expended on the litigation (as supported by adequate documentation) by a reasonable hourly rate for the region and experience of the lawyer."[124]  The court may then adjust that figure "upward or downward by an appropriate positive or negative multiplier reflecting a host of 'reasonableness' factors."[125]  I focus on these factors and calculations below.

### a.  The Hours and Billing Rates Proposed By Class Counsel Are Reasonable

132.  The designated rates for Keller Rohrback partners working on the case range from $710 to $995; for associates the range is $400 to $650; and for paralegals the range is $225 to $325. To gauge the reasonableness of class counsel's rates, courts in the Ninth Circuit generally begin by examining hourly rates charged by comparable attorneys and law firms in "the forum in which the District Court sits."[126]  Other prominent plaintiffs' class action firms in Northern California designate rates comparable to those designated by Keller Rohrback in this case. Examples include Lieff Cabraser Heimann & Bernstein (between $285 and $1,025 per hour);[127] Cotchett, Pitre & McCarthy (between $360 and $900 per hour);[128] and Altshuler Berzon

---

[124] *Bluetooth*, 654 F.3d at 941 (citation omitted).  In addition, as the Ninth Circuit has explained, "The lodestar should be computed either using an hourly rate that reflects the prevailing rate as of the date of the fee request, to compensate class counsel for delays in payment inherent in contingency-fee cases, or using historical rates and compensating for delays with a prime-rate enhancement."  *Stetson v. Grissom*, 821 F.3d 1157, 1166 (9th Cir. 2016). Thus, it is appropriate to look at the most recent comparable rates, as opposed to relying on older cases involving a very different legal market.

[125] *Id.* at 941–42 (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1029 (9th Cir. 1998)).

[126] *Camacho v. Bridgeport Fin., Inc.*, 523 F.3d 973, 979 (9th Cir. 2008).

[127] *See, e.g.*, Decl. of Eric B. Fastiff at Ex. 2, *CIPRO Cases I & II*, Nos. 4154 & 4220 (Cal. Super. Ct., San Diego Cnty.) (filed Mar. 22, 2017); *see also* Notice of Entry of Order as to Pls.' Mot. for Atty's Fees, Reimbursement of Costs, & Incentive Awards, *CIPRO Cases I & II*, Nos. 4154 & 4220, slip op. at Ex. 1 (Cal. Super. Ct., San Diego Cnty. Apr. 26, 2017) (approving fees based on those billing rates).

[128] *See, e.g.*, Decl. of Mark C. Molumphy at Ex. B, *In re Med. Capital Sec. Litig.*, No. 8:10-ml-02145-DOC-RNB (C.D. Cal.) (filed Apr. 18, 2013).

(between $460 and $930 per hour).[129]

133.   When a case involves a controversy of national significance, it is not uncommon for highly regarded plaintiffs' class action firms to designate billing rates that are comparable to those of major national defense firms.[130]   As recent examples, in the *Volkswagen Clean Diesel* case, billing rates for class counsel ranged from $275 to $1,600 for partners and $150 to $790 for associates.[131]   In *NFL Concussion*, billing rates for class counsel ranged from $750 to $1,350 for partners and $525 to $850 for associates.[132]   In litigation involving alleged breaches of fiduciary duty with respect to 401(k) plans, the court approved rates of $974 per hour for plaintiffs' attorneys with at least 25 years of experience.[133]   In a securities fraud class action, the court approved "a billing rate ranging from $750 to $985 per hour for partners, $500 to $800 per hour for 'of counsels'/senior counsel, and $300 to $725 per hour for other attorneys."[134]

---

[129] *See, e.g.*, Decl. of Eve H. Cervantez at 33–34, *In re Anthem Data Breach Litig.*, No. 15-md-02617-LHK (NC) (N.D. Cal.) (filed Dec. 1, 2017).

[130] *See, e.g.*, *In re Agent Orange Prods. Liab. Litig.*, 818 F.2d 226, 232 (2d Cir. 1987) (approving "the use of national hourly rates in exceptional multiparty cases of national scope").

[131] *In re Volkswagen "Clean Diesel" Marketing, Sales Practices & Prods Liab. Litig.*, No. 3:15-md-02672-CRB, 2017 WL 1047834, at *5 (N.D. Cal. Mar. 17, 2017).

[132] *See* Co-Lead Class Counsel's Pet. for An Award of Atty's Fees at Add. 1, Ex. C, *In re Nat'l Football League Players' Concussion Injury Litig.*, No. 12-MD-2323 (AB) (E.D. Pa.) (filed Feb. 13, 2017).

[133] *Abbott v. Lockheed Martin Corp.*, No. 06-cv-701-MJR-DGW, 2015 WL 4398475, at *3 (S.D. Ill. July 17, 2015) (awarding fees of $974 per hour for attorneys with at least 25 years of experience, and $826 per hour for attorneys with 15–24 years).

