UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| SHAHRIAR JABBARI and KAYLEE HEFFELFINGER, on behalf of themselves And all others similarly situated, | Case No. 3:15-cv-02159-VC |
| Plaintiffs, | OBJECTION FOR DEFENDANTS TO PROCEED DUE TO THEIR FRAUD ON THE COURT |
| v. WELLS FARGO & COMPANY AND WELLS FARGO BANK, N.A., | |
| Defendants. | |

## VICTIM MOTION TO OBJECT FOR DEFENDANTS TO PROCEED DUE TO FRAUD ON THE COURT BY DEFENDANTS AND TO EXTEND CLAIMS AVAILABLE TO THE YEAR 1997

**COMES NOW, JULIET COTTON, pro se, a Victim and Minority Female**, files this her, **Victim's Motion Objection For Defendants To Proceed Due To Their Fraud On The Court And To Compel Defendants To Claims Available To The Year 1997,** since she has been denied the opportunity to have my claim involved in a court of law, or in this lawsuit, due to the enormous loss caused by the Defendants, because the Defendants have knowingly withheld from this Honorable Court that the practice of opening accounts did not end at the year 2000, and as if it only happened to individuals.

1.

The Defendants targeted Ms. Cotton and opened two unauthorized investment accounts in her company's name because she was a minority owned business, and African-American female, with seventy-six (76%) of the majority outstanding shares (**9,120,000**) in the company.

1

2.

Ms. Cotton was racially discriminated by the Defendants to file a claim because she is an African-American and black and a female.

3.

The Defendants claim was false when they stated their practice of opening unauthorized accounts only went back to the year 2000.

4.

The Defendants were aware that Ms. Cotton had two unauthorized investment accounts opened in her and her company's name that dated back to August 1, 1997 to November 28, 1997.

5.

The Defendants bought out Wachovia Bank NA, and Wachovia Bank.

6.

The Defendants opened two investment accounts, <u>without</u> Ms. Cotton's <u>knowledge</u> or <u>authorization</u>, from the period <u>August 1, 1997 to November 28, 1997</u>, when they invested her and her company's **$12,000,000.00 (Twelve Million Dollars)** into the stock market **<u>without her knowledge and authorization</u>**.

7.

The Defendants opened unauthorized investment account number **14600012** for the period of August 1, 1997 through August 28, 1997 and ran it through SouthTrust Securities.

8.

The Defendants opened unauthorized investment account number **14610110** for the period of September 9, 1997 through November 28, 1997 and ran it through SouthTrust Securities.

9.

The Defendants withheld from this Honorable Court and other government agencies, the very fact that they knew their practices of opening unauthorized accounts did <u>**not**</u> end in 2000, and not just for personal accounts.

10.

The Defendants, have caused great harm, financial loss, inter alia, to Ms. Cotton when they opened the two investment accounts identified herein without her knowledge or authorization.

11.

The Defendants opened two investment accounts, <u>without</u> Ms. Cotton's <u>knowledge</u> or <u>authorization</u>, from the period <u>August 1, 1997 to November 28, 1997</u>, when they invested her and her company's **$12,000,000.00 (Twelve Million Dollars)** into the stock market <u>**without her knowledge and authorization.**</u>

The Defendants, knowingly subjected Ms. Cotton's $12-million dollars to Investment Risk as well as the risk of Possible Loss of the Principal Amount invested, through SouthTrust Securities, as shown in the Account Statement below:



13.

The Defendants **opened two investment accounts, without** Ms. Cotton's **knowledge or authorization**, from the period **August 1, 1997 to November 28, 1997**, where they invested my company's **$12,000,000.00 (Twelve Million Dollars)** into the stock market **without my knowledge and authorization**, whereby the Defendants, knowingly subjected the $12-million dollars to Investment Risk as well as the risk of Possible Loss of the Principal Amount invested.

14.

