Derek W. Loeser, *admitted pro hac vice*
Gretchen Freeman Cappio, *admitted pro hac vice*
KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
(206) 623-1900; Fax: (206) 623-3384
dloeser@kellerrohrback.com
gcappio@kellerrohrback.com

Jeffrey Lewis (Bar No. 66587)
KELLER ROHRBACK L.L.P.
300 Lakeside Drive, Suite 1000
Oakland, CA 94612
(510) 463-3900; Fax: (510) 463-3901
jlewis@kellerrohrback.com

***Attorneys for Plaintiffs***

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| SHAHRIAR JABBARI and KAYLEE HEFFELFINGER, on behalf of themselves and all others similarly situated,<br><br>          Plaintiffs,<br><br>  v.<br><br>WELLS FARGO & COMPANY AND WELLS FARGO BANK, N.A.,<br><br>          Defendants. | No. 15-cv-02159-VC<br><br>**SUPPLEMENTAL DECLARATION OF PROFESSOR ROBERT H. KLONOFF RELATING TO CLASS SETTLEMENT APPROVAL, ATTORNEYS' FEES, COSTS, AND INCENTIVE PAYMENTS**<br><br>Date:   May 30, 2018<br>Time:   10:30 a.m.<br>Courtroom: 4, 17th Floor<br><br>Judge:  Hon. Vince Chhabria |

ROBERT H. KLONOFF, under penalty of perjury, declares as follows:

## I.  INTRODUCTION

1.  On January 19, 2018, I submitted a declaration relating to class settlement approval, attorneys' fees, costs, and incentive payments.  *See* Decl. of Prof. Robert H. Klonoff Relating to Class Settlement Approval, Attorneys' Fees, Costs, & Incentive Payments (Dkt. No. 187) (hereinafter "Klonoff Decl.").  Since that submission, 12 substantive objections to the settlement have been filed.  I have been asked by class counsel to address those 12 objections.[1]  As with my original declaration, I offer my opinions for the Court's consideration based on my background and experience.  I recognize that my role is limited and that this Court will make the ultimate decision.

## II.  QUALIFICATIONS

2.  My qualifications are set forth in my original declaration.  *See* Klonoff Decl. ¶¶ 2–14 & App. A.

## III.  MATERIALS RELIED UPON

3.  In addition to the materials listed in my original declaration, *see id.* at ¶ 16 & App. B, I have reviewed all 12 substantive objections to the settlement (submitted from January 19, 2018, to May 17, 2018), along with a spreadsheet prepared by class counsel tracking objections to the settlement.  I have also reviewed additional case law and filings in other class action cases.

## IV.  DISCUSSION

4.  The 12 objections target specific (and in some instances, narrow) concerns, but collectively they address the propriety of class certification, the fairness of the settlement, and the amount of attorneys' fees.  In the following paragraphs, I evaluate those objections.  Before

---

[1] Three objections—by Adam Brunet, Shimshon Wexler, and Charles Darbyshire—appear to be untimely, but I nonetheless address them herein.  Other objections (in addition to the 12) are conclusory and do not provide substantive arguments.  One objection, filed by Juliet Cotton on March 23, 2018 (Dkt. No. 220), appears to be from someone who is not in the class, since the accounts she complains about were opened in 1997, prior to the commencement of the class period (May 1, 2002).  In my original declaration, I addressed several other objections that had been filed at the preliminary approval stage.  *See* Klonoff Decl. ¶¶ 72–93.

doing so, however, I first discuss the significance of the number of objections and opt outs that have been filed in this case.

**A. Number of Objections and Opt Outs**

5. Class counsel have advised me that a total of 29 class members have filed objections. That figure represents the total number of class members who objected at either the preliminary approval stage or after the Court's order granting preliminary approval.  Some objections were filed on behalf of multiple class members.  For that reason, the actual number of objections (20) is lower than the number of objectors.  With respect to opt-outs, class counsel have advised me that a total of 1,104 class members have timely opted out of the class.  This includes 129 individuals who submitted both opt-outs and claim forms.

6. As I suggested in my original declaration (*see* Klonoff Decl. ¶¶ 56, 72), an important consideration in assessing the fairness of a class action settlement is the reaction of the class—as reflected in the number of objections and opt outs as a percentage of the class as a whole.  Courts in the Ninth Circuit and elsewhere have consistently confirmed that "[i]t is established that the absence of a large number of objections to a proposed class action settlement raises a strong presumption that the terms of [the] proposed class settlement are favorable to the class members."[2]  Similarly, courts have noted that a low opt-out rate provides "strong circumstantial evidence supporting the fairness of [a] settlement."[3]

7. Using the estimate for the size of the class supplied to me by class counsel—2.73

---

[2] *Nat'l Rural Telecomm. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 529 (C.D. Cal. 2004).  *Accord, e.g.*, *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 812 (3d Cir. 1995) ("In an effort to measure the class's own reaction to the settlement's terms directly, courts look to the number and vociferousness of the objectors."); *Cruz v. Sky Chefs, Inc.*, No. C-12-02705 DMR, 2014 WL 7247065, at *5 (N.D. Cal. Dec. 19, 2014) ("A court may appropriately infer that a class action settlement is fair, adequate, and reasonable when few class members object to it."); *Barcia v. Contain-A-Way, Inc.*, No. 07-cv-938-IEG-JMA, 2009 WL 587844, at *4 (S.D. Cal. Mar. 6, 2009) (lack of objectors "strongly supports the fairness, reasonableness, and adequacy of the settlement"); *Nat'l Treasury Employees Union v. United States*, 54 Fed. Cl. 791, 798 (2002) ("[T]here is no question that the small number of objections weighs in favor of the court's approval.").

[3] *Mangone v. First USA Bank*, 206 F.R.D. 222, 227 (S.D. Ill. 2001).  *Accord, e.g.*, *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1027 (9th Cir. 1998) ("[T]he fact that the overwhelming majority of the class [members] . . . stayed in the class presents at least some objective positive commentary as to its fairness."); *In re Processed Egg Prods. Antitrust Litig.*, 284 F.R.D. 249, 269 (E.D. Pa. 2012) (opt-out rate of 1.14 percent of class members was "virtually *di minimis*" and "weigh[ed] in favor of the proposed settlement's fairness and adequacy").

million[4]—the number of objectors represents a very low percentage of the class (0.001 percent) and the number of opt outs also represents a low percentage of the class (0.040 percent).   But even using an unrealistically low estimate of half that number of class members (1.365 million), the number of objectors represents only 0.002 percent of the class, and the number of opt outs represents only 0.080 percent of the class.

8.   These figures are among the lowest percentages of objections and opt outs that I have seen in more than 30 years of practicing, teaching, and researching in the field of class actions.   In some instances, low numbers such as these are not especially significant.   For instance, in a case in which a settlement is not highly publicized, low numbers may simply reflect class members' lack of awareness.   Alternatively, the recoveries may be so inconsequential that class members do not deem it worth their time to object or opt out.   But such circumstances do not exist here. The Wells Fargo unauthorized accounts scandal has been the subject of thousands of news articles, blog entries, television and radio reports, government reports, social media postings, and targeted class notices.   Moreover, although there is not enough at stake to warrant individual lawsuits, there are genuine payouts under the settlement to compensate class members for out-of-pocket losses, and not (for example) worthless coupons.   *See* Klonoff Decl. ¶¶ 23, 27, 65.

9.   Several recent high-profile cases have relied heavily on the small number of objections and opt outs in approving class settlements.   In the *Volkswagen Clean Diesel* litigation, for example, in granting final approval of the 2.0-liter settlement, the court emphasized that the objection rate of 0.09 percent and the opt-out rate of 0.7 percent strongly favored final approval.[5] Similarly, in granting final approval of the 3.0-liter *Volkswagen* settlement, the court noted that only 0.036 percent of class members had objected to the settlement, while only 0.67 percent of class members had opted out, emphasizing that those low objection and opt-out rates strongly indicated that the settlement was fair, adequate, and reasonable.[6]   And in granting final approval

---

[4] Class counsel arrived at this figure by dividing the total number of affected accounts (3.5 million) by the average affected accounts per person (1.28).   *See* Pls.' Supp. Briefing in Response to Court Inquiries at 3 (Dkt. No. 145).