[134] *In re Amgen Inc. Sec. Litig.*, No. CV 7-2536 PSG, 2016 WL 10571773, at *9 (C.D. Cal. Oct. 25, 2016).  *See also, e.g.*, *In re Cathode Ray Tube (Crt) Antitrust Litig.*, MDL 1917, No. 3:07-cv-5944 JST, 2016 WL 721680, at *43 (N.D. Cal. Jan. 28, 2016) (finding $875 per hour for lead counsel "reasonable and responsible" for purposes of lodestar cross-check in antitrust class settlement); *In re High-Tech Employee Antitrust Litig.*, No. 11-CV-2509-LHK, 2015 WL 5158730, at *9 (N.D. Cal. Sept. 2, 2015) (approving billing rates as high as $975 per hour for partners and $800 per hour for other attorneys); *Cheesemore v. Alliance Holdings, Inc.*, No. 09-cv-413-wmc, 2014 WL 4415919, at *6 (W.D. Wis. Sept. 5, 2014) (approving rate of $895 per hour for highest level partners in ERISA class settlement); *In re Heartland Payment Systems, Inc.*, 851 F. Supp. 2d 1040, 1087–88 (S.D. Tex. 2012) (noting hourly rates as high as $825 per hour; court found that the hourly rates were "within the 'prevailing market rates for lawyers with comparable experience and expertise' in complex class-action litigation and thus are reasonable." (citation omitted)); *In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Prods. Liab. Litig.*, No. 10-ml-02151 JVS (FMOx), slip op at 5 & 90 n.13 (C.D. Cal. July 24, 2013) (approving rates up to $950 per hour).  Rates for paralegals in other major class actions have ranged from $150 to $490 per hour.  *See, e.g.*, *In re Volkswagen*, 2017 WL 1047834, at *5 ($150 to $490 per hour); Co-Lead Class Counsel's Pet. for An Award of Atty's Fees at Add. 1, Ex. C, *In re Nat'l Football League Players' Concussion Injury Litig.*, No. 12-MD-2323 (AB) (E.D. Pa.) (filed Feb. 13, 2017) ($215 to $325 per hour); *High-Tech Employee Antitrust*, 2015 WL 5158730, at *9–10 ($190 to $430 per hour, "with most in the $300 range"); *Astiana v. Kashi Co.*, No. 11-CV-1967-H (BGS), slip op at 17 (S.D. Cal. Sept. 2, 2014) ($245 to $315 per hour).

134.   The reasonableness of the rates proposed by Keller Rohrback are also confirmed by looking at rates for prominent defense firms.  For instance, at DLA Piper, the range of billing rates for partners is $530–$1,120; at Kay Scholer, the range is $685–$1,080; at Winston & Strawn, the range is $580–$1,130; and at Manatt, Phelps & Phillips, the range is $540–$850.  The ranges for associates at these firms are, respectively, $320–$730, $310–$705, $350–$600, and $215–$550.[135]  And one study found that partners at five major California firms—Latham & Watkins; Gibson, Dunn & Crutcher; Quinn Emanuel Urquhart & Sullivan; Irell & Manella; and Morrison & Foerster—charged an average hourly rate of $928 in 2013.[136]

135.   It is also instructive, in gauging billing rates for class counsel, to look at rates for the firm actually representing the defendant in the litigation.[137]  Here, in other litigation Munger, Tolles & Olson partners have billed between $745 and $1,300 per hour; of counsel at that firm have billed between $735 and $1,025 per hour; and associates have billed between $410 and $725 per hour.[138]

136.   The rates designated by Keller Rohrback in the instant case are comparable to (or below) the above-described billing rates.  For example, the billing rates designated for Keller Rohrback are well below Munger, Tolles & Olson's billing rates, with no Keller Rohrback attorney (even the managing partner of the firm) billing out anywhere close to $1,300 per hour— or even over $995 per hour.

137. Keller Rohrback's blended rate in this case is $585.41.  That rate is consistent with blended rates in other cases.  For example, Lieff Cabraser Heimann & Bernstein designated a blended rate of $529 per hour in the *Volkswagen Clean Diesel* litigation.[139]  And in the *Sony*

---

[135] *See A Nationwide Sampling of Law Firm Billing Rates*, NAT'L L.J. (Dec. 19, 2011), *available at* http://tpmlaw.com/global_pictures/NationalLawJournal2011.PDF.

[136] *See Billing Rates Across the Country*, NAT'L L.J. (Jan. 13, 2014), available at https://www.law.com/nationallawjournal/almID/1202636785489/.

[137] *See, e.g., Chrapliwy v. Uniroyal, Inc.*, 670 F.2d 760, 768 n.18 (7th Cir. 1982) ("The rates charged by the defendant's attorneys provide a useful guide to rates customarily charged in this type of case.  Also, when the defendant has hired expensive, out of town counsel, the plaintiffs seem justified in saying that the nature of the case required the skills of out of town specialists." (citation omitted)).

[138] *See Kirkland, Kutak Rocke Unite Again in Toys 'R' Us Bankruptcy*, KIRKLAND & ELLIS LLP (Sept. 29, 2017), https://www.kirkland.com/sitecontent.cfm?contentID=230&itemId=13055.

[139] *See In re Volkswagen*, 2017 WL 1047834, at *5.

49

*Pictures* data breach litigation, the court approved a blended rate of $509.34 per hour.[140]  In any event, it is my opinion that it is not useful to compare the blended rate here with the rates in other cases, especially those in which the tasks performed were very different.  For example, in a case involving substantial discovery, it would not be efficient for tasks such as document coding, document management, and other similar tasks to be performed by a partner (or even a senior associate).  A cost-conscious firm will look for ways to assign such work to low-level attorneys or paralegals.  Here, however, most of the work was, by its very nature, high level and thus not suitable for a paralegal or low-level attorney.  For example, the firm could not assign a paralegal to handle the negotiations at the mediation, to interview and work with experts, or to evaluate the complicated issues of law (such as the law governing the causes of action and arbitration issues).  Given the nature of the tasks that make up the hours spent by Keller Rohrback, the blended rate here is very reasonable.  Simply comparing that number to other cases, in which the mix of tasks performed was very different, is not an especially probative exercise.