The below is part of the first page of Account Statement for <u>unauthorized</u> account 14600012, where the Defendants invested Ms. Cotton's $12 million dollars, as exhibit 1 <u>in globo</u>:

**SouthTrust Securities**
P.O. Box 2554
BIRMINGHAM, AL 35290

QUALITY GRAIN CO (GHANA) LTD
ATTN J R WOODARD
2022 POWERS FERRY RD
SUITE 180
ATLANTA GA 30339

| PERIOD | PAGE |
|---|---|
| 08/08/97-08/29/97 | 1 |

| SOC. SEC/TAX ID | ACCT NO. | OFFICE | A/E |
|---|---|---|---|
| | 14600012 | 11D | 0944 |

YOUR REPRESENTATIVE: DAVID P. KANNE          404-853-5604

### COMBINED CASH SUMMARY

| DESCRIPTION | AMOUNTS PAID | AMOUNTS RECEIVED | BALANCE |
|---|---|---|---|
| BALANCE FROM PREV STATEMENT | | | .00 |
| AMOUNTS CREDITED DUE TO: | | | |
| SALES | | 11,782,000.00 | |
| DEPOSITS | | 15,422,415.45 | |
| AMOUNTS PAID DUE TO: | | | |
| PURCHASES | 11,769,995.45 | | |
| CASH WITHDRAWALS | 15,434,420.00 | | |
| ENDING BALANCE | 27,204,415.45 | 27,204,415.45 | .00 |

### DAILY ACCOUNT ACTIVITY

| DATE | ACTIVITY | QUANTITY | DESCRIPTION | PRICE | AMOUNT | BALANCE |
|---|---|---|---|---|---|---|
| | | | OPENING ACCOUNT BALANCE | | | 0.00 |
| | | | PURCHASES AND SALES | | | |
| 8/08/97 | BUY | 11,782,000 | GENERAL ELECTRIC CAP CORP DISCOUNT COMMERCIAL PAPER 08/15/97 | 99.8981111 | 11,769,995.45DR | |
| 8/15/97 | SELL | 11,782,000- | GENERAL ELECTRIC CAP CORP DISCOUNT COMMERCIAL PAPER 08/15/97 | 100.0 | 11,782,000.00CR | |
| | | | DEPOSITS AND WITHDRAWALS | | | |
| 8/08/97 | CASH RECEIPT | | 80-023-531 | | 11,769,995.45CR | |
| 8/15/97 | TEFRA WITHHOLD | | SLS TEFRA WHD TID | | 3,652,420.00DR | |
| 8/15/97 | JOURNAL ENTRY | | REV TEFRA W/H | | 3,652,420.00CR | |
| 8/15/97 | DISBURSEMENT | | 80-023-531 | | 11,782,000.00DR | |
| | | | CLOSING ACCOUNT BALANCE | | | 0.00 |

*THESE INVESTMENTS ARE NOT INSURED BY THE FDIC; THEY ARE NOT A DEPOSIT OR OBLIGATION OF, ENDORSED BY, OR GUARANTEED IN ANY WAY BY ANY BANK OR ANY BANK SUBSIDIARY; AND THEY ARE SUBJECT TO INVESTMENT RISK, INCLUDING THE POSSIBLE LOSS OF THE PRINCIPAL AMOUNT INVESTED.*

END OF STATEMENT

01368

ACCOUNT CARRIED WITH
BHC SECURITIES, INC.
MEMBER NEW YORK STOCK EXCHANGE



15.

The Defendants knew their scheme and artifice did not end in 2000, because Ms. Cotton submitted the below Account Statements as well as Sworn testimony, from the Defendants' employee, William (Bill) Browning, Senior Vice President of International Operations, who admitted Ms. Cotton was correct and did not authorize the investment account to be opened, and to close it and not open it again.

16.

Ms. Cotton submitted in a detailed letter to the Defendants' attorneys, former Chief Executive Officer, Mr. John G. Stumpf, and Mr. Timothy Sloan, CEO, for the Defendants, which was sent via certified and U.S. Postal Service Priority Mail service with tracking number that verified it was received. In addition, evidence that the opening of the two unauthorized accounts went to other employees of the Defendants.