[5] *In re Volkswagen Clean Diesel Mktg., Sales Practices & Prods. Liab. Litig.*, No. 3:15-md-02672-CRB, 2016 WL 6248426, at *16 (N.D. Cal. Oct. 25, 2016).

[6] *See* Order Granting Final Approval of Consumer and Reseller Dealership 3.0-Liter Class Action Settlement, *In re Volkswagen Clean Diesel Mktg., Sales Practices & Prods. Liab. Litig.*, slip op. at 27–28, No. 3:15-md-02672-CRB (N.D. Cal. May 17, 2017) (Doc. 3229).

of the franchise dealer settlement, the court in *Volkswagen* again emphasized that the "low opt-out and objection rates [of 1 percent] . . . strongly favor[ed] final approval."[7]  Similarly, in the *NFL Concussion* case, the district court emphasized that, despite the "[s]ubstantial and sustained media coverage" of the settlement and successful notice to class members, "only approximately 1 [percent] of class members filed objections, and only approximately 1 [percent] of class members opted out."[8]  The court noted that these figures were "impressive" and "weigh[ed] in favor of approving the settlement."[9]  Numerous other courts have emphasized the low number of objections and opt outs in approving class settlements.[10]  The percentages here are extremely low under any conceivable benchmark.

10.  These low numbers are especially important, given the high-profile nature of this case. In such cases, particularly when highly publicized and egregious misconduct is alleged, it is reasonable to expect that class members will be especially critical and vigilant if they do not like the settlement.  Moreover, in this case, the original deadline for objecting and opting out (February 19, 2018) was extended to May 14, 2018, giving class members approximately three additional months to make their decision.  In my mind, the paucity of objections and opt outs reflects what I concluded in my original declaration:  that the settlement here represents a commendable effort to recoup class members' actual injuries, plus additional noncompensatory damages.

11.  In my view, the handful of objections here should not unravel a settlement that resolves

---

[7] *In re Volkswagen Clean Diesel Mktg., Sales Practices & Prods. Liab. Litig.*, 229 F. Supp. 3d 1052, 1067–68 (N.D. Cal. 2016).

[8] *In re Nat'l Football League Players Concussion Injury Litig.*, 307 F.R.D. 351, 389 (E.D. Pa. 2015) (initial capitalization omitted), *aff'd*, 821 F.3d 410 (3d Cir. 2016).

[9] 307 F.R.D. at 389.

[10] *See, e.g.*, *Rodriguez v. West Publ'g Corp.*, 563 F.3d 948, 967 (9th Cir. 2009) (54 objections out of 376,301 class members—0.014 percent—supported fairness of settlement); *Churchill Village., L.L.C. v. Gen. Elec.*, 361 F.3d 566, 577 (9th Cir. 2004) (noting objection rate of 0.05 percent and opt-out rate of 0.55 percent in upholding class settlement); *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 148 F.3d 283, 318 (3d Cir. 1998) (district court correctly concluded that 0.004 percent objection rate and 0.2 percent opt-out rate "weighed in favor of approving the settlement"); *In re High-Tech Employees Antitrust Litig.*, No. 11-CV-02509-LHK, 2015 WL 5159441, at *3 (N.D. Cal. Sept. 2, 2015) (0.017 percent objection rate and 0.09 percent opt-out rate considered "indicia of the approval of the class" and "support[ed] the Court's final approval of the Settlement"); *Wren v. RGIS Inventory Specialists*, No. C-06-05778 JCS, 2011 WL 1230826, at *11 (N.D. Cal. Apr. 1, 2011) (the fact that only 0.02 percent of the class objected to the settlement "strongly support[ed] approval of the settlement"); *Garner v. State Farm Mutual Auto Ins. Co.*, No. CV-08-1365 CW (EMC), 2010 WL 1687832, at *14–15 (N.D. Cal. Apr. 22, 2010) (0.004 percent objection rate and 0.4 percent opt-out rate provided "further indication of the fairness of the settlement").

the claims of millions of class members who have chosen not to object or opt out.

**B. Objections Relating to Class Certification**

12.  In this section, I address the various objections that challenge the certification of this case as a settlement class.  As I explained in my original declaration (*see* Klonoff Decl. ¶¶ 53), the claims in this case are negative-value claims (*i.e.*, not sufficiently large to be worth bringing individually).  Thus, if the objectors are successful in arguing that this Court should deny class certification (and therefore should reject the class settlement on that ground), the result will be that the class members get *nothing*.  It is hard to understand how these objectors believe that such an outcome would be good for the class.

13.  Indeed, it is quite possible that some of the objectors and their attorneys have no real interest in pursuing their objections at all.  Notably, some of the attorneys who filed objections here have been repeatedly and severely criticized by courts for filing baseless objections for the purpose of extracting payoffs from class counsel to drop their objections (threatening to file appeals that would hold up the settlement for years if the payments were not forthcoming).[11]

---

[11] Thus, John Pentz, counsel for objector Jill Piazza, has been repeatedly criticized by courts as a serial objector. *See, e.g.*, *In re Initial Pub. Offering Sec. Litig.*, 721 F. Supp. 2d 210, 214 (S.D.N.Y. 2010), *reconsideration denied*, 2010 WL 2605233 (S.D.N.Y. June 28, 2010) *and opinion clarified*, No. 21 MC 92 (SAS), 2010 WL 5186791 (S.D.N.Y. July 20, 2010) (calling Pentz a "serial" objector, finding "evidence of bad faith or vexatious conduct" by [Pentz and four other attorneys for objectors] and requiring Pentz to post an appeal bond); *In re Wal-Mart Wage & Hour Employment Practices Litig.*, No. 2:06-CV-00225-PMP-PAL, 2010 WL 786513, at *1 (D. Nev. Mar. 8, 2010) (noting, in requiring that Pentz post an appeal bond, that Pentz has "a documented history of filing notices of appeal from orders approving other class action settlements, and thereafter dismissing said appeals when [he and his clients] were compensated by the settling class or counsel for the settling class"); *In re Compact Disc Minimum Advertised Price Antitrust Litig.*, No. MDL 1361, 2003 WL 22417252, at *2 n.3 (D. Me. Oct. 7, 2003) (requiring appeal bond, calling Pentz a "repeat objector," and characterizing his objection as "groundless" and potentially frivolous); *In re MetLife Demutualization Litig.*, 689 F. Supp. 2d 297, 350–51 (E.D.N.Y. 2010) (characterizing Pentz's objections as "meritless").

Similarly, Timothy Hanigan, counsel for objector Chad Farmer, is ranked just below Pentz as one of the nation's top ten serial objectors by one organization that tracks such objections.  Hanigan has filed at least 15 different objections to class action settlements as of 2018.  *See* SERIAL OBJECTOR INDEX, https://www.serialobjector.com/persons (last visited May 16, 2018).  As one district court stated, Hanigan is a "'serial' objector[ ] who [is] well-known for routinely filing meritless objections to class action settlements for the improper purpose of extracting a fee rather than to benefit the Class."  *Chambers v. Whirlpool Corp.*, 214 F. Supp. 3d 877, 890 (C.D. Cal. 2016).

Mr. Farmer is also represented by perhaps the most notorious "serial objector" of all, Christopher Bandas.  Bandas has filed at least *71* objections to class settlements as of 2018, *see* SERIAL OBJECTOR INDEX, https://www.serialobjector.com/persons (last visited May 16, 2018), and has been harshly criticized by numerous federal courts.  *See, e.g.*, *In re Gen. Elec. Sec. Litig.*, 998 F. Supp. 2d 145, 156 (S.D.N.Y. 2014) (noting that Bandas "has been repeatedly admonished for pursuing frivolous appeals of objections to class action settlements" and concluding that the objector's "relationship with Bandas, a known vexatious appellant, further supports a finding

Indeed, the pending changes to Rule 23 are designed precisely to deal with the abuses of serial objectors.[12]  This Court should be highly skeptical of attorneys who have built a law practice out of filing groundless objections and extorting payoffs to drop them.