138.  I should also note that I see no red flags suggesting that Keller Rohrback's work was inefficient or that there was needless duplication.  I have reviewed detailed descriptions of the tasks performed in this case by major Keller Rohrback timekeepers.  (Those descriptions were prepared at my request by members of the firm.)  As reflected in those descriptions, attorneys at the firm targeted specific tasks:  some worked heavily on briefing and legal research; some drafted pleadings; some worked on technical aspects of credit report damages and other financial issues; some investigated facts underlying Wells Fargo's alleged misconduct; some focused on issues for the mediation; some took the lead on communications with class members; and so forth.  Moreover, the paralegals assigned to the case focused on traditional paralegal tasks, such as organizing files, monitoring court dockets, proofreading materials, tracking expert and vendor billing and disbursements, reviewing documents, and conducting simple research.  Based on my many years of work at a major law firm, I see nothing to suggest that this case was overstaffed, that there was needless duplication of effort, or that Keller Rohrback attorneys or paralegals were focusing on unnecessary tasks.

---

[140] *See Corona v. Sony Pictures Entm't, Inc.*, No. 14-CV-09600 RGK (SHx), slip op at 2 (C.D. Cal. Apr. 12, 2016).

### b. Additional Expected Hours Should Be Included

139.   When calculating the lodestar, courts in the Ninth Circuit routinely take into account hours that class counsel reasonably anticipate spending on the matter after final approval (*e.g.*, hours to be spent on claims management issues).[141]

140.   I am advised by class counsel that they have spent 7,655.40 hours on the case to date, and expect to spend at least 2,500 hours in the future due to the size of the class and the complex settlement administration.   I am advised that such work will include, among other things, assisting class members in the settlement claims process, consulting with experts on an ongoing basis concerning their methodology, coordinating with third parties (including credit reporting agencies) to execute the credit impact damages methodology, and working with the settlement administrator to address concerns as they arise.   In estimating the additional time that will be required, Keller Rohrback relies on its own experience to date in this litigation, and assumes that the blended rate thus far will continue to represent the likely mix of attorney and non-attorney resources.   As discussed in ¶ 138, I was able to review the hour totals of the major timekeepers, along with descriptions of the major tasks that they performed.   The figure for time spent thus far on a complicated case such as this strikes me as entirely reasonable, as does the figure representing hours likely to be expended by the firm going forward.

### c. The Multiplier Is Well Justified Under the *Kerr* Factors

141.   In my opinion, this Court should apply a risk multiplier in calculating the lodestar.   As the Ninth Circuit has said, "[T]he district court *must* apply a risk multiplier to the lodestar 'when (1) attorneys take a case with the expectation they will receive a risk enhancement if they

---

[141] *See, e.g.*, *Reyes v. Bakery & Confectionary Union*, ___ F. Supp. 3d ___, No. 14-CV-05596-JST, 2017 WL 6623031, at *11, *14 (N.D. Cal. Dec. 28, 2017) (including estimated hours for "future work" related to, *inter alia*, "managing class members' claims"); *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*, No. 2672 CRB (JSC), slip op at 8 (N.D. Cal. Mar. 17, 2017) (granting fee request reserving "an additional 21,000 hours to (1) guide the hundreds of thousands of Class Members through [claims period]; (2) assist in the implementation and supervision of the Settlement . . . ; and (3) defend and protect the settlement on appeal, among other things" (citation and internal quotation marks omitted)).   This approach is applied in other circuits, as well. *See, e.g.*, *Lasalle Town Houses Coop. Ass'n v. City of Detroit*, No. 4:12-cv-13747, slip op at 19 (E.D. Mich. Mar. 29, 2016) (noting that "fees appropriately were computed based on work hours and estimated future work hours through the conclusion of the litigation").

prevail, (2) their hourly rate does not reflect that risk, and (3) there is evidence the case was risky.' "[142]

142.   In this case, there is no question that class counsel reasonably expected to be awarded a multiplier (assuming that the lodestar method applied).   They were taking on a case that, as explained in ¶¶ 59–64, entailed enormous risk.   As noted, prior to the commencement of settlement talks, the case had been dismissed by this Court because of the arbitration clauses.   In my opinion, it would be unreasonable to rely solely on normal billing rates without enhancement in a situation where there was a high likelihood that class counsel would recover nothing.   Class counsel's designated hourly rates do not reflect that risk.   As noted, those rates are in line with (or below) what comparable defense firms charge, even though defense firms are paid those rates regardless of whether they win or lose.

143.   Here, using a lodestar cross check based just on the current number of hours spent on the case by class counsel (7,655.40 hours), the multiplier would be 4.75.[143]   If the figures include time that class counsel anticipates spending to complete their work on the case (which adds another 2,500 hours to the total at the blended rate), the multiplier declines to 3.58.   In my opinion, either multiplier is reasonable under the circumstances here.

144.   Multipliers in this range are not uncommon.   Courts in the Ninth Circuit and elsewhere have applied similar or greater multipliers in numerous other significant cases.   For example, in *Steiner v. American Broadcasting Co., Inc.*, the Ninth Circuit upheld a multiplier of 6.85, and emphasized that it "f[ell] well within the range of multipliers that courts have allowed."[144] Another court noted that "[c]ourts regularly award lodestar multipliers of up to eight times the lodestar, and in some cases, even higher multipliers."[145]   Examples include *Perera v. Chiron Corp.* (multiplier of 9.14),[146] *Stop & Shop Supermarket Co. v. Smith-Kline Beecham Corp.*

---

[142] *Stanger v. China Elec. Motor, Inc.*, 812 F.3d 734, 741 (9th Cir. 2016) (citation omitted).