17.

The Account Statement for the **August 8, 1997 -August 29, 1997**, clearly stated at the bottom of the page, "showed the Defendants knew accounts were opened past the year 2000

18.

The Defendants Account Statements where they invested Ms. Cotton's $12 million through SouthTrust Securities stated, "**THESE INVESTMENTS ARE NOT INSURED BY THE FDIC; THEY ARE NOT A DEPOSIT OR OBLIGATION OF, ENDORSED BY, OR GUARANTEED IN ANY WAY BY ANY BANK OR ANY BANK SUBSIDIARY; AND THEY ARE SUBJECT TO INVESTMENT RISK, INCLUDING THE POSSIBLE LOSS OF THE PRINCIPAL AMOUNT INVESTED.**"

The below is a transcript (**exhibit 2 *in globo***) of the testimony of the Defendants' employee **William (Bill) Browning** where he testified that his bank was using Ms. Cotton's $12 million dollars, and she was correct that she did not give him authorization, and she told him to close the unauthorized investment account after three (3) weeks when she found out about it, . Browning closed the unauthorized account number 14600012, for the period of August 8, 1997 -August 29, 1997. Yet, he and his accomplices, Ramechia Banks, and David Kanne of SouthTrust Securities, opened a different unauthorized investment account with account number 14610110 for the period of September 9, 1997 through November 28, 1997.

```
15       Q    Okay. Whose permission did you have to get to put
16  the monies in a -- in those securities? Wasn't that money --
17  Once the loan was done, Mr. Browning --
18       A    Yes.
19       Q    -- wasn't those monies for the exclusive use of
20  Quality Grain -- wasn't it -- it was supposed to have been in
21  an account, but your company was not supposed to trade that
22  money through any papers, like General Electric, without the
23  company's permission, the Ghana company; is that correct?
24       A    Well, I think that adds a brand new level of
25  complexity to it. But I think what -- I think you are correct
```

777

20.

The below is the testimony of William (Bill) Browning, in a civil action in Georgia, where he admitted Ms. Cotton was correct, that he had no permission to put our money into an investment account. The $12 million dollars was to be used only to collateralize the Letter of Credits (LC) to purchase service, and goods for the commercial rice mill and farm project:

**Transcript page 777, lines 15-25:**

Q. Okay. Whose permission did you have to get to put the monies in a –in those securities? Wasn't that money—Once the loan was done, Mr. Browning—
A. Yes.
Q. --wasn't those monies for the exclusive use of Quality Grain—wasn't it—it was supposed to have been in an account, **but your company was not supposed to trade that money through any papers, like General Electric, without the company's permission, the Ghana company; is that correct?**
A. " Well, I think that adds a brand new level of complexity to it. **But I think what –I think you are correct**
**Page 777, lines 1-25:**
**Browning continued: that we put this into an investment** account with the intention that as long as it was going to be cash collateral it should actually be earning some additional money for the project.
Q. Yes, go on.
A. And some of the letters of credit actually didn't - - Some of the letters of credit didn't mature until three or four months down the line. *And when you've got $12 million in an investment account, your desire is to get several more dollars of income, because the collateral is being parked.*
<u>Now, it was upon your instruction, after about three weeks, because you did not want the funds to remain in the investment account,</u> **because you felt that the – the very fact that these were in short-term investments, that there could have been loss, devaluation loss to those - -**
*Although I tried to explain at the time, we issued the letters of credit - - if we issued letters of credit for $100 and those letters of credit were already issued and our cash collateral diminished, that was going to be the bank's problem, not yours. Because we were using that - - and we had put them there in an effort to earn additional funds for you.*
<u>But you elected after about three weeks that it would be best simply to be put into a - - just a simple blocked account, no interest, no additional earning, and that account simply be debited as payments came in under letters of credit."</u>