### 1. Class Definition and Scope of Class

14.  Objectors Darlene Martinez et al. make the conclusory argument that the class definition is "overbroad and vague."  Objections to Final Approval at 4 (Dkt. No. 193) (setting forth objection of Darlene Martinez, Doris Lopez, and Caitlin Turner) (hereinafter "Martinez et al. Obj.").  As I have explained, however, *see* Klonoff Decl. ¶ 45, the class definition is in fact clear and objective, and the settlement agreement provides definitions for all of the crucial terms.  Moreover, the concern that this case will somehow serve to release claims that are "only

that [objector] brings this appeal in bad faith"); *In re Hydroxycut Mktg. & Sales Practices Litig.*, No. 09-md-2087 BTM (KSC), 2013 WL 5275618, at *5 (S.D. Cal. Sept. 17, 2013) (noting that "Mr. Bandas was attempting to pressure the parties to give him $400,000 to withdraw the objections and go away" and "was using the threat of questionable litigation to tie up the settlement unless the payment was made"); *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 281 F.R.D. 531, 533 (N.D. Cal. 2012) ("Bandas routinely represents objectors purporting to challenge class action settlements, and does not do so to effectuate changes to settlements, but does so for his own personal financial gain; he has been excoriated by Courts for this conduct.").

Another objector, Charles Darbyshire (as guardian of Roy Geiersbach), submitted his objection "with the assistance of Florida Counsel, N. Albert Bacharach, Jr., FBN 209783."  Objection to Mot. for Final Approval & Mot. for Attorney's Fees & Costs at 6 (Dkt. No. 242) (hereinafter "Darbyshire Obj.").  Bacharach, too, is a serial objector.  *See* SERIAL OBJECTOR INDEX, https://www.serialobjector.com/persons (last visited May 18, 2018) (noting that Bacharach has filed at least 12 objections to class action settlements as of 2018, and listing him as the fourteenth most frequent serial objector behind only the likes of Bandas, Pentz, and Hanigan).

I should also note that objector Brunet, who touts the fact that he is "not represented by an attorney" (Objection of Adam Brunet at 2 (Dkt. 238) (hereinafter "Brunet Obj.")), is more knowledgeable and involved in class actions than he lets on.  He appears to be the National Director of Sales at Lex Recovery Group, LLC.  Lex Recovery Group is a "claims aggregator" or "bulk filer" that charges class members to assist them with filing claims.  *See* LEX RECOVERY GROUP, LLC, https://www.lexrecoverygroup.com/ (last visited May 17, 2018); https://www.zoominfo.com/p/Adam-Brunet/1703260601 (last visited May 17, 2018) (noting Brunet's position with Lex Recovery Group).  Indeed, this is not Brunet's first objection to a class action settlement.  *See* Pls.' Reply in Support of Mot. for Final Approval of Class Action Settlement & Request for Award of Attorneys' Fees & Expenses at 6, 21–22, *Rikos v. Proctor & Gamble Co.*, No. 11-CV-00226-TSB (S.D. Ohio) (filed Apr. 9, 2018), *available at* http://www.alignsettlement.com/media/1369474/plaintiffs__reply_in_support_of_motion_for_final_approval_of_class_action_settlement_and_request_for_award_of_attorneys__fees_and_expenses.pdf (responding to similar objections filed by Brunet in another recent class action settlement, and noting that companies like Lex Recovery Group "have been roundly criticized for using deceptive practices to convince people that they need help [filing claims for a fee] when they do not").

[12] *See* ROBERT H. KLONOFF, CLASS ACTIONS AND OTHER MULTI-PARTY LITIGATION IN A NUTSHELL 338–39 (West 5th ed. 2017) (discussing proposed rule changes); Ryan DiClemente, *Are Significant Changes to Class Actions on the Horizon? (Part Two)*, INSIDEARM (June 29, 2017), https://www.insidearm.com/news/00043061-are-significant-changes-class-actions-hor/ (same); Jocelyn D. Larkin, *Civil Rules Committee Takes on Serial Objectors With Proposed Rule 23 Changes*, IMPACT FUND (June 24, 2016), https://www.impactfund.org/legal-practitioner-blog/r23changes (same).

tangentially related to the opening of an unauthorized account" (Martinez et al. Obj. at 4) is belied by the actual release itself, which by its terms releases only claims based on the "identical factual predicate" of the claims asserted in the lawsuit. *See* Amended Settlement ¶ 2.50, discussed in Klonoff Decl. ¶¶ 27, 91. Indeed, this carefully circumscribed release was crafted—after this Court raised concerns—precisely to avoid covering claims that are unrelated to this lawsuit. *See* Klonoff Decl. ¶¶ 27, 91. It is inexplicable that objectors Martinez et al., in complaining that this case encompasses irrelevant claims, ignore the amended release language (and ignore the reason why such language was narrowed from the original release language).

### 2. Adequacy of Representation

15. Objector Scott Johnston filed two objections. His first objection raises, *inter alia*, a host of interrelated adequacy of representation issues under Rule 23(a)(4). Objection of Scott Johnston to Notice of Final Approval at 13-22 (Dkt. No. 196) (hereinafter "Johnston Obj. #1").[13] In essence, his argument is that the class consists of numerous conflicting subgroups that required separate class representatives and counsel. Very similar objections were raised by other objectors at the preliminary approval stage, and I addressed those arguments at length in my original declaration. *See* Klonoff Decl. ¶¶ 82–89. I explained why courts have been reluctant to order subclasses absent concerns on par with those in *Amchem Products, Inc. v. Windsor*[14] and *Ortiz v. Fibreboard Corp.*[15] Klonoff Decl. at ¶¶ 86–88. As I noted, subclassing can lead to "Balkanization" and can result in a situation where settlement negotiations are rendered all but impossible. Johnston offers nothing that causes me to change my opinion.

16. Indeed, many of Johnston's arguments are not even plausible. For instance, Johnston claims that, because approximately 1.4 million additional unauthorized accounts were disclosed by Wells Fargo in August 2017, those 1.4 million account holders should have been designated as a separate subclass. *See* Johnston Obj. #1 at 4, 14. But Johnston omits a crucial fact, which I discussed in my original declaration: At the behest of the Court, the settlement is now uncapped and provides full compensation for unauthorized fees and credit impact damages, even if the

---

[13] His first objection also raises complaints about the fairness of the settlement, which I address in ¶¶ 26, 29–30, 35. His second objection raises largely duplicative objections about the fairness of the settlement. *See* ¶ 26.

[14] 521 U.S. 591 (1997).

[15] 527 U.S. 815 (1999).

amount that must be paid by Wells Fargo exceeds the designated settlement amount of $142 million.  *See* Klonoff Decl. ¶ 27.  Thus, these additional account holders will be fully compensated for their losses, and for that reason there is no "conflict."

17. Even more specious are several of the other categories of class members that, in Johnston's view, require separate subclasses:  homeless class members, minors, and "non-English speaking victims."  Johnston Obj. #1 at 14, 20.  Johnston offers no cogent reason why these categories require subclasses, a remedy that would necessitate throwing out this entire settlement and starting over again.  It is equally true that the class includes both males and females, people from different racial and ethnic groups, people with different sexual orientations, blondes and redheads (as well as brunettes), and tall people as well as short people.  But none of that matters to adequacy of representation.[16]  Moreover, to the extent that Johnston's argument for subclassing is based on different damages calculations sought by different segments of the class, that argument also does not justify subclassing,[17] as numerous courts have held.[18]

18. Finally, objector Johnston claims (Johnston Obj. #1 at 13–15, 17–21) that subclasses are compelled here based on two Second Circuit cases:  *In re Payment Card Interchange Fee &*

---

[16] Objector Darbyshire also argues that subclasses should be created, proposing five categories: (1) those who were charged fees on their unauthorized accounts; (2) those with legitimate credit card accounts who incurred overdrafts or other negative credit history as a result of associated unauthorized accounts; (3) those enrolled in identity theft protection services; (4) those whose credit was affected by unauthorized applications for products or services; and (5) those affected by unauthorized unsecured credit cards, unsecured lines of credit, or small business checking or savings accounts.  *See* Darbyshire Obj. at 4.  But, like Johnston, Darbyshire does not explain why these five categories require separate class representatives and class counsel to ensure adequacy of representation.