[143] As class counsel have confirmed, the current lodestar figure is $4,481,569.50.  With anticipated future hours, that figure is $5,945,094.50.

[144] 248 F. App'x 780, 783 (9th Cir. 2007). *See also, e.g., Vizcaino*, 290 F.3d at 1051 n.6, App. (collecting cases applying multipliers ranging as high as 19.6).

[145] *Beckman v. KeyBank, N.A.*, 293 F.R.D. 467, 481 (S.D.N.Y. 2013).

[146] No. 95-20725-SW (N.D. Cal. 1999), *cited in* ELIZABETH J. CABRASER, CALIFORNIA CLASS ACTIONS AND COORDINATED PROCEEDINGS § 15.05 (2d ed. 2017).

(multiplier of 15.6),[147] the *Cendant Corp. PRIDES* litigation (multiplier of 7),[148] *Craft v. County of San Bernardino* (multiplier of 5.2),[149] the *3COM* securities litigation (multiplier of 6.67),[150] the *Enron* securities litigation (multiplier of 5.2),[151] the *Cardinal Health* securities litigation (multiplier of 6),[152] *In re Merry-Go-Round Enterprises, Inc.* (multiplier of 19.6),[153] the *Credit Default Swaps* antitrust litigation (multiplier of 6.2),[154] and the *Rite Aid* securities litigation (multiplier of 6.96).[155]

145.  The multiplier is also reasonable using the applicable criteria set out in the case law. Just as the Ninth Circuit has adopted various criteria to analyze the fairness of settlements and the general reasonableness of attorneys' fees, that Circuit has also formulated a variety of factors to be used in assessing a proposed multiplier.  In particular, in *Kerr v. Screen Extras Guild, Inc.*, the Ninth Circuit stated that district courts should consider some or all of 11 factors:

> (1) the time and labor required; (2) the novelty and difficulty of the questions involved; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) time limitations imposed by the client or the circumstances; (7) the amount involved and the results obtained; (8) the experience, reputation, and the ability of the attorneys; (9) the 'undesireability' of the case; (10) the nature and length of the professional relationship with the client; and (11) awards in similar cases.[156]

In my opinion, application of these factors here reveals that a multiplier of 3.58 or 4.75 is entirely reasonable.  I address each of the *Kerr* factors separately below.

---

[147] No. Civ. A. 03-4578, 2005 WL 1213926, at *18 (E.D. Pa. May 19, 2005).

[148] *In re Cendant Corp. PRIDES Litig.*, 243 F.3d 722, 732 (3d Cir. 2001).

[149] 624 F. Supp. 2d 1113, 1123–25 (C.D. Cal. 2008).

[150] *In re 3COM Corp. Sec. Litig.*, No. C-97-21083, slip op. at 12 (N.D. Cal. Mar. 9, 2001).

[151] *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 586 F. Supp. 2d 732 (S.D. Tex. 2008).

[152] *In re Cardinal Health Inc. Sec. Litig.*, 528 F. Supp. 2d 752, 768 (S.D. Ohio 2007).

[153] 244 B.R. 327, 335 (Bankr. D. Md. 2000).

[154] *In re Credit Default Swaps Antitrust Litig.*, No. 1:13-md-02476, 2016 WL 2731524, at *17 (S.D.N.Y. Apr. 26, 2016).

[155] *In re Rite Aid Corp. Sec. Litig.*, 362 F. Supp. 2d 587, 589–90 (E.D. Pa. 2005).

[156] 526 F.2d 67, 70 (9th Cir. 1975), *abrogated on other grounds by City of Burlington v. Dague*, 505 U.S. 557 (1992).  A twelfth factor, "whether the fee is fixed or contingent," was recited in *Kerr*, but has since been recognized as irrelevant by the Ninth Circuit.  *See Davis v. City & Cnty. of S.F.*, 976 F.2d 1536, 1546 n.4 (9th Cir. 1992), *vacated on other grounds*, 984 F.2d 345 (1993).

### i.  Time and Labor Required

146.  This case has required (and will continue to require) a significant investment of time by class counsel.  As noted, to date, class counsel have devoted 7,655.40 hours to the case, and expect to devote at least 2,500 hours in the future to implement the settlement.  Counsel were required to get up to speed on the underlying facts and applicable law, engage in extensive negotiations, litigate the arbitration issues before this Court, and pursue an appeal in the Ninth Circuit.[157]

### ii.  Novelty and Difficulty of Questions Involved

147.  This case raises novel and difficult questions.  To my knowledge, this type of lawsuit (involving fraudulent creation of unauthorized accounts) has never been the subject of major litigation, and the case raised a host of issues involving factual proof and governing law, both federal and state.  Indeed, the fact that the parties and objectors have focused so extensively on the selection of the appropriate causes of action confirms that this is a novel and uncharted litigation context.

148.  The case also raised a host of difficult (and potentially fatal) issues related to the arbitration clauses signed by plaintiffs.  Indeed, this Court ruled against plaintiffs on that issue, and the prospects for success on appeal were uncertain at best.