**Transcript page 777, lines 15-25:**

```
11              Now, it was upon your instruction, after about three
12   weeks, because you did not want the funds to remain in the
13   investment account, because you felt that the -- the very fact
14   that these were in short-term investments, that there could
15   have been loss, devaluation loss to those --
16              Although I tried to explain at the time, we issued
17   the letters of credit -- if we issued letters of credit for
18   $100 and those letters of credit were already issued and our
19   cash collateral diminished, that was going to be the bank's
20   problem, not yours. Because we were using that -- and we had
21   put them there in an effort to earn additional funds for you.
22              But you elected after about three weeks that it would
23   be best simply to be put into a -- just a simple blocked
24   account, no interest, no additional earning, and that account
25   simply be debited as payments came in under letters of credit.
```

778

The below is the entire transcript pages of **777, and 778**, which is also attached as **Exhibit 2 in globo:**

```
 1      A    Okay, that, that's a little different.  And let me
 2  see if I can add any clarity to all this.  This is the second
 3  transaction.  The funds originated from New York; they came to
 4  Atlanta.  They were originally held in an investment account.
 5  They were locked in an investment account.  They were used as
 6  cash collateral, cash collateral to fund those letters of
 7  credit we just talked about.  Correct?
 8      Q    Yes.
 9      A    Some of those letters of credit were issued in fact
10  to Ghana companies.
11      Q    Yes.
12      A    And some of the instructions for payment were to
13  debit this account and transfer those funds for payment against
14  invoices originating from Ghana.  Is --
15      Q    Okay.  Whose permission did you have to get to put
16  the monies in a -- in those securities?  Wasn't that money --
17  Once the loan was done, Mr. Browning --
18      A    Yes.
19      Q    -- wasn't those monies for the exclusive use of
20  Quality Grain -- wasn't it -- it was supposed to have been in
21  an account, but your company was not supposed to trade that
22  money through any papers, like General Electric, without the
23  company's permission, the Ghana company; is that correct?
24      A    Well, I think that adds a brand new level of
25  complexity to it.  But I think what -- I think you are correct
```

777

22.

Ms. Cotton provides **Transcript page 778**, is the testimony of the Defendants' employee, William Browning, where he admitted Ms. Cotton told him to close the investment account:

```
1   that we -- We put this into an investment account with the
2   intention that as long as it was going to be cash collateral it
3   should actually be earning some additional money for the
4   project.
5       Q   Yes.
6       A   And some of the letters of credit actually didn't --
7   Some of the letters of credit didn't mature until three or four
8   months down the line. And when you've got $12 million in an
9   investment account, your desire is to get several more dollars
10  of income, because the collateral is being parked.
11          Now, it was upon your instruction, after about three
12  weeks, because you did not want the funds to remain in the
13  investment account, because you felt that the -- the very fact
14  that these were in short-term investments, that there could
15  have been loss, devaluation loss to those --
16          Although I tried to explain at the time, we issued
17  the letters of credit -- if we issued letters of credit for
18  $100 and those letters of credit were already issued and our
19  cash collateral diminished, that was going to be the bank's
20  problem, not yours. Because we were using that -- and we had
21  put them there in an effort to earn additional funds for you.
22          But you elected after about three weeks that it would
23  be best simply to be put into a -- just a simple blocked
24  account, no interest, no additional earning, and that account
25  simply be debited as payments came in under letters of credit.
```

23.

The Defendants' employees William Browning and Ramechia Banks **closed the first unauthorized** investment account that they were using for their benefit and without Ms. Cotton's authorization nor knowledge during the period of **August 8, 1997 through August 29, 1997.**

24.