[17] Apart from different damages calculations for those seeking fees for unauthorized accounts and those seeking damages for credit injuries, it is hard to understand how the various categories cited by Johnston lead to differences in how damages are calculated.  For instance, it is hard to fathom how being homeless would alter the damages formulae for those class members who are in that situation.

[18] *See, e.g.*, *In re Nat'l Football League Players' Concussion Injury Litig.*, 821 F.3d 410, 432 n.9 (3d Cir. 2016) (upholding district court's conclusion that additional subclasses were not necessary for class members with different medical diagnoses and for spouses of retired NFL players with loss of consortium claims); *In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*, 910 F. Supp. 2d 891, 918–19 (E.D. La. 2012) (holding that subclasses were "neither necessary, useful, nor appropriate" despite significant differences among class members in type and calculation of damages, and noting that "[s]uch rigid formalism, which would produce enormous obstacles to negotiating a class settlement with no apparent benefit, is not required and could even reduce the negotiating leverage of the class" (citations omitted)), *aff'd*, 739 F.3d 790 (5th Cir. 2014); *In re Ins. Brokerage Antitrust Litig.*, No. 04-5184, 2009 WL 411877, at *14 (D.N.J. Feb. 17 2009) ("A class need not be divided into subclasses merely because different groups have alternative legal theories for recovery, or because those groups have different factual bases for relief." (citations omitted)).

*Merchant Discount Antitrust Litigation*,[19] and *In re Literary Works in Electronic Databases Copyright Litigation*.[20]   But as noted above, here there are no conflicts that warrant subclasses. The circumstances in *Payment Card Interchange* and *Literary Works* bear no resemblance to those in this case.[21]

### 3. Predominance

19.   Relying on the Ninth Circuit's recent decision in *In re Hyundai & Kia Fuel Economy Litigation*,[22] objectors Jill Piazza (represented by attorney John Pentz) and Chad Farmer (represented by attorneys Timothy Hanigan and Christopher Bandas) claim that a nationwide class action cannot be certified because the laws of all 50 states will apply, thus raising predominance issues under Rule 23(b)(3).   *See* Objection to Class Certification & Request for Attorneys' Fees at 1–2 (Dkt. No. 192) (hereinafter "Piazza Obj."); Objection of Chad Michael

---

[19] 827 F.3d 223 (2d Cir. 2016).

[20] 654 F.3d 242 (2d Cir. 2011).

[21]   *Payment Card Interchange* involved a proposed settlement for fees improperly charged by credit card companies to merchants.   The settlement class was structured as a complex hybrid of two classes:  one under Federal Rule of Civil Procedure 23(b)(3), and the other a *mandatory* class under Rule 23(b)(2).   Those merchants in the (b)(3) class stood to divide a settlement worth potentially billions of dollars and could opt out if the deal was unsatisfactory, while those merchants in the (b)(2) class would have released their individual claims for monetary damages in exchange for "virtually worthless" injunctive relief.  827 F.3d at 238.   The Second Circuit therefore overturned the settlement as unfair to the (b)(2) class members.   In the instant case, the proposed settlement class is brought entirely under Rule 23(b)(3), and none of the subclasses suggested by Johnston is necessary to protect absent class members.   The settlement is uncapped, all absent class members stand to receive significant monetary compensation for their actual injuries as well as noneconomic damages, and each class member had the chance to opt out if he or she was unsatisfied with that relief.

*Literary Works* involved another complex proposed settlement class made up of freelance authors seeking compensation for unauthorized electronic reproduction of written works.   The written works at issue were divided into three categories by the proposed settlement:   Categories A and B included written works that had been registered with the U.S. Copyright Office, while Category C (encompassing over 99 percent of the total claims at issue) included unregistered works.   The settlement was capped at $18 million, and was structured such that, if the total of all claims plus attorneys' fees and costs of notice and settlement administration exceeded the $18 million limit, compensation for Category C claims would be reduced pro rata (to $0 if necessary).   The class representatives, however, each held combinations of all three categories of claims, while some absent class members held only Category C claims.   Under these facts, the Second Circuit held that there was a "fundamental conflict" between class members with only Category C claims and the rest of the class.  654 F.3d at 256.   The court thus overturned the settlement, holding that a subclass of Category C-only plaintiffs should have been carved out of the class and given separate representation.   Here, by contrast, this settlement is uncapped; regardless of the claims of other class members, each class member will receive compensation for his or her actual damages.

[22] 881 F.3d 679 (9th Cir. 2018).

Farmer at 5–7 (Dkt. No. 200) (hereinafter "Farmer Obj.").[23]  As noted above (¶ 13 n.11), these specific attorneys have been roundly criticized by numerous courts as serial objectors who advance baseless arguments to extract a payment from class counsel to go away.  In all events, even putting aside the identities of the lawyers who have advanced the *Hyundai* argument, that argument is without merit.  Even if the Ninth Circuit's 2–1 *Hyundai* decision survives rehearing en banc and Supreme Court review, it is completely inapposite here.[24]

20.  The problem in *Hyundai* was that *all* of the claims in the case arose under state law, and the defendant there had vigorously argued that "differences in state consumer protection laws precluded the application of California law to consumers who are not Californians and defeated predominance."[25]  Those circumstances do not exist here.

21.  Most importantly, unlike *Hyundai* (and *Mazza v. American Honda Motor Co.*,[26] relied upon in *Hyundai*), the instant case involves *federal claims* as well as state claims—specifically, claims under the Fair Credit Reporting Act (FCRA)[27] and the Electronic Funds Transfer Act (EFTA).[28]  Those federal statutes provide a substantial basis for the damages sought in this case, and thus this Court need not even consider purported predominance issues arising out of the additional state law claims.

22.  Piazza and Farmer inexplicably ignore this critical difference from *Hyundai*.  But ignoring that distinction does not make it go away.  Indeed, shortly after *Hyundai* was announced, a blog sponsored by a prestigious defense law firm, Mayer Brown, provided a detailed analysis of the *Hyundai* case.  That blog is heavily pro-defendant in its perspective (indeed, it is called the "Class Defense Blog"), so its analysis of *Hyundai* is especially important because the case is one that defendants in class actions will likely rely on going forward

---

[23] In his second objection, Johnston also cites *Hyundai*, although he does not appear to be claiming that a class cannot be certified.  *See* Johnston Objection to Final Fairness Hearing and Stipulation and Proposed Order at 2 (Dkt. No. 237) (hereinafter "Johnston Obj. #2").

[24] The decision contains a lengthy dissent by Judge Nguyen.  On March 8, 2018, both plaintiffs and defendant filed petitions for rehearing en banc.  Those petitions are still pending.

[25] 881 F.3d at 695.

[26] 666 F.3d 581 (9th Cir. 2012).

[27] 15 U.S.C. §§ 1681 *et seq.*

[28] 15 U.S.C. §§ 1693 *et seq.*

10

(assuming it is not overturned).[29]  Indeed, since many of Mayer Brown's own corporate clients rely on choice-of-law issues under state law in challenging predominance,[30] Mayer Brown would not make an argument on its blog that could later be used against it unless it was convinced that that argument was beyond reproach.  Yet, the Mayer Brown blog makes the crucial point that Piazza and Farmer ignore:

> [I]f there is a viable federal claim among the state claims, and the federal claim can support the damages provided by the settlement and by state-law claims, that claim can make a choice-of-law analysis immaterial.[31]

Because Piazza and Farmer ignore the federal claims in this case, their arguments cannot be taken seriously.