### iii.  Skill Requisite to Perform the Legal Service Properly

149.  A high level of skill was necessary to conduct the required analysis and to engage in settlement negotiations, particularly given the difficulties raised, *inter alia*, by the arbitration clauses.  An important factor in evaluating a proposed fee award is the quality of opposing counsel.[158]  Here, class counsel's opponent, Munger, Tolles & Olson, is a prestigious defense

---

[157] Comparable settlements have often involved many more hours spent by class counsel.  *See, e.g.*, Decl. of Eve H. Cervantez in Support of Pls.' Mot. for Final Settlement Approval, Service Awards to Named Pls., & an Award of Attorneys' Fees and Costs at 7, *In re Anthem, Inc. Data Breach Litig.*, No. 15-md-02617-LHK (NC) (N.D. Cal.) (filed Dec. 1, 2017) (78,553 hours declared by class counsel in connection with $115 million proposed settlement reached in less than three years); *High-Tech Employees Antitrust*, 2015 WL 5158730, at *10–11 (36,215 hours declared by class counsel approved as "a reasonable amount of time" in connection with $415 million settlement).

[158] *See, e.g.*, *In re Equity Funding Corp. Sec. Litig.*, 438 F. Supp. 1303, 1377 (C.D. Cal. 1977) ("[P]laintiff's attorneys in this class action have been up against established and skilled defense lawyers, and should be compensated accordingly."); *Arenson v. Bd. of Trade*, 372 F. Supp. 1349, 1354 (N.D. Ill. 1974) (emphasizing, in awarding attorneys' fees to class counsel, that "attorneys for the defendants represent the cream of the anti-trust bar in the United States").

firm comprised of highly respected attorneys.[159]  That class counsel achieved such an impressive settlement against top-flight defense counsel is a testament to class counsel's skill.

### iv.  Preclusion of Other Employment Due to Acceptance of the Case

150.  Keller Rohrback was clearly precluded from taking on significant work as a result of this case.  At least 21 lawyers and staff dedicated more than 30 hours to the case, at least 14 dedicated more than 100 hours, and at least 12 billed more than 250 hours.  Indeed, five lawyers and staff have billed more than 500 hours on the case.  This case has been a huge drain on the firm's time, and has significantly impeded the firm's ability to take on other work.

### v.  Customary Fee

151.  As explained in ¶¶ 133–135, the hourly rates designated by class counsel are well within the customary rates designated by comparable class action firms and billed by national defense firms.

### vi.  Time Limitations Imposed By the Client or the Circumstances

152.  Serious time limitations were imposed in this case.  Because Wells Fargo was successful in having the case dismissed because of the arbitration clauses, class counsel were forced to gear up to handle the appeal in the Ninth Circuit and, at the same time, were attempting to broker a settlement before obtaining a (potentially adverse) ruling by the Ninth Circuit.  A loss on appeal would have made it very difficult for class counsel to negotiate a settlement even close to the one here.

### vii.  Amount Involved and Results Obtained

153.  This case involved hundreds of millions of dollars and potentially millions of class members injured by Wells Fargo's conduct.  As noted, class counsel successfully negotiated a

---

[159] *See, e.g., Munger, Tolles & Olson LLP: Rankings*, U.S. News & World Report, https://bestlawfirms.usnews.com/profile/munger-tolles-olson-llp/rankings/12813 (last visited Jan. 16, 2017) (ranking Munger, Tolles & Olson "Tier 1" (on a national level) in appellate practice, commercial litigation, employee benefits law, employment law–management, litigation–bankruptcy, litigation–labor & employment, and media law, and noting that the firm's clients include Bank of America, Boeing, ESPN, Facebook, Fox Entertainment, Intel, and Merrill Lynch); *Munger Tolles & Olson LLP: Overview*, TopLawSchools.com, http://www.top-law-schools.com/munger-tolles-olson-llp.html (last visited Jan. 16, 2017) (describing Munger, Tolles & Olson as an "elite firm" and "among the most selective in the country in terms of hiring").  Notably, two Munger, Tolles & Olson attorneys were nominated by President Obama to the Ninth Circuit and were subsequently confirmed by the U.S. Senate.  *See* Maura Dolan, *Two Lawyers From Same California Firm Nominated For 9th Circuit*, L.A. Times (Aug. 1, 2013), http://articles.latimes.com/2013/aug/01/local/la-me-ln-9th-circuit-appointees-20130801.

settlement worth at least $142 million.   In my opinion, this is a superb result given the difficulties posed by the arbitration clauses.   The fact that class counsel achieved this strong result after expending only $7,655.40 hours is very impressive, and weighs in favor of a higher multiplier here.

### viii.  Experience, Reputation, and Ability of the Attorneys

154.   Class counsel are highly skilled and experienced class action attorneys.   Keller Rohrback is a prestigious plaintiffs' class action firm.   Indeed, at least two of the attorneys who have billed substantial hours to the case were ranked as "Super Lawyers" for 2017 (Derek Loeser and Lynn Sarko),[160] and one (Benjamin Gould) was named a 2017 "Rising Star."[161]

### ix.  The "Undesirability" of the Case

155.   It is fair to characterize this case as undesirable because of the arbitration clauses.   As noted in ¶ 21, until an agreement in principle was announced, no firm other than Keller Rohrback had filed a class action.   This fact contrasts dramatically with several other recent cases, in which myriad class actions were filed within days after news emerged about potential corporate wrongdoing.   Examples include the *Volkswagen "Clean Diesel"* litigation,[162] the *Equifax Data Breach* litigation,[163] and the *Flint, Michigan* litigation.[164]   Two examples within the past several

---

[160] Super Lawyers are selected each year based on an extensive research and peer-evaluation process.   They represent the top five percent of attorneys in each state and practice area.   *See Selection Process Detail*, SUPER LAWYERS, https://www.superlawyers.com/about/selection_process_detail.html (last visited Jan. 16, 2018).