Ms. Cotton contends the Defendants employee gave perjured testimony when he stated her $12-million dollars would be paid back by bank if loss, which contradicts the Account Statement at the bottom of the page showed Ms. Cotton's and her company's $12 million dollars was subjected **to loss and risk, unlike what the Defendants' employee, Browning gave perjured testimony about in the civil action, that if anything happened to the cash collateral or that it diminished, that it would be the banks problem, and not the Company's.** The Defendants were not authorized to open the investment account, and buy the **General Electric Cap Corp Discount Commercial Paper shown below:**

DAILY ACCOUNT ACTIVITY

| DATE | ACTIVITY | QUANTITY | DESCRIPTION | PRICE | AMOUNT | BALANCE |
|---|---|---|---|---|---|---|
| | | | OPENING ACCOUNT BALANCE | | | 0.00 |
| | | | PURCHASES AND SALES | | | |
| 8/08/97 | BUY | 11,782,000 | GENERAL ELECTRIC CAP CORP DISCOUNT COMMERCIAL PAPER 08/15/97 | 99.8981111 | 11,769,995.45DR | |
| 8/15/97 | SELL | 11,782,000- | GENERAL ELECTRIC CAP CORP DISCOUNT COMMERCIAL PAPER 08/15/97 | 100.0 | 11,782,000.00CR | |
| | | | DEPOSITS AND WITHDRAWALS | | | |
| 8/08/97 | CASH RECEIPT | | 80-023-531 | | 11,769,995.45CR | |
| 8/15/97 | TEFRA WITHHOLD | | SLS TEFRA WHD TID | | 3,652,420.00DR | |
| 8/15/97 | JOURNAL ENTRY | | REV TEFRA W/H | | 3,652,420.00CR. | |
| 8/15/97 | DISBURSEMENT | | 80-023-531 | | 11,782,000.00DR | |
| | | | CLOSING ACCOUNT BALANCE | | | 0.00 |

*THESE INVESTMENTS ARE NOT INSURED BY THE FDIC; THEY ARE NOT A DEPOSIT OR OBLIGATION OF, ENDORSED BY, OR GUARANTEED IN ANY WAY BY ANY BANK OR ANY BANK SUBSIDIARY; AND THEY ARE SUBJECT TO INVESTMENT RISK, INCLUDING THE POSSIBLE LOSS OF THE PRINCIPAL AMOUNT INVESTED.*

END OF STATEMENT

01368

ACCOUNT CARRIED WITH
BHC SECURITIES, INC.
MEMBER NEW YORK STOCK EXCHANGE



25.

The Defendants were not authorized to open the investment account, and buy the **General Electric Cap Corp Discount**

26.

Ms. Cotton contends that the Defendants' employees Browning, Banks and **David Kanne**, closed the first account about three weeks when Ms. Cotton found out about it. However, they knowingly went against Ms. Cotton's, Chief Executive Officer, order to close the Investment account and not open another one, and to just use the loan proceeds to collateralize the Letters of Credit (LCs) and pay them when they came in to the bank, per the loan agreement.

27.

The Defendants' employees opened another investment account unknown to Ms. Cotton, in Ms. Cotton's company's name, and put it to Ms. Cotton's attention again, as if Ms. Cotton authorized it or had knowledge of their scheme to open another investment account. Ms. Cotton emphatically told the Defendants' employees of Browning, Ramechia Banks, and David Kanne, Account Representative, to close the first account, and not to open any others, and to cease and desist from their actions.

28.

The following is <u>Second</u> investment account that the Defendants opened **without** Ms. Cotton's knowledge and authorization with a **DIFFERENT** account number of <u>**14610110**</u> from **9/09/97 thru 09/30/97**, where the Defendants still kept Ms. Cotton's balance of **$8,644,000.00** <u>in the stock market</u>, in an unauthorized investment account without Ms. Cotton's knowledge,

and made over **$46,711,287.01 for that period from 9/09/97 thru 09/30/97**, where the Defendants were paid **cash, received and deposited $46,711, 287.01**, using my company's **$8,644, 000.00, without my knowledge** nor <u>authorization</u> and did not pay it to Ms. Cotton:

## SouthTrust Securities
P.O. Box 2554
BIRMINGHAM, AL 35290

QUALITY GRAIN CO (GHANA) LTD
ATTN J R WOODARD
2022 POWERS FERRY RD
SUITE 180
ATLANTA GA 30339

| PERIOD | PAGE |
|---|---|
| 09/09/97-09/30/97 | 1 |

| SOC SEC/TAX ID | ACCT NO | OFFICE | A/E |
|---|---|---|---|
| | 14610110 | 11D | 0944 |

YOUR REPRESENTATIVE: DAVID P. KANNE      404-853-5604

<<<<<<<<<<<<<<< DUPLICATE STATEMENT FOR THE ACCOUNT OF >>>>>>>>>>>>>>>
QUALITY GRAIN CO GHANA LTD
ATTN J R WOODARD
23 AIRPORT AKOSOMBO ROAD