23.  *Hyundai* can be distinguished on additional grounds as well.  First, in *Hyundai*, defendants had made an extensive argument (supported by a 34-page appendix of state law claims) that in that case, the laws of all 50 states applied.[32]  Here, no such argument has been made by Wells Fargo, and objectors offer no choice-of-law analysis of their own.  Second, in this case, because Wells Fargo is based in California and the allegedly wrongful conduct emanated from there, a strong argument exists that, for at least some causes of action, California law should control for all class members.[33]  The Court need not reach these two additional grounds, however, since the presence of substantial federal claims in this case is dispositive in rendering

---

[29] *See, e.g.*, Perry Cooper, Hyundai *Class Ruling 'Gift to Corporate Defendants'*, BLOOMBERG BNA (Jan. 25, 2018), https://www.bna.com/hyundai-class-ruling-n73014474703/; Lucía X. Roibal, *Ninth Circuit's Pro-Defense Decision in* Hyundai *Opens the Door for Class Certification Defenses*, LEXOLOGY (Feb. 12, 2018), https://www.lexology.com/library/detail.aspx?g=73f6fa0a-54a4-48ca-b87e-904d9a3edf2c.

[30] *See, e.g.*, *Mazza*, 666 F.3d 581 (arguing that state choice-of-law issues defeated predominance); Def. Citibank, N.A. & Citimortgage, Inc.'s Mem. of Points & Authorities in Opposition to Pls.' Mot. for Class Certification at 22–26, *Stitt v. Citibank, N.A.*, No. 4:12-cv-3892-YGR (N.D. Cal.) (Dkt. No. 126-2; filed July 10, 2015), *available at* https://ecf.cand.uscourts.gov/cgi-bin/DktRpt.pl?345923046417277-L_1_0-1 (arguing that "[m]aterial differences among state laws" defeated predominance and "preclude[d] a nationwide class").

[31] Donald Falk, *Ninth Circuit Rejects Nationwide Class Settlement*, MAYER BROWN CLASS DEFENSE BLOG (Feb. 8, 2018), https://www.classdefenseblog.com/2018/02/ninth-circuit-rejects-nationwide-class-settlement/.

[32] 881 F.3d at 695.

[33] *See, e.g.*, *Johnson v. Triple Leaf Tea Inc.*, No. C-14-1570 MMC, 2014 WL 4744558, at *7–8 (N.D. Cal. Sept. 23, 2014) (noting that courts have applied California law to claims by nationwide classes where defendants were headquartered in California, and citing cases); *Parkinson v. Hyundai Motor Am.*, 258 F.R.D. 580, 598 (S.D. Cal. 2008) (certifying nationwide class and applying California consumer protection law where "the alleged wrongful conduct occurred in California").

*Hyundai* inapplicable.  I note them only to point out that *Hyundai* is distinguishable on multiple grounds that are nowhere acknowledged by Piazza or Farmer.

### C. Objections Relating to the Fairness of the Settlement Under Rule 23(e)

#### 1. Lack of Discovery and Absence of Pertinent Information

24.  Several objectors complain about the lack of discovery in this case.  *See* Objection of Mr. & Mrs. Paul Squicciarini at 2 (hereinafter "Squicciarini Obj."); Martinez et al. Obj. at 2–4.  I have already addressed this issue in detail in my original declaration.  As I explained there, formal discovery was not possible, because the case was dismissed pursuant to the arbitration clauses.  *See* Klonoff Decl. ¶ 69.  In any event, class counsel conducted extensive informal discovery, both on their own and directly with Wells Fargo during settlement negotiations.  *See id.* at ¶¶ 68–69, 74.  Informal discovery has often served as a valid predicate for classwide settlements.  *See id.* at ¶ 68 & n.48 (citing case law).  Nothing offered by the Squicciarinis or Martinez et al. causes me to rethink my view that the informal discovery conducted by class counsel in this case is sufficient to support the settlement.

25.  Objectors Martinez et al. also make a conclusory argument that the settlement was "collusi[ve]" because of the lack of formal discovery.  Martinez et al. Obj. at 3.[34]  As I have already explained (above and in my original declaration), however, the facts surrounding the exchange of information here are not concerning.  Moreover, in my original declaration, I provided a detailed analysis of the issue of potential collusion based on the factors set forth by the Ninth Circuit in *In re Bluetooth Products Liability Litigation*.[35]  *See* Klonoff Decl. ¶¶ 94–97.  Objectors Martinez et al. do not even cite *Bluetooth*, let alone frame their collusion argument within the parameters set forth by the Ninth Circuit for analyzing that precise issue.

26.  Objector Johnston raises a number of related arguments.

    a.  First, in his initial filing, Johnston complains that the parties have not definitively identified "how many class members were affected" by the conduct at issue.

---

[34] Objector de Rios also argues that the Court should look at possible collusion, but she makes no argument that this settlement is in fact collusive.  *See* Objection to Class Settlement at 3 (Dkt. No. 194) (hereinafter "de Rios Obj.").

[35] 654 F.3d 935, 946 (9th Cir. 2011).

Johnston Obj. #1 at 2.  He raises the same point in his second objection, complaining that "the true number of victims" is not known.  Johnston Obj. #2 at 2.[36]  Objector Darbyshire raises the same point.  *See* Darbyshire Obj. at 2.  But there is no requirement that, as a precondition to settlement, the parties must determine precisely how many people are in the class.[37]  (Indeed, in many class actions, obtaining such information would not be possible.)  This is especially true here because, as I explained in my original declaration (*see* Klonoff Decl. ¶ 27) and in ¶ 16 above, although the original settlement was capped at $142 million, that settlement was later revised to make it uncapped.  Thus, regardless of how many claimants come forward, all will be compensated for their losses under the prescribed formula, even if the total amount paid exceeds $142 million.  Johnston simply ignores the uncapped nature of the settlement in advancing his objection.

b.  Second, Johnston asserts that Wells Fargo is "hid[ing] information" and "refuses to produce documentation to establish the number of victims."  Johnston Obj. #2 at 3.  Again, Johnston offers nothing but sheer speculation, and is again relying on the erroneous premise that a court must determine the exact number of victims before approving a settlement.

c.  Third, Johnston complains about Wells Fargo's recordkeeping (*see id*. at 2), but, again, cites nothing to suggest that a concern about recordkeeping justifies rejection of a class settlement.  Nor does Johnston provide more than speculation regarding Wells Fargo's records.

d.  Fourth, Johnston complains that class members with undeliverable email addresses

---

[36] Indeed, although Johnston purports to base his second objection, filed May 14, 2018, on the parties' proposed forthcoming notice (Dkt. No. 234), much of the objection merely repeats his prior arguments.  On that basis alone, the Court would be well within its discretion to strike Johnston's second objection.  The Court nowhere stated that a class member could file multiple objections, especially to repeat the same points.  In all events, as discussed herein, the points in Johnston's second objection are meritless.

[37] *See, e.g.*, *Evans v. U.S. Pipe & Foundry Co*., 696 F.2d 925, 930 (11th Cir. 1983) (noting that "plaintiff[s] need not show the precise number of members in the class"); *Lizondro-Garcia v. Kefi LLC*, No. 12 Civ. 1906 (HBP), slip op. at 8 (S.D.N.Y. May 29, 2014) (noting, in granting preliminary approval of class settlement and discussing the numerosity requirement, that "precise calculation of the number of class members is not required"); Alba Conte & Herbert Newberg, Newberg on Class Actions § 3.3 (4th ed. 2002) (noting that "evidence of exact class size is not required").

will not receive the email that the parties propose to send out (with the Court's permission) by June 22, 2018.  *See id.* at 5.  But in virtually every class settlement, some notices (whether by first class mail or email) will be returned as undeliverable. Johnston cites nothing to say that such a problem is a basis for disapproving the settlement.[38]  There is no showing that the parties are acting in anything but good faith in attempting to notify class members.

e. Fifth, Johnston complains that the proposed email discussed above "fails to adequately inform victims [sic] the basic information regarding the settlement." Johnston Obj. #2 at 5.  But class members have already received notice containing the basic information about the settlement.  The proposed email is designed to inform class members of the July 7, 2018 deadline for filing claims and to provide contact information if a particular class member is unable to complete the claim form or desires other information.  The proposed notice was approved by various state Attorneys General, who had originally asked Wells Fargo to send out an additional notice.  Moreover, Johnston's objection is premised on the notion that there are serious flaws with the settlement—flaws that class members must be told about.  *See, e.g.*, *id.* at 6 (arguing that the proposed notice "fails to inform victims about the inadequacies of representation" (boldface omitted)).  But as I explain in this Supplemental Declaration, all of the purported flaws asserted by Johnston and other objectors are without merit.[39]

### 2. Amount of the Settlement

27.  Certain objectors complain about the dollar amount of the settlement.  I have already discussed at length why I believe that, all things considered, the amount of the settlement is impressive.  *See* Klonoff Decl. ¶¶ 65–67.  The recent objections do not undermine my analysis.