[161] Attorneys under 40 years of age or in practice for ten years or less are eligible to be designated Rising Stars if they have not been designated Super Lawyers.   The Rising Stars selection process is similarly based on independent research and a peer-evaluation process.   Only 2.5 percent of eligible lawyers are designated Rising Stars.  *See The Rising Stars Selection Process*, SUPER LAWYERS, https://www.superlawyers.com/about/selection_process_detail.html (last visited Jan. 16, 2018).

[162] *See, e.g.*, Alison Frankel, *How U.S. Lawyers Were So Quick Off the Mark to Sue Volkswagen*, REUTERS (Sept. 22, 2015), https://www.reuters.com/article/us-usa-volkswagen-lawyers/how-u-s-lawyers-were-so-quick-off-the-mark-to-sue-volkswagen-idUSKCN0RM2QZ20150922 ("Less than four days after the U.S. Environmental Protection Agency announced that Volkswagen had designed some of its diesel models to cheat emissions tests, lawyers have brought at least 25 class actions on behalf of scores of car owners in all 50 U.S. states.").

[163] *See, e.g.*, Kevin McCoy, *Equifax Hit With at Least 23 Class-Action Lawsuits Over Massive Cyberbreach*, USA Today (Sept. 11, 2017), https://www.usatoday.com/story/money/2017/09/11/equifax-hit-least-23-class-action-lawsuits-over-massive-cyberbreach/653909001/ ("Equifax faces at least 23 proposed class-action lawsuits since its disclosure that [consumers' data was compromised].   And additional cases are likely to come."); Lisa Vaas, *Equifax Is Facing a Towering Pile of Class Action Law Suits*, NAKED SECURITY (Oct. 31, 2017), https://nakedsecurity.sophos.com/2017/10/31/equifax-is-facing-a-towering-pile-of-class-action-law-suits/.

[164] *See, e.g.*, *Class Action Suit Filed by Residents Over Flint Water Crisis*, CHICAGO TRIBUNE (Mar. 7, 2016), http://www.chicagotribune.com/news/local/breaking/ct-flint-water-crisis-class-action-lawsuit-20160307-story.html

weeks are illustrative. In December 2017, Apple publicly apologized to customers for "throttling" (reducing) iPhone speed. Within just a week of the admission of wrongdoing, at least 12 different class action lawsuits had been filed in various courts.[165] And earlier this month, Intel revealed flaws in their computer processors that could make them vulnerable to hacking and data piracy. Again, within days, more than ten different class action lawsuits were filed against Intel in various courts.[166] The fact that Keller Rohrback was not faced with competing class actions until *after* it had negotiated a settlement is indicative of the difficult challenges that this case posed.

156. In addition, this was a highly publicized case attacking the credibility and integrity of one of the country's largest banks.[167] Wells Fargo hired prominent national counsel to defend it. Any class action firm would realize that, absent a settlement, Wells Fargo would adopt a scorched-earth strategy, sparing no resources. The litigation thus had the potential to last for many years—with a high risk of no recovery for the reasons stated previously.

### x. Nature and Length of the Professional Relationship With the Client

157. The nature and relationship with the client is not a consideration here. These are small-claims cases individually, and I am advised that Keller Rohrback did not have a prior relationship with the particular class representatives.

### xi. Awards in Similar Cases

158. The awards in similar cases confirm the reasonableness of the fees requested here. As

---

("Numerous lawsuits have been filed on behalf of Flint residents since a public health emergency was declared . . . .").

[165] *See, e.g.*, Chris Smith, *Apple Faces at Least 12 Different Class-Action Lawsuits Over iPhone Slowdowns*, BGR (Dec. 29, 2017), http://bgr.com/2017/12/29/iphone-slowdown-class-action-suits-12-cases/; *Despite Apple's Public Apology and Explanation of Battery Performance, Another Class Action Was Filed Yesterday in San Jose*, Patently Apple (Dec. 29, 2017), http://www.patentlyapple.com/patently-apple/2017/12/despite-apples-public-apology-and-explanation-of-battery-performance-another-class-action-was-filed-yesterday-in.html.

[166] *See, e.g.*, Sean Czarnecki, *Intel Faces Dozen Class-Action Lawsuits Over Chip Flaws*, PR WEEK (Jan. 10, 2018), https://www.prweek.com/article/1454201/intel-faces-dozen-class-action-lawsuits-chip-flaws ("Revelations about security vulnerabilities in Intel's processors have triggered a flood of class action lawsuits."); Samuel Gibbs, *Intel Facing Class-Action Lawsuits Over Meltdown and Spectre Bugs*, The Guardian (Jan. 5, 2018), https://www.theguardian.com/technology/2018/jan/05/intel-class-action-lawsuits-meltdown-spectre-bugs-computer.

[167] *See* John Maxfield, *Wells Fargo Is the Biggest Bank in America According to These 3 Measures*, THE MOTLEY FOOL (Nov. 4, 2015), https://www.fool.com/investing/general/2015/11/04/wells-fargo-is-the-biggest-bank-in-america-accordi.aspx (noting that Wells Fargo is the nation's fourth-largest bank by assets, but the largest in terms of loans, net interest income, and market valuation).

noted in ¶¶ 110–114, the percentage requested here (15 percent) is clearly on the low side, both for class actions throughout the country and in light of the Ninth Circuit's 25 percent benchmark. Comparable class settlements have frequently resulted in attorneys' fees awards greater than the $21.3 million sought here.[168]

* * *

159.  In sum, the *Kerr* factors strongly support the requested multiplier.

**5.  Conclusion on Attorneys' Fees**

160.  The attorneys' fees sought are well justified based on the percentage method, and they remain well justified even if this Court were to analyze the requested fees under a lodestar cross check.