### ACCOUNT VALUE

| DESCRIPTION | MARKET VALUE | % PORTFOLIO |
|---|---|---|
| CASH | 478.02CR | |
| MONEY MARKET INSTRUMENTS | 8,644,000.00CR | 100.0 |
| VALUE | 8,644,478.02CR | |

### EARNINGS SUMMARY

| DESCRIPTION | THIS PERIOD | YEAR-TO-DATE |
|---|---|---|

### COMBINED CASH SUMMARY

| DESCRIPTION | AMOUNTS PAID | AMOUNTS RECEIVED | BALANCE |
|---|---|---|---|
| BALANCE FROM PREV STATEMENT | | | .00 |
| AMOUNTS CREDITED DUE TO: | | | |
| SALES | | 19,047,000.00 | |
| DEPOSITS | | 27,664,287.01 | |
| AMOUNTS PAID DUE TO: | | | |
| PURCHASES | 27,663,808.99 | | |
| CASH WITHDRAWALS | 19,047,000.00 | | |
| ENDING BALANCE | 46,710,808.99 | 46,711,287.01 | 478.02CR |

### YOUR PORTFOLIO SUMMARY

| ACCOUNT TYPE | SYMBOL | QUANTITY | DESCRIPTION | CURRENT PRICE | MARKET VALUE | EST ANNUAL INCOME | EST YLD |
|---|---|---|---|---|---|---|---|
| | | | MONEY MARKET INSTRUMENTS | | | | |
| CASH | GMSP10/01/97 | 8,644,000 | GENERAL MOTORS ACCEPTANCE CORP DISCOUNT COMMERICAL PAPER 0% 10/01/97 | 100.000 | 8,644,000.00 | | |

### DAILY ACCOUNT ACTIVITY

| DATE | ACTIVITY | QUANTITY | DESCRIPTION | PRICE | AMOUNT | BALANCE |
|---|---|---|---|---|---|---|
| | | | OPENING ACCOUNT BALANCE | | | 0.00 |
| | | | PURCHASES AND SALES | | | |

CONTINUED ON PAGE 2

01363

ACCOUNT CARRIED WITH
BHC SECURITIES, INC.
MEMBER NEW YORK STOCK EXCHANGE

SIPC

29.

The Defendants targeted Ms. Cotton and her company because she was a black woman, and they could skip from paying taxes to the IRS on the over $145-million they made from Ms. Cotton's $12 million dollars during the four months that they had in the stock market because it was a foreign company.

30.

Ms. Cotton is entitled to all the money that was paid out and earned through both unauthorized investment accounts the Defendants opened without Ms. Cotton's knowledge.

31.

The defendants owe Ms. Cotton the $145-million dollars plus the annual rate of 12% (twelve percent) interest that the Defendants said would be paid to her when the Defendants opened the first unauthorized investment account, and the money made from their two <u>unauthorized investment accounts</u> shown herein the Defendants opened.

32.

The Defendants have not paid Ms. Cotton any of the over $145 million (One hundred forty-five million dollars) plus interests and have only sought to cover-up their actions.

33.

Ms. Cotton contends that the Honorable Court, Public and other minority owned businesses or minority owned U.S. citizens, with foreign companies that are account holders at Wells Fargo Bank, or any of the banks like Wachovia and SouthTrust Bank, that the Defendants

bought out and acquired, have no idea whether their company may have been the victim also to have their money invested and money laundered into unauthorized investment accounts, and stolen and had a fake W-9 created, to prevent the Defendants' from paying taxes.

34.