---

[38] Indeed, Rule 23 does not require that every class member receive actual notice.  *See generally Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 812 (1985) (requiring only the "best practicable" notice under the circumstances); *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 317–19 (1950) ("[N]otice reasonably certain to reach most of those interested in objecting is likely to safeguard the interests of all[.]").

[39] Johnston complains about some of the precise dates set in the proposed notice.  *See* Johnston Obj. #2 at 8-10.  I am confident that the parties and the Court will review all of the proposed dates and ensure that they are sensible and workable.  Surely, the possibility that a date or two in the proposed notice might be changed is not a reason for the Court to reject the settlement.

Indeed, one objector, Barbara Cochran, admits that the settlement "looks pretty good." Objection of Barbara Cochran at 1 (unfiled) (hereinafter "Cochran Obj.").

28. The Squicciarinis call the settlement "too small," saying that the maximum possible award was actually $600 million, and that punitive damages might have been added to that amount. Squicciarini Obj. at 1–2. Similarly, objector Peter Dames claims that Wells Fargo should be "put out of business completely" or put in "dire straits financially," and suggests that the settlement amount should be $100 billion. Objection of Peter Dames at 2 (unfiled) (hereinafter "Dames Obj."). The short answer to these arguments, however, is that a settlement is necessarily a compromise. As I explained in my original declaration, in many instances settlements yield only pennies on the dollar. *See* Klonoff Decl. ¶ 65 & n.44 (citing case law). In my original declaration, I explained the significant risks faced here by class counsel and the class. *See id.* at ¶¶ 59–64. It is sheer fantasy to believe that Wells Fargo would simply write a check for $100 billion (or for the maximum amount that, according to the Squicciarinis, a jury could have awarded in a best-case scenario). Indeed, one of the core problems with the case is that, under the arbitration clauses, class members may never have had a real day in court at all. *See id.* at ¶¶ 60–63. The settlement here is designed to provide immediate and certain compensation for injuries, along with additional non-compensatory damages. Moreover, a settlement that would bankrupt Wells Fargo—as Dames desires—would not inure to the benefit of the class.[40]

29. For the same reason, it is unpersuasive for objector Johnston to complain that the settlement fails to contain an additional award representing punitive damages. *See* Johnston Obj. #1 at 8–9. Again, settlements are compromises. Moreover, settlements that provide for punitive damages are virtually unheard of, even in cases involving allegations of egregious wrongdoing. For example, in the *Volkswagen Clean Diesel* litigation, despite Volkswagen's open admission of fraud, none of the consumer settlements provided for punitive damages (on top of compensatory damages). As the district court stated in the *BP Deepwater Horizon* oil spill litigation:   "Given that any award of punitive damages is inherently speculative and

---

[40] *See, e.g.*, *In re Volkswagen*, 2016 WL 6248426, at *18 (acknowledging that the defendant's bankruptcy "would present a huge impediment to prompt, efficient, and fair payments to injured claimants" and concluding that, "[w]eighing [the possibility of bankruptcy] against the immediate and guaranteed benefits provided by the Settlement, settlement is clearly favored" (citation and internal quotation marks omitted)).

discretionary, courts regularly approve settlements that offer no or little compensation representing the risk of a punitive damages award."[41]   In the vast majority of class settlements, defendants do not even admit liability, let alone pay money over and above compensatory damages on a theory that they engaged in egregious misconduct.[42]

30.   Objector Johnston also attacks the sufficiency of the settlement on the ground that it does "not constitut[e] even one percent (1%) of one year's profits."   Johnston Obj. #1 at 23.   But the issue is not how wealthy a defendant is in the abstract; rather, it is whether the particular settlement is fair, reasonable, and adequate, given the factors set forth in *Churchill Village, L.L.C. v. General Electric*,[43] including (among other things) the strength of plaintiff's case and the risk of litigation.   *See* Klonoff Decl. ¶¶ 56–93.   As the Third Circuit has emphasized, where a settlement is otherwise fair, reasonable, and adequate, the defendant's "ability to pay a higher amount [is] irrelevant to determining the fairness of the settlement."[44]

31.   Objector Shimshon Wexler complains that the settlement provides "zero relief for class members like me who have had an account opened but who didn't suffer harm to credit or fees wrongfully charged."   Objection of Shimshon Wexler at 1 (Dkt. No. 243) (hereinafter "Wexler Obj.").   That assertion is incorrect.   Such class members will still be entitled to a share of noncompensatory damages.   *See* Klonoff Decl. ¶ 27.   Moreover, if class members who suffered no financial injury (such as Wexler) believed that they could do better by litigating separately,

---

[41] *In re Oil spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*, 295 F.R.D. 112, 155 (E.D. La. 2013). *Accord, e.g., Louzau v. FedEx Ground Package System, Inc.*, No. 3:05-MD-527 RLM, slip op. at 9–10 (N.D. Ind. Apr. 28, 2017) (rejecting objector's argument that settlement was unfair because it did not include compensation for punitive damages); *Moore v. Verizon Commc'ns Inc.*, No. C 09-1823 SBA, slip op. at 19 n.16 (N.D. Cal. Aug. 28, 2013) (to the same effect); *Draney v. Wilson, Morton, Assaf & McElligott*, No. Civ. 79-1029, 1985 WL 5820, at *3 (D. Ariz. Sept. 30, 1985) (approving settlement and reasoning that "[a]ny award of punitive damages would be highly speculative"); *cf. Rodriguez v. West Publ'g Corp.*, 563 F.3d 948, 964 (9th Cir. 2009) ("[C]ourts generally determine fairness of an antitrust class action settlement based on how it compensates the class for past injuries, without giving much, if any, consideration to treble damages.").

[42] *See, e.g.*, ABA SECTION OF ANTITRUST LAW, ANTITRUST CLASS ACTIONS HANDBOOK 207 (2010) ("[D]efendants typically . . . state that they do not admit to any liability or wrongdoing by agreeing to the [class] settlement."); DEBORAH R. HENSLER ET AL., CLASS ACTION DILEMMAS: PURSUING PUBLIC GOALS FOR PRIVATE GAIN 75–76 (2000) (noting that the defendant typically "does not admit to any liability").

[43] 361 F.3d 566, 575 (9th Cir. 2004).

[44] *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 538 (3d Cir. 2004); *see also, e.g., McDonough v. Toys "R" US, Inc.*, 80 F. Supp. 3d 626, 645 (E.D. Pa. 2015) ("The ability of the defendants to withstand a greater judgment generally only comes into play when a settlement in a given case is less than would ordinarily be awarded but the defendant's financial circumstances do not permit a greater settlement." (citation and internal quotation marks omitted)).

they were free to opt out.