**COSTS**

**D.  The Out-of-Pocket Costs Sought By Class Counsel Are Reasonable**

161.  Class counsel seek out-of-pocket costs in the amount of $442,974.75.  It is well settled in the Ninth Circuit that "[c]lass counsel are entitled to reimbursement of reasonable out-of-pocket expenses" incurred in the litigation.[169]

162.  In my opinion, the costs sought by class counsel are eminently reasonable.  Those costs represent only 0.31 percent of the settlement fund.  The bulk of the costs (about $400,000) relate to experts, mediation services, travel, and computer research—costs that were essential to investigate the case and negotiate a settlement.  Indeed, had class counsel not undertaken such crucial investment of resources to understand and prosecute the case, they would have been subject to criticism for being too frugal at the expense of the class.  Notably, as previously discussed, class counsel invested those costs without any assurance that the case would ultimately succeed.

163.  Based on my experience, costs of that magnitude are well within (indeed, below) the

---

[168] *See, e.g., In re Ikon Office Solutions, Inc. Sec. Litig.*, 194 F.R.D. 166 (E.D. Pa. 2000) ($112 million common fund, $32 million fee award); *In re Informix Corp. Sec. Litig.*, No. 97-1289 (N.D. Cal. Nov. 23, 1999), *reprinted in* 21 CLASS ACTION REPORTS 261 (2000) ($137 million fund, $40 million fee award).

[169] *Wakefield v. Wells Fargo & Co.*, No. 3:13-CV-05053-LB, 2015 WL 3430240, at *6 (N.D. Cal. May 28, 2015). *Accord, e.g., Willner v. Manpower Inc.*, No. 11-CV-02846-JST, 2015 WL 3863625, at *7 (N.D. Cal. June 22, 2015); *Buccellato v. AT&T Operations, Inc.*, No. C10-00463-LHK, 2011 WL 3348055, at *2 (N.D. Cal. June 30, 2011).

norm for major class actions.  For example, in the *Bank of America* securities litigation, costs were 0.33 percent of the settlement;[170] in *BP Deepwater Horizon*, costs were 0.34 percent of the settlement;[171] in *Diet Drugs*, costs were 0.40 percent;[172] in *Enron*, costs were 0.50 percent;[173] in *Visa Antitrust*, costs were 0.55 percent;[174] and in the *Tyco* securities litigation, costs were 0.87 percent.[175]  Taking smaller settlements into account, the numbers are even higher:  Professors Eisenberg and Miller found that mean and median total costs awarded in class settlements between 2003 and 2008 were 2.7 percent and 1.7 percent, respectively.[176]

## INCENTIVE PAYMENTS

### E.  The Proposed Incentive Payments for the Class Representatives Are Reasonable

164. Class counsel seek a $5,000 incentive payment for each of the four class representatives.  In my view, these requests are eminently reasonable.

165. The Ninth Circuit has described incentive payments as compensation to class representatives for "work done on behalf of the class, to make up for financial or reputational risk undertaken in bringing the action, and, sometimes, to recognize their willingness to act as a private attorney general."  *Rodriguez v. West Publishing Corp.*, 563 F.3d 948, 958–59 (9th Cir. 2009).  It is widely recognized that incentive payments are often "necessary to induce individuals to become named representatives"—particularly where, as here, the amount that potential

---

[170] *See In re Bank of Am. Corp. Sec., Derivative, & ERISA Litig.*, No. 09-md-2058 (S.D.N.Y. Apr. 8, 2013) ($8 million in costs compared to $2.4 billion settlement).

[171] *See In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*, No. 2:10-md-02179-CJB, 2016 WL 6215974 (E.D. La. Oct. 25, 2016) ($44.8 million in costs compared to $13 billion settlement).

[172] *See In re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Prods. Liab. Litig.*, 553 F. Supp. 2d 442 (E.D. Pa. 2008) ($24.2 million in costs compared to $6.4 billion settlement).

[173] *See In re Enron Corp. Sec., Derivative & ERISA Litig.*, 586 F. Supp. 2d 732 (S.D. Tex. 2008) (approximately $39 million in costs compared to $7.2 billion settlement).

[174] *See In re Visa Check/Mastermoney Antitrust Litig.*, 297 F. Supp. 2d 503 (E.D.N.Y. 2003) ($18.7 million in costs compared to $3.4 billion settlement).

[175] *See In re Tyco Int'l Ltd. Litig.*, 535 F. Supp. 2d 249 (D.N.H. 2007) ($28.9 million in costs compared to $3.3 billion settlement).

[176] Eisenberg & Miller, *supra* note 94, at 274.

representatives stand to gain from their individual claims is minimal.[177]

166.   Courts in the Ninth Circuit have consistently held that, "[i]n general, . . . $5,000 incentive payments are reasonable."[178]   And courts in the Ninth Circuit and elsewhere have approved much larger payments.[179]

167.   Moreover, a $5,000 payment to each class representative is very reasonable in these particular circumstances.   In evaluating the reasonableness of incentive payments, this Court has considered various criteria, including:

> (1) the risk to the class representative in commencing suit, both financial and otherwise; (2) the notoriety and personal difficulties encountered by the class representative; (3) the amount of time and effort spent by the class representative; (4) the duration of the litigation; and (5) the personal benefit (or lack thereof) enjoyed by the class representative as a result of the litigation.[180]

168.   **Risk.**   The class representatives took a significant risk that, after investing many hours in the case, they would ultimately be left with nothing other than the undesirable option of pursuing an individual arbitration remedy.