Ms. Cotton contends that if she was a white woman, or white male, she would not be discriminated against, nor had her claim barred due to Fraud on the Court by the Defendants, and only limited it to accounts that were opened for only personal accounts.

35.

Ms. Cotton contends that the Defendants are required to extend the time-frame of the period to include Ms. Cotton's two unauthorized investment accounts opened by the Defendants, and make restitution for the $145-million dollars earned plus interest from her $12-million dollars **that the Defendants ran through her company, plus the 12% interest that Browning stated was paid on the two unauthorized investment accounts, the disbursed cash withdrawals paid to the Defendants, without Ms. Cotton's knowledge or authorization.**

36.

The **September 9, 1997 thru September 30, 1997**, Account Statement <u>**14610110**</u>, clearly showed that Ms. Cotton's **$8,644,478.02 million** was still subjected to loss and used to buy General Motors Acceptance Corp Discount Commercial Paper.

The below is page **2 of 3** of the Account Statement showed how the Defendants bought General Motors Acceptance Corp Discount Commercial Paper with Cotton's millions:

| CUSTOMER NAME | PAGE |
|---|---|
| QUALITY GRAIN CO (GHANA) LTD | 2 |
| PERIOD | ACCOUNT NUMBER |
| 09/09/97 - 09/30/97 | 14610110 |

### DAILY ACCOUNT ACTIVITY

| DATE | ACTIVITY | QUANTITY | DESCRIPTION | PRICE | AMOUNT | BALANCE |
|---|---|---|---|---|---|---|
| 9/10/97 | BUY | 9,669,000 | GENERAL MOTORS ACCEPTANCE CORP DISCOUNT COMMERICAL PAPER 09/17/97 | 99.9018056 | 9,659,505.58DR | |
| 9/17/97 | BUY | 9,378,000 | GENERAL MOTORS ACCEPTANCE CORP DISCOUNT COMMERICAL PAPER 09/24/97 | 99.9018056 | 9,368,791.33DR | |
| 9/24/97 | BUY | 8,644,000 | GENERAL MOTORS ACCEPTANCE CORP DISCOUNT COMMERICAL PAPER 10/01/97 | 99.9018056 | 8,635,512.08DR | |

**DEPOSITS AND WITHDRAWALS**

| DATE | ACTIVITY | | DESCRIPTION | | AMOUNT | |
|---|---|---|---|---|---|---|
| 9/10/97 | CASH RECEIPT | | 80-023-531 | | 3,652,420.00CR | |
| 9/10/97 | CASH RECEIPT | | 80-023-531 | | 6,007,085.58CR | |
| 9/11/97 | CASH RECEIPT | | 80-023-531 | | 281.42CR | |
| 9/17/97 | JOURNAL ENTRY | | TYPE 4 TO CASH MRG6 | | 9,369,000.00CR | |
| 9/25/97 | JOURNAL ENTRY | | TYPE 4 TO CASH MRG6 | | 8,635,500.01CR | |

**ACTIONS AFFECTING YOUR PORTFOLIO**

| DATE | ACTIVITY | QUANTITY | DESCRIPTION | | | |
|---|---|---|---|---|---|---|
| 9/11/97 | DELIVERED | 9,669,000- | GENERAL MOTORS ACCEPTANCE CORP DISCOUNT COMMERICAL PAPER CASH TO TYPE 4 MRG6 0% 09/17/97 | | | |
| 9/18/97 | DELIVERED | 9,378,000- | GENERAL MOTORS ACCEPTANCE CORP DISCOUNT COMMERICAL PAPER CASH TO TYPE 4 MRG6 0% 09/24/97 | | | |
| 9/25/97 | DELIVERED | 8,644,000- | GENERAL MOTORS ACCEPTANCE CORP DISCOUNT COMMERICAL PAPER CASH TO TYPE 4 MRG6 0% 10/01/97 | | | |