### 3. Calculation of Credit Impact Damages

32. As a more focused attack regarding the amount of the settlement, objectors Martinez et al. complain about the calculation of credit impact damages, saying with no explanation that such damages are "unfairly minimized and uncertain."  Martinez et al. Obj. at 6 (initial capitalization omitted).   They mention that plaintiffs' expert, Edward Stockton, submitted a declaration on January 19, 2018, which explains precisely the methodology (with specific examples) for calculating credit impact damages.   The relevance of this point is unclear.   By their own admission, objectors thus had over a month prior to the original due date for objections to analyze Stockton's declaration and submit their analysis and criticisms.   Yet despite all that time (and all the additional time in light of the Court's extension until May 14, 2018, for filing objections), those objectors offer no challenge to Stockton's January 19th submission.   Merely asserting with no support that the calculation of credit impact damages is flawed is not sufficient.[45]

33. As a related matter, Martinez et al. complain that under the settlement, Wells Fargo is only required to "'***ask*** Consumer Report Agencies to suppress credit inquiries or Delinquency or Derogatory Reports related to certain Unauthorized Accounts and Unauthorized Applications.'" Martinez et al. Obj. at 6 (italics and boldface in original).   But these objectors do not specify what else Wells Fargo could have been required to do under a settlement.   Certainly, Wells Fargo has no power to alter the credit reports on its own; that can only be done by the credit reporting agencies.[46]   And those agencies are not parties to the case, so there is no legal basis to embody

---

[45] *See, e.g.*, *Rossi v. Proctor & Gamble Co.*, No. 11-7238 (JLL), slip op. at 12–13 (D.N.J. Oct. 3, 2013) ("Without providing reasons in support of his conclusory statement, this Court is not in a position to asses in any meaningful way the merits of [objector's] argument. . . . [Objector's] conclusory objection . . . is therefore rejected."); *In re TD Ameritrade Acct. Holder Litig.*, No. C 07-2852 SBA, slip op. at 17–23 (N.D. Cal. Sept. 12, 2011) (rejecting "conclusory and unsubstantiated" objections); *In re Initial Pub. Offering Sec. Litig.*, 671 F. Supp. 2d 467, 496–97 (S.D.N.Y. 2009) (rejecting "conclusory objections" (initial capitalization omitted)); *In re AremisSoft Corp. Sec. Litig.*, 210 F.R.D. 109, 131 (D.N.J. 2002) (disregarding "vague and conclusory objection").

[46] *See, e.g.*, *How Do I Dispute an Error on My Credit Report?*, Consumer Financial Protection Bureau, https://www.consumerfinance.gov/ask-cfpb/how-do-i-dispute-an-error-on-my-credit-report-en-314/ (last visited May 16, 2018) (noting that banks and other companies can furnish updated information to credit reporting companies, but that only the credit reporting companies themselves can update credit reports); Kali Geldis, *How to Dispute Credit Report Errors*, Credit.com (May 8, 2017), https://www.credit.com/credit-repair/credit-repair-content/dispute-credit-report-error/ (to the same effect).

such an obligation in the terms of this settlement.   Thus, while objectors may wish that Wells Fargo could unilaterally correct the credit reports, the reality is that it cannot.   Thus, the objectors' argument is meritless.

### 4.  Scope of the Release

34. The Squicciarinis assert, with no explanation, that "the release is vague and overly broad."  Squicciarini Obj. at 2 (initial capitalization omitted).   As noted above, however, conclusory objections should be disregarded.  *See* ¶ 32 n.45, *supra*.  In any event, as explained in ¶ 14 above and in my original declaration (¶¶ 27, 91), the release here was significantly revised (per the Court's involvement) to ensure that it releases only claims based on the "identical factual predicate" of the claims asserted in the lawsuit.  *See* Amended Settlement ¶ 2.50, discussed in Klonoff Decl. ¶¶ 27, 91.

### 5.  Class Counsel's Reliance on the Arbitration Clauses to Support the Settlement

35. Objectors Martinez et al., Johnston, and Darbyshire assert that class counsel undervalued the settlement by giving too much weight to concerns about the arbitration clauses.  *See* Martinez et al. Obj. at 5–6; Johnston Obj. #1 at 7–8; Darbyshire Obj. at 3.  In the view of these objectors, the arbitration clauses are a non-issue.  As I explained in my initial declaration, however, the arbitration clauses posed serious risks for the class.  *See* Klonoff Decl. ¶¶ 60–63.  Martinez et al., Johnston, and Darbyshire appear to be under the mistaken impression that Wells Fargo disavowed the arbitration clauses *in this specific litigation*, making them irrelevant.  *See* Martinez et al. Obj. at 3–5; Johnston Obj. #1 at 8; Darbyshire Obj. at 3.  It supposedly did so before Congress and in a Utah-based case, *Mitchell v. Wells Fargo Bank, N.A.*[47]  But general testimony before Congress and conduct in another case are not binding in this case.  These objectors cite nothing to show that Wells Fargo waived the arbitration clauses *in the instant case*.  To the contrary, Wells Fargo vigorously—and successfully—made the argument that the arbitration clauses controlled here, and class counsel were litigating a contested Ninth Circuit appeal on that issue at the time this case settled.  Had this case not settled, there is every reason to believe that Wells Fargo would have continued to argue that the arbitration clauses were binding and controlling.

---

[47] No. 2:16-cv-00966 (D. Utah filed Sept. 16, 2016).

**D.  Objections Relating to Attorneys' Fees**

36.  Several objectors complain that the attorneys' fees sought by class counsel are too high.  *See* Piazza Obj. at 2; Squicciarini Obj. at 2; de Rios Obj. at 2; Cochran Obj. at 1; Notice of Objection of Mike Murphy at 2–7 (Dkt. No. 235) (hereinafter "Murphy Obj."); Brunet Obj. at 2–3.  Their arguments, however, are meritless.

37.  As I have explained, the fees sought by class counsel are very modest.  *See* Klonoff Decl. ¶¶ 105–160.  Among other things, I noted that: (1) the Court should use the percentage approach; (2) under that approach, the 15 percent sought by class counsel is reasonable because it is well under the Ninth Circuit's benchmark of 25 percent and is at the low end compared to other major class actions; (3) the Ninth Circuit's reasonableness factors support the requested fees; (4) there is no need to do a lodestar cross check; and (5) in all events, a lodestar cross check only confirms the reasonableness of the fees.  Piazza, de Rios, Cochran, Brunet, and the Squicciarinis simply ignore all of these points.

38.  Objectors Piazza, Cochran, and Brunet complain about future time being included in the lodestar and multiplier.  *See* Piazza Obj. at 2; Cochran Obj. at 1; Brunet Obj. at 3–4.  But as I explained above and in my prior declaration, the fees are fully justified based on the percentage method, without any need for a lodestar cross check.  In any event, there is ample authority for including future work in a lodestar request.  *See* Klonoff Decl. ¶ 139 n.141 (citing case law).[48]  It would be highly unfair if class counsel were forced to ignore all of the time that they will need to spend on the case going forward.  Indeed, the existence of substantial future work is itself a reason for this Court to choose the percentage method over the lodestar approach.  *See* Klonoff Decl. ¶ 129, citing *In re AT&T Mobility Wireless Data Services Sales Tax Litig.*[49]

---

[48] *Accord, e.g.*, *Rose v. Bank of Am. Corp.*, Nos. 5:11-CV-02390-EJD & 5:12-CV-04009-EJD, 2014 WL 4273358, at *7, *9 (N.D. Cal. Aug. 29, 2014) (adding 100 hours to lodestar for future work, including "assist[ing] Class Members with individual inquiries, oversee[ing] the claims resolution process, and . . . help[ing] resolve Class Member challenges to the result of their claims submissions"); *Frederick v. Range Resources-Appalachia, LLC*, No. CA 08-288 Erie, slip op. at 21–22 (W.D. Pa. Mar. 17, 2011) (including projected future hours in lodestar calculation and noting that "it is entirely reasonable to assume that a substantial number of additional hours will be reasonably incurred [by class counsel] over the next several years").

[49] 792 F. Supp. 2d 1028, 1038–40 (N.D. Ill. 2011) (substantial future work to be done by class counsel "suggest[ed] that a lodestar approach may [have been] be both difficult and misleading").