169.   **Notoriety and Personal Difficulties.**   This high-profile case caused the class representatives to suffer various hardships.   For instance, class representative Heffelfinger testified in her declaration (Dkt. No. 104) that she lost a job opportunity because a potential employer had read about the case during the application process, and also that she had to publicly expose her personal banking history.   Heffelfinger Decl. ¶ 6.   Similarly, Jabbari testified in his declaration (Dkt. No. 103) that he had been contacted by reporters, who had scrutinized his

---

[177] *Pavlik v. FDIC*, No. 10-C-816, slip op at 3 (N.D. Ill. Nov. 1, 2011) (citing *In re Continental Ill. Sec. Litig.*, 962 F.2d 566, 572 (7th Cir. 1992)).

[178] *Kirchner v. Shred-It USA Inc.*, No. 2:14-1437 WBS EFB, 2015 WL 1499115, at *5 (E.D. Cal. Mar. 31, 2015) (quoting *Hopson v. Hanesbrands Inc.*, No. 08-0844 EDL, 2009 WL 928133, at *10 (N.D. Cal. Apr. 3, 2009)).

[179] *See, e.g.*, *Cook v. Niedert*, 142 F.3d 1004, 1016 (7th Cir. 1998) (upholding $25,000 incentive award); In re Easysaver Rewards Litig., No. 09-CV-02094, 2016 WL 419048, at *5 (S.D. Cal. Aug. 9, 2016) (approving incentive payments of $10,000 and $15,000); *Garner v. State Farm Mut. Auto Ins. Co.*, No. 08-CV-1365-CW, 2010 WL 1687832, at *17 & n.8 (N.D. Cal. Apr. 22, 2010) (awarding $20,000 incentive payment and noting that "[n]umerous court in the Ninth Circuit and elsewhere have approved incentive awards of $20,000 or more where, as here, the class representative has demonstrated a strong commitment to the class"); *Van Vranken v. Atlantic Richfield Co.*, 901 F. Supp. 294, 299–300 (N.D. Cal. 1995) (awarding $50,000 incentive payment); *In re Dun & Bradstreet Credit Serv. Customer Litig.*, 130 F.R.D. 366, 373–74 (S.D. Ohio 1990) (awarding incentive payments ranging from $35,000 to $55,000).

[180] *Van Vranken*, 901 F. Supp. at 299 (citations omitted).

bank records, and he explained that he had to answer questions about the case during the application process when he moved to a different residence.  Jabbari Decl. ¶ 7.  He also testified that Wells Fargo pressured a friend of his who worked for Wells Fargo, telling her not to contact him, and requesting that she turn over correspondence with him.  Indeed, Jabbari was concerned that his friend might lose her job because of her friendship with him.  He was thus forced to avoid spending time with her.  *Id.* at ¶ 6.

170.  **Time and Effort.**  All four class representatives have spent a great deal of time and have done significant work on the case, including discussing the case with class counsel (by telephone, by email, and in person), gathering documentation, reviewing documents and electronic records, staying up-to-date on settlement negotiations, preparing for possible depositions and discovery, and maintaining records related to the case.   For example, Heffelfinger amassed "hours" on the phone with class counsel, exchanged "close to 200 emails" with class counsel and staff, and missed work to spend time at her Wells Fargo branch reviewing her accounts and gathering documentation.  Heffelfinger Decl. ¶ 5.  Antonette Brooks testified that she "spent time searching through old emails and old records to find information about [her] 2006 account."  Brooks Decl. ¶ 6 (Dkt. No. 112).  And Jose Rodriguez testified that he "spent hours on phone calls and emails with [class counsel]."  Rodriguez Decl. ¶ 7 (Dkt. No. 105).

171.  **Duration of the Litigation.**   This was not a protracted case, but since the representatives' personal claims were small, even being saddled with class representative responsibilities for a year or two was very significant.

172.  **Personal Benefit (or Lack Thereof).**   As noted, because the amounts that the representatives stood to recover from the case were small (in the magnitude of around $30), they had little incentive to be vigorous representatives if the sole benefit was increasing their odds of receiving a meager amount of money.

173.  Finally, none of the flaws that have caused courts to reject or overturn incentive payments in other cases exist here.  For example, in *Radcliffe v. Experian Information Solutions Inc.*, the Ninth Circuit overturned a class settlement because the settlement agreement provided for incentive awards *only* if the class representatives supported the settlement, creating a "patent

divergence of interests between the named representatives and the class."[181]  By contrast, the incentive payments in this case are not conditioned on the representatives' support for the settlement.  Additionally, this is not a case where the unnamed class members receive nothing.[182]  Here, the unnamed class members will receive full compensation for the fees that they paid for unauthorized accounts and for the harm to their credit ratings.  Thus, the entire class will directly benefit from the class representatives' investment of time in the case.

## VII.  CONCLUSION

174.  It is my opinion that this Court should certify a settlement class under Rule 23(b)(3); approve the settlement as fair, reasonable, and adequate; award attorneys' fees in the amount of $21,300,000 and out-of-pocket costs of $442,974.75; and award each of the class representatives $5,000 as an incentive payment.

* * *

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct based on information known to me.

_Robert Klonoff_

Robert H. Klonoff

January 19, 2018

4822-3739-3498, v. 1

---

[181] 715 F.3d 1157, 1161 (9th Cir. 2013).

[182] Even in a case where the settlement fund went solely to a *cy pres* entity and to attorneys' fees, the Ninth Circuit has affirmed incentive payments. *See Lane v. Facebook, Inc.*, 696 F.3d 811, 817 (9th Cir. 2012).