**CLOSING ACCOUNT BALANCE** 478.02CR

0.00

**PURCHASES AND SALES**

| DATE | ACTIVITY | QUANTITY | DESCRIPTION | PRICE | AMOUNT | |
|---|---|---|---|---|---|---|
| 9/17/97 | SELL | 9,669,000- | GENERAL MOTORS ACCEPTANCE CORP DISCOUNT COMMERICAL PAPER 09/17/97 | 100.0 | 9,669,000.00CR | |
| 9/24/97 | SELL | 9,378,000- | GENERAL MOTORS ACCEPTANCE CORP DISCOUNT COMMERICAL PAPER 09/24/97 | 100.0 | 9,378,000.00CR | |

**DEPOSITS AND WITHDRAWALS**

| DATE | ACTIVITY | | DESCRIPTION | | AMOUNT | |
|---|---|---|---|---|---|---|
| 9/17/97 | DISBURSEMENT | | 60-806-421 | | 300,000.00DR | |
| 9/17/97 | JOURNAL ENTRY | | TYPE 4 TO CASH MRG6 | | 9,369,000.00DR | |
| 9/24/97 | DISBURSEMENT | | 60-806-421 | | 742,499.99DR | |
| 9/25/97 | JOURNAL ENTRY | | TYPE 4 TO CASH MRG6 | | 8,635,500.01DR | |

CONTINUED ON PAGE 3



ACCOUNT CARRIED WITH
BHC SECURITIES, INC.
MEMBER NEW YORK STOCK EXCHANGE

01364 

38.

The Defendants betrayed her confidence in her banker. The Account Statement below on Page 3 of 3, showed the Defendants betrayed Ms. Cotton's trust when they bought over $8.5 million dollars in Discount Commercial paper, with her millions, and subjected it to loss:

| CUSTOMER NAME | PAGE |
|---|---|
| QUALITY GRAIN CO (GHANA) LTD | 3 |
| PERIOD | ACCOUNT NUMBER |
| 09/09/97 - 09/30/97 | 14610110 |

DAILY ACCOUNT ACTIVITY

| DATE | ACTIVITY | QUANTITY | DESCRIPTION | PRICE | AMOUNT | BALANCE |
|---|---|---|---|---|---|---|
| | | | ACTIONS AFFECTING YOUR PORTFOLIO | | | |
| 9/11/97 | RECEIVED | 9,669,000 | GENERAL MOTORS ACCEPTANCE CORP DISCOUNT COMMERICAL PAPER CASH TO TYPE 4 MRG6 0% 09/17/97 | | | |
| 9/18/97 | RECEIVED | 9,378,000 | GENERAL MOTORS ACCEPTANCE CORP DISCOUNT COMMERICAL PAPER CASH TO TYPE 4 MRG6 0% 09/24/97 | | | |
| 9/25/97 | RECEIVED | 8,644,000 | GENERAL MOTORS ACCEPTANCE CORP DISCOUNT COMMERICAL PAPER CASH TO TYPE 4 MRG6 0% 10/01/97 | | | |
| | | | | | | 0.00 |

TRADES SETTLING NEXT PERIOD

| ACCOUNT TYPE | DATE | ACTIVITY | QUANTITY | SYMBOL | DESCRIPTION | PRICE | AMOUNT |
|---|---|---|---|---|---|---|---|
| OTHER | 10/01/97 | SELL | 8,644,000- | GMSP10/01/97 | GENERAL MOTORS ACCEPTANCE CORP DISCOUNT COMMERICAL PAPER | 100.0 | 8,644,000.00CR |

*THESE INVESTMENTS ARE NOT INSURED BY THE FDIC; THEY ARE NOT A DEPOSIT OR OBLIGATION OF, ENDORSED BY, OR GUARANTEED IN ANY WAY BY ANY BANK OR ANY BANK SUBSIDIARY; AND THEY ARE SUBJECT TO INVESTMENT RISK, INCLUDING THE POSSIBLE LOSS OF THE PRINCIPAL AMOUNT INVESTED.*

END OF STATEMENT

01365

ACCOUNT CARRIED WITH
BHC SECURITIES, INC.
MEMBER NEW YORK STOCK EXCHANGE

SIPC