39. Piazza also argues that because "this case lasted less than two years between filing and settlement," fees "should be adjusted *downward* from 15 [percent] to 8 [percent]." Piazza Obj. at 3 (emphasis in original). But as noted above (¶ 37) and in my original declaration (*see* Klonoff Decl. ¶¶ 109–124), the 15 percent figure is already extremely low. Piazza offers no plausible argument for her arbitrary selection of 8 percent in this case.[50]

40. Objector de Rios argues that fees should have been limited to the lodestar, with no multiplier added. *See* de Rios Obj. at 2. As I have explained, however, even assuming that a lodestar analysis is appropriate (and in my view, it is not), the multiplier requested here is entirely reasonable. *See* Klonoff Decl. ¶¶ 130–158.[51]

41. The Squicciarinis complain that "[t]he attorney fees are not fully documented so that [these objectors] can review the detail of the attorney[s'] work." Squicciarini Obj. at 2. Brunet makes a similar argument. *See* Brunet Obj. at 3. But they cite nothing to indicate that objectors are entitled to production and review of class counsel's lengthy, day-to-day billing records.[52]

---

[50] Piazza contends that *Rose v. Bank of America Corp.*, Nos. 5:11-CV-02390-EJD & 5:12-CV-04009-EJD, 2014 WL 4273358 (N.D. Cal. Aug. 29, 2014), is squarely on point, stating that "[t]his Court has previously awarded less than 15 [percent] in a case that posed little risk and was of short duration." Piazza Obj. at 5. The circumstances in *Rose*, however, are entirely different than those in this case. *Rose* involved claims brought under the Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227. In contrast to the instant case, the *Rose* court found that the result achieved for the class—"the most important factor in determining the appropriate fee award in a common fund case"—fell "in the lower range of recovery achieved in other TCPA class action settlements" and included non-monetary relief that was "particularly nominal in comparison to non-monetary relief achieved in other TCPA class action settlements." 2014 WL 4273358, at *10–11. The court also found that class counsel had taken on minimal risk in pursuing the case, and (in contrast with the instant case) noted that six different class actions were filed by law firms seeking to capitalize on the defendant's misconduct. *See* Klonoff Decl. ¶¶ 121, 155 (noting that no other class action was filed here until after class counsel had reached an agreement in principle with Wells Fargo). In short, *Rose* bears no resemblance to this case.

[51] Objector de Rios also suggests that class counsel are not entitled to seek reimbursement of their expenses. *See* de Rios Obj. at 3. That argument is frivolous. It is well established that such costs can be recouped as part of a class settlement. *See* Klonoff Decl. ¶ 161 n.169 (citing case law).

[52] Indeed, the case law is to the contrary. *See, e.g.*, *Gucci Am., Inc. v. Pieta*, No. CV 04-9626 ABC (Mcx), 2006 WL 4725707, at *2 (C.D. Cal. July 17, 2006) (noting that a fee applicant "is not required to record in great detail how each minute of [his or her] time was expended"; rather, "[he or she must] list[ ] [the] hours and identif[y] the general subject matter of [the] time expenditures"); *Pac. W. Cable Co. v. City of Sacramento*, 693 F. Supp. 865, 870 (E.D. Cal. 1988) ("The cases do not indicate that every minute of an attorney's time must be documented . . . ."). And the requirements are even less stringent in the context of a lodestar cross check alone. As the Third Circuit has stated, "The lodestar cross-check calculation need entail neither mathematical precision nor bean-counting. The district courts may rely on summaries submitted by the attorneys and need not review actual billing records." *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 306–07 (3d Cir. 2005).

42. Piazza asserts that "there was little or no risk to Class Counsel of zero recovery." Piazza Obj. at 4. Likewise, de Rio argues that because of the involvement of government agencies, it was a foregone conclusion that the class would achieve a substantial settlement. de Rios Obj. at 2. Brunet and Darbyshire make the same point. *See* Brunet Obj. at 4; Darbyshire Obj. at 5. And Cochran argues that "it looks like a disgruntled employee blew the whistle, so the case wasn't all that risky." Cochran Obj. at 1.[53] Those arguments are nothing more than 20/20 hindsight. They ignore the serious problems in this case, detailed above and in my prior declaration. Indeed, as I noted, the case was so daunting that, prior to the settlement, no other attorneys had filed class actions, despite the high-profile nature of the case and Wells Fargo's highly publicized admission of wrongdoing. *See* Klonoff Decl. ¶¶ 78, 121, 155. Again, this contrasts sharply with other high-profile class actions, where multiple class actions are typically filed by numerous law firms almost immediately after news of corporate wrongdoing hits the press. *See id*. at ¶ 155. Had this case been the cake walk that objectors now claim, lawyers from other law firms would have been filing class actions all over the country. Instead, they did nothing, while Keller Rohrback risked litigating the claims for years with the very real possibility of no recovery. *See* Klonoff Decl. ¶ 60.

43. Also meritless is Mike Murphy's objection that, because this is a "mega-fund" settlement, the fee should be between five and ten percent. *See* Murphy Obj. at 5, 7. Murphy, however, ignores the empirical evidence on so-called mega-fund settlements, as discussed in my initial declaration. Specifically, one comprehensive study found that, for settlements between $100 million and $250 million, the mean and median awards of fees for the period studied were, respectively, 17.9 percent and 16.9 percent. *See* Klonoff Decl. ¶ 112. Another important study found that, for the period studied, mean and median percentages for settlements above $100 million were between 16.6 percent and 25.5 percent. *See id*. Murphy offers no relevant support for his proposed figure of between five and ten percent, and likewise offers no relevant support for his argument that the fees sought here (15 percent) are excessive.[54] Finally, as is true with

---

[53] The Squicciarinis note that Wells Fargo was willing to "make amends," that there was "the threat of Government (CFPB and OCC) intervention, and that this Court exercised "constant oversight," Squicciarini Obj. at 2, but they do not explain how those points demonstrate that the modest 15 percent figure sought by class counsel is excessive.

[54] Murphy relies on *In re Domestic Air Transportation Antitrust Litigation*, 148 F.R.D. 297 (N.D. Ga. 1993). In that case, however, the 5.25 percent fee award was calculated against the estimated value of a settlement comprised

1   Piazza, there is no basis for Murphy's argument that "the degree of risk assumed by class

2   counsel" was only "modest." Murphy Obj. at 3.

3       44. Finally, Objector Darbyshire's argument (Darbyshire Obj. at 4–5) that class counsel

4   should not be compensated for time spent negotiating and drafting the settlement is frivolous. It

5   is not surprising that he cites nothing for his view that the focus of attorneys' fees should be

6   *solely* on "time spent litigating" the case, *id.* at 5, as opposed to time spent negotiating a

7   settlement.

8   **V. CONCLUSION**

9       45. In sum, none of the objections, either individually or collectively, casts doubt on the

10  conclusions in my original declaration.

                                        * * *

12  I declare under penalty of perjury under the laws of the United States of America that the

13  foregoing is true and correct based on information known to me.

                                        Robert H. Klonoff

16  May 21, 2018

---

23  primarily of non-monetary relief (discount travel coupons). The court specifically emphasized that it was "unwilling, for the purpose of computing an award of attorneys' fees, to place an award of [coupons] on equal footing with an award of cash." *Id.* at 320. Murphy also relies on *Wal-Mart Stores, Inc. v. Visa U.S.A.*, Inc., 396 F.3d 96 (2d Cir. 2005), where the Second Circuit affirmed the district court's award of 6.5 percent of the common fund as attorneys' fees. In that case, however, the common fund was $3.05 billion—more than 21 times the fund in the instant case—resulting in a fee award of over $220 million even at 6.5 percent. Indeed, in other mega-fund cases after *Wal-Mart*, courts in the Second Circuit have continued to approve fee awards much higher than the 15 percent requested by class counsel here. *See, e.g.*, *In re U.S. Foodservice Inc. Pricing Litig.*, No. 3:07-md-01894 (AWT), slip op. at 5 (D. Conn. Dec. 9, 2014) (33.3 percent fee award in $297 million settlement); *In re Initial Pub. Offering Sec. Litig.*, 671 F. Supp. 2d 467, 516 (S.D.N.Y. 2009) (33.3 percent fee award in $510 million settlement).